LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
Renee V. Masongsong, Esq. (SBN 281819)
rvalentine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA  91367
Telephone:   (818) 347-3333
Facsimile:    (818) 347-4118

Attorneys for Plaintiffs
R.L., M.L., and H.L., minors, by and through guardian *ad litem* Roberta Haro; A.W.,
a minor, by and through guardian *ad litem* Alisha White, ALISHA WHITE


**TONI JARAMILLA, A Professional Law Corp.**
Toni J. Jaramilla, Esq. (SBN 174625)
Toni@tjjlaw.com
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
T: (310) 551-3020 | F: (310) 551-3019

**ALEXANDER MORRISON + FEHR LLP**
J. Bernard Alexander, III (State Bar No. 128307)
balexander@amfllp.com
Britt L. Karp (State Bar No. 278623)
bkarp@amfllp.com
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
T: (310) 394-0888 | F: (310) 394-0811

Attorneys for Plaintiffs
MICKEL ERICK LEWIS JR, ORIONA LEWIS
and BRIONA LEWIS

1

2

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

3

4

5

6

7

8

9

10

11

12

MICKEL ERICK LEWIS JR, individually and as successor-in-interest to MICKEL E. LEWIS SR., ORIONA LEWIS, individually and as successor-in-interest; and BRIONA LEWIS, individually and as successor-in-interest,

                        Plaintiffs,

                vs.

KERN COUNTY, Deputy JASON AYALA, and Does 1–20, inclusive,

                        Defendants.

Case No: 1:21−CV−00378−KES-CDB
Hon. District Judge Kirk E. Sherriff

**PLAINTIFFS' MOTION *IN LIMINE* NO. 3 TO EXCLUDE OR LIMIT THE TESTIMONY OF DEFENDANTS' EXPERT WITNESS MICHAEL J. KUZEL; DECLARATION OF BRITT L. KARP, ESQ.**

Trial Date:  March 11, 2025
Time:        8:30 a.m.
Dept.:       Courtroom 6

Consolidated with Case No. 1:21−CV−01352−DAD−JLT

13

14

15

16

17

18

19

20

21

22

23

24

25

26

R.L., M.L., and H.L., minors, by and through guardian *ad litem* Roberta Haro, individually and as successors in interest to Michel Lewis Sr., deceased; A.W., a minor, by and through her guardian *ad litem* Alisha White, individually and as a successor in interest to Michel Lewis Sr., deceased; ALISHA WHITE, individually and as a successor in interest to Mickel Lewis Sr.,

                        Plaintiffs,

        vs.

COUNTY OF KERN; JASON AYALA; and DOES 1-10, inclusive,

                        Defendants.

27

28

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD AND TO THIS HONORABLE COURT, PLEASE TAKE NOTICE** that Plaintiffs R.L., M.L., and H.L., minors, by and through guardian ad litem Roberta Haro; A.W., a minor, by and through her guardian ad litem Alisha White, ALISHA WHITE, MICKEL ERICK LEWIS JR, ORIONA LEWIS and BRIONA LEWIS ("Plaintiffs") will and do hereby move to exclude Defendants' COUNTY OF KERN and JASON AYALA's ("Defendants") expert witness, Michael J. Kuzel, based on lack of proper foundation, lack of sufficient reliability and/or appropriate scientific methodology as to the basis of his opinions. Alternatively, Plaintiffs will move to limit the testimony of Mr. Kuzel to his area of expertise and to testimony for which a proper foundation has been laid.

This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities, Declaration of Britt L. Karp, the records and files of this Court, and upon such other oral and documentary evidence as may be presented at the time of the hearing. A proposed order is submitted herewith.

Pursuant to L.R. 7-3, Plaintiffs' counsel informed defense counsel of their intention to bring the instant Motion and the basis for it, and invited defense counsel to discuss.


Respectfully submitted,


Date: February 11, 2025          ALEXANDER MORRISON + FEHR LLP
                                 TONI JARAMILLA, A Professional Law Corp.

                                 s/J. Bernard Alexander, III
                                 J. Bernard Alexander, III
                                 Toni Jaramilla
                                 Britt L. Karp
                                 Counsel for Plaintiffs MICKEL ERICK LEWIS JR, ORIONA LEWIS and BRIONA LEWIS

Dated: February 11, 2025       Law Offices of Dale K. Galipo

                                       s/ Dale K. Galipo
                                       Renee V. Masongsong
                                       Dale K. Galipo
                                       Counsel for Plaintiffs, R.L., M.L., and H.L., minors, by and through guardian ad litem Roberta Haro; A.W., a minor, by and through guardian ad litem Alisha White; and Alisha White

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3    Plaintiffs seek to preclude testimony from Defendant's "human factors"

4    expert, Michael J. Kuzel.  Mr. Kuzel's purported conclusions usurp the function of

5    the jury, and are not the subject-matter of reliable facts or scientifically testable

6    methodology.

7    Pursuant to Federal Rule of Civil Procedure 26(a)(2), Defense expert,

8    Michael J. Kuzel authored a report opining on  the "human factors" applicable to

9    Defendant Deputy Ayala during the shooting at issue.  Mr.  Kuzel seeks to offer

10   opinions about Deputy Ayala's "perception of "risk," "perception/reaction time"

11   and the ability to visualize Decedent Mickel E. Lewis Sr., given the facts of the

12   case. In his report, some of the testimony Mr. Kuzel proposes to provide include

13   the following conclusions:

14   1) "The evidence does not support Plaintiff's description of the event, which

15   describe that Deputy Ayala shot Mr. Lewis without provocation, as he was

16   standing near the SUV and turning to comply with commands";

17   2) "Based on the behavioral cues that Deputy Ayala detected from Mr.

18   Lewis, in conjunction with information had had [sic] been given by the informant

19   and the verbal statements made by Mr. Lewis, Deputy Ayala would reasonably

20   predict that Mr. Lewis was retrieving a handgun or other weapon from the SUV";

21   3) "If Mr. Lewis was armed with a handgun or other weapon[1], as Deputy

22   Ayala believed, then Mr. Lewis posed a threat of serious harm to Deputy Ayala,

23   who was approximately 10 feet away from Mr. Lewis when Mr. Lewis exited the

24   vehicle and began to move toward him";

25   4) "The differences in the event descriptions provided by Deputy Ayala and

26   other witnesses are explainable by personal differences in training and experience,

27

28   [1] It is undisputed that Decedent was not armed at the time he was shot. *See* Plaintiff's Motion in Limine No. 1.

1   visual attention, expectations, and the level of stress being experienced"; and

2       5) "When the facts and evidence of the subject event are considered in

3   context with the expected human performance of an officer in this situation,

4   Deputy Ayala's decision to use force was reasonable." (Declaration of Britt Karp

5   ("Karp Decl."), ¶ 2 – Ex. 1 at p. 9).

6       All of the above statements constitute nothing more than argument.  No

7   scientific or reliable evidence is offered to support these conclusions, other than

8   Mr. Kuzel's own speculation, and reference to evidence which he himself admits is

9   unreliable and/or uncertain. Simply put, Mr. Kuzel's opinions are the product of

10  non-scientific and purely subjective observations, rather than based on reliable and

11  scientifically testable methodology.  Such testimony is simply not helpful for the

12  jury.

13      Even if Mr. Kuzel's opinions were scientifically sound in the abstract (which

14  they are not), Mr. Kuzel is not an expert, either in police practices or procedure, or

15  human factors concerning or involving a shooting event.  Mr. Kuzel has never

16  offered trial testimony, published any studies and/or analyses, or received any

17  formal education regarding human factors in the context of a police shooting.  As

18  such, Mr. Kuzel is wholly unqualified to offer opinions in the field of human

19  factors with regard what Deputy Ayala may have been thinking, or his reactions, or

20  otherwise addressing the facts justifying the shooting in this case.

21      Accordingly, the Court should exclude Mr. Kuzel from testifying as a human

22  factors expert in this case. Alternatively, Mr. Kuzel's testimony should be limited

23  to the opinions on which he is qualified to testify, and which are based on reliable

24  facts or scientifically testable methodology.

25  **II.   LEGAL STANDARD**

26      The Federal Rules of Evidence provide that an expert may testify in the form

27  of an opinion if: "(a) the expert's scientific, technical, or other specialized knowledge

28  will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on scientific facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. § 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) ("Daubert I"), the Supreme Court held that Rule 702 poses a special gate-keeping obligation upon a trial judge to make a preliminary assessment of the admissibility of expert scientific testimony. Specifically, the Court held that under Rule 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589.

In making this determination, the Court engages in a two-part inquiry. First, the court must determine whether the expert is qualified to testify as an expert – that is "the individuals whose testimony is being proffered are experts in a particular [] field." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("Daubert II"). Second, the court must determine whether the proffered testimony is relevant and reliable. Generally, to satisfy Rule 702's reliability requirement, "the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Daubert II*, 43 F.3d at 1316.  To this end, the Supreme Court set forth the following non-exclusive factors for the trial court to consider when assessing the reliability of proffered expert testimony:

(1) Testing. Whether the expert's theory can be, and has been tested;

(2) General Acceptance. Whether the theory, technique, or methodology is generally accepted in the relevant scientific community;

(3) Peer Review. Whether the theory or technique has been subjected to peer review and publication; and

(4) Rate of Error. Whether the technique or methodology has an acceptable known or potential rate of error.

*See id.* at 594-95; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (stating *Daubert's* gatekeeping obligation "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.").

In addition to the above factors, the Ninth Circuit has advised that a trial court may also question whether the expert is proposing to testify about "matters growing naturally and directly out of the research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying" as another significant inquiry weighing on reliability. 43 F.3d at 1317. "Establishing that an expert's proffered testimony grows out of pre-litigation research or that the expert's research has been subjected to peer-review are two principal ways the proponent of expert testimony can show that the evidence satisfies the first prong of Rule 702." *Id.* at 1318.

