1 | James D. Weakley, Esq.     Bar No. 082853
Brande L. Gustafson, Esq.   Bar No. 267130
2 | **WEAKLEY & ARENDT**
A Professional Corporation
3 | 5200 N. Palm Avenue, Suite 211
Fresno, California 93704
4 | Telephone: (559) 221-5256
Facsimile: (559) 221-5262
5 | Jim@walaw-fresno.com
Brande@walaw-fresno.com
6 |
Attorneys for Defendant Deputy Jason Ayala
7 |

8 | **UNITED STATES DISTRICT COURT**

9 | **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10 |

11 | MICKEL ERICK LEWIS JR., individually and
as successor-in-interest to MICKEL E. LEWIS,
12 | SR., ORIONA LEWIS; and BRIONA LEWIS,
individually and as successor-in-interest,
13 |
Plaintiff,
14 |
vs.
15 |
KERN COUNTY, Deputy JASON AYALA,
16 | and DOES 1-20, inclusive,
17 |
Defendant.
18 |
R.L., M.L., and H.L., minors, by and through
19 | guardian *ad litem* Roberta Haro, individually
and as successors in interest to Michel Lewis
20 | Sr., deceased; A.W., a minor, by and through
her guardian *ad litem* Alisha White,
21 | individually and as a successor in interest to
Michel Lewis Sr., deceased; ALISHA WHITE,
22 | individually and as a successor in interest to
Michel Lewis Sr.,
23 |
Plaintiffs,
24 |
vs.
25 |
COUNTY OF KERN; JASON AYALA; and
26 | DOES 1-10, inclusive,
Defendants.
27 |

28 |

Case No. 1:21-CV-00378-KES-CDB
*Consolidated with Case No.*
*1:21−CV−01352−DAD−JLT*

**DECLARATION OF JAMES D.
WEAKLEY IN SUPPORT OF
DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTIONS IN LIMINE**

–1–

1    I, James D. Weakley, declare:

2    1.    I am an attorney at law, duly licensed to practice before all of the courts in the State

3    of California and the Eastern District of California. I am an attorney in the law firm of Weakley &

4    Arendt, A Professional Corporation, the attorneys of record for defendant Deputy Jason Ayala and

5    am an attorney assigned to the case. As such, I have personal knowledge of the matters set forth

6    herein, except those matters stated on information and belief, and would so testify.

7    2.    Attached hereto as **Exhibit A** are relevant portions of what I am informed and believe

8    to be a true and accurate transcript of the relevant portions of the interview of Deputy Jason Ayala

9    taken on October 7, 2020.

10    3.    Attached hereto as **Exhibit B**, is what I am informed and believe to be a true and

11    accurate copy of the relevant portions of the Rule 26 expert report of Michael Levine, M.D.,

12    Defendants' retained toxicology expert.

13    4.    Attached hereto as **Exhibit C**, is what I am informed and believe to be a true and

14    accurate copy of the relevant portions of the transcript of the deposition testimony of Michael J.

15    Kuzel, Defendants' retained human factors expert, taken on December 20, 2022.

16    5.    Attached hereto as **Exhibit D** are relevant portions of what I am informed and believe

17    to be a true and accurate transcript of the relevant portions of the deposition testimony of Deputy

18    Jason Ayala taken on June 17, 2022.

19    6.    Attached hereto as **Exhibit E** are relevant portions of what I am informed and believe

20    to be a true and accurate transcript of the relevant portions of the deposition testimony of Marlyn

21    Komenenus taken on August 15, 2022.

22    7.    Attached hereto as **Exhibit F** are relevant portions of what I am informed and believe

23    to be a true and accurate transcript of the relevant portions of the interview of Marlyn Komenenus

24    taken on October 2, 2020.

25

26    ///

27    ///

28    ///

Declaration of JDW in Support of Defendants' Opposition to Plaintiffs' Motions in Limine

1       I declare under penalty of perjury under the laws of the Unted States that the foregoing is true

2 and correct to the best of my knowledge and belief and that this declaration was executed in Fresno,

3 California on February 25, 2025.

4

5                                          */s/ James D. Weakley*
                                         James D. Weakley

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of JDW in Support of Defendants' Opposition to Plaintiffs' Motions in Limine

*Mickel Erick Lewis, Jr., et al. v. Kern County, et al.*
**United States District Court Case No. - 1:21-CV-00378-KES-CDB**
**[Consolidated with Case No. 1:21-CV-01352-DAD-JLT]**

# Exhibit A

**In the Matter Of:**

MICKEL E. LEWIS vs KERN COUNTY

2020-00137643

---

**JASON AYALA**

*October 07, 2020*

---



800.211.DEPO (3376)
EsquireSolutions.com

COK 01366

1

2

3

4

5

6

7

8                    THE RECORDED INTERVIEW OF
                          JASON AYALA
9                 AUDIO FILE:  201007_0504
                      OCTOBER 7, 2020
10

11   IN RE:  MICKEL E. LEWIS, ET AL. v. KERN COUNTY, ET AL.

12

13

14

15

16

17

18

19

20

21

22   Transcribed by:
     Christine Aiello
23
     J8129382
24

25



1          DEPUTY AYALA:  Yeah.  So how -- how I -- how I
2    was in the area, basically is that what you're asking?
3    Why I was in that specific -- specific --
4          DETECTIVE WONG:  Yeah, if it was -- for
5    instance, if you were at a traffic stop or anything
6    like that, or if it was somebody called --
7          DEPUTY AYALA:  Yeah.
8          DETECTIVE WONG:  -- 911 or anything.
9          DEPUTY AYALA:  No calls for service.  There
10   was a confidential informant --
11         DETECTIVE WONG:  Okay.
12         DEPUTY AYALA:  -- and I had received
13   information from them.
14         DETECTIVE WONG:  Okay.  Can you kind of --
15   regarding the confidential informant, how long had you
16   been in contact with your informant?
17         DEPUTY AYALA:  Since mid-September.
18         DETECTIVE WONG:  Okay.  Are you the --
19   currently the controlling deputy of that informant?
20         DEPUTY AYALA:  Yes.
21         DETECTIVE WONG:  Okay.  Do you believe the
22   information provided to you by the informant was
23   reliable?
24         DEPUTY AYALA:  Yes.
25         DETECTIVE WONG:  Okay.  Have you ever had



1  received information from this informant which has

2  proven unreliable?

3           DEPUTY AYALA:  No.

4           DETECTIVE WONG:  Okay.  Can you tell me what

5  information you received from this informant which is

6  relative to this -- to this event -- or I'm sorry --

7  incident?

8           DEPUTY AYALA:  I had a vehicle description.  I

9  had a subject's name and that he was armed with

10 firearms.

11          DETECTIVE WONG:  Okay.  Can you briefly

12 describe the vehicle which he mentioned to you?

13          DEPUTY AYALA:  Yes.

14          DETECTIVE WONG:  Or she mentioned to you.

15          DEPUTY AYALA:  It was a newer -- a newer model

16 Chevy Suburban, Chevrolet Suburban black --

17          DETECTIVE WONG:  Okay.

18          DEPUTY AYALA:  -- with a temporary license

19 plate.

20          DETECTIVE WONG:  Okay.  Did the informant tell

21 you the name of the person --

22          DEPUTY AYALA:  Yes.

23          DETECTIVE WONG:  -- in that vehicle?  What

24 name did they give you?

25          DEPUTY AYALA:  Mikel Lewis, Senior.



 1          DETECTIVE WONG:  Okay.  And as far as the
 2   weapons that was described to you, do you know what
 3   weapons?
 4          DEPUTY AYALA:  It was described to me as a
 5   handgun and another rifle, a shotgun-type weapon with a
 6   scope on it.
 7          DETECTIVE WONG:  Okay.  Did they give you any
 8   other descriptions of the weapons other than that?
 9          DEPUTY AYALA:  No, not that I remember.
10          DETECTIVE WONG:  Okay.  Did the informant that
11   you spoke with offer any statements made by Lewis
12   concerning law enforcement?
13          DEPUTY AYALA:  Can you say that one more time?
14   I'm sorry.
15          DETECTIVE WONG:  Did -- in other words, did
16   your informant say anything that the person that you
17   were in contact, Lewis, or the -- during that specific
18   traffic stop, did he mention anything regarding any --
19   anything that -- issues or anything that he had with
20   law enforcement or that he was -- any statements that
21   he made?
22          DEPUTY AYALA:  No.
23          DETECTIVE WONG:  Okay.  Did he tell you
24   specifically the location Lewis was going to be in?
25          DEPUTY AYALA:  The informant, yes, gave me a



```
 1   location.

 2             DETECTIVE WONG:  Okay.

 3             DETECTIVE NELSON:  What was that location?

 4             DEPUTY AYALA:  It was -- I'm trying to think

 5   of the exact name of it.

 6             DETECTIVE NELSON:  You can be general.

 7             DEPUTY AYALA:  So there -- it's a hotel on the

 8   corner of Sierra Highway and Mono Street.

 9             DETECTIVE WONG:  Okay.

10             DEPUTY AYALA:  It may be a Best Econo Inn or

11   something like that.  And it's directly north of the

12   Wienerschnitzel.

13             DETECTIVE NELSON:  Okay.

14             DEPUTY AYALA:  Room 31.

15             DETECTIVE NELSON:  And this informant, that's

16   where they told you Lewis would be?

17             DEPUTY AYALA:  Yes.

18             DETECTIVE NELSON:  Okay.  Go ahead, Chris.

19   Sorry.

20             DETECTIVE WONG:  Okay.  Do you believe the

21   information your informant was provide -- did you

22   believe the information that the informant was

23   providing to you?  Did you -- was it believable?

24             DEPUTY AYALA:  Yes.

25             DETECTIVE WONG:  Okay.  Was the information
```



1    from the informant direct or secondhand knowledge?

2            DEPUTY AYALA:  Direct.

3            DETECTIVE WONG:  When did you receive this

4    information?

5            DEPUTY AYALA:  I had information for probably

6    a few weeks before that he was armed with different

7    firearms.

8            DETECTIVE WONG:  Okay.

9            DEPUTY AYALA:  The location and that he was

10   seen with a gun that day I received that afternoon.

