MARGO A. RAISON, COUNTY COUNSEL
Kimberly L. Marshall, Deputy (SBN 186838)
Andrew C. Hamilton, Deputy (SBN 299877)
Kern County Administrative Center
1115 Truxtun Avenue, Fourth Floor
Bakersfield, CA 93301
Telephone: (661) 868-3800
Facsimile: (661) 868-3805
ahamilton@kerncounty.com
marshallkim@kercounty.com

Attorneys for Defendant County of Kern

James D. Weakley, Esq. (SBN 082853)
Brande L. Gustafson, Esq. (SBN 267130)
**WEAKLEY & ARENDT**
A Professional Corporation
5200 N. Palm Avenue, Suite 211
Fresno, California 93704
Telephone:  (559) 221-5256
Facsimile:  (559) 221-5262
Jim@walaw-fresno.com
Brande@walaw-fresno.com

Attorneys for Defendant Deputy Jason Ayala

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICKEL ERICK LEWIS JR., individually and as successor-in-interest to MICKEL E. LEWIS, SR., ORIONA LEWIS; and BRIONA LEWIS, individually and as successor-in-interest,<br><br>Plaintiff,<br><br>vs.<br><br>KERN COUNTY, Deputy JASON AYALA, and DOES 1-20, inclusive,<br><br>Defendant. | Case No. 1:21-CV-00378-KES-CDB<br>*Consolidated with Case No.*<br>*1:21−CV−01352−DAD−JLT*<br><br>**DEFENDANTS COUNTY OF KERN AND JASON AYALA'S MOTION FOR A NEW TRIAL (Fed.R.Civ.P. 59)**<br><br>*Filed concurrently with:*<br>*Declaration of Andrew C. Hamilton.* |
| R.L., M.L., and H.L., minors, by and through guardian *ad litem* Roberta Haro, individually and as successors in interest to Michel Lewis Sr., deceased; A.W., a minor, by and through her guardian *ad litem* Alisha White, individually and as a successor in interest to Michel Lewis Sr., deceased; ALISHA WHITE, individually and as a successor in interest to Mickel Lewis Sr.,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF KERN; JASON AYALA; and DOES 1-10, inclusive,<br><br>Defendants. | Judge: Hon. District Judge Kirk E. Sherriff<br>Department: 6<br>Date: June 16, 2025<br>Time: 1:30 p.m. |

/ / /

/ / /

1

## NOTICE OF MOTION AND MOTION FOR A NEW TRIAL

2      **NOTICE IS HEREBY GIVEN** that on June 16, 2025, at 1:30 p.m., or as soon thereafter as

3 the matter may be heard by Judge Kenneth E. Sherriff, in Department 6, of the above entitled Court,

4 located at the Federal District Court located at 2500 Tulare Street, Fresno, CA 93721, Defendants

5 County of Kern and Deputy Jason Ayala will, and hereby do, move for a new trial on the grounds

6 stated herein pursuant to Fed. R. Civ. P. 59. Defendants have filed a concurrent renewed motion for

7 judgment as a matter of law under Fed. R. Civ. P. 50(b). Pursuant to Rule 50(b), should the Court

8 deny that motion, Defendants request that, in the alternative, the Court order a new trial or remittitur.

9      This motion is based upon this notice, the attached memorandum of points and authorities,

10 the Declaration of Andrew C. Hamilton, the court file in this matter, and oral argument. The steps

11 taken to meet and confer are as set forth in the Declaration of Andrew C. Hamilton.

12 Dated: April 18, 2025                        Respectfully Submitted,

13                                              MARGO A. RAISON, COUNTY COUNSEL

14                                              By: /s/ Andrew C. Hamilton _____
                                                   Kimberly L. Marshall, Deputy
15                                                 Andrew C. Hamilton, Deputy
                                                   Attorneys for County of Kern
16

17                                              WEAKLEY & ARENDT, APC

18                                              By: /s Brande L. Gustafson _____
                                                   James D. Weakley, Esq.
19                                                 Brande L. Gustafson, Esq.
                                                   Attorneys for Jason Ayala
20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION FOR A NEW TRIAL..........................................................ii

TABLE OF AUTHORITIES ............................................................................................................. v

MOTION FOR A NEW TRIAL .........................................................................................................1

I.       INTRODUCTION ...................................................................................................................1

II.      APPLICABLE STANDARDS ON A MOTION FOR A NEW TRIAL ................................1

III.     ARGUMENT ..........................................................................................................................2

A.     A Verdict Should Be Set Aside Where It Is Against the Clear Weight of the Evidence, is based on Evidence Which Is False, or Will Result in a Miscarriage of Justice............................2

B.     The Evidence of the Handgun and Drug Use Were Relevant and Admissible. .................2

    1.     Defendants' Evidence of the Gun in Decedents' Vehicle Is Highly Relevant and Admissible. ...................................................................................................................................5

    2.     Defendants' Evidence of Lewis' History of Drug Use and Sales Were Highly Relevant and Admissible. ...........................................................................................................7

C.     Lewis' History of Drug Use and Criminal History Were Relevant to Damages...............8

D.     The Trial Court Should Have Allowed Defendants to Submit Special Interrogatories to the Jury to Help Determine the Issue of Qualified Immunity........................................................10

    1.     The defense of qualified immunity hinges on the reasonable-ness of officers' conduct, which is a legal question for a court. When the facts are disputed, jurors must resolve them, and the court then applies the law to their findings........................................10

    2.     The jury must answer factual interrogatories in special verdicts because raising qualified immunity issues in Rule 50 motions is futile when parties dispute the facts. ........11

    3.     The district court erred in refusing to supply the jury with a verdict form designed to resolve the key factual disputes necessary to adjudicate officers' qualified immunity defense. ......................................................................................................................................13

    4.     Plaintiffs cannot carry their burden of showing that the district court's error was harmless. ....................................................................................................................................15

E.     A New Trial Is Required to Remedy the Violation of the Lump-Sum Rule. ..................15

    1.     Under California law, the jury must award heirs a lump sum. The trial judge, not the jury, then apportions the lump sum among the heirs. ..........................................................15

    2.     The Court violated the lump-sum verdict rule. ......................................................17

    3.     The Court's error was prejudicial. .........................................................................18

F.     The Court Improperly Excluded Impeachment Evidence In Connection With Plaintiffs' Police Practices Expert. ..........................................................................................................18

G.    The Trial Court Improperly Excluded Defendants' Human Factors Expert.................. 19

H.    The *Bane Act* instruction was erroneous......................................................... 20

I.    A New Trial Is Proper Because It Is Likely the Jury's Award to Plaintiffs Was Excessive. In the Alternative, the Court Should Grant a Remittitur............................ 21

    1.    The Award for Pre-death Pain and Suffering Was Excessive and Not Supported by Any Evidence.......................................................................................... 22

    2.    The Award for Plaintiff's Pecuniary Loss Is Likely the Result of Confusion or an Improper Basis.......................................................................................... 22

IV.    CONCLUSION.............................................................................................. 24

Defendants' Motion for a New Trial

# TABLE OF AUTHORITIES

**Cases**

*Acosta v. City & Cnty. of S. F.*, 83 F.3d 1143 (9th Cir. 1996)....................................10, 11

*Act Up!/Portland v. Bagley*, 988 F.2d 868 (9th Cir. 1993).................................................12

*Allen v. Toledo*, 109 Cal.App.3d 415, 423 (1980) ..............................................................9

*Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001)..............................................................4

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) ..........................................................10

*Barnard v. Theobald*, 721 F.3d 1069 (9th Cir. 2013) ........................................................12

*Barrett v. Superior Court*, 222 Cal.App.3d 1176 (1990).....................................................9

*Borquez v. City of Tucson*, 475 F. App'x 663 (9th Cir. 2012)...........................................12

*Boyd v. City & Cnty. of San Francisco*, 576 F.3d 938 (9th Cir. 2009 ............................3, 4

*Butz v. Economou*, 438 U.S. 478 (1978)............................................................................13

*Canavin v. Pac. Sw. Airlines*, 148 Cal. App. 3d 512 (Cal. Ct. App. 1983) ......................17

*Castro v. Cnty. of L.A.*, 2015 U.S. Dist. LEXIS 103945, *11, 2015 WL 4694070 (C.D. Cal. Aug 3, 2015)...........................................................................................................................8

*Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014) ....................................20

*Conner v. Heiman*, 672 F.3d 1126 (9th Cir. 2012) ......................................................10, 13

*Corder v. Corder*, 41 Cal. 4th 644 (2007) ...................................................................16, 17

*Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014)...........................................3, 6, 15

*Dang v. Cross*, 422 F.3d 800 (9th Cir. 2005) ...................................................................20

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422 (9th Cir. 1996), aff'd, 526 U.S. 687 (1999)..................................................................................................22

*Devenpeck v. Alford*, 543 U.S. 146 (2004) ........................................................................5

*Dominguez v. City of Los Angeles*, cv17-4557-DMG (PLAx) 2018 WL 6164278 (C.D. Cal., Oct. 9, 2018)...........................................................................................................................20

*Est. of Casillas v. City of Fresno*, No. 1:16-CV-1042 AWI-SAB, 2019 WL 586747, at *3 (E.D. Cal. Feb. 13, 2019)..................................................................................................8