Failing this, the proponent may attempt to meet this burden through the testimony of its expert. *Id.* at 1319. "For such a showing to be sufficient, the experts must explain precisely how they went about researching their conclusions and point to some objective source – a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal of the like – to show that they have followed the scientific method, as it practiced by (at least) a recognized minority of scientists in their field." *Id.* In other words, "the party proffering the evidence must explain the expert's methodology and demonstrate in some objectively verifiable way that the expert has chosen a reliable scientific method and followed it faithfully." *Id.* at 1319 n.11.

Offering the expert's qualification, conclusions, and an assurance of reliability is insufficient. *Id.* at 1319. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ip*se dixit* of the expert. A court may conclude that there is

1    simply too great an analytical gap between the data and the opinion proffered." *Gen.*

2    *Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Kumho Tire Co.*, 526 U.S. at 157.

3    **III.    LEGAL ARGUMENT**

4    **A. Mr. Kuzel is Unqualified to Offer Human Factors Opinions**

5    **Regarding Police Shooting Events.**

6    As part of the Court's gate-keeping function, the Court must analyze the

7    foundation of an expert's opinions to ensure that the testimony rests on a reliable

8    footing and is relevant to the task at hand. *In re Toyota Motor Corp. Prods. Liab.*

9    *Litig.*, 978 F. Supp. 2d 1053, 1064 (C.D. Cal. 2013). A trial court's gatekeeping

10   function to admit only expert testimony that is both reliable and relevant is

11   especially important "considering the aura of authority experts often exude, which

12   can lead juries to give more weight to their testimony." *Id.* (quoting *Mukhtar v. Cal.*

13   *State Univ.*, 299 F.3d 1053, 1063-64 (9th Cir. 2002)). Here, Mr. Kuzel's expert

14   opinions are not reliable or relevant, because he lacks the expertise to offer opinion

15   testimony regarding perception/reaction time, risk analysis, and other human factors

16   subjects in the context of a police shooting.

17   Mr. Kuzel has no expertise in police training.  Mr. Kuzel has no licenses or

18   certifications regarding police practices or training. (*See* Appendix 2 at p. 1-2.) He

19   has not published any articles in the last ten years concerning any shooting event, of

20   any kind, let alone police shootings. (*Id.* at p. 3-4.) Similarly, he has performed no

21   studies or written any publications regarding police officer experience in shooting

22   scenarios. (*Id.*) His qualifications to testify regarding law enforcement responses or

23   reactions are exceedingly thin, if not non-existent, leaving him with no foundation

24   upon which to offer expert opinions.  Accordingly, Defendants have failed to

25   establish that his techniques or methods (to the extent he has any) have been tested,

26   subjected to peer review, and/or generally accepted. In fact, there has been no

27   showing of any methodology used by Mr. Kuzel in reaching his conclusions, let

28   alone  scientific validity to support the conclusion. Or that his conclusions,

especially with respect to the specialized area of police response, are appropriately applied in the context of this case.

Mr. Kuzel's true area of expertise appears to be trip-and-fall accidents, bike accidents, and/or pedestrian accidents. The majority of the articles published by Mr. Kuzel in the last ten years focus on these issues. (*Id.* at p. 3-4.) It is unclear how Mr. Kuzel's trip-and-fall expertise is appropriately applied in the context of addressing the facts and legal issues raised by this fatal shooting.

In short, Mr. Kuzel has no special knowledge, education, training, or police officer "experience" – elements which he admits are highly relevant to his human factors analysis in this case, and no experience with shootings generally, or police officer experiences in shooting scenarios.   Mr. Kuzel is not qualified to offer "scientific, technical, or other specialized knowledge" in the area of human factors as they pertain to this shooting case. Fed. R. Evid. § 702. He has provided no assurances that his opinions regarding Deputy Ayala's perception/reaction time or perception of risk are applicable and relevant in the context of a police shooting. For this reason, Mr. Kuzel's expert opinion testimony in the field of human factors should be excluded, in its entirety.

## B. Mr. Kuzel Should be Precluded from Offering Testimony That Is Not Supported By the Available Evidence.

To be admissible under Federal Rule of Evidence 702, an expert's opinions must be relevant and reliable. Fed. R. Evid. § 702; *De La Torre v. Cashcall, Inc.*, 56 F. Supp. 3d 1073, 1095 (N.D. Cal. 2014). Expert testimony is reliable only if it is based upon sufficient facts or data, is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case. *Id.* In other words, the expert's opinions must be supported by the facts in the case and provide a link between the expert's opinions and the matter to be proven. *U.S. v. Bighead*, 128 F.3d 1329, 1335 (9th Cir. 1997).

1   In his reports and proposed testimony, Mr. Kuzel offers unsubstantiated

2   opinions regarding Deputy Ayala's mindset *if* Decedent was armed. This

3   hypothetical fact is irrelevant and improper and should be excluded, given that

4   Deputy Ayala has conceded that he was not aware of the presence of a gun at any

5   time prior to shooting the Decedent.  The Court should exclude these opinions under

6   the *Daubert* standard because they are unsupported, contrary to available evidence,

7   and lack "fit" with the facts of this case.  It is undisputed that the Decedent was

8   unarmed at the time of the shooting, as confirmed by Deputy Ayala through a pat-

9   down search. Deputy Ayala never saw a gun inside Decedent's vehicle and never

10  saw the Decedent holding a gun at any point before Deputy Ayala shot the

11  Decedent.

12      Mr. Kuzel's opinion that Deputy Ayala reasonably predicted that Decedent

13  retrieved a handgun from his SUV and/or that he was armed is therefore unreliable

14  and not logically connected to the underlying facts of this case. Further, Mr. Kuzel's

15  opinion that: "While Lewis was unarmed in the critical moment, the investigation

16  was later discovered [sic] that the weapon had been in the vehicle.  Deputy Ayala

17  did not know that Ms. Komenenus had taken possession of the handgun.

18  Accordingly, Deputy Ayala was most likely concerned about Mr. Lewis being in

19  possession of a weapon when processing his actions." (Karp Decl., ¶ 2 – Ex. 1 at p.

20  7.)  This conclusion is not based on information actually known to Deputy Ayala at

21  the time of the incident, but solely information discovered after the fact.  In essence,

22  Mr. Kuzel is saying that although Deputy Ayala did not know this after-acquired

23  evidence, his conduct was most likely dictated by it.  This is not only lacking in

24  scientific support, but also not logically sound.  These opinions should therefore be

25  excluded. *U.S. v. Bighead*, 128 F.3d at 1335

26  **C. Mr. Kuzel's Opinions Fail To Satisfy The *Graham v. Conner***

27      **Standard For Use of Force Events**

28  Fourth Amendment claims of excessive force are analyzed under an objective

1    reasonableness standard. *Espinosa v. City & Cnty. Of San Francisco*, 598 F.3d 528,

2    537 (9th Cir. 2010) *citing Scott v. Harris*, 550 U.S. 372, 381 (2007). When

3    evaluating a claim of excessive force, the inquiry is whether the officers' actions are

4    "objectively reasonable" in light of the facts and circumstances confronting them.

5    *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011) *quoting Graham v.*

6    *Connor*, 490 U.S. 386, 397 (1989). As discussed above, Mr. Kuzel is not an expert in

7    police practices, training, or standards. As such, Mr. Kuzel fails to consider or

8    address the *Graham v. Connor* standard against which all officer conduct is

9    measured with respect to whether their use of force is "reasonable." Instead, Mr.

10    Kuzel opines that Deputy Ayala "likely experienced increased stress in response to

11    Mr. Lewis' behaviors", and that these behaviors "likely led Deputy Ayala to

12    perceive and predict that Mr. Lewis had intentions to harm [him]" and that "Deputy

13    Ayala's decision to use force was reasonable." (Karp Decl., ¶ 2 – ex. 1 at p. 8 & 9.)

14    However, subjective fear is not the standard. *Deorle v. Rutherford*, 272 F.3d 1272,

15    1281 (9th Cir. 2001) (holding that an officer's "desire to resolve quickly a

16    potentially dangerous situation" does not, on its own, justify the use of deadly force).

17    Mr. Kuzel's opinions regarding the reasonableness of Deputy Ayala's fear is

18    therefore unhelpful to the trier of fact, confusing, and unduly prejudicial under

19    Federal Rule of Evidence 403, and seeks to usurp the province of the jury. For this

20    reason, also, his testimony should be excluded.

21    **IV.    CONCLUSION**

22        Based upon the foregoing, Plaintiffs respectfully request that the Court grant

23    their Motion to Exclude the Opinions and Testimony of Michael J. Kuzel, and

24    preclude Mr. Kuzel from offering any opinions or testimony as an expert witness.

25    Alternatively, Plaintiffs respectfully request that Mr. Kuzel's opinions be limited to

26    the opinions on which he is qualified to testify, and which are based on reliable,

27    scientifically testable methodology.

28

1    Dated: February 11, 2025                    LAW OFFICES OF DALE K. GALIPO

2
                                        By:  _____/s/ Dale K. Galipo_____
3                                            Dale K. Galipo
                                             Renee V. Masongsong
4                                            Attorneys for Plaintiffs

5
     Date: February 11, 2025                  ALEXANDER MORRISON + FEHR LLP
6
                                              TONI JARAMILLA, A Professional Law
7                                             Corp.

8                                             s/J. Bernard Alexander, III
9                                             J. Bernard Alexander, III
                                              Toni Jaramilla
10                                            Britt L. Karp
                                              Counsel for Plaintiffs MICKEL ERICK
11                                            LEWIS JR, ORIONA LEWIS and BRIONA
                                              LEWIS
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>DECLARATION OF BRITT L. KARP</u>

2       I, Britt L. Karp, declare:

3       1.      I am an attorney at law duly admitted to practice before all of the courts

4   of the State of California and the United State District Court for the Eastern District,

5   and a senior associate in the law firm of Alexander Morrison + Fehr LLP, counsel of

6   record for Plaintiffs MICKEL ERICK LEWIS JR, ORIONA LEWIS and BRIONA

7   LEWIS.  I am familiar with this file and if called as a witness, I could and would

8   competently testify to the following facts based on my own personal knowledge.