11           DETECTIVE WONG:  Okay.  Were other deputies

12   aware of this information?

13           DEPUTY AYALA:  Yes.

14           DETECTIVE WONG:  Okay.  And was there any

15   prior action taken on the information provided by the

16   -- this informant by you or any other deputies in the

17   days leading up to this -- to this incident?

18           DEPUTY AYALA:  I believe they had some

19   deputies that morning in a UC car watching room 31.

20           DETECTIVE WONG:  Okay.  And when you're

21   describing a UC car, is that an undercover-type

22   vehicle?

23           DEPUTY AYALA:  Undercover-type --

24           DETECTIVE WONG:  Okay.

25           DEPUTY AYALA:  -- vehicle, yeah.



1      DETECTIVE WONG:  Okay, all right.  Okay.  So

2  start from the beginning.

3      MR. PERRY:  Was -- was there anything else

4  when you were -- you had communication with the

5  informant on the night of the --

6      DEPUTY AYALA:  Yes.

7      MR. PERRY:  -- shooting?  Can you please

8  explain to the detectives the information -- like all

9  the information the informant had given you?

10     DEPUTY AYALA:  So a little bit before I had

11  just cleared a call on Rosamond.  It was maybe -- maybe

12  8:00 p.m., 8:30 p.m., I received a text message from my

13  informant saying that Mikel Lewis had forced his way

14  into her hotel room and threatened her and her kids,

15  and that's when she saw the firearm on him.  The -- it

16  was a handgun, something like a handgun.  That's what

17  brought me from Rosamond to Mojave.

18     DETECTIVE WONG:  Okay.

19     MR. PERRY:  Okay.

20     DETECTIVE WONG:  All right.  Start from the

21  beginning and tell me what happened.

22     DEPUTY AYALA:  So picking up kind of where I

23  just left off, I was in Rosamond at approximately, I

24  probably got dispatched around 8:00 p.m., finished the

25  call probably around 8:30 p.m. when I received a text



October 07, 2020
15

1   message from my informant stating Mikel Lewis, Senior,

2   had forced his way into her hotel room, which is

3   directly next to his, so she was in room 30, forced his

4   way into her room and threatened her and her kids.

5              She had told me that she was scared of him

6   and that she was, I think she said, she knew he meant

7   business.  That's kind of what brought me to Mojave.

8   We -- we -- I'm sorry.

9              DETECTIVE NELSON:  I -- no, I don't mean to

10  interrupt.  So --

11             DEPUTY AYALA:  No, that's fine.

12             DETECTIVE NELSON:  -- just going -- going off

13  of that, did she give my real specifics as to that

14  particular incident, outside of, he came into my hotel

15  room and made threats?

16             DEPUTY AYALA:  Just that he had guns on him.

17             DETECTIVE NELSON:  Okay.

18             DEPUTY AYALA:  He came into her hotel room --

19             DETECTIVE NELSON:  Okay.

20             DEPUTY AYALA:  -- made threats, and that he

21  was armed.

22             DETECTIVE NELSON:  Did you -- did you ask her

23  if she was wanting to make a report?

24             DEPUTY AYALA:  Yes.

25             DETECTIVE NELSON:  Okay.



 1              DEPUTY AYALA:  I asked her if she wanted to

 2      report it.  She said she did not.

 3              DETECTIVE NELSON:  Okay.  So going back, you

 4      said that you made your way back to Mojave.  You can

 5      pick up from there.

 6              DEPUTY AYALA:  So made my way back to Mojave.

 7      She sent me another text message when I was in Mojave

 8      stating she was trying to leave her room to get out of

 9      the situation, but she didn't want to basically run

10      into Mikel Lewis again because she was scared of him.

11      So that's when I was kind of driving around Mojave

12      trying to see if I could find him if he was out driving

13      around, because we had been looking for him for a

14      while.  I saw --

15              DETECTIVE WONG:  Could you explain why you

16      were looking for him?

17              DEPUTY AYALA:  Yeah, yeah.

18              DETECTIVE WONG:  And --

19              DEPUTY AYALA:  So we were looking for him.

20      She also provided us information that he was selling

21      meth amphetamine in Mojave and just that he -- he had

22      multiple guns on him.  So --

23              DETECTIVE WONG:  I see.

24              DEPUTY AYALA:  So when I was driving, I think

25      I was driving north on Sierra Highway past the



1   Wienerschnitzel.  I saw a newer model Chevy, black

2   Chevy Tahoe in the drive-thru.  Traffic was moving

3   pretty slow, so I was able to see inside and saw that

4   Mikel Lewis, Senior was the driver.  I couldn't see

5   anybody else inside the car.  I circled the block and

6   waited until he pulled out, and that's when I conducted

7   a traffic stop.

8           So how specific would you like me to get on

9   directions, east and west and streets?

10          DETECTIVE NELSON:  Everything.

11          DEPUTY AYALA:  Okay.

12          DETECTIVE NELSON:  Yeah.

13          DEPUTY AYALA:  So I circled the block, and

14  then he turned east onto Mono Street.  I turned east

15  onto Mono Street, initiated the traffic stop with my

16  forward-facing solid red lights.  He turned south onto

17  South K, which is the next street east and yielded.  I

18  exited my patrol car, walked up to the driver's side

19  door.  I identified myself as Deputy Ayala with the

20  Kern County Sheriff's Office.  I was trying to break

21  the ice with him because I didn't -- I didn't -- I -- I

22  knew he was -- I knew he was armed that night.  I

23  didn't want to give him any reason to do anything

24  crazy.  So I identified myself.

25          I have had prior contact with him, so I have



1    kind of a rapport with him.  I took a report.  Would

2    you like me to go into that?

3              DETECTIVE NELSON:  We'll go into that in --

4              DEPUTY AYALA:  Okay.

5              DETECTIVE NELSON:  -- in a little bit.

6              DEPUTY AYALA:  I had a brief conversation with

7    him at the door, just stating why I pulled him over.  I

8    knew he was on probation and asked him to step out of

9    the car.  He stepped out of the car.  And instead of

10   walking him back to my patrol car to do a search, I

11   believe he was going to be armed, so I did a search

12   right -- right there.  I walked him back from the

13   driver's seat to the back of his bumper, put him in the

14   standing modified that I search for weapons.  I didn't

15   find any weapons on him.

16              I asked him to walk back to my car to get him

17   kind of out of the street since I knew he didn't have

18   any guns on him at that point, walked him back to my

19   passenger door.  And I said, all right, I'm going to --

20   you're being detained pending a probation search of

21   your vehicle.  I know you're on probation.  And he said

22   -- he said, fuck you.  You can't search my car.  And I

23   said, well, you're on probation, under search terms, I

24   can search your car.  And I told him to put his hands

25   on top of his head.  And he put his hands on top of his



1  head, turned towards me real quick and lunged at me.

2          So I would -- I said to him -- he kind of

3  tried to punk me, so he kind of lunged at me like he

4  was going to attack me.

5          DETECTIVE NELSON:  Can you describe -- because

6  I know -- I know you're doing physical --

7          DEPUTY AYALA:  Right.  So --

8          DETECTIVE NELSON:  -- motions.

9          DEPUTY AYALA:  So I -- so the way he did it,

10  he turned towards me, and he had his hands in a fist,

11  both fists, and he -- and he took a step quickly

12  towards me.

13          DETECTIVE NELSON:  Uh-huh.

14          DEPUTY AYALA:  He jerked his body towards me.

15          DETECTIVE NELSON:  Okay.

16          DETECTIVE WONG:  Did you feel like you were

17  going to get punched or hit or something like that?

18          DEPUTY AYALA:  Yes.

19          DETECTIVE WONG:  Okay.

20          DEPUTY AYALA:  I did.  So I kind of -- I took

21  one step back, and he -- he ran.  So he ran towards the

22  -- away from my car, so he ran north and then circled

23  around my car and started going south back towards his

24  vehicle.  He ran past his car, kept going south, and

25  then turned east and was hiding behind a semi-truck



1    that was parked right there.  So the semi-truck, to

2    give you a picture, was parked directly adjacent from

3    his car on -- on the east side.  He was parked on the

4    west side of the street.  So and I was on the east side

5    facing north.

6           He ran to the back tire of the semi-truck and

7    laid down.  I could see him looking at me.  That made

8    me think he was waiting for me to either move away from

9    his car or leave -- or leave to go chase after him, and

10   I thought he was going to circle back.  I was standing

11   approximately at his driver's side door when this

12   happened, so I reached inside, and I took his keys out

13   of the ignition and I put them in my pocket.

14          He came out from behind the semi-truck.  I

15   said -- I said, I -- I believe I said, you're under

16   arrest.  I said, you can't go anywhere.  I have your

17   keys.  So at that point he charged towards.  He ran

18   towards me.  I backed up to the bumper of his car, and

19   I was waiting for the collision basically to happen.

20   So I was going to go hands-on with him.  Before he got

21   to me, he jumped in his driver's seat of his car.  His

22   car door was still open.  He jumped in the driver's

23   seat.

24          I knew he -- I knew he heard me when I said,

25   I have your keys, you can't go anywhere, because that's



1    when he started running at me.  So when he jumped in

2    his driver's seat, he jumped in, and I moved, kind of

3    cantered myself out from his car to see what he was

4    doing in there.  I drew my weapon.  He was kind of

5    under the seat of his car.  He was under the seat of

6    his car.

7            DETECTIVE WONG:  Can you describe that?

8    You're like --

9            DEPUTY AYALA:  Yes.  I'm sorry.

10           DETECTIVE WONG:  You're motioning with your

11   arms.

12           DEPUTY AYALA:  So he was -- he jumped in the

13   driver's seat of his car, left the door open.

14           DETECTIVE WONG:  Okay.

15           DEPUTY AYALA:  He took both of his arms and

16   reached deep under the driver's side seat where he was

17   sitting, underneath him.  He -- I don't know if you'd

18   like me to go into mindset at this point or if you just

19   want me to state the events, the facts.