*Estate of Phounsy v. County of San Diego et al.*, JVR No. 2006040008, 2022 WL 1750521 (S.D.Cal.)...........................................................................................................................22

*Estate of Picket v. County of San Bernardino, et al.*, JVR No. 2001060032, 2018 WL 10230033 (C.D.Cal.) ...............................................................................................................................22

*Experience Hendrix*, 762 F.3d at 842 .............................................................................................2

*Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415 (1996) ...........................................................21

*Gates v. Rivera*, 993 F.2d 697 (9th Cir. 1993)...............................................................................8

*George v. Morris*, 736 F.3d 829 (9th Cir. 2013 ...........................................................................14

*Gonzales v. Duran*, 590 F.3d 855 (10th Cir. 2009) .............................................................11, 12

*Gros v. Port Washington Police Dist.*, 944 F. Supp. 1072 (E.D.N.Y. 1996) ...............................12

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ..................................................................................13

*Hernandez v. Fujioka, supra*, 40 Cal.App.3d 294 .......................................................................16

*Hunter v. Bryant*, 502 U.S. 224 (1991) ........................................................................................10

*Illinois v. Wardlow*, 528 U.S. 119 (2000)......................................................................................6

*Jackson v. County of San Bernardino*, 194 F.Supp.3d 1004 (C.D. Cal., July 5, 2016)....................7

*Johnson v. Breeden*, 280 F.3d 1308 (11th Cir. 2002) ...................................................................11

*Kelley v. LaForce*, 288 F.3d 1, 7 (1st Cir. 2002) .........................................................................12

*Kling v. Varastehpour*, No. B308292, 2023 WL 3050625, at *1 (Cal. Ct. App. Apr. 24, 2023) ......23

*Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365 (9th Cir. 1987)...................................2

*Lessin v. Ford Motor Company*, 2024 WL 5007092 (S.D. Cal., Oct. 31, 2024).............................20

*Littrell v. Franklin*, 388 F.3d 578 (8th Cir. 2004).........................................................................12

*Mahach-Watkins v. Depee*, 2007 WL 3238691, at *2 (N.D. Cal. Oct. 31, 2007) ..............................8

*Malley v. Briggs*, 475 U.S. 335 (1986.........................................................................................10

*Mattos v. Agarano*, 661 F.3d 433(9th Cir. 2011)..........................................................................13

*Molski v. M.J. Cable, Inc.*, 481 F.3d 724 (9th Cir. 2007) ...............................................................2

*Murphy v. City of Long Beach*, 914 F.2d 183 (9th Cir. 1990).....................................................2, 20

*N.W. v. City of Long Beach*, 2016 WL 9021966, at *5-6 (C.D. Cal. June 7, 2016) ...........................8

*Nelson v. Cnty. of Los Angeles*, 113 Cal. App. 4th 783 (2003) .............................................16, 23

*P.C. v. City of L.A.*, 2011 U.S. Dist. LEXIS 165075, *7-8 (C.D. Cal. August 22, 2011) .................8

*Pearson v. Callahan*, 555 U.S. 223 (2009)..........................................................................10, 13

1  *People v. Mims,* 9 Cal.App.4th 1244 (1992)..................................................................6

2  *Rakovich v. Wade*, 850 F.2d 1180 (7th Cir. 1988)......................................................12

3  *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703 (9th Cir. 2010).................11

4  *Ryder v. City of Topeka*, 814 F.2d 1412 (10th Cir. 1987)...........................................7

5  *Sanders v. City of Newport*, 657 F.3d 772 (9th Cir. 2011) .....................................15, 18

6  *Saucier v. Katz*, 533 U.S. 194 (2001) ........................................................................13

7  *Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994)..........................................................14

8  *See Gonzales v. S. Cal. Edison Co.*, 77 Cal. App. 4th 485 (1999).................................17

9  *Simmons v. Superior Court* (2016) 7 Cal.App.5th 1113................................................21

10 *Simoneau v. Pac. Elec. Ry. Co.*, 159 Cal. 494 (1911)..................................................17

11 *Sloman v. Tadlock*, 21 F.3d 1462 (9th Cir. 1994)..................................................10, 12

12 *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) ..............................................13

13 *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992)..........................................................3

14 *Thompson v. Hubbard*, 257 F.3d 896 (8th Cir. 2001)................................................6, 7

15 *Torres v. City of L. A.*, 548 F.3d 1197 (9th Cir. 2008)..............................................11

16 *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075 (9th Cir. 2009) ...................11, 12

17 *Turner v. County of Kern*, No. 1:11-cv-1366-AWI-SKO, 2014 WL 560834, at *2 (E.D. Cal., Feb. 13, 2014)..................................................................................................7

18

19 *U.S. v. Engelbrecht*, 993 F.2d 885 (9th Cir. 1993) ...................................................19

    *United States v. Beardslee*, 197 F.3d 378 (9th Cir. 1999) .........................................19

20  *United States v. Green*, 648 F.2d 587 (9th Cir. 1981) ...............................................19

21  *Valtierra v. City of Los Angeles*, 99 F. Supp. 3d 1190 (C.D. Cal. 2015).........................8

22  *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997)..................12

23  *Warren v. Dwyer*, 906 F.2d 70 (2d Cir. 1990)..........................................................12

24  *Watkins v. Nutting*, 17 Cal. 2d 490 (1941)...............................................................16

25  *White v. Ford Motor Co.*, 312 F.3d 998 (9th Cir. 2002)............................................20

26  *Young v. Killeen*, 775 F.2d 1349 (5th Cir. 1985).........................................................4

27

28

Defendants' Motion for a New Trial

**Statutes**

42 U.S.C. § 1983 ..................................................................................................................8, 20

California Civil Code section 52.1 ...................................................................................20

California Code of Civil Procedure § 377.34 ...................................................................16

California Code of Civil Procedure § 377.60 ...................................................................15

California Code of Civil Procedure § 377.61 ...................................................................16

Code of Civil Procedure § 872.010...................................................................................16

Penal Code § 290 ...............................................................................................................9

**Rules**

Federal Rules of Civil  Procedure, Rule 50 .......................................................11, 12, 14

Federal Rules of Civil Procedure, Rule 59(a).................................................................1, 2

Federal Rules of Evidence, Rule 403...........................................................................2, 5, 7

Federal Rules of Evidence, Rule 801 ................................................................................19

**Treatises**

9B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2506 n.7 (3d ed. 2008)...........................................................................................................................12

**Jury Instructions**

California Civil Jury Instructions (CACI) No. 3066 ........................................................21

California Civil Jury Instructions (CACI) No. 3922 (2014).............................................16

**Legal Reference**

Laurie R. Kuslansky, *5 Signs Your Verdict Form is Problematic*, The Litigation Consulting Report (July 2, 2013, 2:05 PM)........................................................................................................18

Defendants' Motion for a New Trial

## MOTION FOR A NEW TRIAL

### I.    INTRODUCTION

Between March 11 and 19, 2025, the seven Plaintiffs and Defendants County of Kern and Jason Ayala engaged in a five-day jury trial. During the trial, the Court excluded Defendants' evidence of decedent Mickel Lewis, Sr.'s ("Lewis") handgun that was actually in his vehicle and his drug use which would have corroborated Deputy Jason Ayala's ("Deputy Ayala") testimony about what he saw and explained Lewis' actions the night of the shooting. The Court excluded Defendants' evidence of Lewis' criminal and drug use history which would have discredited Plaintiffs' testimony of their relationship with Lewis. The Court prohibited Defendants from effectively cross-examining Plaintiffs' police practices expert on his false testimony about the record of the case and refused to offer a curative instruction. The Court excluded Defendants' human factors expert even though he was well qualified to testify as to Deputy Ayala's perception and reaction under stress. The Court refused to issue special interrogatories to the jury, depriving Deputy Ayala of the defense of qualified immunity. The Court issued an erroneous instruction on the Bane Act claim. Each error on its own prejudiced Defendants and deprived the jury of the opportunity to hear a complete record of the events that transpired the night of the shooting. The cumulative effect of these rulings was one-sided and overwhelming against Defendants. Plaintiffs unfairly used every exclusion to their advantage to throw doubt upon Deputy Ayala's testimony, paint a one-sided and rosy picture of Plaintiffs' relationship with Lewis, deprive Deputy Ayala of his legal defenses, and maximize their damages award. The trial resulted in the third highest Fourth Amendment excessive force damages award in California, the second highest award for an officer involved shooting, and the highest excessive force award in California *ever* without punitive damages. The only remedy is a new trial.

### II.    APPLICABLE STANDARDS ON A MOTION FOR A NEW TRIAL

Under Rule 59(a) of the Federal Rules of Civil Procedure, a court may "grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59 (a)(1)(A). Those include that the damages awarded are "excessive," the "trial was not fair to the moving party," or that the verdict is "contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage

1  of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (internal quotation marks

2  omitted). Unlike a motion for judgment as a matter of law, when considering a motion for new trial

3  under Rule 59, the court "can weigh the evidence and assess the credibility of the witnesses."