9   This declaration is submitted in support of Plaintiffs' Motion in Limine Nos. 1 and

10  3.

11      2.      Defendants served their expert witness disclosures on October 25, 2022.

12  It included the report of their designated human factors expert, Michael J. Kuzel.

13  Attached hereto as Exhibit "1" is a true and correct copy of Mr. Kuzel's expert

14  report.

15      I declare under penalty of perjury under the laws of the United States of

16  America that the foregoing is true and correct.

17      Executed this 11th day of February 2025, in the County of Los Angeles, State

18  of California.

19

20                                  s/ Britt L. Karp

21      _____

22                                  BRITT KARP, ESQ.

23

24

25

26

27

28

**EXHIBIT 1**

# EXHIBIT E



October 25, 2022

Kathleen S. Rivera, Esq.
Kern County Counsel
1115 Truxtun Avenue, Fourth Floor
Bakersfield, CA 93301

**Project: Lewis, Jr. et al. vs. Kern County, et al.**

Dear Ms. Rivera,

I have conducted an event reconstruction and human factors analysis of the October 2, 2020, Officer Involved Shooting of Mikel Lewis. A list of materials provided for review to conduct the analysis are listed in Appendix 1. The opinions described in this report are given to a reasonable degree of scientific certainty based on my education, training and experience and the cited scholarly articles in association with evidence presented in the materials reviewed. These opinions may be amended or supplemented if additional information becomes available.

A summary of my qualifications, current curriculum vitae, four-year testimony list, and current rate sheet are attached in Appendix 2.

**I.    Event synopsis**

1.    On October 2, 2020, Deputy Jason Ayala (age 34) of the Kern County Sheriff's Office received information from a confidential informant that Mikel Lewis (age 39) had made threats of harm to the informant and was in possession of a handgun and shotgun style rifle. Mr. Lewis was on probation, with search terms for weapons and drugs. Deputy Ayala was also informed that Mr. Lewis was driving a black SUV.

2.    While Deputy Ayala was patrolling for the SUV that Mr. Lewis was reportedly driving, he saw a similar type vehicle at the Wienerschnitzel drive through and was able to identify Mr. Lewis as the driver of that vehicle. He waited for Mr. Lewis to exit the drive through, then initiated a traffic stop by activating his forward overhead lights. Mr. Lewis brought his vehicle to a stop on Mono Street, facing south, near the intersection with K Street.

3.    A semi-tractor with two hay trailers, driven by Jeremy Tertletter, had been stopped on the east side of Mono Street, facing north, in the area where Mr. Lewis stopped his SUV. The stopped location of the SUV was approximately across from the semi-tractor cab.

4.    There were three passengers in the Lewis SUV, Marlyn Komenenus, who was a romantic friend of Mr. Lewis, and her two minor daughters. Deputy Ayala was unaware of their presence in the vehicle when he made the traffic stop.

5.  Mr. Lewis had a handgun in the SUV, which Ms. Komenenus had seen earlier that evening laying near the center console. She hid the gun between her jacket and shirt when she entered the vehicle and while Mr. Lewis and her daughters were still outside the SUV. She did so to prevent her daughters from seeing the gun.

6.  Deputy Ayala stopped his patrol vehicle behind the Lewis SUV, then exited the patrol vehicle and walked to the driver's window of the SUV. Deputy Ayala identified himself and asked Mr. Lewis to exit the vehicle. Deputy Ayala saw Ms. Komenenus in the front passenger's seat but was unaware of the presence of the two girls in the back seat.

7.  Mr. Lewis, who was wearing white t-shirts and loose-fitting shorts, exited the SUV and walked with Deputy Ayala to the patrol vehicle. A security video from Wienerschnitzel captured these actions, which were partially obstructed when the men were standing on the left side of the SUV.

8.  Deputy Ayala initially had Mr. Lewis stop near the front of the vehicle, where he conducted a pat down and confirmed that Mr. Lewis had no weapons on his person. Deputy Ayala then escorted Mr. Lewis to the right rear of the patrol vehicle, where he told Mr. Lewis that he intended to place handcuffs on him and put him into temporary custody while he conducted a search of the Lewis SUV.

9.  While they were standing near the back of the patrol vehicle, Mr. Lewis fled from Deputy Ayala. Surveillance video from the Wienerschnitzel and Denny's Restaurant depict Mr. Lewis running around the rear of the patrol vehicle, then along the left side of the patrol vehicle and his SUV. Deputy Ayala initially pursued Mr. Lewis and immediately called for backup.

10. The Wienerschnitzel video depicts Mr. Lewis continuing to run south toward the rear of the second hay trailer, while Deputy Ayala stopped pursuit at the approximate mid-position of first trailer behind the semi-tractor. Deputy Ayala returned to the SUV while Mr. Lewis appears to crouch near the rear of the second trailer.

11. Deputy Ayala is next seen returning to the SUV. In his post incident interview and deposition, he described that he returned to the SUV and took the keys out of the ignition, then told Mr. Lewis that he had his keys, so that further flight would not be possible.

12. Mr. Terletter had been observing the interaction between Deputy Ayala and Mr. Lewis from inside the cab of the semi-tractor. He told investigators at the scene that after watching Deputy Ayala search Mr. Lewis, they walked toward the rear of the patrol vehicle and then he saw Mr. Lewis run away from the Deputy. He observed Deputy Ayala walk back toward the SUV, near the driver's door. He then observed Mr. Lewis run from the front of the semi-tractor to the SUV.

13. Deputy Ayala walked backward toward his patrol vehicle when Mr. Lewis came from the front of the semi-tractor, believing that Mr. Lewis may try to physically engage him. At this time, Deputy Ayala had not drawn his firearm.

14. Mr. Terletter saw Mr. Lewis get into the driver's seat of the SUV and face forward in the front seat with at least one leg fully inside, which coincides with Deputy Ayala's description. These actions led Deputy Ayala to move away from the side of the SUV and remove his duty weapon from the holster. Based on his actions and position, Deputy Ayala believed that Mr. Lewis was reaching in the area under the driver's seat.

15. Deputy Ayala stated in his post-incident interview on October 7, 2020, that he believed Mr. Lewis was armed based on information he received earlier that evening, and that since the keys were not in the vehicle, he knew of no reason for Mr. Lewis to get into the driver's seat, other than to retrieve a weapon he most likely had in the vehicle, hidden under the seat.

16. Mr. Lewis exited the driver's seat and turned counterclockwise (as viewed from above, which would be a left side leading exit from the seat) toward Deputy Ayala. Deputy Ayala, as well as the backseat witness, recalled that Mr. Lewis was yelling and stated he was going to shoot Ayala, and said *"you're going to have to kill me"* as he was exiting the vehicle. Deputy Ayala perceived that Mr. Lewis had his right hand behind his back as he said this and began to sprint at Deputy Ayala.

17. Mr. Terletter also saw Mr. Lewis exit the SUV, then run aggressively toward Deputy Ayala, in what appeared to be an attempt to tackle the deputy. Mr. Terletter described in his deposition that Mr. Lewis was close enough to the deputy that he could have grabbed the deputy's shoulders. He did not recall seeing Mr. Lewis' hands behind his back. Mr. Terletter did not see Mr. Lewis with his hands raised and he was facing the deputy when shots were fired.

18. Deputy Ayala pulled his weapon toward his body and fired 5 rounds as he moved backward, toward his patrol vehicle and away from Mr. Lewis. Mr. Lewis was shot five times by Deputy Ayala, twice in the chest, once in the lateral aspect of the right shoulder, once in the upper back and once in the left side of the lower back.

19. Mr. Lewis came to rest on the ground near the rear of the SUV with his head oriented toward the north and his feet oriented toward the south. His feet were near the rear bumper of the SUV. Deputy Ayala approached Mr. Lewis and conducted a weapons search to his front and back. To search his back, he reached under his body without moving him.

20. The event was also witnessed by Nicholas Montoya, who was fueling his pick-up truck at a nearby convenience store. Mr. Montoya had observed a portion of the event. His attention was drawn to the area when he heard Deputy Ayala yell *"stop."* During his deposition, he testified to the same sequence of events, that he saw Mr. Lewis exit the driver's side door of the SUV and begin to move aggressively toward Deputy Ayala, who was walking backwards and yelling *"stop."* Deputy Ayala did not recall saying stop when he was questioned during his deposition.

21. Mr. Montoya, being a former emergency medical technician, approached the area and checked Mr. Lewis pulse and breathing. Detecting neither, he attempted to provide cardiopulmonary resuscitation on Mr. Lewis. He was unable to detect signs of life and believed that Mr. Lewis was deceased when he first approached.

22.  Ms. Komenenus exited the vehicle with her daughters after the shooting.  At some time afterward, she moved away from the area and dropped Mr. Lewis' gun in a nearby grassy area.

23.  In the First Amended Complaint, Plaintiff's claim that *"while [Mr. Lewis] was standing in the open car door of his vehicle with his back facing AYALA, AYALA issued a command that DECEDENT turn and walk toward the rear of [Mr. Lewis'] vehicle where AYALA was standing well over a car-length away. In response to AYALA's command, [Mr. Lewis] began to turn in the direction of AYALA. However, before [Mr. Lewis] was fully turned, without provocation and despite [Mr. Lewis] being unarmed with his hands up in surrender, AYALA shot [Mr. Lewis] six times: three times in the back; once in the side, and two bullets entering the front of [Mr. Lewis'] torso. At no time did this unarmed [Mr. Lewis] pose a threat of serious bodily injury or death to AYALA."*

## II.  Summary of relative literature

1.  Police officers involved in a use of force event are evaluated by a reasonableness standard, specifically, their actions and decisions are to be *"judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."* The assessment is to *"embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."* The following review of published research provides a basis for evaluation of Deputy Jason Ayala's use of force in the subject event.