20           SERGEANT HARKER:  Just you can tell us what

21   you were thinking --

22           DETECTIVE NELSON:  Yeah.

23           DEPUTY AYALA:  Okay.

24           SERGEANT HARKER:  -- at the time and yeah.

25           DEPUTY AYALA:  So I knew him to be armed.  I



JASON AYALA
MICKEL E. LEWIS vs KERN COUNTY

```
 1   knew he was armed that night an hour before.  I
 2   believed he was armed at the time.  And I knew when I
 3   searched him the first time, he didn't -- I didn't find
 4   a weapon on him.  I knew he knew that he couldn't go
 5   anywhere.  There was no reason for him to jump in the
 6   driver's seat because I had his keys.  I believed he
 7   was reaching for a weapon under his seat, a firearm.  I
 8   believe he had it hidden there.  I believe he reached
 9   under his seat to get it to shoot me.
10          He jumped out of the driver's seat.  Right
11   before he jumped out, he said something to the effect
12   of, you're going to have to kill me.  At that point is
13   when he jumped out.  He had his right hand behind his
14   back like this, and he was in the middle of saying,
15   when he -- he was in -- in the driver's seat, he said,
16   you're going to have to kill me.  He jumped out with
17   his hand behind his back and said, you're going to die.
18          He did a full sprint towards me.  I was
19   standing at roughly the back passenger door on the
20   driver's side.  He charged towards me, and I had my gun
21   pointed at him.  And he got close enough, I thought he
22   was going to grab my gun because he had one hand free,
23   one hand behind his back.  So I thought he's either
24   going to try and grab my gun or he's going to pull a
25   gun out from behind his back.
```



1          I pulled my gun back to me so he couldn't get
2     it.  As I -- as I ran backwards.  His face was in my
3     face, so his face was right about here.
4          DETECTIVE NELSON:  So about how far is that?
5          DEPUTY AYALA:  That's about a foot away from
6     my head.
7          DETECTIVE NELSON:  Okay.
8          DEPUTY AYALA:  So his face was about a foot
9     away from my head.  And when he said -- it's kind of
10    hard to explain, but this was all happening in a fluid
11    motion.  So he said, you're going to have to kill me,
12    and then when he was saying, or you're going to die, as
13    he was running towards me, his hand started coming from
14    his back to his front; and before -- before it got past
15    his waist is when his face was approximately one foot
16    away from my face when I was backpedaling, walking
17    backwards.
18         I thought he was going to pull out a gun, and
19    I thought I was going to die.  I thought he was going
20    to shoot me.
21         DETECTIVE WONG:  Okay.
22         DEPUTY AYALA:  I fired approximately five
23    rounds in succession, one after the other while backing
24    up.  I saw that he had stopped moving.  He was standing
25    still.  I stopped firing my weapon because I didn't



1  think he was a threat at that point.  That's when he

2  fell to the ground.

3          After -- after he fell on the ground, a

4  gentleman came up from behind me from the -- I believe

5  it was the northwest parking lot of the

6  Wienerschnitzel.  He identified himself as an off-duty

7  EMT.  He asked me -- I'm sorry, before -- before he

8  came up, I -- I got on the radio.  I said, 998,

9  officer-involved shooting.  Dispatch medical aid.

10 There's one subject down.  That's when this gentleman

11 came up from -- from behind me and said he was an

12 off-duty EMT.  He asked me if I would like him to start

13 CPR.

14         At that time there was people coming out from

15 everywhere.  It seemed like immediately there was

16 probably 10 to 15 people standing right there,

17 including his -- including Mikel Lewis, Senior's

18 daughter and the son.  So anyway, so that all kind of

19 happened at the same time.

20         I don't know his name, whoever the EMT guy

21 was, I have no idea what his name is, started CPR.

22 Before he started CPR, I did a quick search of Mikel

23 who was laying on his back on the ground.  I did a

24 quick search of his waistband because I didn't want him

25 to hurt this guy or me.  After I did my search, I



1  didn't find a weapon right there, and I said, okay, go

2  ahead; and he started CPR.

3          At that point I was worried about the crowd

4  because I knew there was a close family member there.

5  I was worried about retaliation.  So I was watching him

6  do CPR.  I was watching the crowd to make sure nobody

7  attacked us.  I saw somebody get out of the -- the

8  vehicle.  I believe it was his girlfriend.  I'm not

9  really sure.  There was an adult female in the

10  passenger seat.

11          DETECTIVE WONG:  Uh-huh.

12          DEPUTY AYALA:  She came around to the back of

13  the car.  And I don't know what she did, but she did

14  something.  I was trying to keep a bunch of people

15  back.  I don't know if she went to try and help him, to

16  help Mikel on the ground or what she did.  I told her,

17  when I looked and realized she was right next to him, I

18  told her to get back, and she got back.  And I said, go

19  stand in the parking lot -- I told her to go to the

20  Wienerschnitzel.  I didn't want to have to deal with

21  her as well as another threat.  So she -- she backed

22  up, and she went away.

23          A bunch of deputies arrived, medical, fire.

24          DETECTIVE WONG:  Okay.

25          DEPUTY AYALA:  So --



JASON AYALA
MICKEL E. LEWIS vs KERN COUNTY

October 07, 2020
26

```
1              DETECTIVE WONG:  Thank you.  If you can, just
2    some follow-up questions here.
3              DEPUTY AYALA:  Sure.
4              DETECTIVE WONG:  Do you remember what the
5    suspect was wearing or what Lewis was wearing, if you
6    can recall?
7              DEPUTY AYALA:  I believe he was wearing a
8    white T-shirt and basketball shorts.
9              DETECTIVE WONG:  You said basketball shorts?
10             DEPUTY AYALA:  Yeah.  Some --
11             DETECTIVE WONG:  Okay.
12             DEPUTY AYALA:  I think some loose-fitting
13   shorts.
14             DETECTIVE WONG:  Did you notice any signs or
15   symptoms of drug or alcohol intoxication?
16             DEPUTY AYALA:  He -- he was acting like a lot
17   of people have acted, in my experience, as being under
18   the influence of meth amphetamine.
19             DETECTIVE WONG:  Okay.
20             DEPUTY AYALA:  He had very rigid -- rigid
21   movements.  He -- he was talking very fast.  Just not
22   normal behavior for somebody.
23             DETECTIVE WONG:  Okay.  And I think you kind
24   of listed out some, several crimes that he was possibly
25   doing, but can you kind of just go over what crimes
```



1  that you believe the suspect was committing during the

2  incident?

3         DEPUTY AYALA:  During the -- during this

4  incident?

5         DETECTIVE WONG:  Correct.  So, like, your

6  contact with him, stuff like that.

7         DEPUTY AYALA:  Right.  So -- so he -- he was

8  refusing orders.  He ran from me.  So --

9         DETECTIVE NELSON:  Do you know what crime that

10  is?

11         DEPUTY AYALA:  PC 148 (a)(1).

12         DETECTIVE WONG:  Uh-huh.

13         DEPUTY AYALA:  So obstruct, resist, or delay a

14  peace officer.

15         DETECTIVE WONG:  Okay.

16         DEPUTY AYALA:  So I knew he had committed

17  that.

18         DETECTIVE NELSON:  You told him he was

19  detained, right, when --

20         DEPUTY AYALA:  Yes.

21         DETECTIVE NELSON:  -- at --

22         DETECTIVE WONG:  Yeah.

23         DETECTIVE NELSON:  -- at the back of the car?

24         DEPUTY AYALA:  Yes.

25         DETECTIVE NELSON:  And that was when you said



JASON AYALA                                                    October 07, 2020
MICKEL E. LEWIS vs KERN COUNTY                                              28

```
 1   that he faced you --
 2             DEPUTY AYALA:  Yes.
 3             DETECTIVE NELSON:  -- took that aggressive
 4   stance, and ran from you?
 5             DEPUTY AYALA:  Yes.
 6             DETECTIVE NELSON:  Okay.
 7             DETECTIVE WONG:  You also mentioned that he
 8   made some sort of like fist clenching or it seemed like
 9   he was possibly going to attack you or something like
10   that?
11             DEPUTY AYALA:  Yeah, I thought he was going to
12   attack me when he lunged forward at me.
13             DETECTIVE WONG:  Okay.  After that --
14             DEPUTY AYALA:  So --
15             DETECTIVE WONG:  -- any other crimes that you
16   witnessed?
17             DEPUTY AYALA:  No.
18             SERGEANT HARKER:  Did you say that you told
19   him he was under arrest when he was -- when you saw him
20   laying behind the trailer?
21             DEPUTY AYALA:  Yes.
22             SERGEANT HARKER:  Okay.
23             DEPUTY AYALA:  I told him, I said, you may as
24   welcome back, you're under arrest.  I have your car
25   keys.
```



1            DETECTIVE WONG:  Did you -- I believe you

2    mentioned that, you stated that he was in the car at

3    one point, and it appeared he was digging.

4            DEPUTY AYALA:  Yeah.

5            DETECTIVE WONG:  And you stated that he said

6    something to you.

7            DEPUTY AYALA:  Yes.

8            DETECTIVE WONG:  What did he say exactly?

9            DEPUTY AYALA:  He said something to the effect

10   of, you're going to have to kill me.  You're going to

11   die.

12           DETECTIVE WONG:  Okay.  Is there any violation

13   of the law regarding that?

14           DEPUTY AYALA:  Yes.  The PC 422, it's criminal

15   threats.

16           DETECTIVE WONG:  Okay.  At -- at any time did

17   you request backup when you were -- during this

18   incident?

19           DEPUTY AYALA:  So when he ran from me, the

20   only radio traffic I put out was foot pursuit

21   southbound South K Street.

22           DETECTIVE WONG:  Okay.  Did you know at this

23   time if anyone else was en route to back you?

24           DEPUTY AYALA:  I did not.  I figured they

25   would be, but I knew they were all in Rosamond.  We had



JASON AYALA
MICKEL E. LEWIS vs KERN COUNTY

1   just finished a call, and I was the first one.

2           DETECTIVE WONG:  Okay.  Prior to your contact

3   with Lewis, has there -- had there been a records check

4   done on him or anything like that?

5           DEPUTY AYALA:  Yes.

6           DETECTIVE WONG:  Okay.

7           DEPUTY AYALA:  I'd done a records check on

8   him.