4  *Experience Hendrix*, 762 F.3d at 842. And the court is "not limited to the grounds a party asserts to

5  justify a new trial, but may sua sponte raise its own concerns" about the verdict.  *Id.*

6  **III.    ARGUMENT**

7          **A.    A Verdict Should Be Set Aside Where It Is Against the Clear Weight of the**

8                  **Evidence, is based on Evidence Which Is False, or Will Result in a Miscarriage**

9                  **of Justice.**

10         "If, having given full respect to the jury's findings, the judge on the entire evidence is left with

11 the definite and firm conviction that a mistake has been committed, it is to be expected that he will

12 grant a new trial." *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371–72 (9th Cir.

13 1987). A district judge has "the right, and indeed the duty, to weigh the evidence as he saw it, and to

14 set aside the verdict of the jury, even though supported by substantial evidence, where, in his

15 conscientious opinion, the verdict is contrary to the clear weight of the evidence, or . . . to prevent, in

16 the sound discretion of the trial judge, a miscarriage of justice." *Murphy v. City of Long Beach*, 914

17 F.2d 183, 187 (9th Cir. 1990). In making this determination, "[t]he judge can weigh the evidence and

18 assess the credibility of witnesses, and need not view the evidence from the perspective most

19 favorable to the prevailing party." *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371

20 (9th Cir. 1987). As explained in the renewed motion for judgment as a matter of law, the verdict is

21 contrary to the clear weight of the evidence, and Defendants ask the court to issue a new trial to

22 prevent a miscarriage of justice.

23         **B.    The Evidence of the Handgun and Drug Use Were Relevant and Admissible.**

24          "The court may exclude relevant evidence if its probative value is *substantially* outweighed

25 by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the

26 jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403

27 (emphasis added). " 'Evidence is unfairly prejudicial if it "makes a conviction more likely because it

28 provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude

1   toward the defendant *wholly apart from its judgment as to his guilt or innocence of the crime*

2   *charged*." ' " *Boyd v. City & Cnty. of San Francisco*, 576 F.3d 938, 947 (9th Cir. 2009) (citations

3   omitted, original emphasis). The Sixth Circuit has noted: "We must avoid substituting our personal

4   notions of proper police procedure for the instantaneous decision of the officer at the scene. We must

5   never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex

6   world that policemen face every day. What constitutes 'reasonable' action may seem quite different

7   to someone facing a possible assailant than to someone analyzing the question at leisure." *Smith v.*

8   *Freland*, 954 F.2d 343, 347 (6th Cir. 1992).

9          The case *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) is much like this one.

10  In that case, an informant told officers that Cruz was armed with a handgun. *Id.*, at 1078. "The

11  informant also reported that Cruz was carrying the gun in his waistband and had made it clear that

12  'he was not going back to prison.' " *Id*. The officers conducted a traffic stop of Cruz's vehicle, and

13  Cruz briefly attempted to escape. *Id*. "Cruz opened his door, and the police shouted at him to get on

14  the ground as he was emerging from the vehicle. According to four of the officers, he ignored their

15  commands and instead reached for the waistband of his pants. Fearing that he was reaching for a gun,

16  all officers opened fire. They fired about twenty shots in two to three seconds." *Id.* Much like

17  Terletter and Montoya, the third-party witnesses in this case, the third party witness in *Cruz* had a

18  view that was partially obstructed: "A bystander, Norman Harms, witnessed most of the event from

19  the other side of Cruz's vehicle, but he could only see Cruz's feet and the top of his head at the time

20  of the shooting, so he didn't see whether Cruz reached for his waistband." *Id*. Like this case, the

21  officers believed, but did not actually know, that Cruz had a gun in his possession. "After they ceased

22  firing, the officers approached Cruz's body to find it tangled in his seat belt and hanging from it. After

23  they cut the body loose, they found no weapon on it, but a loaded nine-millimeter was later recovered

24  from the passenger seat." *Id*.

25         The Ninth Circuit found that the existence of a gun was relevant to the officers' credibility

26  and, ultimately, their defense.

27         It would be unquestionably reasonable for police to shoot a suspect in Cruz's position
       if he reaches for a gun in his waistband, or even if he reaches there for some other

28     reason. Given Cruz's dangerous and erratic behavior up to that point, the police would

1 doubtless be justified in responding to such a threatening gesture by opening fire.
2 Conversely, if the suspect doesn't reach for his waistband or make some similar
   threatening gesture, it would clearly be unreasonable for the officers to shoot him after
3 he stopped his vehicle and opened the door. At that point, the suspect no longer poses
   an immediate threat to the police or the public, so deadly force is not justified.

4 *Id.,* at 1078–79.

5       The Ninth Circuit found that the existence—or non-existence—of a gun in decedent's

6 waistband would be relevant to corroborate the officer's testimony to a jury (finding summary

7 judgment improper). "[I]n the deadly force context, we cannot 'simply accept what may be a self-

8 serving account by the police officer.' Because the person most likely to rebut the officers' version

9 of events—the one killed—can't testify, '[t]he judge must carefully examine all the evidence in the

10 record . . . to determine whether the officer's story is internally consistent and consistent with other

11 known facts.' This includes 'circumstantial evidence that, if believed, would tend to discredit the

12 police officer's story.' " *Id.* at 1079. "In this case, there's circumstantial evidence that could give a

13 reasonable jury pause. Most obvious is the fact that Cruz didn't have a gun on him, so why would he

14 have reached for his waistband?" *Id.*[1]

15       The case *Boyd v. City & Cnty. of San Francisco*, 576 F.3d 938, 943 (9th Cir. 2009) is also

16 instructive. In *Boyd*, the decedent was killed by officers after attempting to kidnap two women and

17 engaging in a high-speed pursuit through San Francisco.

18       Cammerin finally stopped his vehicle on Larch Way in San Francisco and was quickly
   surrounded by San Francisco police officers, who approached the vehicle with their
19 guns drawn. The police ordered Cammerin out of the vehicle and, when he emerged,
   commanded him to put his hands up and get down on the ground. Witnesses testified
20 that Cammerin put his hands up but did not get on the ground; instead, he walked
   towards the officers and then back to the SUV. When Officer Paine perceived that
21 Cammerin did not comply fully with the commands, but instead reached back into the
   vehicle, Officer Paine fired three times, striking Cammerin twice and fatally wounding
22 him.

23 *Id.* at 942. The Ninth Circuit determined that the trial court did not err in admitting, among other

24

---

25 [1] As the Fifth Circuit held in *Young v. Killeen*, 775 F.2d 1349 (5th Cir. 1985), if a suspect's
   movements give an officer cause to believe that there was a threat of serious physical harm, then the
26 use of deadly force is not a constitutional violation because "no right is guaranteed by federal law
   that one will be free from circumstances where he will be endangered by the misinterpretation of his
27 acts." *Id.* at 1353; *see also Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001) (finding no
   constitutional violation when suspect, who police believed was armed, was shot while reaching into
28 his waistband to turn off the music playing on his Sony Walkman because "[a]ny reasonable officer
   in Russell's position would have imminently feared for his safety and the safety of others.").

1  evidence, evidence of decedent's attempts to kidnap two women and the likely incarceration he would

2  have faced had he survived, and evidence that decedent had drugs in his system at the time he was

3  shot. *Id*. at 944-945. The evidence that decedent was on drugs was relevant to support the police's

4  assertions he was acting erratically at the time of the shooting, even if the officers did not have actual

5  knowledge of his toxicology. *Id*., at 944. Decedent's criminal history, particularly the two attempted

6  kidnappings preceding the high-speed chase, were relevant to decedent's motivation (suicide by cop).

7  *Id*., at 944-945.

8          1.      ***Defendants' Evidence of the Gun in Decedents' Vehicle Is Highly Relevant***

9                  ***and Admissible.***

10         The court improperly excluded evidence that there was a handgun in Lewis' vehicle under

11 Fed. R. Evid. 403. Pretrial Trn., at pp. 41:2-43:9; R.T. at 49:15-54:20. *See Devenpeck v. Alford*, 543

12 U.S. 146, 153 (2004) ("Our cases make clear that an arresting officer's state of mind (*except for the*

13 *facts that he knows*) is irrelevant to the existence of probable cause." (Emphasis added.)).

14         Here, Deputy Ayala had preexisting knowledge that Lewis had a gun in his possession. R.T.,

15 at p. 69:11-13. The evidence revealed that Deputy Ayala had once pulled over a female who became

16 a confidential informant. R.T., at pp. 62:4-16.  This woman was an ex-girlfriend of Mr. Lewis. R.T.,

17 at pp. 66:13-16, 205:3-5. The informant specifically told Deputy Ayala that Lewis was involved in

18 criminal activity *and had a gun*. R.T., at pp. 69:11-13, 164:14-22, 165:16-166:7. A background search

19 revealed Lewis was on probation. R.T., at pp. 164:14-165:2. Furthermore, on October 2, 2020, the

20 informant texted Deputy Ayala that Lewis had burst into her motel room, threatened her and her

21 children, and had a handgun. R.T., at pp. 69:11-13, 160:16-161:7, 165:16-166:19.

22         In fact, Marlyn Komenenus, Lewis's front seat passenger, told Deputy Wong in a recorded

23 interview that she found the gun under Lewis' seat and removed it. (Video Deposition of Marlyn

24 Komenenus (audio of interview), Defense Exhibit JJ, at 48:26 (11:31:08 a.m.) – 53:20 (11:35:03

25 a.m.).) Had the Court allowed evidence of the gun, Defendants would have had the opportunity to

26 ask Komenenus about the gun in Lewis' vehicle and where she found it.