2.  A use of force event most frequently involves moments of intense, rapidly changing conditions that present a perceived imminent risk of harm to self or others.  While police officers are provided training on how to operate weapons and discern threatening events, neither training nor experience can provide them capabilities beyond the limits that an organically intact member of the general population is able to obtain (Ainsworth, 1981).  Accordingly, they are susceptible to the same limitations of any other person.

3.  When assessing if/when to shoot during a critical incident, an officer is likely to experience an increase in activation of cognitive processes.  Accordingly, they are trained to engage in an OODA loop (Observe, Orient, Decide and Act) before firing their weapon. This is more taxing on the cognitive mechanisms of the officer, putting the officer at a disadvantage when faced with someone who intends to cause them harm.  If an officer delays or has a moment of indecision, the difference can be life-or-death for self or others (Sharf and Binder, 1983).

4.  Decision-making is rooted in both perceptual and cognitive factors, which influence the decision of whether to shoot or not to shoot, and consist of both internal (*e.g.*, expectations, mood, emotions, etc.) and external (e.g., time pressure and environment, *etc*) factors (Dror, 2007).  The Sequential Sampling Model and the Drift Diffusion Model explain that the decision to shoot or not to shoot by an officer consists of a time-based mechanism that considers, one at a time, the various choices available in a situation until a threshold is reached (Forstmann, Ratcliff & Wagenmakers, 2016). Factors that affect the decision to shoot come from prior biases, environmental cues, expectations, and evidence obtained in the moment (Klien, 2011; Shan & Yang, 2016).

5.   Thinking and decision-making are guided by two Systems (System 1 and System 2). System 1 is instantaneous, automatic thinking that requires little effort and is driven by our experiences, instincts, and heuristics. Heuristics and mental shortcuts are engaged when making decisions, especially when stress levels are high or cognitive resources are low. A heuristic approach can be effective to making an immediate, judgments; however, relying on the more automatic approach to problem-solving can lead to errors.  Conversely, System 2 is more analytical, deliberate, and rational, requiring more time for a deeper mental search for additional information acquired through past learning and experience (Tversky & Kahneman, 1974; Kahneman, 2003).  In high stress, time-pressing situations, thinking and decision-making defaults to System 1.

6.   Processing of information in the human brain is guided by expectation and prediction, constantly searching and scanning the environment to prepare, anticipate or predict future events and states of being (Fridman et al, 2017). Top-down processes, such as experience and prior knowledge, are constantly guiding bottom-up input, and in some cases may override decision-making. When someone expects to see, read, hear, do, smell or touch something, regardless of the conflicting bottom-up sensory information, they may distort their perceived reality to that belief.

7.   Expectations can contribute to perceptual distortions and justification of inaccurate information (Posner, 1980; Clark, 2013; Levitan, 2008).  Under moments of stress the automatic nervous system (ANS) triggers muscle contractions (Enoka, 2003), an increased heart rate (Friedman et al., 2019), pupil dilation (Pedrotti et al, 2014) and a release of adrenaline into the circulatory system (Bertilsson, 2019). Adrenaline is known to affect cognitive processing required for rational decision-making. Both perceptually and cognitively, adrenaline can aid in sharpening one's attentional focus and has the effect of blocking, inhibiting or distorting incoming visual or auditory information (Artwohl, 2002; Klinger & Brunson, 2009; Vickers & Lewinski, 2012). Yet, humans will narrow their attention and ignore irrelevant information to adapt to stress (Hancock and Szalma ,2017).

8.   Decision-making, in life-or-death situations, becomes automatic and emotional in nature (Kahenman, 2003; Dror, 2007).  Decisions and actions made during a critical incident are likely to be highly rooted in experiential learning and information (Epstein, 1994), while other factors such as environmental cues (Kahn & Davies, 2017), training (Taylor, 2019), heuristics (Tversky & Kahneman, 1974), and prior expectations (Clark, 2013) will dictate the pattern of behaviors.

9.   Priming, information given to an officer prior to a confrontation with a suspect (e.g., information from an informant that a suspect is in possession of a weapon), is highly likely to be influential in decision-making during a critical incident (Taylor, 2020). Priming and perceived cues from the environment and suspect are automatically interpreted, influencing decision-making at an unconscious level.  Training for cue awareness and being cognizant of automatic processes may improve an officer's ability to interpret cues and override the more natural instincts but time-pressure or unexpected actions by a suspect are likely to result in a default to experiential based responses, rooted in heuristics.

10. When an officer has an encounter with a person that desires to harm an officer (*e.g.*, shooting an officer), that suspect will have a time advantage on the officer relating to the timing of cognitive processing and decision-making. This is because the suspect can focus on the act of shooting, without attending to other factors, while the officer must engage more cognitive processes (Observe, Orient, Decide and Act) to assess their decision of the most appropriate action. In a simulated threat with a suspect, even if the officer had their gun drawn, they were unable to fire before the suspect (Blair et al., 2011; Lewinski et al., 2013). The probable risk of harm to an officer further increases when a suspect has hidden hands, due to the reduction of information available to the officer, resulting in a further delay in the decision to shoot while the suspect is proceeding with a planned action (Lewinski, 2000; Remsberg, 2010).

11. Once an officer decides to pull the trigger, the action can be as quick as four shots per second (Lewinski, 2002), yet stopping the motor response can require 200 ms to 1.5 seconds (Logan & Cowen, 1984; Lewinski, 2009). Generally, the shooting motor response continues until the threat is neutralized, i.e., the stop shooting action allows several shots to be fired after the officer has ceased to perceive a threat. Combat shooting accuracy of police officers is relatively low, despite their intensive trainings (Vila & Morrison, 1994). Being within short distance and in close range with a suspect may improve shot accuracy but such conditions are more threatening to the officer when a suspect encroaches on the officer's personal space.

12. When impacted by a bullet, a human body with momentum will most likely continue to travel forward, twist, pivot and contort depending on the motor response of the suspect that is initiated prior to and during the shots fired by the officer. Accordingly, due to the velocity of bullets and quick reaction movements of the person being shot, there can be entry and exit wounds from either side of the body, i.e., a suspect that was initially facing an officer may be shot in the back (Lewinski, 2000).

13. In a critical incident, officers act to protect themselves and others against a perceived danger. During a traumatic event, such as a shooting, an officer is likely to experience challenges fully processing all his/her actions, movement, and perceptions during the event (Lewinski et al, 2016). Studies have found that stress can impair complex motor skills, even if highly trained, and errors, slips or misjudgments can still occur.

14. Stress and time pressure can distort sensory perception and performance (Horowitz, 1976). Klinger & Bruson (2009) reported that 94% of officers involved in 113 police shootings had their perception of reality altered at some point in the event, including distortion of the sequence of events, time or memory distortions. Perception distortion during stressful moments of overload can come in many forms such as, auditory illusions, visual illusions, tunnel vision, color distortions, and selective attention or narrowing of attention (Ross, 2013; Artwohl, 2002; Artwohl, 2003).

15. When the human brain is under stress of the event, the working memory center must be efficient with processing (Kane and Engle, 2002) and may filter out irrelevant tasks. These can create conditions such as inattentional blindness, attentional blink, and weapon focus effect (Fawcett, Russell, Peace and Christie, 2013). This can result in an officer, or lay witness, being unable to provide complete and accurate details of an event when questioned during post event interview or deposition questioning.

### III.    Observations and Opinions

1.  The statements and testimony provided by Deputy Ayala and witnesses Terletter and
    Montoya do not support the event description provided in the Plaintiff's Complaint.
    Specifically, the statements and testimony consistently describe that Mr. Lewis rapidly
    moved toward Deputy Ayala after he had reentered his vehicle, whereas Plaintiff's
    describe that Mr. Lewis exited the vehicle with his back to Deputy Ayala.

2.  Deputy Ayala likely experienced increased stress in response to Mr. Lewis' behaviors
    during the attempted traffic stop and detention, which ultimately involved Mr. Lewis
    rapidly moving toward Deputy Ayala after reentering his vehicle. These combined
    actions led Deputy Ayala to perceive and predict that Mr. Lewis had intentions to
    harm the Deputy as he attempted to retrieve something from the SUV.

3.  In response, Deputy Ayala described that he moved backwards, towards the back of
    SUV, to gain a better vantage point to assess Mr. Lewis' actions, while removing his
    firearm from the holster. His reactions and decision-making during this portion of the
    event were likely guided by his training, cues he perceived from Mr. Lewis, and
    information that he had been provided regarding Mr. Lewis' possession of a weapon.

4.  Deputy Ayala had to interpret Mr. Lewis' behaviors within the context of the
    environment. Mr. Lewis' re-entry to the vehicle combined with Mr. Lewis searching
    and moving within the driver's seat, may have led Deputy Ayala to suspect Lewis had
    become armed. Deputy Ayala was likely visually searching for confirmation that the
    weapon had been obtained. Deputy Ayala was likely standing approximately 10 feet
    away from Mr. Lewis when Mr. Lewis exited the SUV.

5.  Deputy Ayala reported that he perceived Mr. Lewis' right hand being concealed
    behind his back, leading him to believe a weapon was in the hand. The information
    that Mr. Lewis was in possession of a handgun and the bodily cues of Mr. Lewis, who
    was observed searching under the seat of the SUV in the several second interval prior
    to exiting the vehicle, were highly likely to result in Deputy Ayala predicting that he
    needed to act to protect himself against the advantage Mr. Lewis had as he charged
    Deputy Ayala.    This prediction combined with Mr. Lewis' abrupt, aggressive
    movements towards him, resulted in the decision to shoot threshold being reached.