9           DETECTIVE WONG:  Okay.

10          DEPUTY AYALA:  Do you want me to go into it?

11          DETECTIVE NELSON:  Briefly.

12          DETECTIVE WONG:  Briefly, yeah, please.

13          DEPUTY AYALA:  So I knew that he was arrested

14  within the past year for possession of meth

15  amphetamines for sales and PC 29 -- 29800, so felon in

16  possession of a firearm.

17          DETECTIVE NELSON:  And you had mentioned

18  before that you believed he had status?

19          DEPUTY AYALA:  Yes.

20          DETECTIVE NELSON:  Okay.  And what --

21          DEPUTY AYALA:  Yeah.  I --

22          DETECTIVE NELSON:  -- kind of status?

23          DEPUTY AYALA:  Search terms for narcotics.

24          DETECTIVE NELSON:  Under probation?

25          DEPUTY AYALA:  Yes.



```
 1   STATE OF WASHINGTON)

 2                     ) SS:

 3   COUNTY OF WHATCOM  )

 4

 5

 6

 7

 8                    I, CHRISTINE AIELLO, do hereby certify

 9   that I transcribed the audio, and that the foregoing is

10   a true and complete transcription of the audio

11   transcribed under my personal direction.

12                    IN WITNESS WHEREOF, I do hereunto set my

13   hand at Blaine, Washington, this 11th day of April,

14   2022.

15

16

17

18

19                    _____

20                            Christine Aiello

21

22

23

24

25
```



*Mickel Erick Lewis, Jr., et al. v. Kern County, et al.*
**United States District Court Case No. - 1:21-CV-00378-KES-CDB**
**[Consolidated with Case No. 1:21-CV-01352-DAD-JLT]**

# Exhibit B

Michael Levine, MD

# EXPERT OPINION REPORT

**Pursuant to Federal Rules of Civil Procedure, Rule 26**

Court:  United States District Court – Eastern District of California

Case Number: U.S.D.C. No: 1:21-CV-00378-DAD-BAK (SKO); consolidated with 1:21-CV-01352

Case Name:  Mickel Erick Lewis Jr et. al.

Vs:  Kern County Deputy Jason Alaya et. al.

Date:  22 October, 2022


I, Michael David Levine, am an adult over 18 years of age and would be competent to testify if called as a witness in this matter.  I have prepared this report on behalf of the defendants in the matter of Lewis et. al. vs. Kern County Deputy Ayala, et. al. in the United States District Court, Eastern District of California.

A.  The University of California, Los Angeles employs me as an Associate Professor of emergency medicine.  I am also in charge of the toxicology consulting service at UCLA. My duties include, but are not limited to, supervising interns and residents in the emergency department, serving as an attending physician in the emergency department at several UCLA affiliated emergency departments, including UCLA Ronald Regan Medical Center, Olive View UCLA Medical Center and Santa Monica UCLA Medical Center.  As the Director of Toxicology, I am in charge of a consulting service at several hospitals and run the outpatient toxicology clinic at Ronald Regan UCLA Medical Center.  My functions include providing bedside consultations, in which I provide direct care for patients with various toxicologic complaints including overdoses. In addition, I am in charge of a teaching rotation for residents and fellows, performing research, and serving on various ad hoc committees.  In addition to my employment at UCLA, I am also an attending physician in the emergency department at Huntington Memorial Medical Center in Pasadena, California

B.  Past employment:  University of Southern California, Banner Good Samaritan Medical Center in Phoenix, AZ and Banner Thunderbird Medical Center in Glendale, AZ

C.  While at USC, I served as the vice chair of the pharmacy and therapeutics committee at LA County-USC Medical Center, and was chair of the medication safety committee at the Los Angeles County-USC Medical Center.

I have and continue to serve on numerous committees as a member of the American College of Medical Toxicology during the past five years, and have helped develop guidelines, participate in research, and advance education of physicians currently in their emergency medicine residency and medical toxicology fellowships.

I serve on the fatality review committee for the American Association of Poison Control

Centers, and have done so for more than 10 years.  This committee assess causes of death in drug-associated fatalities.

D.  I have 18 years of emergency medicine experience, and 14 years of medical toxicology experience as a toxicologist.  My areas of expertise include, but are not limited to, emergency medicine and medical toxicology.

E.  I have provided expert opinions in approximately 50 cases.  I have been deposed approximately 17 times and have provided expert testimony in in seven cases, including the Superior Court of the State of California (Los Angeles County Superior Court), Superior Court of the State of Arizona (County of Mohave) and the United States District Court, Southern District of California.

F.  I have been retained as an expert witness in this case by Ms. Kathleen S. Rivera, a deputy attorney in the Kern County, County Counsel office, who represents the defense.  I was originally informed of this case on or about 13 September, 2022.  I have been retained primarily to opine if Mr. Lewis had used methamphetamine the day he died, and if what contribution, if any, the methamphetamine had on this case.

G.  At the time of making this report, I have reviewed a variety of documents, including original research, to reach an opinion in this matter.

H.  The statements made herein are based on my personal knowledge, which is based upon a review of the medical records, the filed complaint, depositions, as well as years of training as a medical toxicologist and emergency physician.  A copy of my Curriculum Vitae is attached herewith and incorporated hereto as though fully set forth.

I.  I have received numerous documents from the defense counsel in September, 2022

J.  DOCUMENTS REVIEWED
1.  File entitled Bates 01366-01426 Jason Ayala Interview
2.  File entitled K and Mono OIS Montoya video
3.  File entitled Lewis – Deposition transcript of Jason Ayala
4.  File entitled Lewis – Destiny Salcedo interview 10-3-20 transcribed
5.  File entitled Lewis – First amended complaint for damages and other relief (Doc 6)
6.  File entitled Lewis – Jeremy Turletter interview 10-2-20 transcribed
7.  File entitled Lewis – Jessica Salcedo interview 10-3-20 transcribed
8.  File entitled Lewis – Marlyn Komnenus Interview 10-2-20 (2) transcribed
9.  File entitled Lewis – Nicholas Montoys interview 10-2-20 transcribed
10. File entitled Lewis – NMS Result DL isomer testing from KC coroner
11. File entitled Lewis – passenter marlin komenus interview 10-2-20 transcribed
12. File entitled Lewis – Records from Kern County Coroner
13. File entitled Lewis – Report 2020-00137643 – KCSO Homicide report – from MCW
14. File entitled Lewis – Summons and Complaint from Galipo's Office
15. File entitled Lewis – Depositions transcripts of Marlyn Komenesus
16. File entitled Lewis – Depositions transcripts for Nicholas Montoya

17. File entitled Lewis – Depositioons transcript of Jessica L. Salcedo
18. File entitled Lewis – Depositioons transcript of Destiny Salcedo
19. File entitled Lewis – Depositioons transcript of Jose Castellanos with exhibitis
20. File entitled Lewis – Depositioons transcript of Orina Lewis
21. File entitled Lewis – Depositioons transcript of Jeremy Terletter
22. File entitled Lewis – Depositioons transcript of Letter to expert Dr. Levine w deposition transcripts
23. File entitled Lewis – Depositioons transcript of for Briona Lewis
24. File entitled 22347677 (WO 20313638) LEWIS,MICKEL

**K. OPINION NUMBER 1:** Mr. Lewis had used methamphetamine on the day of his death. Mr. Lewis had a methamphetamine level of 360 ng/mL and an amphetamine level of 67 mg/dL. Methamphetamine undergoes N-demethylation to form amphetamine, which is an active metabolite. Furthermore, the fact that the methamphetamine level is much higher than the amphetamine level suggests relatively recent use. Furthermore, chiral analysis of the methamphetamine revealed 100% of the methamphetamine was D-amphetamine, an illicit form of methamphetamine.

**L.  OPINION NUMBER 2:** Use of methamphetamine can cause impaired judgement. Both Jeremy Terletter, Nicholas Montoya, and Marlyn Komenenus had witnessed the shooting. Mr. Terletter witnessed Mr. Lewis get back into the car and then run at the officer. Ms. Komenenus had said she heard Mr. Lewis yelling before running back into the car. Mr. Montoya heard the deputy say stop twice before shooting. All of these behaviors are consistent with impaired judgement. A level of 360 ng/mL, will likely result in impaired judgement. While the exact degree of impairment is variable, and I cannot say how impaired Mr. Lewis was, it is highly likely that an individual with this level will have some impaired judgement.

**M. EXHIBITS:**
    1. Records reviewed

**N: QUALIFICATIONS:**
    See attached Curriculum Vitae

**O. EXPERT TESTIMONY**
    See attached

**P: PUBLICATIONS:**
    See attached curriculum vitae

**Q: PERSONAL COMPENSATION**
    Case review        $300/hour
    Deposition fee     $450/hour
    Court testimony    $600/hour

**R:  Disclaimer:**  I reserve the right to modify, amend, or change my opinion should additional information be obtained.