27         In this case, Deputy Ayala testified that a confidential informant told him Lewis had a gun,

28 that Lewis panicked when Deputy Ayala told Lewis he was going to search Lewis's vehicle, that

–5–

1  Lewis returned to his vehicle and appeared to be searching for a gun under his seat. Here, the existence

2  of the handgun in the vehicle was circumstantial evidence that could have given the jury a reason to

3  believe Deputy Ayala's testimony.[2] The fact that there was a gun in the vehicle—as had been

4  specifically told to Ayala before the encounter with Lewis—would have corroborated Deputy Ayala's

5  testimony that the informant was reliable, that Deputy Ayala reasonably believed there was a gun in

6  Lewis' vehicle, and that Lewis appeared to be searching for something in the vehicle. Rather, the

7  exclusion of the gun prejudiced the defendants by giving jury a reason (which was contrary to the

8  evidence) to doubt Deputy Ayala's version of events. *See*, *e.g.*, R.T., at pp. 905:24-906:8 (Plaintiffs'

9  closing argument).

10      The evidence of the gun also would have explained Lewis's conduct at the time. Combined

11  with the fact that Lewis was on felony probation, the existence of the gun in Lewis' vehicle explains

12  why Lewis panicked at the news Ayala was going to search his vehicle, explains why Lewis returned

13  to the vehicle without closing the door as if he were prepared to leave, explains why Lewis searched

14  under the seat, and explains Lewis's desperation and why he became aggressive and charged towards

15  Deputy Ayala (tending also to corroborate the testimony of Ayala, Terletter, and Montoya).

16      *Cruz* demonstrates that while admitting the evidence of the gun may have had some

17  prejudicial effect—as all relevant evidence does—against the Plaintiffs, excluding the evidence of

18  the gun had at least an equally prejudicial effect against Defendants to undermine Deputy Ayala's

19  credibility. However, admitting the evidence of the gun would have been consistent with the actual

20  facts of the incident. To wit, at closing argument Plaintiffs were able to unfairly argue there was

21  nothing to corroborate Deputy Ayala's testimony about Lewis' actions and the informant, throwing

22  doubt onto his testimony, while Defendants were deprived of their ability to use the actual existence

23  of a gun to corroborate Deputy Ayala's testimony. In *Thompson v. Hubbard*, 257 F.3d 896 (8th Cir.

24  2001), the decedent's estate attempted to argue that the officer's force was unreasonable because the

25  officer never saw a weapon on the decedent and the officer "should have considered the fact that the

26

27  _____

    [2] The Supreme Court has held that, "[h]eadlong flight . . . is the consummate act of evasion:  It is not
28  necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528
    U.S. 119, 124 (2000); *see also People v. Mims*, 9 Cal.App.4th 1244, 1249 (1992).

waistband of Thompson's sweat pants may not have been strong enough to hold a gun." *Id.* at 899. The Eighth Circuit disagreed, noting that "*[a]n officer is not constitutionally required to wait until he sets eyes upon the weapon before employing deadly force to protect himself against a fleeing suspect who turns and moves as though to draw a gun.*" *Id.* (emphasis added); *see also Ryder v. City of Topeka*, 814 F.2d 1412, 1419 n.16 (10th Cir. 1987) (concluding that, because a requirement that a suspect actually have a weapon would place police in "a dangerous and unreasonable situation . . . whether a particular seizure is reasonable is dependent on the 'totality of the circumstances,' and not simply on whether the suspect was actually armed."). Had the jury known about the gun, it could have very reasonably concluded that the only reason Deputy Ayala is alive is because Komenenus had removed the gun from where Lewis could find it. The exclusion of this evidence prejudiced the defendants at trial, and a new trial is necessary.

> ## 2. *Defendants' Evidence of Lewis' History of Drug Use and Sales Were Highly Relevant and Admissible.*

The court excluded evidence of Lewis' previously unrelated drug use and evidence of prior drug sales not known to Deputy Ayala under Fed. R. Evid. 403. Pretrial Conf. Trs. 28:16-33:12. This included expert testimony about the levels of methamphetamine in his system, as well photographs from the scene that his vehicle contained significant drug paraphernalia.

The excluded testimony of Dr. Ayako Chan-Hosokawa would have established that Lewis was intoxicated on methamphetamine at the time of the incident. This evidence would have corroborated Deputy Ayala's testimony that (1) he observed symptoms in Lewis that made him believe Lewis was on methamphetamine and (2) that Lewis became erratic and aggressive.

The toxicology and drug use evidence also would have explained Lewis' motive and furtive conduct during the course of the encounter. *See Jackson v. County of San Bernardino*, 194 F.Supp.3d 1004, 1010-11 (C.D. Cal., July 5, 2016), *citing Turner v. County of Kern*, No. 1:11-cv-1366-AWI-SKO, 2014 WL 560834, at *2 (E.D. Cal., Feb. 13, 2014) (admitting evidence that the plaintiff had alcohol and methamphetamine in his system because it was relevant to explain his conduct and to corroborate the deputies' version of events). Combined with the fact that Lewis was on felony probation, the existence of intoxication and drug paraphernalia in Lewis's vehicle explains why Lewis

1    panicked at the news Ayala was going to search his vehicle and explains why he became aggressive

2    and charged towards Deputy Ayala (tending also to corroborate the testimony of Ayala, Terletter, and

3    Montoya).

4    **C.    Lewis' History of Drug Use and Criminal History Were Relevant to Damages.**

5          The Court also excluded evidence of Lewis' history of drug use and criminal history. Pretrial

6    Conf. Trn., at pp. 34:4-6, 35:18-40:8. But these issues were relevant to the issue of damages. *See*

7    *Gates v. Rivera*, 993 F.2d 697, 700 (9th Cir. 1993); *Valtierra v. City of Los Angeles*, 99 F. Supp. 3d

8    1190, 1194 (C.D. Cal. 2015) (" '[E]vidence of plaintiffs' claimed lack of awareness of decedent's

9    criminal history is relevant to show that plaintiffs' 'relationships with decedent were not particularly

10   close.' "). "[E]vidence of [Decedent's] mental health and criminal history was relevant to the nature

11   and degree of emotional comfort and companionship that plaintiff had received from [Decedent]."

12   *Mahach-Watkins v. Depee*, 2007 WL 3238691, at *2 (N.D. Cal. Oct. 31, 2007). In allowing evidence

13   of drug use and criminal history, the court in *Est. of Casillas v. City of Fresno*, No. 1:16-CV-1042

14   AWI-SAB, 2019 WL 586747, at *3 (E.D. Cal. Feb. 13, 2019) summarized other decisions on the

15   issue:

16           Plaintiffs seek economic damages as well as damages for "the loss of the comfort,
     familial relationship, society, attention, friendship, companionship, services, [and]

17   support of the decedent." The above set of facts are relevant to the damages elements
     of Plaintiffs' claims. *See N.W. v. City of Long Beach*, 2016 WL 9021966, at *5-6 (C.D.

18   Cal. June 7, 2016) (Evidence of the presence of marijuana in decedent's system and
     drug-use history deemed "relevant to the determination of noneconomic damages as

19   recognized in California; as it goes to his life expectancy, health, habits, activities,
     lifestyle, and occupation."; decedent's criminal history deemed relevant to future

20   earnings; and decedent's history of incarceration deemed relevant to the amount of
     time "plaintiffs and decedent have spent time apart."); *Castro v. Cnty. of L.A.*, 2015

21   U.S. Dist. LEXIS 103945, *11, 2015 WL 4694070 (C.D. Cal. Aug 3, 2015) (denying
     motion in limine to exclude decedent's drug use history because of its relevance to the

22   issue of damages for plaintiffs' § 1983 and wrongful death claims); *P.C. v. City of
     L.A.*, 2011 U.S. Dist. LEXIS 165075, *7-8 (C.D. Cal. August 22, 2011) (denying

23   plaintiff's motion in limine to exclude decedent's criminal history partly due to the
     issue of damages, and stating that while the nature of decedent's convictions would

24   raise 403 concerns, inquiry into the "length of time decedent spent in prison . . . are
     probative of damages and of the credibility of damages witnesses who may testify to

25   having spent considerable time with decedent.").

26         The amount of time that Lewis spent in jail or in the courts defending against such criminal

27   allegations is relevant to the amount of time Lewis was free to even pursue gainful legal employment.

28   Similarly, the time Lewis spent in jail away from his children also impacts Lewis' ability to provide

—8—

1   care, protection, guidance, advice, training, nurturing, love, society, or companionship.

2           In this case, it is highly likely that the omission of this evidence was prejudicial to Defendants.

3   All seven Plaintiffs were allowed to testify about Lewis to paint a one-sided and rosy picture of their

4   relationship with Lewis, including the fact he would buy them expensive vehicles while living in

5   Mojave while on the income of a grip in Los Angeles. At the same time, Defendants were precluded

6   from asking Plaintiffs about their knowledge of Lewis' drug use, knowledge of Lewis' convictions

7   and time in jail, his status as a Penal Code § 290 (Meghan's List) registrant, and effect those facts

8   had on their relationship, or where they thought he got the money for their expensive gifts on a low

9   income job. It should have been left to the jury to weigh the significance of these facts, and the

10  exclusion of this evidence was prejudicial against Defendants.