6.  While Lewis was unarmed in the critical moment, the investigation was later
    discovered that the weapon had been in the vehicle. Deputy Ayala did not know that
    Ms. Komenenus had taken possession of the handgun. Accordingly, Deputy Ayala
    was most likely concerned about Mr. Lewis being in possession of a weapon when
    processing his actions.

7.  While Mr. Terletter did not recall seeing Mr. Lewis' hand behind his back, this is
    easily explained due to the obstruction created by the driver's door of the SUV and the
    timing of the relative visual search of Deputy Ayala and Mr. Terletter. When Mr.
    Lewis exited the SUV with counterclockwise rotation, his right hand would have
    trailed his left shoulder, which was likely the threshold point for Deputy Ayala's
    decision to shoot. Mr. Terletter would not have had the same view, or necessarily
    attention to this detail, as Deputy Ayala. As Mr. Lewis continued to move forward,
    his right arm may have been extended, as Mr. Terletter perceived, while Deputy Ayala
    was focused on Mr. Lewis' motion and relative position, not the position of his arm.

8. Deputy Ayala's firing five shots at Mr. Lewis is consistent with perception reaction time to start and stop shooting. The shots fired encompass the response of the threat as well as the continual firing until the threat was neutralized.

9. The video does not provide a direct view of Mr. Lewis' motion after exiting the vehicle, however, the witness statements, the bullet wounds identified in the autopsy report, and Mr. Lewis' final rest position do provide information relevant to understanding his motions during the incident. .

10. Deputy Ayala and witnesses described that Mr. Lewis exited the SUV with counterclockwise rotation. In this exit position, Mr. Lewis' right hand would have initially concealed and the front of Mr. Lewis' body (*i.e.*, his chest) would have been exposed to Deputy Ayala.

11. Deputy Ayala initiated firing after Mr. Lewis exited the vehicle, left side leading, and began moving toward him. Accordingly, the first two shots most likely impacted Mr. Lewis in the chest. Due to momentum, Mr. Lewis likely continued to rotate counterclockwise as he moved toward Deputy Ayala after being shot in the chest, leading to the shot in the right shoulder. As he continued forward motion with rotation, and Deputy Ayala continuing to fire his weapon, Mr. Lewis was impacted in the upper mid-back and below the left shoulder. Mr. Lewis then fell to the ground, on his back, with his feet to the south. His rest position is entirely consistent with the counterclockwise rotation as he exited the vehicle.

12. The bullet wounds to Mr. Lewis' back do not provide evidence of him initially being shot in the back. The rest position of Mr. Lewis would be inconsistent with him being shot in the back after exiting the vehicle and standing and turning in place, as described in the Complaint, as Mr. Lewis' body would not have the necessary momentum in the northbound direction to cause him to move nearly 10 feet from the SUV driver's door to his rest position behind the SUV. Conversely, initial forward motion toward Deputy Ayala, while facing him, would provide the necessary momentum to result in Mr. Lewis coming to rest with his head to the north after being shot five times by Deputy Ayala.

## IV.    Conclusions

1.    The evidence does not support Plaintiff's description of the event, which describe that Deputy Ayala shot Mr. Lewis without provocation, as he was standing near the SUV and turning to comply with commands.

2.    When exiting the SUV, after being seated in the driver's seat, initial counterclockwise rotation would conceal Mr. Lewis' right arm, as described by Deputy Ayala.

3.    Based on the behavioral cues that Deputy Ayala detected from Mr. Lewis, in conjunction with information had had been given by the informant and the verbal statements made by Mr. Lewis, Deputy Ayala would reasonably predict that Mr. Lewis was retrieving a handgun or other weapon from the SUV.

4.    Based on Mr. Lewis' described bodily motion upon exiting the SUV, Deputy Ayala had less than 1 second to decide whether to fire his weapon at Mr. Lewis.

5.    If Mr. Lewis was armed with a handgun or other weapon, as Deputy Ayala believed, then Mr. Lewis posed a threat of serious harm to Deputy Ayala, who was approximately 10 feet away from Mr. Lewis when Mr. Lewis exited the vehicle and began to move toward him.

6.    The described motion of Mr. Lewis as he exited the vehicle and move toward Deputy Ayala is consistent with him being shot twice in chest first, then in the right arm, and finally twice in the back.

7.    The differences in the event descriptions provided by Deputy Ayala and other witnesses are explainable by personal differences in training and experience, visual attention, expectations, and the level of stress being experienced.

8.    When the facts and evidence of the subject event are considered in context with the expected human performance of an officer in this situation, Deputy Ayala's decision to use force was reasonable.

Sincerely,

Michael J. Kuzel, P.E., CHFP
Principal
Enclosures (2)

## References

Ainsworth, P. B. (1981). Incident perception by British police officers. Law and Human Behavior, 5(2-3), 231.

Artwohl, A. (2002). Perceptual and memory distortion during officer-involved shootings. FBI Law Enforcement Bull., 71, 18.

Blair, J. P., Pollock, J., Montague, D., Nichols, T., Curnutt, J., & Burns, D. (2011). Reasonableness and reaction time. Police quarterly, 14(4), 323-343.

Clark, A. (2013). Whatever next? Predictive brains, situated agents, and the future of cognitive science. Behavioral and brain sciences, 36(3), 181-204.

Correll, J., Park, B., Judd, C. M., Wittenbrink, B., Sadler, M. S., & Keesee, T. (2007). Across the thin blue line: police officers and racial bias in the decision to shoot. Journal of personality and social psychology, 92(6), 1006.

Dror, I. E. (2007). Perception of risk and the decision to use force. Policing: A Journal of Policy and Practice, 1(3), 265-272.

Engel, R. S., & Smith, M. R. (2009). Perceptual distortion and reasonableness during police shootings: Law, legitimacy, and future research. Criminology & Pub. Pol'y, 8, 141.

Enoka, R. M. (2003). Involuntary muscle contractions and the unintentional discharge of a firearm. In Law Enforcement Executive Forum (Vol. 3, No. 2, pp. 27-39).

Epstein, S. (1994). Integration of the cognitive and the psychodynamic unconscious. American psychologist, 49(8), 709.

Fridman, J., Barrett, L. F., Wormwood, J. B., & Quigley, K. S. (2019). Applying the theory of constructed emotion to police decision making. Frontiers in psychology, 10, 1946.

Forstmann, B. U., Ratcliff, R., & Wagenmakers, E. J. (2016). Sequential sampling models in cognitive neuroscience: Advantages, applications, and extensions. Annual review of psychology, 67, 641.

Johnson, D. J., Cesario, J., & Pleskac, T. J. (2018). How prior information and police experience impact decisions to shoot. Journal of personality and social psychology, 115(4), 601.

Kahneman, D. (2003). A perspective on judgment and choice: mapping bounded rationality. American psychologist, 58(9), 697.

Kahn, K. B., & Davies, P. G. (2017). What influences shooter bias? The effects of suspect race, neighborhood, and clothing on decisions to shoot. Journal of Social Issues, 73(4), 723-743.

Klein, G. A. (2011). Streetlights and shadows: Searching for the keys to adaptive decision making. MIT Press.

Klinger, D. A., & Brunson, R. K. (2009). Police officers' perceptual distortions during lethal force situations: Informing the reasonableness standard. Criminology & Public Policy, 8(1), 117-140.

Lewinski, B. (2000). Why is the suspect shot in the back. The Police Marksman, 25(6), 20-28.

Lewinski, B. (2002). Biomechanics of lethal force encounters–Officer movements. The Police Marksman, 27(6), 19-23.

Lewinski, W. J. (2008). The attention study: A study on the presence of selective attention in firearms officers. In Law Enforcement Executive Forum (Vol. 8, No. 6, pp. 107-139).

Lewinski, W. J., & Redmann, C. (2009). New developments in understanding the behavioral science factors in the "stop shooting" response. In Law Enforcement Executive Forum (Vol. 9, No. 4, pp. 35-54).

Lewinski, W. J., Dysterheft, J. L., Seefeldt, D. A., & Pettitt, R. W. (2013). The influence of officer positioning on movement during a threatening traffic stop scenario. In *Law Enforcement Executive Forum* (Vol. 13, No. 1, pp. 98-109).

Lewinski, W. J., Dysterheft, J. L., Priem, M. M., & Pettitt, R. W. (2016). Police officers' actual vs. recalled path of travel in response to a threatening traffic stop scenario. Police Practice and Research, 17(1), 51-67.

Logan, G. D., & Cowan, W. B. (1984). On the ability to inhibit thought and action: A theory of an act of control. Psychological review, 91(3), 295.

Pedrotti, M., Mirzaei, M. A., Tedesco, A., Chardonnet, J. R., Mérienne, F., Benedetto, S., & Baccino, T. (2014). Automatic stress classification with pupil diameter analysis. International Journal of Human-Computer Interaction, 30(3), 220-236.

Petersson, U., Bertilsson, J., Fredriksson, P., Magnusson, M., & Fransson, P. A. (2017). Police officer involved shootings–retrospective study of situational characteristics. Police practice and research, 18(3), 306-321.

Plant, E. A., & Peruche, B. M. (2005). The consequences of race for police officers' responses to criminal suspects. Psychological Science, 16(3), 180-183.

Plant, E. A., Peruche, B. M., & Butz, D. A. (2005). Eliminating automatic racial bias: Making race non-diagnostic for responses to criminal suspects. Journal of Experimental Social Psychology, 41(2), 141-156.

Porter, L. E., Ready, J., & Alpert, G. P. (2019). Officer-involved shootings: testing the effect of question timing on memory accuracy for stressful events. Journal of experimental criminology, 15(1), 1-28.