Date:  18 October, 2022

Signature,  _____
                Michael Levine MD, FACEP, FACMT

*Mickel Erick Lewis, Jr., et al. v. Kern County, et al.*
**United States District Court Case No. - 1:21-CV-00378-KES-CDB**
**[Consolidated with Case No. 1:21-CV-01352-DAD-JLT]**

# Exhibit E

**MICKEL ERICH LEWIS, JR., ET AL. vs KERN COUNTY, ET AL.**
**Michael Kuzel on 12/20/2022**

```
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF CALIFORNIA

 3

 4   Mickel Erich Lewis, Jr., individually )
     and as successor-in-interest to       )
 5   Mickel E. Lewis, Sr., Oriona Lewis,    )
     individually and as successor-in-     )
 6   interest; and Briona Lewis,            )
     individually and as successor-in-     )
 7   interest,                              )
                                            )
 8                    Plaintiffs,           )
                                            )
 9              vs.                         )Case No.
                                            )1:21-CV-00378-NONE-JLT
10   Kern County, Deputy Jason Ayala, and  )
     DOES 1-2, inclusive,                   )
11                                          )
                      Defendants.           )
12   _____)
     R.L., M.L., and H.L., minors, by and  )
13   through guardian ad litem Roberta      )
     Haro, individually and as successors  )
14   in interest to Mickel Lewis, Sr.,      )
     deceased; A.W., a minor, by and        )
15   through guardian ad litem Alisha       )
     White, individually and as a          )
16   successor in interest to Mickel Lewis,)
     Sr., deceased; Alisha White,           )
17   individually and as a successor in     )
     interest to Mickel Lewis, Sr.,         )
18                                          )
                      Plaintiffs,           )
19                                          )
                vs.                         )
20                                          )
     County of Kern; Jason Ayala; and      )
21   DOES 1-10, inclusive,                  )
                                            )
22                    Defendants.           )
                                            )
23   _____)

24

25
```

**MICKEL ERICH LEWIS, JR., ET AL. vs KERN COUNTY, ET AL.**
Michael Kuzel on 12/20/2022                                      Page 2

1

2

3

4

5                REMOTE VIDEOCONFERENCE DEPOSITION OF

6                          MICHAEL KUZEL

7                     TUESDAY, DECEMBER 20, 2022

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    Reported Stenographically By:

24    Jinna Grace Kim, CSR No. 14151

25    Job No.:  426803

```
 1                 UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF CALIFORNIA

 3

 4   Mickel Erich Lewis, Jr., individually )
     and as successor-in-interest to       )
 5   Mickel E. Lewis, Sr., Oriona Lewis,   )
     individually and as successor-in-     )
 6   interest; and Briona Lewis,           )
     individually and as successor-in-     )
 7   interest,                             )
                                           )
 8                Plaintiffs,              )
                                           )
 9                vs.                      )Case No.
                                           )1:21-CV-00378-NONE-JLT
10   Kern County, Deputy Jason Ayala, and  )
     DOES 1-2, inclusive,                  )
11                                         )
                  Defendants.              )
12   _____)
     R.L., M.L., and H.L., minors, by and  )
13   through guardian ad litem Roberta     )
     Haro, individually and as successors  )
14   in interest to Mickel Lewis, Sr.,     )
     deceased; A.W., a minor, by and       )
15   through guardian ad litem Alisha      )
     White, individually and as a          )
16   successor in interest to Mickel Lewis,)
     Sr., deceased; Alisha White,          )
17   individually and as a successor in    )
     interest to Mickel Lewis, Sr.,        )
18                                         )
                  Plaintiffs,              )
19                                         )
                  vs.                      )
20                                         )
     County of Kern; Jason Ayala; and      )
21   DOES 1-10, inclusive,                 )
                                           )
22                Defendants.              )
                                           )
23   _____)

24

25
```

**MICKEL ERICH LEWIS, JR., ET AL. vs KERN COUNTY, ET AL.**
Michael Kuzel on 12/20/2022                                    Page 4

1

2

3

4

5          The remote videoconference deposition of MICHAEL

6   KUZEL, taken on behalf of the Plaintiffs, beginning at 10:01

7   a.m., and ending at 12:22 p.m., on Tuesday, December 20,

8   2022, before Jinna Grace Kim, California Stenographic Court

9   Reporter, License No. 14151.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX

 2   WITNESS:                                      PAGE

 3   MICHAEL KUZEL

 4       BY: MR. GALIPO                            7

 5       BY: MS. RIVERA                            83

 6

 7                        EXHIBITS

 8   MARKED FOR IDENTIFICATION                     PAGE

 9                                                 7

10   Exhibit 1           Report                    19
     (Late File)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**MICKEL ERICH LEWIS, JR., ET AL. vs KERN COUNTY, ET AL.**
Michael Kuzel on 12/20/2022                                              Page 6

```
 1    APPEARANCES OF COUNSEL:

 2
      For the Plaintiffs:
 3
                LAW OFFICES OF DALE K. GALIPO
 4              BY:  DALE K. GALIPO, ESQ.
                BY:  RANHEE LEE, ESQ.
 5              21800 Burbank Boulevard, Suite 310
                Woodland Hills, California 91367
 6              Tel:  818-347-3333
                Fax:  818-347-4118
 7              E-mail:  dalekgalipo@yahoo.com
                E-mail:  rlee@galipolaw.com
 8

 9              TONI JARAMILLA, A PROFESSIONAL LAW CORP.
                BY:  TONI J. JARAMILLA, ESQ.
10              1900 Avenue of the Stars, Suite 900
                Los Angeles, California 90067
11              Tel:  310-551-3020
                Fax:  310-551-3019
12              E-mail:  toni@tjjlaw.com

13
                ALEXANDER MORRISON + FEHR, LLP
14              BY:  J. BERNARD ALEXANDER, III, ESQ.
                1900 Avenue of the Stars, Suite 900
15              Los Angeles, California 90067
                Tel:  310-394-0888
16              Fax:  310-394-0811
                E-mail:  balexander@amfllp.com
17

18
19    For the Defendants:
                OFFICE OF THE COUNTY COUNSEL
20              COUNTY OF KERN
                BY:  KATHLEEN RIVERA, ESQ.
21              1115 Truxton Avenue, 4th Floor
                Bakersfield, California 93301
22              Tel:  661-868-3800
                Fax:  661-868-3805
23              E-mail:  krivera@kerncounty.com
                E-mail:  anavarro@kerncounty.com
24

25
```

**MICKEL ERICH LEWIS, JR., ET AL. vs KERN COUNTY, ET AL.**
Michael Kuzel on 12/20/2022                                    Page 8

1        Q.    Usually, I go about an hour and then take a short

2    break, but if you feel you need to take a break at any time

3    before that, just let me know and we'll take a break.

4              Okay?

5        A.    Okay.

6        Q.    And you've testified in court as an expert witness

7    before?

8        A.    Yes.

9        Q.    And do you have an estimate as to how many times

10   you have done that?

11       A.    Roughly 50 times.

12       Q.    Have you testified in depositions or court before in

13   officer-involved shooting cases?

14       A.    Depositions, yes.  Court, I have testified in

15   officer -- police practices case, but not in an

16   officer-involved shooting case.

17       Q.    Okay.  So with respect to officer-involved shooting

18   cases, you have not testified in court, but you have,

19   perhaps, given deposition testimony?

20       A.    Yes.

21       Q.    And you have testified in police cases in court;

22   they just were not officer-involved shooting cases.

23       A.    Correct.  And they involved some aspects of an event

24   that may have involved an officer-involved shooting, but my

25   role wasn't about the officer-involved shooting in those

**MICKEL ERICH LEWIS, JR., ET AL. vs KERN COUNTY, ET AL.**
**Michael Kuzel on 12/20/2022**                                    Page 9

```
 1   cases.
 2        Q.   For example, have you ever testified in court before
 3   as an expert witness that the use-of-force was reasonable?
 4        A.   No.  I have never testified about the reasonableness
 5   in trial, about the reasonable use-of-force.
 6        Q.   And have you worked with Ms. Rivera in other cases
 7   before?
 8        A.   In one other case.
 9        Q.   Okay.  Do you recall either the name of that case or
10   what it was generally about?
11        A.   It was an officer-involved shooting and the name of
12   the case is Roberts R-o-b-r-t-s versus Kern County.
13        Q.   And is that case still going on, if you know?
14        A.   Yes.
15        Q.   And have you had your deposition taken in that case
16   yet?
17        A.   No.
18        Q.   In that case was the person struck by any of the
19   gunfire, if you recall?
20        A.   Yes.
21        Q.   And do you recall if the person survive or not?
22        A.   He did survive, yes.
23        Q.   Was that person armed at the time of the shooting,
24   if you recall?
25        A.   He was not.  He was not armed with an actual
```

**MICKEL ERICH LEWIS, JR., ET AL. vs KERN COUNTY, ET AL.**
**Michael Kuzel on 12/20/2022**

```
 1   firearm.  He had a like a fake gun on him at the time.
 2        Q.   And have you done any other work for Ms. Rivera's
 3   office?  In other words, it might have been another lawyer in
 4   her office that you worked with in other cases?
 5        A.   No.
 6        Q.   And if you know, have you done any other cases for
 7   Kern County other than this one and the other one you
 8   mentioned?
 9        A.   No.  These are the only two.
10        Q.   In the Roberts case, if you recall, where was this
11   fake gun at the time the shots were fired?
12             Was it in a waistband or a pocket, or do you
13   recall?
14        A.   There is different testimony as to where it was.
15             In some of the testimony, as I recall, the gun was
16   being raised towards the deputy that fired the shots.
17        Q.   Okay.  Different people had different accounts of
18   what occurred; is that fair?
19        A.   Yes.
20        Q.   Before we get into your opinions in this case, I
21   just would like to learn a little bit about your background.
22             Can you start me off maybe with your college
23   education and take me through your formal education.
24        A.   Sure.  I have a bachelor's degree in Bioengineering
25   from Arizona State University.  I have a master's degree in
```

**MICKEL ERICH LEWIS, JR., ET AL. vs KERN COUNTY, ET AL.**
**Michael Kuzel on 12/20/2022**                                    **Page 11**

```
 1    Industrial Engineering from Arizona State University, and my
 2    area of emphasis and for my research was Human Factors
 3    Industrial Engineering.
 4            And then I have a second master's degree in Applied
 5    Psychology, again, from Arizona State University, and my area
 6    of research was Human Factors Sensation of Perception.
 7       Q.   And when did you, in what year did you get your
 8    master's degrees?  I'm sure they were different years, but
 9    can you let me know that.
10       A.   Sure.  My first masters was 2000; second was 2012.
11       Q.   When did you first start doing work as an expert
12    witness?
13       A.   My first testimony was 2003 or 2001, maybe.
14            Kind of been working in this area since April of
15    1998.
16       Q.   And have you been providing expert testimony since
17    the early 2000's?
18            In other words, approximately 20 years?
19       A.   Yes.
20       Q.   Generally in the area of human factors?
21       A.   Human factors is generally a component in it, you
22    know, because I have a bit of a broader background, I'm also
23    involved in doing collision reconstruction.  I have a PE in
24    mechanical engineering.  So sometimes people want more than
25    one, you know, area.  They can have me as kind of filling two
```

1  roles.  I also do biomechanics.  That's sort of where I

2  started.  And so then I went into human factors.

3          So I kind of have all three roles in cases.

4      Q.  **Do you have any estimate as to how many cases in**

5  **total you have been retained on in the last 20 years?**

6      A.  I mean I can tell you that I generally open about

7  200 cases a year, and so we're probably getting on, you know,

8  early on in my career there were not that many.