11          Lewis' criminal history and drug use were also relevant to his damages. The jury instructions

12  required the jury to consider "You should consider the following as to plaintiffs' damages on behalf

13  of Mickel Lewis, Sr.'s damages: . . . 1. The nature and extent of Mickel Lewis, Sr.'s injuries;  . . . 2.

14  The loss of life and loss of enjoyment of life; and . . . 3. The mental, physical, and emotional pain and

15  suffering experienced prior to death." Doc. 146, at 47. Indeed, the CACI jury instructions on wrongful

16  death (proposed by Defendants and refused by the Court) requires a jury to consider "the average life

17  expectancy of a person of that age, as well has that person's health, habits, activities, lifestyle, and

18  occupation." Doc. 106, p. 32. The public policy underlying a cause of action for wrongful death is,

19  in part, to compensate the survivors for the loss of their family member. *See Barrett v. Superior Court*,

20  222 Cal.App.3d 1176, 1184 (1990). Courts have recognized that lost benefits include "the personal

21  services, advice, and training the heirs would have received from the deceased, and the value of her

22  society and companionship. 'The services of children, elderly parents, or nonworking spouses often

23  do not result in measurable net income to the family unit, yet unquestionably the death of such a

24  person represents a substantial 'injury' to the family for which just compensation should be paid.'"

25  *Allen v. Toledo*, 109 Cal.App.3d 415, 423 (1980). The Court's exclusion of this instruction was error.

26  Evidence of both Lewis' drug use and criminal history were highly relevant to an assessment of

27  plaintiffs' damages because both facts would have aided the jury in determining what kind of

28  "benefits" Lewis would have been able to provide to his children had he survived. Lewis' occupation

1    as a drug dealer,[3] criminal history, and drug user, were all highly relevant to this determination.

2    **D.    The Trial Court Should Have Allowed Defendants to Submit Special**

3    **Interrogatories to the Jury to Help Determine the Issue of Qualified Immunity.**

4    **1.    *The defense of qualified immunity hinges on the reasonable-ness of***

5    ***officers' conduct, which is a legal question for a court. When the facts are***

6    ***disputed, jurors must resolve them, and the court then applies the law to***

7    ***their findings.***

8    Qualified immunity is a defense to "'liability for civil damages insofar as [officers'] conduct

9    does not violate clearly established statutory or constitutional rights of which a reasonable person

10   would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The defense protects "all but

11   the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335,

12   341 (1986). The root of the defense is a "standard of reasonableness": "If a law enforcement officer

13   'reasonably but mistakenly conclude[s]' that the constitutional predicate for a search or seizure is

14   present, he 'should not be held personally liable.' " *Atwater v. City of Lago Vista*, 532 U.S. 318, 367

15   (2001).

16   Because qualified immunity represents (in part) a right to avoid standing trial, the defense is

17   ideally resolved "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227

18   (1991) (per curiam). But that is not always possible. When the parties dispute the facts that bear on

19   whether an officer violated a plaintiff's constitutional rights, a qualified immunity defense may not

20   be resolved until trial. *See Acosta v. City & Cnty. of S. F.*, 83 F.3d 1143, 1147 & n.10 (9th Cir. 1996).

21   At trial, qualified immunity remains "a defense," though it no longer functions as "an 'immunity from

22   suit.' " *Sloman v. Tadlock*, 21 F.3d 1462, 1468 n.6 (9th Cir. 1994).

23   Resolving a qualified immunity defense at trial is a complicated matter because the judge and

24   jury play distinct roles. While the ultimate issue of "reasonableness" presents a legal question for a

25   court to decide, a jury must resolve underlying factual disputes necessary for the court to gauge

26   whether officers acted reasonably. *See Conner v. Heiman*, 672 F.3d 1126, 1131 n.2 (9th Cir. 2012)

27

28   _____

[3] Defendants could have asked the Plaintiffs, for example, where Lewis obtained the money he used
to buy their expensive gifts when he allegedly worked as a Hollywood grip while living in Mojave.

1  ("[D]etermining the facts is the jury's job (where the facts are in dispute), [while] determining what

2  objectively reasonable inferences may be drawn from such facts may be determined by the court as

3  a matter of logic and law."); *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 707 (9th

4  Cir. 2010) ("[T]he reasonableness of defendants' actions[ ] is not a question of fact—it's a question

5  of law.").

6      Allowing a jury to answer the legal question of "reasonableness" would abdicate a district

7  judge's obligation to resolve a matter entrusted to the court. *See Johnson v. Breeden*, 280 F.3d 1308,

8  1317-18 (11th Cir. 2002) ("[T]he jury does not apply the law relating to qualified immunity to those

9  historical facts it finds; that is the court's duty."); *Gonzales v. Duran*, 590 F.3d 855, 864-65 (10th

10  Cir. 2009) (Ebel, J., concurring) ("[A] court should never ask the jury to resolve the legal question of

11  whether a defendant's conduct is objectively reasonable.").

12      **2.**    ***The jury must answer factual interrogatories in special verdicts because***

13          ***raising qualified immunity issues in Rule 50 motions is futile when parties***

14          ***dispute the facts.***

15      Just as an officer may raise a qualified immunity defense *before* trial in a summary judgment

16  motion, an officer may raise that defense *during* trial by moving for judgment as a matter of law

17  under Rule 50. *See Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1083 (9th Cir. 2009).

18      But such motions are pointless when the parties dispute the underlying facts necessary to

19  determine whether officers violated constitutional rights. That is because, in resolving a Rule 50

20  motion, a court assumes the truth of the plaintiff's account of what transpired. And the plaintiff's

21  version of a key factual dispute will invariably defeat qualified immunity. *See, e.g., Torres v. City of

22  L. A.*, 548 F.3d 1197, 1210 (9th Cir. 2008) ("[T]he same issues of material fact also prevent the court

23  from granting the officers' motion for judgment as a matter of law.") (collecting similar cases). That

24  is never more true than in an excessive force case, like this one, where ultimate questions of

25  reasonableness are presented both as to constitutional liability and the defense of qualified immunity.

26  *See, e.g., Acosta*, 83 F.3d at 1147 ("The factual findings the jury must have made to reach its verdict

27  that Yawczak violated Acosta's constitutional rights by using excessive force are dispositive of the

28  question of Yawczak's entitlement to qualified immunity . . . .").

–11–

1    To avoid the futility of asserting qualified immunity through Rule 50 motions when the facts

2  are disputed, and to enable district judges to fulfill their obligation to rule on the legal question of

3  reasonableness, many circuit courts now require (or strongly prefer) that juries return special verdicts

4  pinpointing their resolution of the factual disputes necessary to allow district courts to answer the

5  ultimate legal question of qualified immunity. *See Gonzales*, 590 F.3d at 860 & n.4 ("[T]he better

6  approach is for the court to submit special interrogatories to the jury to establish the facts. . . . Once

7  the jury determines the purely historical facts, the judge then decides the three legal questions of

8  qualified immunity [including] whether the actions violated the plaintiff's constitutional rights . . .

9  ."); *accord, e.g., Littrell v. Franklin*, 388 F.3d 578, 586 (8th Cir. 2004); *Kelley v. LaForce*, 288 F.3d

10  1, 7 (1st Cir. 2002); *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990); *Rakovich v. Wade*, 850 F.2d

11  1180, 1202 n.15 (7th Cir. 1988) (*en banc*); 9B Charles Alan Wright & Arthur R. Miller, Federal

12  Practice and Procedure § 2506 n.7 (3d ed. 2008) ("unresolved factual questions bearing on qualified

13  immunity should be decided by jury on special interrogatories") (citing *Gros v. Port Washington

14  Police Dist.*, 944 F. Supp. 1072 (E.D.N.Y. 1996)); *cf. Warner-Jenkinson Co., Inc. v. Hilton Davis

15  Chem. Co.*, 520 U.S. 17, 39 n.8 (1997) (recommending "a special verdict and/or interrogatories" in a

16  trial implicating the validity of a patent—another context where judge and jury play distinct roles).

17    This Ninth Circuit has been receptive to special verdicts and interrogatories in this situation.

18  *See Barnard v. Theobald*, 721 F.3d 1069, 1074, 1075-76 (9th Cir. 2013) (relying on a special verdict

19  returned by the jury to resolve qualified immunity issues); *Borquez v. City of Tucson*, 475 F. App'x

20  663, 664 (9th Cir. 2012) (same); *cf. Tortu*, 556 F.3d at 1084 (noting that the absence of special

21  interrogatories prevented the Court from ascertaining whose version of the facts the jury accepted);

22  *Act Up!/Portland v. Bagley*, 988 F.2d 868, 876 (9th Cir. 1993) (Norris, J., dissenting from order

23  denying reh'g en banc) ("[T]he only tool readily available for the job is the special verdict. . . .