Harman, J. L., Zhang, D., & Greening, S. G. (2019). Basic processes in dynamic decision making: How experimental findings about risk, uncertainty, and emotion can contribute to police decision making. Frontiers in Psychology, 10, 2140.

Kerstholt, J., Eikelboom, A., Dijkman, T., Stoel, R., Hermsen, R., & van Leuven, B. (2010). Does suggestive information cause a confirmation bias in bullet comparisons?. Forensic Science International, 198(1-3), 138-142.

Ratcliff, R., & McKoon, G. (2008). The diffusion decision model: theory and data for two-choice decision tasks. Neural computation, 20(4), 873-922.

Taylor, P. L. (2019). Beyond false positives: A typology of police shooting errors. Criminology & Public Policy, 18(4), 807-822.

Taylor, P. L. (2020). Dispatch priming and the police decision to use deadly force. Police Quarterly, 23(3), 311-332.

Tversky, A., & Kahneman, D. (1974). Judgment under Uncertainty: Heuristics and Biases: Biases in judgments reveal some heuristics of thinking under uncertainty. science, 185(4157), 1124-1131.

Vickers, J. N., & Lewinski, W. (2012). Performing under pressure: Gaze control, decision making and shooting performance of elite and rookie police officers. Human movement science, 31(1), 101-117.

Vila, B. J., & Morrison, G. B. (1994). Biological limits to police combat handgun shooting accuracy. Am. J. Police, 13, 1.

# Appendix 1

County of Kern's Discovery Responses
> Initial Rule 26 Disclosure with Exhibits 1 - 11
> First Supplemental Responses to Request for Production, Set One with Exhibit I
> Second Supplemental Responses to Request for Production, Set One with Exhibits
> Third Supplemental Responses to Request for Production, Set One with Exhibit H
> Fourth Supplemental Responses to Request for Production, Set One with Exhibit
> Responses to Interrogatories, Set One with Exhibit A
> Responses to Requests for Production, Set One with Exhibits A - H

Depositions with Exhibits
> Jason Ayala
> Jose Castellanos
> Jeremy Terletter
> Oriona Lewis
> Mickel Lewis, Jr.
> Briona Lewis
> Destiny Salcedo
> Jessica L. Salcedo
> Nicholas Montoya
> Marlyn Komenenus
> Alisha White
> Roberta Haro

Plaintiffs' Documents
> Complaint
> First Amended Complaint for Damages and Other Relief
> Plaintiffs'' Responses to Discovery Requests
> Briona Lewis' Responses to Ayala's Interrogatories, Set One
> Briona Lewis' Responses to COK's Interrogatories, Set One
> Briona Lewis' Responses to Kern County's Request for Production, Set One
> Briona Lewis' Verification for Response to COK's  Request for Production, Set One
> Briona Lewis' Verification for Responses to Ayala's Interrogatories, Set One
> Mickel Lewis Jr's Responses to Ayala's Special Interrogatories, Set One
> Mickel Lewis Jr's Responses to COK's Interrogatories, Set One
> Mickel Lewis Jr's Responses to COK's Request for Production, Set One
> Mickel Lewis Jr's Verification for Responses to Ayala's Special Interrogatories, Set One
> Mickel Lewis Jr's Verification for Responses to COK's Request for Production, Set One
> Oriona Lewis' Responses to Ayala's Special Interrogatories, Set One
> Oriona Lewis' Responses to COK's  Interrogatories, Set One
> Oriona Lewis' Responses to COK's Request for Production, Set One
> Oriona Lewis' Verification for Responses to Ayala's Special Interrogatories, Set One
> Oriona Lewis' Verification for Responses to COK's Request for Production, Set One
> Plaintiffs' Initial Disclosures with Exhibits
> Plaintiff's Supplemental Documents Produced (Bates Lewis 000001-000050)
> Plaintiff's Supplemental Documents Produces (Bates Lewis 000051-000057)

# Appendix 2

**Qualifications**

1. I have a Bachelor of Science in Bioengineering from Arizona State University (ASU). The field of Biomechanics includes the scientific evaluation of the forces and motions experienced during a dynamic event, and the evaluation of those forces and motions for purposes of assessing injury mechanics and injury potential. To obtain this degree, I completed courses in anatomy, physiology, engineering design, mechanical engineering, materials science, general biomechanics, and movement biomechanics.

2. I have a Master of Science in Industrial Engineering from ASU. Industrial Engineers evaluate processes and systems to improve quality, productivity and safety. The emphasis of my coursework and research was in Human Factors, a subset of Industrial Engineering that focuses on the performance and behavior of the human in the system. My graduate program included courses in engineering design, injury biomechanics, psychology, experimental design, and statistical analyses.

3. I have a Master of Science in Applied Psychology from ASU. Applied Psychology is the scientific discipline that evaluates human performance and behavior using established principles and findings of general psychology and a multitude of sub-branches of psychology. My graduate program included courses in sensation and perception, engineering design, cognitive psychology, industrial and organizational psychology, sports psychology, transportation psychology and human factors.

4. I am a registered Professional Engineer in the State of Arizona (Mechanical). My qualifications for examination were directly related to my education, training and professional experience in mechanical engineering, bioengineering, engineering design, materials science, and safety engineering.

5. I am a Certified Human Factors Professional (CHFP). To obtain the CHFP designation required appropriate educational and work experience, as well as passing examinations encompassing disciplines covering the breadth of Human Factors, including applications of engineering design, industrial engineering, mechanical engineering, safety engineering, biomechanics, general and applied psychology, anatomy and physiology, experimental design, and statistical methods.

6. I have investigated and evaluated Police Officer Use of Force events as a reconstruction, injury biomechanics and human factors expert. I have completed the 40-hour Force Science Analyst course offered by Force Science, Ltd.

7. During the past 23 years of my professional career, I have conducted analyses of human performance and behavior involving interactions with variety of environments, products, and tasks. I have been admitted to testify in Federal and State courts as an event reconstruction, injury biomechanics and human factors expert.



# MICHAEL J. KUZEL

mkuzel@4msafety.com

3370 N Hayden Road, #123-683
Scottsdale, Arizona 85251

602-402-7839 (mobile)

## EDUCATION
M.S., Applied Psychology, Arizona State University, 2012
M.S.E., Industrial Engineering, Arizona State University, 2000
B.S.E., Bioengineering, Arizona State University, 1993

## PROFESSIONAL LICENSES AND CERTIFICATIONS
Professional Engineer (Mechanical), Arizona, #45695
Certified Human Factors Professional, #1136

## EMPLOYMENT EXPERIENCE

| | |
|---|---|
| Associate, Maricopa Association of Governments | 10/2020 to Present |
| Principal / Owner, 4M Consulting Group, LLC | 7/2013 to Present |
| Principal Engineer, Exponent, Inc. | 1/2005 to 7/2013 |
| Consulting Engineer, BioRec | 4/1998 to 12/2004 |
| Biomechanical Engineer, Kinex IHA | 9/1997 to 4/1998 |
| Research Engineer, Harrington Arthritis Research Center | 3/1995 to 9/1997 |
| Clinical Engineer, COHR MasterPlan | 7/1994 to 3/1995 |

## PROFESSIONAL PROFILE
Human Factors and Safety Engineering expert with twenty-three years experience conducting analyses of injury loss events for insurance and litigation matters.

Human Factors expert on teams conducting road safety assessments at more than 70 intersections and road segments in the State of Arizona and member on teams creating Strategic Transportation Plans and Transportation Framework Studies.

Project manager, skilled at task management, scheduling, team leadership, and cost management, technical report writing, and verbal communication of findings.

Proficient in analysis of urban traffic safety, applying standards, best practices and published guidelines for evaluation of transportation systems.

Researcher, adept at conducting data analyses, using mathematical computing programs, statistical analysis and simulation programs.

Instructor and presenter in areas related to Human Factors, Safety Engineering and Transportation Safety.

## ACADEMIC APPOINTMENTS

Faculty Associate (Instructor), Arizona State University, 2012 - current
  Introduction to Statistics (PSY 230); Statistical Methods (PSY 330);
  Intermediate Statistics (PSY 530); Human Factors in Transportation (PSY 448);
  Occupational Safety and Ergonomics (OMT 343)
Graduate Student Committee Member
  Lisa Thew, Driving and Priming Reactions in a Simulated Driving Environment,
    June 2014, Arizona State University
  Jessica Twyford, An Investigation of the Role of Goal Setting During Vicarious
    Learning of Physics, November 2014, Arizona State University
  Christopher Corral, Mere Exposure Effect on Uncanny Feelings toward Virtual
    Characters, November 2014, Arizona State University

## PROFESSIONAL AFFILIATIONS

Human Factors and Ergonomics Society
Institute of Transportation Engineers
Society of Automotive Engineers
American Society of Safety Professionals
Transportation Research Board
ASTM International
  Committee F13 on Pedestrian/Walkway Safety and Footwear
  Committee F08 on Sports Equipment, Playing Surfaces, and Facilities
  Committee E58 on Forensic Engineering

## CERTIFICATIONS and TRAINING

League Certified Instructor, League of American Bicyclists, #5193
Bike Instructor Certification Program, Level 1 Ride Guide & Fundamentals Instructor
Professional Mountain Bike Instructor Association, Level 1 Instructor
Certified Playground Safety Inspector, National Recreation and Park Association
CXLT, Certified English XL Tribometrist
Accident Reconstruction I, Institute of Police & Technology Management

## CIVIC VOLUNTEERING

Transportation Commission, City of Scottsdale, Arizona, 2017 - 2020
Paths and Trails Subcommittee, City of Scottsdale, Arizona, 2014-2020
McDowell Sonoran Preserve, Steward in Training, Class 78, 2019

## HOSTED CONFERENCE SESSIONS

*Righting the Wrong-Way Driver*, Human Factors Workshop, Session 144B, TRB 97th
  Annual Meeting, January 2018, Co-Host with John Kissinger
*The Rapid Rise in Pedestrian Fatalities: Changing Driver and Pedestrian Behavior to
  Save Pedestrian Lives*, Human Factors Workshop, Session 1047A, TRB 98th Annual
  Meeting, January 2019, Co-Host with Frank Proulx

Rev 012222

## PUBLICATIONS

Muttart, J., Kuzel, M., Dinakar, S., Gernhard-Macha, S., Edewaard, D. E., Appow, S., & Dickson, C. (2021). Factors that Influence Drivers' Responses to Slower-Moving or Stopped Lead Vehicles. *SAE Technical Paper*, 01-0890.