9          Since 2010 there's been 200-plus a year every year.

10         So we're getting on probably 30-to 3500 cases.

11     Q.  **In your current caseload, any idea what that is?**

12     A.  I think I have opened 200-plus cases in 2022, and

13  then there is the carry-over ones from prior years that are

14  still going.

15     Q.  **And do you generally charge a retainer when you open**

16  **up a case?**

17     A.  I don't.

18     Q.  **You just wait until -- send out the billing when**

19  **appropriate?**

20     A.  Yes.

21     Q.  **And what do you charge per hour for your workup or**

22  **analysis?**

23     A.  I -- currently my rate is 420 an hour.

24         I was 380 until July first of this year, and so any

25  cases that opened before July 1 were at 380, and the change

 1    occurred after that.

 2        Q.   Did you increase your rate in part just because of

 3    inflation, or you thought it was time to give yourself a

 4    little bump, or what was your thinking?

 5        A.   All of these things as a human factors expert with

 6    as much experiences I have, I am probably behind the curb on

 7    what others charge, and, you know, for the number of cases I

 8    do.  So there's that.

 9             You know, I had added a few certifications this

10    year, you know, increasing my experience and qualifications,

11    and it was, you know, so it's kind of a combined two

12    reasons.

13        Q.   Okay.  And do you have an estimate as to how many

14    hours you've worked so far on this case?

15        A.   Yeah.  I'm at like 30 hours or something close to

16    that.  I have an assistant who does some work for me, and so

17    she did some of the summaries and some research.  So I think

18    my total bill to date was through November was about

19    $14,000.

20        Q.   And then have you spent some time on case since

21    November, like, for example, getting ready for the

22    deposition?

23        A.   Yes.  Saturday and then yesterday, and I think there

24    is probably a total of about eight hours there.

25        Q.   And am I understanding you correctly, that even

1    though you're doing about 200 cases a year, at least to date

2    you have not testified in court on an officer-involved

3    shooting case?

4        A.    That's correct.

5        Q.    And I know you have the one other officer-involved

6    shooting case with Ms. Rivera.

7              Do you have any other officer-involved shooting

8    cases right now?

9        A.    I think I have about a half dozen open right now.

10       Q.    And in those cases any of those cases the person

11   shot end up being unarmed?

12       A.    I think in all of those cases the person was

13   unarmed.  Like, one of them is a vehicular case where a

14   person in the vehicle was charging at an officer.  So I mean

15   they're, you know, unarmed by a firearm, but the other ones

16   they were unarmed at the time of shooting.

17       Q.    And in each of those cases, were you retained by the

18   attorneys representing the officers or the law enforcement

19   agency?

20       A.    Yes.

21       Q.    Okay.  And then you wrote a report at some point in

22   this case; is that correct?

23       A.    Yes.

24       Q.    And did you do your best to include your opinions

25   you had as of that time that you wrote your report, did you

**MICKEL ERICH LEWIS, JR., ET AL. vs KERN COUNTY, ET AL.**
Michael Kuzel on 12/20/2022                                    Page 46

1    be instantaneously have his front to the rear of the car as

2    he's starting to get out.

3            You would agree with that at least; correct?

4        A.   I would agree with that, yes.

5        Q.   He has to rotate in order to get his front towards

6    the back of the car?

7        A.   I would agree, yes.

8        Q.   And during that rotation other parts of his body are

9    going to be to the back of the car other than the front?

10       A.   Correct.  Yes.  Other parts of the body.

11       Q.   And we really don't know exactly when the shots

12   started because we don't have any audio of the shooting;

13   isn't that true?

14       A.   We don't have any audio of the shooting, that's

15   correct.

16       Q.   Okay.  And then in Paragraph 14, you quote, "Stress

17   and time pressure can distort sensory perception and

18   performance."

19            Do you see that sentence?

20       A.   Yes.

21       Q.   Do you believe that Deputy Ayala's sensory

22   perception was distorted?

23       A.   To -- I mean I -- we had no idea of knowing whether

24   he did or didn't experience sensory distortion, but it's

25   certainly a factor in how a person perceives an event, how

1    they act during the event, and then how they report the event

2    later.  So I'm not saying that this is, again, sort of a

3    summary of a literature.  I'm not specifically saying Deputy

4    Ayala experienced sensory perception or distortion of

5    perception.

6         Q.   Okay.  I'm just asking you because you included it

7    in your report.

8         A.   I mean, again, these are all factors that go into

9    understanding, you know, the why of, you know, when the

10   shooting occurs, why did Deputy Ayala shoot if ultimately

11   Mr. Lewis didn't have a handgun on him, but Deputy Ayala

12   perceived some level of threat that lead him to shoot.

13             And then later I mean, you know, how -- the second

14   as this is occurring, how is he encoding all of the kind of

15   information around him, you know, how does he -- how much

16   information is he taking in, and how is that being encoded,

17   and then later when he is asked to retrieve that information,

18   it may not be accurate because we experience sensory

19   distortions.

20        Q.   So are you saying that Deputy Ayala's description of

21   what happened may not be accurate because of this concept?

22        A.   Deputy Ayala's or Mr. Turletter's or anybody's.

23             I mean it's common misses, heard -- you know, heard

24   perception of it.  Destiny Salcedo --  I mean any of them who

25   are providing details.  I mean it can all be distorted

1   because of the stress and time pressures of things here.

2       Q.    But that would include Deputy Ayala?

3       A.    Sure.  Absolutely.

4       Q.    Okay.

5             MR. GALIPO:  So we have been going for a little over

6   an hour.  So if this is a good time for everyone, especially

7   our court reporter, I was thinking of taking a ten-minute

8   break.  Let's go off the record.

9             (Recess taken.)

10  BY MR. GALIPO:

11      Q.    I think I might have already asked you this, but the

12  individuals in the SUV, you did review their depositions as

13  well?

14      A.    Yes.

15      Q.    And do you recall whether they said whether

16  Mr. Lewis was completely in the car seated in the driver seat

17  facing forward when he went back in the car?

18      A.    I think you're asking me, and I think my response

19  was is it's going to be I don't recall what their exact

20  description was.  I don't know if that level of detail was

21  asked of them as to whether or not he was, you know,

22  completely in the car seated forward in a seated and looking

23  forward, or if it was just that he got back in the car and

24  was doing something.

25      Q.    Okay.  That's fine.

1   BY MR. GALIPO:

2       Q.   I totally agree with you.  I mean there is a lot of

3   different ways one could lean into a car.

4       A.   Agree.

5       Q.   And at least some of them would have his back

6   exposed to Deputy Ayala, potentially.

7       A.   I would agree that some and potentially, yes.

8       Q.   Okay.  So in Paragraph 2 on Page 7, you talk about

9   that Deputy Ayala likely experienced increased stress.

10          Do you see that?

11      A.   Yes.

12      Q.   And do you think the increased stress affected

13  Deputy Ayala's recall of what happened?

14      A.   It can play a role in affecting his recall, and it's

15  even more so not necessarily affecting his recall, but it's

16  effecting encoding of information.  It affects perception of

17  information because he can be focused on one aspect or area

18  of the scene and not see other parts of it.

19      Q.   All right.  Would you at least agree that you cannot

20  say exactly what Deputy Ayala was thinking at the time of the

21  shooting; is that fair?

22      A.   I cannot.  No one can.  That's correct.

23      Q.   So in Paragraph 3, you're talking about Ayala

24  describing his movements to get a better vantage point.

25      A.   Yes.

MICKEL ERICH LEWIS, JR., ET AL. vs KERN COUNTY, ET AL.
Michael Kuzel on 12/20/2022                                        Page 63

```
 1   that's why he shot.
 2       Q.   Okay.  Going to Page 8, Item 8, you reference the
 3   five shots with the concept of the perception-reaction
 4   time?
 5       A.   Yes.
 6       Q.   Paragraph 9, you're indicating the video doesn't
 7   actually capture the shooting?
 8       A.   Correct.  And we may have two muzzle flash events in
 9   the video, but it doesn't capture the shooting.
10       Q.   And could you tell where with regards to the
11   possible muzzle flash events could you discern where Deputy
12   Ayala was relative to the SUV at the time of those possible
13   muzzle flash events?
14       A.   No.  Because he is hidden from -- he's hidden from
15   view by the SUV at that point.
16       Q.   Okay.
17       A.   His whole body is, and we see him moving afterwards,
18   but not at the time of the shots.
19       Q.   Okay.  Could you tell, in other words, where the
20   muzzle flashes appear to be coming from or it's very
21   difficult?
22           In other words, behind the SUV or to the side of the
23   SUV?
24       A.   To the side of the SUV, but they don't appear to be
25   behind the SUV.
```

1  time passed from Mr. Lewis starting to get out of the car to

2  the first shot?

3      A.   General impression around a second, maybe two.

4      Q.   And in Number 4 you say he had less than one second

5  to decide whether to fire his weapon?

6      A.   Yes.

7      Q.   If, hypothetically, both of Mr. Lewis's hands were

8  visible to Deputy Ayala before any decision to shoot was

9  made, and they were both visibly empty, would you have the

10  same opinion that he had less than one second to decide

11  whether to fire?

12      A.   Depends -- depends when he's making that decision to

13  fire; right?  So we talked about this before; that if -- if

14  his threshold point of this is when Mr. Lewis is getting out

15  of the car and he can't see his right hand, and then as he

16  gets out of the car and now both hands out, but visibly

17  empty, Deputy Ayala's already decided to fire.  He's in that

18  phrase of going to -- going to the trigger pull, sure, I have

19  the same opinion.

20          It's -- it depends when Deputy Ayala's making that

21  decision and how Mr. Lewis has acted prior to that

22  decision.

23      Q.   So do you have an estimate as to how much time it

24  takes to perceive that someone's hands are visibly empty and

25  officer shouldn't shoot?

1      A.   It can be -- I mean you have to be able it see it;

2   right?  So like the amount of time -- this is not a kind of a

3   simple question.  Like I can see my hands and visibly quickly

4   assess them, but it depends where -- where they're coming

5   from and what I'm focused on and the other aspects of it.