24  [W]here the ultimate issue of objective reasonableness turns on a discrete issue of evidentiary fact,

25  such as whether the defendant police officers planted contraband on the plaintiff before arresting her,

26  the issue could be resolved by the jury using special verdicts.").[4]

27  _____

28  [4] Two decades ago, Judge Norris worried that a special verdict might be impractical in a case "that is
literally crawling with factual issues." *Act Up!/Portland*, 988 F.2d at 876. *Sloman* also fretted about

1    Indeed, prior decisions have laid the conceptual groundwork for requiring juries to return

2 special verdicts (absent unusual circumstances). The Court has observed that "[w]hether the officers

3 are entitled to qualified immunity may depend in large part on factual determinations the jury will be

4 required to make." *Smith v. City of Hemet*, 394 F.3d 689, 704 n.7 (9th Cir. 2005). And the Court has

5 distinguished the jury's fact-finding role from the court's law-applying role. *See Conner*, 672 F.3d at

6 1131 n.2. This Court should make explicit what is already implicit in its decisions—that employing

7 verdicts with factual interrogatories is required (unless impracticable) to adjudicate a qualified

8 immunity defense at trial.

9        **3.**      ***The district court erred in refusing to supply the jury with a verdict form***

10          ***designed to resolve the key factual disputes necessary to adjudicate***

11          ***officers' qualified immunity defense.***

12    Qualified immunity shields an officer from liability *even if* his action resulted from "a mistake

13 of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*,

14 555 U.S. 223, 231 (2009); *Butz v. Economou*, 438 U.S. 478, 507 (1978) (qualified immunity covers

15 "mere mistakes in judgment, whether the mistake is one of fact or one of law."); *see also Mattos v.*

16 *Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc); *see also Saucier v. Katz*, 533 U.S. 194, 205

17 (2001) ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be

18 made as to the legal constraints on particular . . . conduct. It is sometimes difficult for an officer to

19 determine how the relevant legal doctrine . . . will apply to the factual situation the officer

20 confronts."). The Supreme Court has held that "the *Harlow* (objective reasonableness) standard . . .

21 gives ample room for mistaken judgments." *Malley v. Briggs*, 475 U.S. 335, 343 (1986), citing

22 *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

23    These concerns were present here. In this case, the applicability of qualified immunity

24 depended on the resolution of five factual disputes: (1) "Was Deputy Ayala's belief that Mickel

25 Lewis, Sr. had a gun in his car at the time Deputy Ayala pulled Mickel Lewis, Sr. over reasonable?"

26

27 "serious logistical difficulties" that might "complicate easy cases." 21 F.3d at 1468. But the widespread adoption of special verdicts in other circuits belies these concerns, as does this Court's reliance on special verdicts in its more recent decisions. In any event, this case presents no such

28 logistical challenges because defendants requested just *five* special interrogatories.

1   (2) "Was Deputy Ayala's belief that Mickel Lewis, Sr. had a gun in one of his hands reasonable when

2   Mickel Lewis, Sr. got out of his car the second time?" (3) "Was it reasonable for Deputy Ayala to

3   believe that Mickel Lewis, Sr. was charging at him after he got out of the car a second time?" (4)

4   "Was Deputy Ayala's belief that he needed to use some force to protect himself from Mickel Lewis,

5   Sr. reasonable?" and (5) "Did Deputy Ayala inflict force upon Mickel Lewis, Sr. beyond that

6   necessary for his own self defense?" Doc. 103, at pp. 8-9.

7       If the jury answered these questions affirmatively (had they been supplied with the

8   opportunity to do so), then as a matter of law Deputy Ayala was entitled to qualified immunity for

9   responding with lethal force. *See George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) ("When an

10  individual points his gun 'in the officers' direction,' the Constitution undoubtedly entitles the officer

11  to respond with deadly force."); *Scott v. Henrich*, 39 F.3d 912, 914-15 (9th Cir. 1994) ("According

12  to the officers, Scott held a 'long gun' and pointed it at them. Officer Henrich fired a shot that missed

13  Scott. Officer Flamand, apparently believing Scott had fired this shot, fired four shots at Scott, one

14  of which caused the fatal wound.") (affirming a summary judgment based on qualified immunity for

15  all officers).

16      The Court was unwilling to grant defendants' Rule 50(a) motion on the issue of qualified

17  immunity, finding that factual disputes were reserved for the jury. R.T., at p. 745:18-24. For this very

18  reason, Defendants proposed special interrogatories on these factual disputes; the jury's answers to

19  these interrogatories would have enabled the district court to resolve the qualified immunity defense

20  by applying governing law. R.T., at p. 746:2-19. But the district court denied the request, foreclosing

21  the defendants' ability to furnish interrogatories to the jury to ultimately resolve the qualified

22  immunity issue. R.T., at pp. 747:6-749:9.

23      Instead, the district court furnished the jury with a verdict form that posed no interrogatories

24  about the factual disputes necessary to resolve the qualified immunity defense. See Doc. 153; see also

25  R.T., at pp. 746:2-747:21. That was a legal error because it meant the jury could never make the

26  factual findings necessary to allow the district court to apply the law of qualified immunity and

27  determine whether officers were entitled to the defense. The Court's failure to do so here had the

28  improper effect of leaving the ultimate ruling on the qualified immunity defense to the jury and, as a

1  practical matter, defaulted that defense.

2        **4.    *Plaintiffs cannot carry their burden of showing that the district court's***
3              ***error was harmless.***

4        " 'We presume prejudice where civil trial error is concerned and the burden shifts to the
5  [appellee] to demonstrate that it is more probable than not that the jury would have reached the same
6  verdict had it been properly instructed.' " *Sanders v. City of Newport*, 657 F.3d 772, 781 (9th Cir.
7  2011).

8        Plaintiffs cannot shoulder their burden here considering the information available to Deputy
9  Ayala at the time, qualified immunity should have applied here, just as in *Cruz*. Prior to the encounter,
10  Deputy Ayala had been informed that Lewis had a gun, then during the encounter Lewis ran to his
11  SUV and appeared to search for something under his seat moments before charging at Deputy Ayala.
12  R.T., pp. 69:11-13, 87:25-88:18, 160:16-161:7, 165:16-166:7. Lewis also told Deputy Ayala that he
13  was "going to die" or that he was "going to kill him." R.T., pp. 91:7-13; 124:12-24. As a result, it
14  was objectively reasonable for Deputy Ayala to respond in self-defense. In the few, tense seconds
15  that Deputy Ayala had to determine whether Lewis had a weapon (as Lewis was charging at him), it
16  was objectively reasonable for Deputy Ayala to have committed a mistake of fact as to whether or
17  not Lewis truly had a gun in his hand. Given Lewis' unpredictable and uncooperative behavior, the
18  only way for Deputy Ayala to have known for sure was to risk his life and potentially die before he
19  could have known that he might have been incorrect. The evidence elicited at trial on this point was
20  at least as favorable to the Defendants as to Plaintiffs, thus Plaintiffs cannot meet their burden of
21  showing that the jury would, " 'more probabl[y] than not,' "  have answered in their favor
22  interrogatories pertaining to qualified immunity. *Sanders*, 657 F.3d at 781.This Court should
23  therefore order a new trial to remedy this issue.

24        **E.    A New Trial Is Required to Remedy the Violation of the Lump-Sum Rule.**

25        **1.    *Under California law, the jury must award heirs a lump sum. The trial***
26              ***judge, not the jury, then apportions the lump sum among the heirs.***

27        A California State cause of action for wrongful death is set forth under Cal. Code Civ. Proc.
28  § 377.60. The California Legislature has limited the damages recoverable as follows: "In an action

under this article, damages may be awarded that, under all the circumstances of the case, may be just, but may not include damages recoverable under Section 377.34. The court shall determine the respective rights in an award of the persons entitled to assert the cause of action." Cal. Code Civ. Proc. § 377.61. "A plaintiff in a wrongful death action is entitled to recover damages for his own pecuniary loss, which may include (1) the loss of the decedent's financial support, services, training and advice, and (2) the pecuniary value of the decedent's society and companionship—but he may not recover for such things as the grief or sorrow attendant upon the death of a loved one, or for his sad emotions, or for the sentimental value of the loss." *Nelson v. Cnty. of Los Angeles*, 113 Cal. App. 4th 783, 793 (2003).

Under California wrongful death law, an award of damages must be made in two steps. First, because the heirs' claims "are deemed joint, single and indivisible and must be joined together in one suit," the jury must calculate damages " 'suffered by all the heirs and return a verdict for *one sum.*' " *Corder v. Corder*, 41 Cal. 4th 644, 652 (2007). Second, if a jury returns a lump-sum verdict, "it is then the duty of the court, in a separate proceeding, to apportion the amount to be awarded each heir." *Watkins v. Nutting*, 17 Cal. 2d 490, 498 (1941); *see* Cal. Code Civ. Proc. § 377.61 ("The court shall determine the respective rights in an award of the persons entitled to assert the cause of action."); *see also* Cal. Civil Jury Instr. (CACI) No. 3922 (2014) ("[C]onsider the losses suffered by all plaintiffs and return a verdict of a single amount for all plaintiffs. I will divide the amount [among/between] the plaintiffs.") (brackets omitted).