Neale, William, James Marr, Nathan McKelvey, and Michael Kuzel. *Nighttime Visibility in Varying Moonlight Conditions*. 2019 World Congress, Society of Automotive Engineers, Paper No. 2019-01-1005, April 2019.

Muttart, J. W., Dinakar, S., Suway, J., Kuzel, M., Gernhard, S., Rackers, M., & Fischer, J. *Influence of Taillight Width on the Ability to Recognize Closing Speed, Closing Distance, and Closing versus Separating*. 61st Annual Meeting of the Human Factors and Ergonomics Society, Vol. 61, No. 1, pp. 1894-1898, 2017.

McNabb, J., Kuzel, M., & Gray, R. *I'll Show You the Way: Risky Driver Behavior When "Following a Friend"*. Frontiers in Psychology, 8, 2017.

Muttart, J., Dinakar, S., Suway, J., Kuzel, M., Maloney, T., Biever, W., Terpstra, T., Voitel, T., Cavanaugh, D., & T.J. Harms. *Comparing A Timed Exposure Methodology to the Nighttime Recognition Responses from SHRP-2 Naturalistic Drivers.* 2017 World Congress, Society of Automotive Engineers, Paper No. No. 2017-01-1366, April 2017.

Muttart, J., Dinakar, S., Suway, J., Kuzel, M., Lohf, D., Maloney, T., & A. Wheat. *Is a Protocol for Measuring Aged Retroreflective Sheeting Warranted? Retroreflectivity Measurements of 191 Trailers from 36 States.* Transportation Research Board Annual Meetings, Paper 17-06767, January 2017.

English, D. & Kuzel, M. *Reliability of Eyewitness Reports to a Major Aviation Accident.* Intl. Journal of Aviation, Aeronautics, and Aerospace, 1(4), 2014.

Kuzel, M., Cohen, H., Rauschenberger, R. & Cohen, J. *Evaluation of mobile eye tracking for forensic analysis of pedestrian falls*. 57th Annual Meeting of the Human Factors and Ergonomics Society, San Diego, CA, October 2012.

Kwasniak, A., Cuadrado, J., Kuzel, M. & Sinocruz, J. *Evaluating public awareness of trip hazards on outdoor walkways.* 56th Annual Meeting of the Human Factors and Ergonomics Society, Boston, MA, October 2012.

George, J., Heller, M. & Kuzel, M. *Effect of shoe type on descending a curb*. Proceedings, 18th World Conference on Ergonomics, International Ergonomics Association, Recife, Brazil, Session S-STF 01, February 2012.

Heller, M. & Kuzel, M. *Footwear characteristics and potential implications on worker safety*. American Society of Safety Engineers 2011 Safety Conference, Chicago, IL, Session 636, 2011.

Heller, M., George, J., Kuzel, M. & Kwasniak, A. *Effect of ascending and descending a curb on normal gait: A review of the literature.* International Conference on Slips, Trips, and Falls 2011, Buxton, United Kingdom, 2011.

George, J., Heller, M., Fritton, K. & Kuzel, M. *Effect of shoe type on level-ground walking in women.* International Conference on Slips, Trips, and Falls 2011, Buxton, United Kingdom, 2011.

Heller, M. & Kuzel, M. *Fashion footwear and the risk of falling in young women.* 2010 International Conference on Fall Prevention and Protection, Morgantown, WV, 2010.

Rev 012222

## Publications (continued)

Kwasniak, A., Kuzel, M. *French lessons: A review of an effective road safety program*. ITE Journal, August 2009.

Heller M., Kuzel M., Kwasniak, A. & Cuadrado, J. *Individuals' abilities and behaviors and current technologies in intersection crosswalks*. ITE Journal, December 2008.

Larson, R., Fowler, G., Kuzel, M., Stubbs, A., Brown, J. & Donelson, A. *Single-vehicle rollovers involving an initial off-roadway excursion followed by a return to roadway: A NASS study and Vehicle Response Measurement*. 2008 World Congress, Society of Automotive Engineers, Paper No. 2008-01-0159, April 2008.

Kuzel MJ, Heller MF, Sala JB, Ciccarelli L, Gray R. *An analysis of real-world accidents involving distracted pedestrians*. XXth Annual International Occupational Ergonomics and Safety Conference, Chicago, IL, 2008.

Kuzel M, Heller M, Gray R, DiJorio S, Straughn S. *Perception and cognition during walking while concurrently using a cellular phone*. International Conference on Contemporary Ergonomics, Nottingham, UK, April 1–3, 2008.

Heller M, DiJorio S, Kuzel M, Carhart M, Ciccarelli L. *Effect of shoe type on kinematics of stair negotiation in women*. International Conference on Contemporary Ergonomics, Nottingham, UK, April 1–3, 2008.

Kuzel M, Krauss D, Moralde M, Kubose T. *Comparison of subjective ratings of slipperiness to the measured slip resistance of real-world walking surfaces*. International Conference on Slips, Trips and Falls 2007 - From Research to Practice, Hopkinton, MA, IEA Press, August 23–24, 2007.

Krauss D, Kuzel M, Cassidy P, Goodman J. *A review of technologies for studying visual perception under low-illumination conditions*. 50th Annual Meeting of the Human Factors and Ergonomics Society, Santa Monica, CA, 2006.

Krauss D, Kuzel M, Arndt S, Delahunt P. *Validation of digital image representations of low-illumination scenes*. 2006 World Congress, Society of Automotive Engineers, Paper No. 2006-01-1288, April 2006.

Kuzel M, Richard D, Werner S. *The effect of stiffness coefficients on output variables in EDSMAC4 Simulations*. 2006 World Congress, Society of Automotive Engineers, Paper No. 2006-01-1396, April 2006.

## ORAL PRESENTATIONS

Kuzel, M. *Motorists overtaking bicyclists: Analysis of driver behavior in a simulated driving environment*. 1st International Conference on Human Factors Aspects of Transportation, San Francisco, CA, July, 2012

Kuzel, M. *Motorist impact on bicycles and pedestrians*. ITE/IMSA Spring Conference, Phoenix, AZ, Session 3C, March 2011.

Kuzel, M. *Cell Phone Use - Distraction When Driving*. ITE/IMSA Spring Conference, Phoenix, AZ, Session 2B, March 2010.

Kuzel, M. *Analysis of bicycle overtaking accidents*. 36th International Forum on Traffic Records & Highway Safety Information Systems, Association of Transportation Safety Information Professionals, New Orleans, LA, July 2010.

Cuadrado, J., Kuzel, M., Crosby, C. & Ward, N. *A survey of driver side view mirror blindzone settings*. XXIIIrd Annual International Occupational Ergonomics and Safety Conference, Tempe, AZ, 2010.

Rev 012222



# Rate and Fees Schedule

## MICHAEL J. KUZEL, P.E., CHFP

    2022 Consultation Fee on litigation matters                   $420 per hour

### EXPLANATION OF FEES AND CHARGES

- Fees apply to all project related activities, including travel billed portal-to-portal.
- A retainer may be required, amount dependent on scope of work and client history.
- Projects with an expert opinion disclosure due date of less than 15 business days from retention or receipt of substantive documents will result in a 1.5 times rate for expert billing for during this period.
- Administrative and Research assistance on projects will be billed at $90 per hour and may include organization of provided file materials (as necessary), basic file material summaries, research and assistance at inspections, testing, *etc.*
- Technical and Scientific assistance on projects will be billed at $150 to $310 per hour, commensurate with experience and expertise, and may include material review, inspections, analyses, research, testing, and review of written reports.
- Deposition testimony requires a minimum 3-hour booking with time beyond 3 hours invoiced to the nearest quarter hour. A 3-hour pre-payment must be received at least two business days prior to scheduled date. A 1-hour fee will be assessed if cancelled within 24 hours of scheduled date.

### EXPENSES

| | |
|---|---|
| Transportation, Lodging, Meals | Cost plus 10% |
| Mileage | Federal allowance |
| Purchased/Rented Materials, Supplies and Equipment | Cost plus 10% |
| Evidence Storage | $10 per cubic foot |

    Requires a 6-month pre-payment and billed thereafter in bi-annual increments.

| | |
|---|---|
| Usage fee for specialty test equipment and cameras | Various |

    Fee applies per item per project, range $50 to $500 depending on item.

### PAYMENT TERMS

    Invoices due upon receipt. After 90 days, unpaid invoices will be re-billed with a 2.0% per month finance charge and result in stoppage of work until paid in full.