6            And -- and where he is in that decision phase.

7            I think that's the critical part here; right?

8            Even though he may see afterward that the hands are

9   empty, the decision has already been made because of the

10   initial movements of Mr. Lewis where if Deputy Ayala doesn't

11   see his hand, now he's made that decision.  He's in the phase

12   of going to the action, and Mr. Lewis now comes out, both

13   hands are visible as the action is occurring, he may be able

14   to see at that time.

15            So I mean it's nearly instantaneous in the way of

16   light reflecting from the object and my eyes perceiving the

17   light on the object and seeing it.  It's the processing of

18   that information that really matters.

19      Q.   Yeah.  I guess what I'm saying is that, you know, in

20   terms of the perception-reaction time, if he sees the hands

21   are visibly empty, if he perceives it, what would be the

22   reaction time to stop shooting or not to shoot?

23      A.   Right.  I mean to stop shooting it could be -- it

24   could be a second, you know, two seconds, second and a half,

25   two seconds.  I mean he can -- at that point in time he is

1  going to keep as Mr. Lewis is coming toward him, he's got to

2  realize that this threat is not what I thought it was.

3          So he's got to actually look at the hands now and

4  not being focused on Mr. Lewis.  It really depends on where

5  he's focused.  If I see the hands, I've already made the

6  decision to shoot -- comes out -- I made the decision to

7  shoot, and it's in that motion as Mr. Lewis is coming around,

8  a shot's going to get fired.

9          Now if I'm focused on the hands, then -- then maybe

10  another shot or two gets fired.  I can stop, you know, but it

11  does take time, you know, to stop the shooting as well

12  because he's got to process that information.  It's new

13  information.

14    Q.    Paragraph 5, you again reference the ten feet away?

15    A.    Yes.

16    Q.    And that's an approximation, obviously?

17    A.    Yes.  And I mean it could be less.  It's -- it

18  really depends on where, relative to because it's not the

19  straight back.  It's the angle how far out that -- that

20  increases that distance.

21    Q.    And then Item 6, you're summarizing the shooting

22  sequence?

23    A.    Yes.

24    Q.    Item 7, you're talking about the differences in

25  different descriptions by different people?

1                          CERTIFICATE

2                              OF

3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

4

5            I, JINNA GRACE KIM, CSR No. 14151, a Certified

6    Stenographic Shorthand Reporter of the State of California,

7    do hereby certify:

8            That the foregoing proceedings were taken before me

9    at the time and place herein set forth;

10           That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12           That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15           Further, that the foregoing is an accurate

16   transcription thereof.

17           I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21           IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  December 20, 2022.

23

24   _____
            Jinna Grace Kim, CSR No. 14151
25

*Mickel Erick Lewis, Jr., et al. v. Kern County, et al.*
**United States District Court Case No. - 1:21-CV-00378-KES-CDB**
**[Consolidated with Case No. 1:21-CV-01352-DAD-JLT]**

# Exhibit F

```
 1                  UNITED STATES DISTRICT COURT

 2                  EASTERN DISTRICT OF CALIFORNIA

 3

 4    Mickel Erich Lewis, Jr., individually )
      and as successor-in-interest to       )
 5    Mickel E. Lewis, Sr., Oriona Lewis,   )
      individually and as successor-in-     )
 6    interest; and Briona Lewis,           )
      individually and as successor-in-     )
 7    interest,                             )
                                            )
 8                 Plaintiffs,              )
                                            )
 9                 vs.                      ) Case No.
                                            ) 1:21-CV-00378-DAD-SKO
10    Kern County, Deputy Jason Ayala, and  )
      DOES 1-2, inclusive,                  )
11                                          )
                   Defendants.              )
12    _____)
      R.L., M.L., and H.L., minors, by and  )
13    through guardian ad litem Roberta     )
      Haro, individually and as successors  )
14    in interest to Mickel Lewis, Sr.,     )
      deceased; A.W., a minor, by and       )
15    through guardian ad litem Alisha      )
      White, individually and as a          )
16    successor in interest to Mickel Lewis,)
      Sr., deceased; Alisha White,          )
17    individually and as a successor in    )
      interest to Mickel Lewis, Sr.,        )
18                                          )
                   Plaintiffs,              )
19                                          )
                   vs.                      )
20                                          )
      County of Kern; Jason Ayala; and      )
21    DOES 1-10, inclusive,                 )
                                            )
22                 Defendants.              )
                                            )
23    _____)

24

25
```

1

2

3

4

5          VIDEOTAPED REMOTE VIDEOCONFERENCE DEPOSITION OF

6                           JASON AYALA

7                      FRIDAY, JUNE 17, 2022

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    Reported Stenographically By:

24    Jinna Grace Kim, CSR No. 14151

25    Job No.:  397703

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF CALIFORNIA

 3

 4  Mickel Erich Lewis, Jr., individually )
    and as successor-in-interest to       )
 5  Mickel E. Lewis, Sr., Oriona Lewis,   )
    individually and as successor-in-     )
 6  interest; and Briona Lewis,           )
    individually and as successor-in-     )
 7  interest,                             )
                                          )
 8              Plaintiffs,               )
                                          )
 9              vs.                       ) Case No.
                                          ) 1:21-CV-00378-DAD-SKO
10  Kern County, Deputy Jason Ayala, and  )
    DOES 1-2, inclusive,                  )
11                                        )
                Defendants.               )
12  _____)
    R.L., M.L., and H.L., minors, by and )
13  through guardian ad litem Roberta     )
    Haro, individually and as successors  )
14  in interest to Mickel Lewis, Sr.,     )
    deceased; A.W., a minor, by and       )
15  through guardian ad litem Alisha      )
    White, individually and as a          )
16  successor in interest to Mickel Lewis,)
    Sr., deceased; Alisha White,          )
17  individually and as a successor in    )
    interest to Mickel Lewis, Sr.,        )
18                                        )
                Plaintiffs,               )
19                                        )
                vs.                       )
20                                        )
    County of Kern; Jason Ayala; and      )
21  DOES 1-10, inclusive,                 )
                                          )
22              Defendants.               )
                                          )
23  _____)

24

25
```

**MICKEL ERICH LEWIS, JR., ET AL. vs KERN COUNTY, ET AL.**
**Jason Ayala on 06/17/2022**                                      Page 25

```
 1   would you like?

 2       Q.    Whatever you're comfortable with.

 3       A.    Over -- over 20, 20 text messages, well over 20.

 4       Q.    How many times did you meet with her in-person?

 5       A.    I can recall one, one time in-person.

 6       Q.    And when -- where did you meet with her in person?

 7       A.    In the Mojave area.

 8       Q.    Where -- where was it?  Was it at a hotel or

 9   somewhere else?

10       A.    Somewhere else.

11       Q.    And what was the purpose of that in-person

12   meeting?

13       A.    To gather information on other people in the Mojave

14   area.

15       Q.    When was the last time you had seen her prior to the

16   day that you shot Mr. Lewis?

17       A.    I -- I don't know the date.  I don't have --

18       Q.    Do you know if it was a day before, a week before,

19   two weeks before?

20       A.    Several weeks before was the in-person contact.

21       Q.    And what information did she provide to you

22   regarding Mr. Lewis?

23       A.    Provided me information that he was selling

24   narcotics in Mojave, and that he was armed with a handgun and

25   a shotgun or a rifle-styled weapon.
```

1        Q.   Okay.  Any other information she provided you

2   regarding Mr. Lewis?

3        A.   Yes.  On -- on that night, on the night of the

4   shooting, yes, but before that, not very much.

5        Q.   What information did she provide you on the night of

6   the shooting?

7        A.   She told me that he had broken into her hotel room

8   which was next door, and he had threatened her life and her

9   children's life, and that he was armed with a firearm.

10       Q.   And what was the last part?

11       A.   Armed with a firearm.  He had firearm.

12       Q.   Okay.  And was this communication electronically?

13       A.   Yes.

14       Q.   And do you still have that communication if we were

15   to request for you to produce it?

16       A.   I believe the Sheriff's Office has it.

17            I provided it to them and they took photographs of

18   all the contacts.

19       Q.   Okay.  Do you know if a police report was generated

20   related to the alleged break-in or threats?

21       A.   It was -- that was close to the time of the incident

22   in discussion.  So the time of the shooting.  It was the same

23   night.

24       Q.   I'm just wondering, did you dispatch a police

25   officer to her hotel room?

```
 1     A.   He would have turned onto Mono Street.

 2     Q.   Is that M-o-n-o?

 3     A.   Yes.

 4     Q.   And did you pull behind him at some point?

 5     A.   I did, yes.

 6     Q.   And what was your intent?

 7          You were going to stop him for what at that point?

 8     A.   So I -- I had information through a criminal records

 9   check that he was on probation and information that he was

10   armed from my confidential informant.  And my intention was

11   to conduct a probation search of his vehicle and attempt to

12   locate a firearm.

13     Q.   Okay.  And did you communicate that intention over

14   the police radio?

15     A.   When I -- no.  Just conducting a traffic stop.

16     Q.   You didn't say over the police radio I'm pulling

17   someone over that I believe may be armed and I want to wait

18   for backup?

19     A.   No.

20     Q.   Why not?

21     A.   My backup was too -- was far -- was -- all of the

22   deputies were in Rosamond.  I was the only one in Mojave.

23     Q.   Okay.  But would you generally agree with me,

24   Deputy, that if you think someone is armed with a weapon,

25   it's good tactics to have a second officer there if you
```

```
 1                        CERTIFICATE

 2                            OF

 3           CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5           I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8           That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10           That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12           That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15           Further, that the foregoing is an accurate

16   transcription thereof.

17           I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21           IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  June 17, 2022.