> Judicial apportionment in this case is consistent with historical precedent which has relied upon the equity powers of the court in dividing such funds, regardless whether the recovery was the result of compromise, settlement, litigation instituted by a personal representative of the decedent as a statutory trustee for the heirs, or trial litigation pursued by any of the heirs. . . . We conclude an apportionment proceeding is equitable in character as well as akin to a special proceeding. Finding no California case precedent in point, we look elsewhere and find, although Lord Campbell's Act provided the apportionment be made by the jury, English case precedent holds "[t]he remedy of the [heirs] to secure an apportionment of the fund is in equity, and not by action at law." Likewise, in *Hernandez v. Fujioka, supra*, 40 Cal.App.3d 294, 304, a trial court proceeding for the approval of a compromise settlement following a wrongful death judgment and allocation of the settlement was essentially treated as an equitable proceeding. Moreover, this statutory apportionment proceeding is at least analogous to partition, a special statutory proceeding (Code Civ. Proc., § 872.010, et seq.), consistently characterized as equitable in nature. Finally, and perhaps alternatively, since the apportionment proceeding is set up by the wrongful death statute in the nature of a post-judgment, ancillary, special proceeding unknown at

common law, there is no right to jury determination of the respective interests of the heirs in the lump-sum award absent statutory authorization.

*Canavin v. Pac. Sw. Airlines*, 148 Cal. App. 3d 512, 534 (Cal. Ct. App. 1983) (citations omitted).

The California Legislature selected this two-step process advisedly. A "lump-sum award reflects the underlying theory the family unit suffered as a whole and the proceeds will perpetuate the continuation of the family of the deceased in the same manner regarding comfort and support had the decedent lived and kept the family together." *Canavin v. Pac. Sw. Airlines*, 148 Cal. App. 3d 512, 533-34 (1983); *see Simoneau v. Pac. Elec. Ry. Co*., 159 Cal. 494, 508 (1911) ("It is not intended that the amount recovered shall be divided into integral or proportional parts . . . the statute being framed upon the theory that the heirs will always constitute the family of the deceased.") (internal quotation omitted). The Legislature also "belie[ved] it was more desirable not to add to the jury's burden the task of apportioning the damages," and concluded the trial judge "was the most desirable party to apportion the damages." *Corder*, 41 Cal. 4th at 654 (quoting legislative history). The lump-sum verdict rule thus relieves heirs of the burden of hiring separate counsel to advocate their "competing and conflicting interests" in maximizing their recoveries. *See Canavin*, 148 Cal. App. 3d at 535. A single attorney can advocate for a lump-sum verdict, then allow the court to apportion the verdict among his clients based on the court's familiarity with the record. Finally, the lump-sum verdict rule works in concert with the "one action rule," which requires all heirs to join in a single wrongful death action, rather than pursuing relief separately. *See Gonzales v. S. Cal. Edison Co*., 77 Cal. App. 4th 485, 489 (1999).

### 2.    *The Court violated the lump-sum verdict rule.*

Defendants proposed a verdict form requiring the jury to award a lump sum (if any sum) to plaintiffs. Doc. 103, at p. 6. Defendants' proposal segregated economic and noneconomic damages, but did not permit the jury to make separate awards to each plaintiff. *Id*. In contrast, plaintiffs' proposed verdict form provided separate blanks for awarding separate damages to each plaintiff. *See* Docs. 96, 99. Over defendants' objection, the district court selected a verdict form that allowed the jury to make separate awards to each plaintiff, which the jury ultimately did. Doc. 153, at p. 4; R.T. 749:19-751:9, 751:21-753:9. The Court therefore erred in rejecting defendants' proposal to request a

1  lump-sum award from the jury, as California law requires.

2                   **3.**      ***The Court's error was prejudicial.***

3         This Court begins by presuming the error was prejudicial and shifting to plaintiffs the burden

4  of rebutting that presumption. *Sanders v. City of Newport*, 657 F.3d 772, 781 (9th Cir. 2011).

5  Plaintiffs cannot rebut that presumption here. The jury may have awarded greater total damages

6  because the verdict form furnished them seven blank lines to complete, rather than one. It is common

7  sense that a jury supplied with multiple damages blanks is likely to award more than a jury supplied

8  with one blank. *See, e.g.*, Laurie R. Kuslansky, *5 Signs Your Verdict Form is Problematic*, The

9  Litigation Consulting Report (July 2, 2013, 2:05 PM),   https://persuadius.com/blog/bid/65947/5-

10  Signs-Your-Verdict-Form-is-Problematic ("The odds increase that jurors will fill in the blank with

11  some amount of money for each blank presented, so for plaintiffs, the more, the merrier . . . .").

12         Plaintiffs may argue that the operation of the lump-sum verdict rule should never concern a

13  defendant. Not so. While it may be true in some cases that a defendant has no stake in the *second-*

14  *step* apportionment proceeding, it does not follow that a defendant lacks a stake in the *first-step*

15  determination of the lump sum. When a jury calculates a lump sum at trial, defendants have a strong

16  interest in ensuring that California law is followed, so that a jury does not return an undeservedly

17  high award due to the placement of additional lines on the verdict form inconsistent with other

18  California wrongful damages awards. An error that causes the jury to award a greater aggregate sum

19  is obviously harmful to a defendant.

20      **F.**    **The Court Improperly Excluded Impeachment Evidence In Connection With**

21               **Plaintiffs' Police Practices Expert.**

22         Plaintiffs' police practices expert Scott DeFoe  testified that (1) he read the entire record,

23  including the Kern County Sheriff's Report on the incident and (2) there was nothing in the record to

24  support Deputy Ayala's testimony that Lewis said he was going to kill him. R.T., at p. 521:19-522:9.

25  On cross examination, Defendants' attorney attempted to impeach Defoe with a witness statement

26  contained in the Kern County Sheriff's Report that *did* support Deputy Ayala's statement: "I guess

27  my stepdad said he was going to shoot him, but he had nothing on him. He didn't do nothing wrong."

28  R.T., at p. 528:14-18. Plaintiffs objected on hearsay grounds. R.T., at p. 522:11-15. At sidebar, the

1  Court sustained the objection and refused to strike DeFoe's testimony that there was nothing in the

2  record to support Deputy Ayala's testimony. R.T., at pp. 522:22-529:21.

3      By definition, the evidence was not hearsay. " 'Hearsay' means a statement that: (1) the

4  declarant does not make while testifying at the current trial or hearing; and (2) a *party offers in

5  evidence to prove the truth of the matter asserted in the statement*." Fed. R. Evid. 801(c) (emphasis

6  added). The at-issue statement, however, was not made for the truth of the matter asserted, i.e., that

7  the Lewis made threats. Rather, it was offered to impeach DeFoe's credibility after he testified such

8  a statement did not exist in the record and to rehabilitate Deputy Ayala from the damage from DeFoe's

9  false statement. R.T., at p. 529:7-8. *See U.S. v. Engelbrecht*, 993 F.2d 885 *4 (9th Cir. 1993)

10  ("Because Nowland specifically testified that Engelbrecht did not have a gun in his pick-up truck, the

11  Colt revolver was relevant impeachment evidence."); *see also United States v. Green*, 648 F.2d 587,

12  596 n.12 (9th Cir. 1981) ("If [a party] believed that it had elicited an untruthful remark, its remedy...

13  was to impeach the witness through cross examination.") For this reason, the district court's exclusion

14  of this critical evidence prevented Defendants from impeaching Plaintiff's police practices expert,

15  thus allowing the jury to find the expert's testimony as both credible and reliable. *See United States

16  v. Beardslee*, 197 F.3d 378, 383 (9th Cir. 1999). The Court's exclusion of this evidence and refusal

17  to issue a corrective instruction was highly prejudicial to Defendants.

18      **G.    The Trial Court Improperly Excluded Defendants' Human Factors Expert.**

19      The Court excluded the opinion of Mike Kuzel, Defendants' human factors expert, in its

20  entirety. Doc. 134. First, the Court concluded that opinions related to the location of bullet wounds

21  and whether they align with certain movements, such as turning counterclockwise, require specialized

22  expert testimony and that defendants failed to establish that Kuzel has such qualifications. *Id.* at 4.

23  Defendants specifically indicated that Kuzel's opinions would not be based on the reasonableness of

24  Ayala's actions or based on police practices or procedures. *Id.* at 5. Defendants stated that: "Kuzel's

25  opinions will be limited to matters relating to human perceptions and reaction time, including under

26  stress." *Id.*

27      Despite this limitation, the Court still refused to consider Kuzel's opinions, concluding that

28  "defendants have not met their burden to establish Kuzel's relevant qualifications and experience to

1  provide such testimony in the context of this case." *Id.* But this Court's ruling was unduly restrictive

2  and prejudicial. Mr. Kuzel has a bachelor's degree in Bioengineering from Arizona State University,

3  a master's degree in Industrial Engineering from Arizona State University (with an emphasis in

4  Human Factors Industrial Engineering), a second master's degree in Applied Psychology, again, from

5  Arizona State University (with an emphasis in Human Factors Sensation of Perception). Doc. 104-1,

6  Exh. C, pp. 10:20-11:06. He has even investigated and evaluated Police Officer Use of Force events

7  as a reconstruction, injury biomechanics and human factors expert, including completing a 40-hour

8  Force Science Analyst course offered by Force Science, Ltd. *See* Doc. No. 86 at 31. Kuzel's

9  qualifications include *scientific* knowledge and study of the human brain sufficient to render him

10  qualified to proffer opinions in this case. *See Dominguez v. City of Los Angeles*, cv17-4557-DMG

11  (PLAx) 2018 WL 6164278 *7 (C.D. Cal., Oct. 9, 2018) (district court excluding expert opinion on

12  perception reaction time because expert did not display "scientific knowledge of the human brain").