Michael J. Kuzel, P.E., CHFP
Four Year Testimony List

| Date Given | Case Name | Court Case Number (if known) | Case Type |
|---|---|---|---|
| | **TRIALS** | | |
| 02-May-18 | Quinonez et al. v Updike Distribution Logistics et al. | Arizona Superior Court, County of Maricopa No. CV2016-094494 | Defense |
| 23-May-18 | Else v La Russa | Arizona Superior Court, County of Maricopa No. CV2016-054335 | Defense |
| 08-Oct-18 | Brown v Dembow | Arizona Superior Court, County of Maricopa No. CV2016-012043 | Defense |
| 11-Jan-19 | Ellison v Copper Star Transportation | Arizona Superior Couty, County of Gila No. CV201600102 | Defense |
| 16-Jan-19 | Hall v Baker and Yavapai County | Arizona Superior-Couty, County of Yavapai No. P1300-CV2017-00575 | Defense |
| 23-Apr-19 | Collins v Tubac Management Company, LLC | Arizona Superior Court, County of Santa Cruz No. CV-15-344 | Defense |
| 16-May-19 | Lordigyan v United States of America | United States District Court for the District of Arizona Case No. 2:17-CV-00683-MHB | Plaintiff |
| 02-Oct-19 | Major v Windy City Carriers, Inc., et al. | Court of Common Pleas Greene County, Ohio Case No. 2017 CV 0165 | Defense |
| 28-Oct-19 | Cook v Newton | Arizona Superior Court, County of Maricopa No. CV2016-017758 | Defense |
| 06-Dec-19 | Lomutu v City of Tucson | Arizona Superior Court, County of Pima No. CV20181477 | Defense |
| 25-Oct-21 | Hanrahan v Baak et al | Arizona Superior Court, County of Pima No. CV20200718 | Defense |
| 26-Oct-21 | Lesihne v City of Tucson et al. | Arizona Superior Court, County of Pima No. C20196316 | Defense |
| 16-Nov-21 | Tomlinson v City of Scottsdale | Arizona Superior Court, County of Maricopa No. CV2014-096171 | Defense |
| 09-Mar-22 | Shepard et al v CA Dept of Transportation (CALTRANS) et al | California Superior Court, County of Los Angeles No. 19STCV32743 | Defense |
| 26-Apr-22 | Beck v City of Sierra Vista | Arizona Superior Court, County of Cochise, No. S0200CV201900530 | Defense |
| 22-Aug-22 | Emore v Daly et al. | Arizona Superior Court, County of Maricopa, No. CV2019-007427 | Defense |
| | **DEPOSITIONS** | | |
| 02-May-18 | Crestbrook Insurance v Toll Brothers AZ et al. | Arizona Superior Court, County of Maricopa No. CV2016-051722 | Defense |
| 16-May-18 | Nutini v L'Auberge Newco, LLC | Arizona Superior Court, County of Maricopa No. CV2017-051932 | Defense |
| 20-Jul-16 | Stephenson v Southwestern International Raceway, L.L.C., et al. | Arizona Superior Court, County of Maricopa No. C20162323 | Defense |
| 14-Aug-18 | Villanueva and Sainz, et al. v State of California, et al. | US District Court Central District of California, Southern Division, No: 8:17-cv-01302-JLS-KES | Defense |
| 06-Sep-18 | Boyles v State of Arizona and City of Tucson | Arizona Superior Court, County of Pima No. C20170062 | Defense |
| 13-Sep-18 | Figueroa v Lhamon and Dillard's, Inc. | Arizona Superior Court, County of Maricopa No. CV2016-093413 | Defense |
| 21-Sep-18 | Fallon v Freakling Bros, Inc. | Nevada District Court, County of Clark, No. A-17-753909-C | Defense |
| 09-Nov-18 | Bradford v Freestone Railroad, LLC, et al. | Arizona Superior Court, County of Maricopa No. CV2016-015732 | Defense |
| 28-Nov-18 | Brock v KS Industries, L.L.C. | State of North Dakota, County of Mountrail, District Court Case No.:31-2-15-CV-00106 | Defense |
| 07-Dec-18 | Collins v Tubac Management Company, LLC | Arizona Superior Court, County of Santa Cruz, No. CV-15-344 | Defense |
| 19-Dec-18 | Cook v Newton | Arizona Superior Court, County of Maricopa, No. CV2014-017758 | Defense |
| 22-Jan-19 | Colton v Cemex Construction Materials Pacific, LLC | California Superior Court, County of San Bernadino Case No. CIVDS1708364 | Defense |
| 25-Jan-19 | Major v Windy City Carriers, INC., et al. | Court of Common Pleas Greene County, Ohio | Plaintiff |
| 08-May-19 | Brennan v Cimaco Floor Service, Inc., et al. | Arizona Superior Court, County of Pima No. C20175467 | Defense |
| 22-May-19 | Nance v Sundt et al. | Arizona Superior Court, County of Maricopa No. CV2016-008280 | Defense |
| 09-May-19 | Proctor v Paradise Valley School District No. 69 et al | Arizona Superior Court, County of Maricopa No. CV2014-000930 | Defense |
| 10-May-19 | Davidson v Clark County et al | Nevada District Court, County of Clark, No. A-17-758687-C | Defense |

Michael J. Kuzel, P.E., CHFP

Four Year Testimony List

| Date Given | Case Name | Court Case Number (if known) | Case Type |
|---|---|---|---|
| | | **DEPOSITIONS (continued)** | |
| 08-Jul-19 | Aceves v Aria Resort & Casino Holdings, LLC et al. | Nevada District Court, County of Clark, No. A-17-754451-C | Defense |
| 09-Jul-19 | McCollum v Stincic | Arizona Superior Court, County of Maricopa No. CV2018-090583 | Defense |
| 16-Dec-19 | Galvin v I Tri Events LLC | 127th Judicial District Court, Harris County, TX Cause No. 2018-01863 | Defense |
| 16-Jan-20 | Hammons v Mason County WA | Superior Court of Washington for Thurston County, No. 16-2-00007-34 | Defense |
| 15-Apr-20 | Morgan v Furst Properties L.L.C. | Arizona Superior Court, County of Maricopa No. CV2019-003823 | Defense |
| 16-May-20 | Rogalski v Potpourri, LLC et al | Arizona Superior Court, County of Yuma No. CV2019-00194 | Plaintiff |
| 19-May-20 | Stropoli v LRS Investments, LLP | Arizona Superior Court, County of Maricopa No. CV2019-053742 | Defense |
| 22-Jun-20 | Youngers v Sandia Mountain Medical | State of New Mexico, County of Santa Fe, First Judicial District Case No. D-101-CV-2019-00214 | Defense |
| 02-Jul-20 | Agrusso v Inland Oceans Operation, LLC | Arizona Superior Court, County of Maricopa No. CV2018-005348 | Plaintiff |
| 13-Jul-20 | Mountz at al v BC Trucdkine et al. | Arizona Superior Court, County of Yavapai No. CV2018-80093 | Defense |
| 22-Jul-20 | Penalver v Hordioulture Unlimited, LLC and M Sandersen | Arizona Superior Court, County of Pima No. CV2019 4566 | Defense |
| 16-Sep-20 | James v State of AZ et al. | Arizona Superior Court, County of Maricopa, No. CV 2019-010688 | Defense |
| 16-Mar-21 | Murphy v Chemical Transport Inc. et al. | State of New Mexico, County of Santa Fe, First Judicial District Case No. D-101-CV-2019-02063 | Defense |
| 13-May-21 | Munoz v SDI Industries et al | Superior Court of The State of California, County of Los Angeles, No. Bc 78262 | Plaintiff |
| 04-Jun-21 | Evans v 3Palms Hotel | Arizona Superior Court, County of Maricopa No. CV2020-006764 | Defense |
| 25-Jun-21 | Munoz v SDI Industries et al | Superior Court of The State of California, County of Los Angeles, No. Bc 78262 | Plaintiff |
| 19-Jul-21 | Hannaoka v Wonder Spaces | Superior Court of The State of California, County of San Diego No. 37-2019-00025265-CU-PO-CTL | Defense |
| 27-Jul-21 | Blaser v Manhole Coatings, Inc., et al | Arizona Superior Court, County of Maricopa No. CV2019-015586 | Defense |
| 06-Aug-21 | Bates v Genie Industries et al. | United States District Court, Central District of California, Western Division No. 2:18-CV-01380 | Defense |
| 17-Aug-21 | Bains v Nottingham et al. | Arizona Superior Court, County of Maricopa No. CV2019-006342 | Defense |
| 29-Sep-21 | Diaz v CHP et al | United States District Court, Central District of California, No. 2:19-CV-04695 | Defense |
| 07-Jan-22 | Kennedy v Greenwood Carriers | Circuit Court for Sevier County, Tennessee No. 16-CV-74-II | Defense |
| 09-Feb-22 | Gonzalez at V Gomaco, Inc., et al | Superior Court of The State of California, County of Sacramento, No.: 34-2016-00202891 | Defense |
| 11-Feb-22 | Chavez v Otero & Sons Roofing Corp | State of New Mexico, County of Bernalillo, Second Judicial District, No. D-202-CV-2021-02063 | Defense |
| 14-Feb-22 | Shepard et al v CA Dept of Transportation (CALTRANS) et al | California Superior Court, County of Los Angeles No. 19STCV32743 | Defense |
| 24-Feb-22 | Ochoa and Ibarra v State of Arizona et al | Arizona Superior Court, County of Maricopa No. CV2017-011933 | Defense |
| 29-Apr-22 | Lehnen v King | Arizona Superior Court, County of Maricopa No. S1100CV202100028 | Defense |
| 19-May-22 | Crawford Smith v City of Bakersfield, et al. | United States District Court Eastern District of California, No. 1:18-CV-00307-DAD-SKO | Defense |
| 23-May-22 | Longoria v Silver State Schools Credit Union et al. | District Court, Clark County, Nevada No.: A-20-814135-C | Defense |
| 03-Jun-22 | Choi v State of Arizona | Arizona Superior Court, County of Maricopa, No. CV2018-065405 | Defense |
| 15-Jul-22 | Solomi v -WAL-MART Stores, Inc, et al | Arizona Superior Court, County of Maricopa, No. -CV2019-051339 | Defense |
| 15-Jul-22 | Sanchez v Graham County et al. | United States District Court for the District of Arizona, No. No. CV-21-00073-TUC-JCH-PSOT | Defense |

2 of 3

8/22/22