23

24                           _____
                              Jinna Grace Kim, CSR No. 14151
25
```

*Mickel Erick Lewis, Jr., et al. v. Kern County, et al.*
**United States District Court Case No. - 1:21-CV-00378-KES-CDB**
**[Consolidated with Case No. 1:21-CV-01352-DAD-JLT]**

# Exhibit G

## In the Matter Of:

## MICKEL ERICK LEWIS JR. vs KERN COUNTY

1:21-CV-00378-NONE-JLT

---

## MARLYN KOMENENUS

*August 15, 2022*

---



800.211.DEPO (3376)
EsquireSolutions.com

1              UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF CALIFORNIA

3

4 MICKEL ERICK LEWIS JR.,
  individually and as
5 successor-in-interest to
  MICKEL E. LEWIS, SR.,
6 ORIONA LEWIS; and BRIONA
  LEWIS, individually and as
7 successor-in-interest,

8         Plaintiffs,

9         vs.          Case No. 1:21-CV-00378-NONE-JLT

10 KERN COUNTY Deputy JASON
   AYALA, and DOES 1-20,
11 inclusive,

12        Defendants.

13 ~~~~~~~~~~~~~~~~~~~~~~~~~~~

14

15

16

17                DEPOSITION OF

18             MARLYN KOMENENUS

19            AUGUST 15TH, 2022

20              10:17 A.M.

21

22         COMFORT INN & SUITES
            Mojave, California
23

24      Julia Foreman, CSR No. 13675

25



```
 1        A.   No.                                          10:43:36
 2        Q.   Who went into the store?                     10:43:37
 3        A.   He did.                                       10:43:39
 4        Q.   So you and your daughters stayed in the car? 10:43:44
 5        A.   Yes.                                          10:43:46
 6        Q.   Did you ever go into the Family Dollar that  10:43:54
 7   night?                                                  10:43:57
 8        A.   No.                                           10:43:57
 9        Q.   Now, you told the detectives for the         10:44:02
10   sheriff's department that at some point you took a     10:44:06
11   gun from Mr. Lewis's -- underneath his seat and took   10:44:08
12   it into your possession.                               10:44:14
13        Do I have that right?                             10:44:16
14        A.   No, no.  I didn't, I didn't find.  I just    10:44:17
15   seen it.  It was right there, and I took it fast       10:44:21
16   because I didn't want my daughters to see it.          10:44:25
17        Q.   Okay.                                        10:44:27
18        A.   And I put it in my possession and --         10:44:27
19        Q.   Okay.                                        10:44:30
20        A.   Yeah.                                         10:44:30
21        Q.   What was -- just to clarify, what was wrong, 10:44:31
22   what I said, that you didn't find it under the seat?   10:44:34
23        A.   No.  It was just right there in the, in the  10:44:37
24   front where you can see it, right there, and I took    10:44:40
25   it really fast.  I don't want my daughters seeing it   10:44:43
```



1 the area where you dropped the gun?                    11:42:40

2     A.  No, not exactly, but I -- doesn't seem like    11:42:45

3 exactly right there.  It was -- there was, like, dead  11:42:48

4 grass.                                                 11:42:52

5     Q.  Okay, okay.  I'll just go to the second page   11:42:52

6 here, and this is --                                   11:42:57

7     A.  Yes.                                           11:43:02

8     Q.  Okay.  This is KCSO 00186.  So what, what he   11:43:02

9 did was -- this is a telephone pole, and he drew in    11:43:13

10 "dead bush."                                           11:43:20

11         Do you see that?                              11:43:21

12     A.  Mm-hmm.                                        11:43:22

13     Q.  Then he drew in "gun."  Do you see that?      11:43:23

14     A.  Yes.                                           11:43:25

15     Q.  It's a yes?  Okay.  So does that refresh      11:43:26

16 your memory that you dropped the gun near a telephone  11:43:31

17 pole?                                                  11:43:35

18     A.  Yes.  That's dead grass; right?               11:43:38

19     Q.  Yeah.  I'll show you some more pictures.      11:43:43

20 Okay.  So these together are marked as Exhibit 13.     11:43:47

21 So let me show you another picture.  Okay.             11:43:50

22         Do you see this photo?  Let me get my hand    11:44:23

23 there where it says KCSO 00359?                        11:44:26

24     A.  Yes.                                           11:44:33

25     Q.  Okay.  So obviously, this -- it's nighttime   11:44:34



1 Our Assignment No. J8449111

2 Case Caption: MICKEL E. LEWIS, ET AL.

3 vs. KERN COUNTY, ET AL.

4          I, Julia Foreman, a Certified Shorthand

5 Reporter in the State of California, holding

6 Certificate Number 13675, do hereby certify that

7 Marlyn Konenenus, the witness named in the foregoing

8 deposition, was by me duly sworn; that said

9 deposition was taken Monday, August 15th, 2022, at

10 the time and place set forth on the first page

11 hereof.

12          That upon the taking of the deposition, the

13 words of the witness were written down by me in

14 stenotypy and thereafter transcribed by computer

15 under my supervision; that the foregoing is a true

16 and correct transcript of the testimony given by the

17 witness.

18          I further certify that I am neither counsel

19 for nor in any way related to any party to said

20 action, nor in any way interested in the result or

21 outcome thereof.

22          Dated this 24th day of August, 2022, at

23 Bakersfield, California.

24          Julia Foreman, CSR No. 13675

25



*Mickel Erick Lewis, Jr., et al. v. Kern County, et al.*
**United States District Court Case No. - 1:21-CV-00378-KES-CDB**
**[Consolidated with Case No. 1:21-CV-01352-DAD-JLT]**

# Exhibit H

**In the Matter Of:**

MICKEL E. LEWIS, ET AL. V KERN COUNTY, ET AL.

---

**MARLYN  KOMNEUS**

*October 02, 2020*

---



800.211.DEPO (3376)
EsquireSolutions.com

COK 01263

```
 1

 2

 3

 4

 5

 6

 7

 8             THE RECORDED INTERVIEW OF MARLYN KOMNENUS
                   AUDIO FILE:  Marlyn Komnenus
 9                      OCTOBER 2, 2020

10
       IN RE:  MICKEL E. LEWIS, ET AL. v. KERN COUNTY, ET AL.
11

12

13

14

15

16

17

18

19

20

21

22    Transcribed by:
      Christine Aiello
23
      J7944197-6
24

25
```



```
1                              * * *

2

3              DETECTIVE WONG:  This is Detective Wong and

4    Detective Nelson.  It is regarding Case No.

5    2020-00137643.  The time is 10/2 of 2020.  It's

6    2358 hours.  We're here at the intersection of Mono and

7    K Street.  And we're speaking with Marlyn, M-a-r-l-y-n,

8    Komnenus -- Komnenus --

9              MARLYN KOMNENUS:  Yes.

10             DETECTIVE WONG:  -- K-o-m-n-e-n-u-s, regarding

11   the incident that occurred here.  So, Marlyn, just to

12   -- just to kind of go, we want to find out exactly what

13   happened here tonight.  And you're obviously -- you

14   know, you're obviously a witness to that.  I just want

15   to get your statement generally what happened.  So

16   start from the very beginning until where we're at

17   right now, okay?

18             MARLYN KOMNENUS:  Uh-huh.

19             DETECTIVE WONG:  Go ahead.

20             MARLYN KOMNENUS:  Okay.  We were ordering food

21   at the Wienerschnitzel because his daughter works

22   there.  We were ordering food, right?

23             DETECTIVE WONG:  Okay.

24             MARLYN KOMNENUS:  The sheriff passes by.  We

25   didn't think nothing of it.  And when we're done, we
```



 1              MARLYN KOMNENUS:  No.

 2              DETECTIVE WONG:  Okay.  You mentioned that you

 3   heard -- you said you heard gunfire; is that right?

 4              MARLYN KOMNENUS:  There was gunfire, sir.

 5              DETECTIVE WONG:  Do you know how many rounds?

 6              MARLYN KOMNENUS:  Like three or four.

 7              DETECTIVE WONG:  What happened after that?

 8              MARLYN KOMNENUS:  That's when I -- I just, I

 9   took my girls out of the truck, and then I just came

10   right here because the sheriff told me afterward, he's

11   like go -- go that way.

12              DETECTIVE WONG:  Which -- which sheriff?  Oh,

13   the --

14              MARLYN KOMNENUS:  Yeah, the same.

15              DETECTIVE WONG:  Right over there, okay, okay.

16   What happened after that?

17              MARLYN KOMNENUS:  That's it.  That's -- and I

18   -- and I ran to him.  I ran to him.

19              DETECTIVE WONG:  Okay.

20              MARLYN KOMNENUS:  He was gone already.  He

21   wasn't even breathing.

22              DETECTIVE WONG:  Okay.  So I'm -- I'm going to

23   ask this question, and like I said, I don't know as far

24   as what's -- what's in the car or anything like that.

25   Is there anything illegal or anything like that I need



MARLYN  KOMNEUS                                    October 02, 2020
MICKEL E. LEWIS, ET AL. V KERN COUNTY, ET AL.                    13

1  to know about --

2            MARLYN KOMNENUS:  That, I don't --

3            DETECTIVE WONG:  -- in your purse or --

4            MARLYN KOMNENUS:  -- know.

5            DETECTIVE WONG:  -- in the car or anything

6  like --

7            MARLYN KOMNENUS:  No.

8            DETECTIVE WONG:  -- that?

9            MARLYN KOMNENUS:  All he had was his stuff --

10  his -- his stuff that -- his clothes.

11            DETECTIVE WONG:  Okay.

12            MARLYN KOMNENUS:  Like --

13            DETECTIVE NELSON:  Is that your car or his

14  car?

15            MARLYN KOMNENUS:  That's his car.

16            DETECTIVE NELSON:  That's his car.

17            DETECTIVE WONG:  Where were you at before

18  tonight -- or before here?

19            MARLYN KOMNENUS:  Where were we at before

20  here?

21            DETECTIVE WONG:  Yeah, before the

22  (indiscernible).

23            MARLYN KOMNENUS:  The Family Dollar store.

24            DETECTIVE NELSON:  Okay.

25            DETECTIVE WONG:  You were shopping or



```
1   STATE OF WASHINGTON)

2                     ) SS:

3   COUNTY OF WHATCOM  )

4

5

6

7

8              I, CHRISTINE AIELLO, do hereby certify

9   that I transcribed the audio, and that the foregoing is

10  a true and complete transcription of the audio

11  transcribed under my personal direction.

12             IN WITNESS WHEREOF, I do hereunto set my

13  hand at Blaine, Washington, this 23rd day of February,

14  2022.

15

16

17

18

19             _____

20                  Christine Aiello

21

22

23

24

25
```



800.211.DEPO (3376)
EsquireSolutions.com
COK 01257