13  The Court's further reasons for exclusion based on the witness' reliability usurped the province of

14  the jury and deprived defendants from putting on a substantial portion of their case. "The more

15  appropriate place to consider these arguments is on how much weight to give to the competing expert

16  testimony, rather than their admissibility." *Lessin v. Ford Motor Company*, 2024 WL 5007092 (S.D.

17  Cal., Oct. 31, 2024) (collecting cases). This Court erred.

18      **H.    The *Bane Act* instruction was erroneous.**

19      Erroneous jury instructions, as well as failing to give adequate instructions, are also grounds

20  for a new trial. *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990). " '[J]ury instructions

21  must fairly and adequately cover the issues presented, must correctly state the law, and must not be

22  misleading.' " *Dang v. Cross*, 422 F.3d 800, 804 (9th Cir. 2005) (quoting *White v. Ford Motor Co.*,

23  312 F.3d 998, 1012 (9th Cir. 2002)).

24      California Civil Code section 52.1, known as the Bane Act, "provides a cause of action for

25  violations of a plaintiff's state or federal civil rights committed by 'threats, intimidation, or

26  coercion.'" *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014), *quoting* Cal. Civ.

27  Code § 52.1. A Bane Act claim is not the state tort twin of an excessive force claim under section

28  1983. Instead, it requires proof of "a specific intent to violate [an individual's] right to freedom from

1  unreasonable seizure." *Cornell*, 17 Cal.App.5th at 801-02; *Reese v. County of Sacramento*, 888 F.3d

2  1030 (9th Cir. 2018); *see also* Cal. Civ. Jury Instr. (CACI) 3066.

3      Here, over defendants' objection, the Court ordered the inclusion of language in Jury

4  Instruction No. 16 regarding "reckless disregard." Doc. 146, at 43, R.T., at 737:738:24, 866:25-

5  868:25. But CACI 3066, the state jury instruction governing Bane Act claims, does not provide

6  qualifying language regarding "reckless disregard." *See* R.T., at 737:7-741:24. Yet the district court

7  relied on *Reese v. County of Sacramento*, 888 F.3d 1030, 1045 where the Ninth Circuit held that: "the

8  jury must find that the defendants "intended not only the force, but its unreasonableness, its character

9  as 'more than necessary under the circumstances.' " *Id.* The Court stated that it is not necessary for

10 the defendants to have been "thinking in constitutional or legal terms at the time of the incidents,

11 because a reckless disregard for a person's constitutional rights is evidence of a specific intent to

12 deprive that person of those rights." *Id.* However, this language is not present in CACI 3066, and

13 according to the Use Notes, "[T]he Bane Act requires that the challenged conduct be intentional."

14 *Simmons v. Superior Court* (2016) 7 Cal.App.5th 1113, 1125.

15      This error prejudiced defendants. At closing argument, Plaintiffs' counsel argued that

16 something less than intentional conduct could prove excessive force—that liability could permissibly

17 result from Ayala's "*overreaction*," rather than a specific intent to violate Lewis's rights. R.T., at p

18 898:1-7. This was plainly incorrect. Thus, Instruction No. 16 was in error, especially in light of

19 counsel's improper argument in closing. Thus, a new trial is necessary.

20  **I.    A New Trial Is Proper Because It Is Likely the Jury's Award to Plaintiffs Was**

21      **Excessive. In the Alternative, the Court Should Grant a Remittitur.**

22      " 'The trial judge in the federal system,' we have reaffirmed, 'has . . . discretion to grant a

23 new trial if the verdict appears to [the judge] to be against the weight of the evidence.' This discretion

24 includes overturning verdicts for excessiveness and ordering a new trial without qualification, or

25 conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Gasperini v. Ctr. for*

26 *Humans., Inc.*, 518 U.S. 415, 433 (1996) (citation omitted).

27      In California, since 2001, there have been *two* Fourth Amendment excessive force awards

28 higher than this one. In *Estate of Phounsy v. County of San Diego et al.*, JVR No. 2006040008, 2022

–21–

WL 1750521 (S.D.Cal.) the jury awarded $85,000,000, including punitive damages, after a decedent died of anoxic brain injury after decedent was hogtied, *then* Tasered and hit with batons by deputies. In *Estate of Picket v. County of San Bernardino, et al.*, JVR No. 2001060032, 2018 WL 10230033 (C.D.Cal.), a deputy attempted to seize a mentally ill man, pushed him onto the floor, shot him as he was scooting away, punched and kicked the man, then interfered with medical treatment. The man later died. The jury awarded $33,500,000, including $18,000,000 in punitive damages. The judge reduced the award to $15,500,000. The parties later settled for $5,719,350. Accordingly, this case represents California's highest Fourth Amendment excessive force award without punitive damages, *ever*.

### 1. *The Award for Pre-death Pain and Suffering Was Excessive and Not Supported by Any Evidence.*

The jury awarded $1 million for Decedent's pre-death pain and suffering. Doc. 153, at p. 4. The uncontroverted expert testimony establishes, however, that Decedent lost consciousness and died almost instantly. R.T., at pp. 452:25-454:5, 653:13-25. The fact that the jury likely based the award on speculation is bolstered by the fact that Plaintiffs' counsel *encouraged* the jury to speculate as to what Decedent was thinking as he lay on the street, even though the evidence establishes he was already dead. R.T., at pp. 917:13-918:14.[5] The award is simply unsupported by evidence and is likely the product of improper speculation. A court should not uphold a damages award if the "amount is grossly excessive or monstrous, clearly not supported by the evidence, or *based only on speculation or guesswork.*" *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996), aff'd, 526 U.S. 687 (1999) (emphasis added).

### 2. *The Award for Plaintiff's Pecuniary Loss Is Likely the Result of Confusion or an Improper Basis.*

"A plaintiff in a wrongful death action is entitled to recover damages for his own pecuniary loss, which may include (1) the loss of the decedent's financial support, services, training and advice,

---

[5] Mr. Galipo stated the following in closing argument: "The last thoughts through his mind, I'm going to die right here on this street. I'm dying. I just saw my daughter. My son lives close by. And I'll guarantee you what was on his mind -- and I say this because of the evidence you have in this case."

1  and (2) the pecuniary value of the decedent's society and companionship—but he may not recover

2  for such things as the grief or sorrow attendant upon the death of a loved one, or for his sad emotions,

3  or for the sentimental value of the loss." *Nelson v. Cnty. of Los Angeles*, 113 Cal. App. 4th 783, 793

4  (2003).

5        Defendants objected to the verdict form as allowing the jury to apportion the damages between

6  the different Plaintiffs in violation of the lump-sum rule. Doc. 103, at p. 6. Instead, the verdict form

7  merely stated: "What amount do you award plaintiffs for their wrongful death damages for the loss

8  of Mickel Lewis, Sr.?" and listed each Plaintiff's name, with a space for an amount. Doc. 153, at p.

9  4. The Court did not provide a place on the form for the jury to state the total damages awarded and

10 did not follow California's lump-sum rule. It is not beyond debate whether the jury meant to award

11 each Plaintiff an identical $3.5 million, or whether the jury intended to award $3.5 million in total,

12 and listed that amount for each Plaintiff. *See* Doc. 153, p.4. The difference between the two

13 possibilities is significant: $21 million. The jury instructions do not alleviate this confusion by

14 instructing the jury on the apportionment of damages amongst the Plaintiffs. See Doc. 146, p. 47.

15 Indeed, CACI model jury instructions proposed by Defendants and refused by the Court included an

16 instruction specifically to address this issue. Doc. 106, p. 32. *See Kling v. Varastehpour*, No.

17 B308292, 2023 WL 3050625, at *1 (Cal. Ct. App. Apr. 24, 2023) (identical awards to multiple

18 plaintiffs is evidence jury confused by erroneous jury instruction).

19        Furthermore, if the jury intended to award $3.5 million for each Plaintiff, it is evidence that

20 the jury based its award not on the evidence presented at trial, but on some other improper basis such

21 as speculation or guesswork. Identical awards are not per se evidence the awards were given on an

22 improper basis. However, at closing, Plaintiffs' counsel argued that the jury should grant *each*

23 Plaintiff an identical award, notwithstanding the facts presented to the jury. R.T., at pp. 921:19-22,

24 938:17-24 (arguing all plaintiffs should get the same amount).

25 / / /

26 / / /

27 / / /

28 / / /

1    **IV.    <u>CONCLUSION</u>**

2        For these reasons, the Court should grant a new trial. If the Court does not grant a new trial,

3    but if the Court finds that damages are excessive, Defendants request the court grant a remittitur.

4    Dated: April 18, 2025                    Respectfully Submitted,

5                                             MARGO A. RAISON, COUNTY COUNSEL

6                                             By: /s/ Andrew C. Hamilton
                                                 Kimberly L. Marshall, Deputy
7                                                Andrew C. Hamilton, Deputy
                                                 Attorneys for County of Kern
8

9                                             WEAKLEY & ARENDT, APC

10                                            By: /s/ Brande L.Gustafson
                                                 James D. Weakley, Esq.
11                                               Brande L. Gustafson, Esq.
                                                 Attorneys for Jason Ayala
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28