# EXHIBIT B

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. KIRK E. SHERRIFF

MICKEL ERICK LEWIS, JR., et          )
al.,                                  )   1:21-cv-00378-KES-CBD
                                      )
            Plaintiffs,               )
                                      )   JURY TRIAL, DAY 1
      vs.                             )
                                      )
COUNTY OF KERN, et al.,               )
                                      )   Volume 1
            Defendants.               )   Pgs. 1 - 105, inclusive
_____  )
                                      )
R.L., et al.,                         )
                                      )
            Plaintiffs,               )
                                      )
      vs.                             )
                                      )
COUNTY OF KERN, et al.,               )
                                      )
            Defendants.               )
_____  )

Fresno, California                    Tuesday, March 11, 2025



                REPORTER'S TRANSCRIPT OF PROCEEDINGS






REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

3

<u>INDEX</u>

<u>PLAINTIFFS' WITNESSES</u>:

JASON AYALA
DIRECT EXAMINATION BY MR. GALIPO                                  55

\* \* \* \* \*

EXHIBITS

\* \* \* \* \*

<u>PLAINTIFFS'</u>                                              Received

6-1                                                          67
6-2 and 6-3                                                  68
5, pages 2, 4, 6, and 13                                     72
5, page 8                                                    80
5, page 34                                                   87

\* \* \* \* \*

4

1    Tuesday, March 11, 2025                    Fresno, California
2    1:33 p.m.                                Jury Trial Day 1
3        (The following proceedings were held in open court:)
4        THE COURT:  All right.  Ladies and gentlemen, as I
5    said, you will be the jury for our case.  Please raise your
6    right hand -- or right hands and be sworn.
7        (The jury was sworn.)
8        THE COURT:  All right.  So at this time, to the other
9    members -- or potential jurors, thank you for doing your civic
10   duty and appearing on the jury summons and sitting through the
11   process of selecting the jury.  You are excused.  You are all
12   free to go.  You may -- you will need to call the 1-800 number
13   on Friday, after 5:00 p.m., but thank you for your time.
14   Thank you for your service in going through the jury selection
15   process, and I wish you a good day.
16       (Remaining Prospective Jurors exit the courtroom.)
17       THE COURT:  At this time, ladies and gentlemen, I am
18   speaking now to the jury who is in the box, we are -- I've run
19   into the lunch hour, and I want to make sure you get your
20   lunch break.  We are going to have you go back to what will be
21   the jury deliberation room, the room where you will meet when
22   you come to court in the morning and where you will leave to
23   at the end on -- recesses.  And from now on, you will enter
24   and exit the courtroom on this door to the side.
25           Because there's a process of making sure you have

1          Why don't we do this, it's about 3:10, why don't we

2   take our afternoon recess at this time.  We'll give you about

3   15 minutes, Members of the Jury.  We'll bring you back in here

4   about 3:25, and then we'll go to 4:30.

5          All right.  So please do not form or express any

6   opinions about the case while on break, do not let yourself be

7   exposed to any outside report or comment.  Do not

8   electronically access any information about the case or

9   subjects related to the case or about any party, or anybody or

10  anything having anything to do with the case.  And please do

11  not do any research, investigation or inquiry on your own.

12          Remember the admonish and have a good break.  We'll

13  see you back here in about 15 minutes.

14      (Jury exits the courtroom at 3:12 p.m.)

15          THE COURT:  All right.  The jury has left the

16  courtroom.  Are there any issues?

17          MR. GALIPO:  No.  Thank you, Your Honor.  Thank you

18  for helping me get that Elmo going.

19          THE COURT:  We had a glitch there with the technical

20  system, but I think we're back on track now.

21          MR. WEAKLEY:  I have two issues, Your Honor.

22          THE COURT:  Mr. Weakley.

23          MR. WEAKLEY:  One is that Mr. Galipo told advised the

24  jury, told the jury that Mr. Lewis was unarmed at the time.

25  The Court's ruling is that we're not allowed to get in the

1  fact that he actually had a gun in the car, because that

2  wasn't something that Deputy Ayala knew.  Deputy Ayala also

3  did not know that he was unarmed.  So if -- if we can't get in

4  information about the gun, they've just said the -- that he

5  was unarmed to impeach our client, and I think that that's

6  opening the door, so we should be able to get in the fact that

7  there, in fact, was a gun.

8          THE COURT:  Well, you brought out the fact that the

9  informant had told --

10         MR. WEAKLEY:  Right.

11         THE COURT:  -- Deputy Ayala that Mr. Lewis was armed.

12         MR. WEAKLEY:  Right.

13         THE COURT:  And so that fact that he's approaching

14 the vehicle with that belief and understanding is in the

15 opening, and that's certainly something you can address in

16 your in the evidence.

17         Based on the evidence before me on the motion in

18 limine, there was no evidence that Mr. Lewis had the weapon.

19 And now if -- if the evidence develops differently, there was

20 evidence that a passenger in the car had a weapon and did

21 something with it afterwards, as I understand it from the

22 argument in evidence that was presented in connection with the

23 motion in limine, and so the ruling is that there's -- unless

24 there's some different evidence that was before me on the

25 motion in limine, I don't -- there id no evidence that

51

1    Mr. Lewis had the weapon on him.

2         MR. WEAKLEY:  Right.  He didn't have it on him, but I

3    think the fact that they said he was unarmed now has raised a

4    doubt in the jury's mind about the accuracy of the information

5    provided to Deputy Ayala.

6         MR. GALIPO:  Your Honor, I said he was unarmed at the

7    time of the shooting which was corroborated by Deputy Ayala

8    searching him immediately after the shooting, there was no

9    weapon on him.  I think jury is allowed to know that he was

10   unarmed at the time he was shot.  That's what I said.

11        THE COURT:  Yeah, look, I think the evidence, as I

12   understand it, is un --  I mean, we'll see, but it seems

13   undisputed from the parties that he was patted down and

14   searched as he stepped -- initially stepped out of the car,

15   had no weapon on him.  Then there was the interaction that led

16   to the shots being fired, and no weapon was ultimately found

17   on him after the shooting.  Now, based on that, there's

18   nothing improper in what was stated in the opening.

19        MS. MARSHALL:  Your Honor, if I may, Mr. Galipo said

20   that Deputy Ayala didn't tell anyone to go look under the seat

21   because he was digging under the seat, maybe that would have

22   been important to look for a gun.

23        THE COURT:  I'm sorry.  So -- meaning that he did not

24   say that to anyone -- what I heard was he did not say that to

25   anyone at the scene that evening.

1    MS. MARSHALL:  Correct.  Inferring that no one went

2    and looked for a gun, which they did do, and they found a gun

3    in the field.

4    MR. GALIPO:  The purpose of what I said was that if

5    he thought there was a gun underneath the seat and he was

6    reaching underneath the seat, he never told anyone that that

7    the fellow officers arriving.  That's what I said.

8    MR. ALEXANDER:  We understand the Court's ruling.

9    What we've dealt with are the objective facts.  At

10    the scene of the accident, there was no statement made by

11    Officer Ayala, Look under the seat, do this or that.  All

12    we've done is deal with objective facts.  The fact of a gun,

13    there was no gun.  That was determined.

14    Throughout the trial it appears is there's going to

15    be an attempt at every instance to try and say that we've

16    opened the door.  We're going out of our way to make sure we

17    did not open the door, and it was not opened here.  In fact,

18    he did not have a gun on him.  In fact, Deputy Ayala did not

19    make a statement at the scene, Please check the car, he was

20    reaching for a gun.  It's factually just impeaching him as to

21    what -- the statement that he gave later, not bringing any

22    issue as to the gun.

23    THE COURT:  The reality is that that -- I think that

24    the defense is presenting the case -- we'll see, but my

25    understanding of what the defense case is is that is the

1    deputy, Deputy Ayala, is going to testify, presumably, that he

2    believed that Mr. Lewis was reaching for a gun.

3              MR. WEAKLEY:  And retrieved one.  And retrieved a

4    gun.

5              THE COURT:  Well -- well, the point of the opening,

6    the comment in the statement in the opening by Mr. Galipo, as

7    I understood it, was that that statement is highly relevant to

8    the defendants' case as to why he reacted the way he did, that

9    he believed that he had retrieved a gun and was coming out

10   with it.

11             MR. WEAKLEY:  Correct.

12             THE COURT:  And that is relevant to his actions that

13   he took next.

14             Mr. Galipo's point in opening was -- what I took from

15   that, was not raising the issue whether anyone in the car had

16   a gun or whether there was a gun somewhere in the car at any

17   point that evening.  But that the point that Mr. Ayala -- or

18   Deputy Ayala did not make that statement at the scene, it was

19   something that was first stated sometime later.  That's what I

20   understood the opening to be.  And I think that's -- assuming

21   that is, in fact, the facts that the plaintiffs intend to

22   present and have some evidence to support, then that doesn't

23   implicate the issue with Mrs. -- the other passenger in the

24   car doing something with a gun at a later time.  So I don't

25   think the door is opened on that.

54

1          MR. WEAKLEY:  Okay.  We think it's -- the cumulative

2   affect of impeaching Deputy Ayala, and the fact that there's

3   was a gun in the car.

4          THE COURT:  Well, the issue is not --

5          MR. ALEXANDER:  If I could.  The issue isn't whether

6   there was in the car.  The issue is whether the decedent had a

7   gun on his person when he was shot.

8          THE COURT:  That and whether the defendant reasonably

9   believed that he did, whether he did or not.  And the

10  reasonableness of the belief is -- let's put it this way, the

11  conduct of Ms. Cominez, if I've got that name correct, after

12  the fact is, at least as I understand it, now raises a 403

13  issue.  And I don't see any basis to change that at this --

14  that ruling at this point.

15         MR. WEAKLEY:  Okay.  I just request that the --

16         MR. GALIPO:  Thank you, Your Honor.

17         MR. WEAKLEY:  -- look at the Cruz case that we cited.

18  I think it's factually very, very similar to this.

19         THE COURT:  All right.

20         MR. GALIPO:  Thank you, Your Honor.

21         THE COURT:  Okay.  We're -- we've got -- I think I

22  told the jury 3:25.  If you need more than five minutes on the

23  break, I'll give that to you, but let's plan to bring them

24  back by 3:30 at the latest.

25      (Recess taken from 3:20 p.m. 3:31 p.m.)

55

1      THE COURT:  Are we ready for the jury?

2      MR. GALIPO:  Yes, Your Honor.

3      THE COURT:  All right.  Let's bring in the jury.

4    (Jury enters the courtroom at 1:33 p.m.)

5      THE COURT:  Welcome back, Members of the Jury.  At

6  this time we're ready to proceed with plaintiffs' case.

7      Mr. Galipo.

8      MR. GALIPO:  Yes.  Thank you, Your Honor.

9      The plaintiffs would like to call the defendant

10 Deputy Jason Ayala, please.

11     THE COURT:  So, Mr. Ayala, if you'll just come to the

12 stand and raise your right hand and be sworn.

13                     JASON AYALA,

14 called as a witness on behalf of the Plaintiffs, having been

15 first duly sworn, testified as follows:

16     THE CLERK:  Please be seated, if you can.  Please

17 state your full name, spelling your last name for the record.

18     THE WITNESS:  Jason Ayala, A-y-a-l-a.

19     MR. GALIPO:  May I inquire, Your Honor?

20     THE COURT:  Yes, you may.  Please proceed.

21     MR. GALIPO:  Thank you.

22                  DIRECT EXAMINATION

23 BY MR. GALIPO:

24 **Q.**  Good afternoon, Deputy Ayala.

25 **A.**  Good afternoon.

1  **Q.**  I think we met each other once before at the time of your

2  deposition; is that correct?

3  **A.**  Yes.

4  **Q.**  Have you had a chance to review your deposition to prepare

5  for your trial testimony?

6  **A.**  Yes.

7  **Q.**  Were you looking at it earlier today as well?

8  **A.**  Yes.

9  **Q.**  You also gave an interview at some point following the

10  shooting; is that correct?

11  **A.**  Yes, I did.

12  **Q.**  And that was recorded, to your knowledge?

13  **A.**  Yes.

14  **Q.**  The shooting happened -- was it October 2nd, 2020?

15  **A.**  Yes.

16  **Q.**  About nine o'clock at night?

17  **A.**  Yes.

18  **Q.**  And near Mono Street?  On K Street, actually?

19  **A.**  Correct.

20  **Q.**  That's in Mojave?

21  **A.**  Correct.

22  **Q.**  And there's a Denny's and a Wienerschnitzel's nearby?

23  **A.**  Yes.

24  **Q.**  And you've had a chance to review your statement?  Not

25  your depo, but the statement, correct?

1    **A.**   Correct, yes.

2    **Q.**   Were you trained that a verbal warning that you're going

3    to use deadly force should be given when feasible?

4    **A.**   When feasible, yes.

5    **Q.**   Were you trained about the concept of reverence for human

6    life?

7    **A.**   Yes.

8    **Q.**   And were you trained that in terms of using deadly force,

9    you're responsibile to justify every shot?

10   **A.**   Correct.

11   **Q.**   You fired five shots; is that correct?

12   **A.**   Yes.

13   **Q.**   What type of weapon, in terms of caliber, did you fire the

14   shots from?

15   **A.**   A .40 caliber.

16   **Q.**   Is that considered a semiautomatic weapon?

17   **A.**   Yes.

18   **Q.**   And to fire five shots with that weapon, do you have to

19   press the trigger for each shot?

20   **A.**   Yes.

21   **Q.**   So in this case, you would have pressed the trigger five

22   times?

23   **A.**   Correct.

24   **Q.**   And did you intentionally press the trigger each time, as

25   opposed to accidental discharge?

1    A.  Yes.

2    Q.  Now, in your deposition, do you recall telling me that

3    nobody else used her as an informant?

4    A.  I don't specifically -- I think I said I didn't have any

5    knowledge of anyone specifically using her as an informant.

6    Q.  Okay.  So I want to ask you a little bit about information

7    that you had or didn't have regarding Mr. Lewis before you

8    pulled his car over.

9    A.  Sure.

10   Q.  Okay.  You did know he was on probation; is that correct?

11   A.  Yes.

12   Q.  And, to your knowledge, did Mr. Lewis ever make any

13   negative comments about law enforcement?

14   A.  Not that I knew of, no.

15   Q.  In fact, you had one prior contact with him, correct?

16   A.  Yes, I did.

17   Q.  And the nature of that contact that you had with him, he

18   was the victim of someone who had been hit by a car?

19   A.  Yes.  He had been hit by a vehicle.

20   Q.  And he was cooperative at that time; is that fair?

21   A.  Yes, he was.

22   Q.  And that was your only prior contact with him, when he had

23   been hit by the car?

24   A.  Yes.

25   Q.  And I asked you these questions at your deposition, but I

1  night of the incident afterwards?

2  **A.**  Yes.

3  **Q.**  That is Exhibit 6, page 2.  And then Exhibit 6, page 3,

4  that would be another photograph taken of you; is that

5  correct?

6  **A.**  Yes.

7  **Q.**  Now, you mentioned that it's generally better if you think

8  someone might have a gun, for example, to have another officer

9  present with you to do a traffic stop; is that true?

10  **A.**  Yeah.  If possible, yes.

11  **Q.**  And you had at least some information from the informant

12  that Mr. Lewis had a gun?

13  **A.**  Yes.

14  **Q.**  And what you were thinking is that if he does have a gun,

15  that would be a violation of his probation, for example?

16  **A.**  Yes.

17  **Q.**  And you also were thinking, because he's on probation, I

18  could stop him without any reason and search his vehicle, even

19  if I don't have, you know, the normal probable cause or

20  reasonable suspicion, because it's part of his probation?

21  **A.**  I had a reason.  Yes, I don't need a traffic infraction in

22  order to stop him if he's on probation.

23  **Q.**  Okay.  Now, did you take any steps to try to arrange to

24  have another deputy present with you when you did this stop?

25  **A.**  So the other deputies that were working were still on the

PX (Ayala G

1   A.  Yes.  Rosamond.

2   Q.  Were you aware that the car, this black Chevy Tahoe, had

3   been at the Wienerschnitzel's drive-thru?

4   A.  When I saw it, yes.

5   Q.  When you first saw it, it was going through the drive-

6   thru?

7   A.  Correct.

8   Q.  Did it look like it was like one of the cars going

9   through, ordering food, getting food?

10  A.  Yes.

11  Q.  And so I'm going to show you Exhibit -- one second,

12  please.

13          MR. GALIPO:  May I approach Mr. Weakley, Your Honor?

14          THE COURT:  You may.

15          MR. GALIPO:  By agreement, Your Honor, is it okay if

16  I read them all off?

17          THE COURT:  Yes, please.

18          MR. GALIPO:  They're all part of Exhibit 5.  And it

19  would be Exhibit 5, page, 2, page 4, page 6, and page 13.

20          THE COURT:  2, 4, 6 and 13?

21          MR. GALIPO:  Yes.

22          THE COURT:  Okay.  No objection?

23          MR. WEAKLEY:  No objection.

24          THE COURT:  They're admitted.

25  ///

DX Ayala G

73

1   **A.**   Uh, I can't remember if it was on Sierra Highway or Mono,

2   but it's the immediate right turn off Seraso.

3   **Q.**   And once you got on Mono, you attempted to pull it over;

4   and it turned on K and pulled over shortly thereafter?

5   **A.**   Yes.

6   **Q.**   And I want to show you a few photos.  This is Exhibit 5-6

7   that's been admitted.  Are you able to see that on your

8   screen?

9   **A.**   Yes.

10  **Q.**   And can we see -- the white vehicle would be your vehicle?

11  **A.**   Yes.

12  **Q.**   And this would be your vehicle where I'm pointing with my

13  pen?

14  **A.**   Yes.

15  **Q.**   And the black vehicle would be the SUV?

16  **A.**   Yes.

17  **Q.**   And is that about the distance the vehicles were apart

18  when you brought your vehicle to a stop?

19  **A.**   Yes.  I didn't move my vehicle.

20  **Q.**   And you didn't see anyone move the black SUV afterwards,

21  did you?

22  **A.**   No.

23  **Q.**   And then that truck across the street, you recall that

24  being there as well?

25  **A.**   Yes.

1   Q.   I'm just showing you a few other perspectives.

2   A.   Sure.

3   Q.   Page 5, Exhibit 4 [sic], that would also show the two

4   vehicles from a different perspective?

5   A.   Yes.

6   Q.   And Exhibit 5, page 2, again, that would show the vehicles

7   from a side perspective; is that correct?

8   A.   Yes.

9   Q.   So you walk up to the driver's door, correct?

10  A.   Correct.

11  Q.   Your gun is holstered at that time?

12  A.   Yes.

13  Q.   You look into the vehicle, correct?

14  A.   Correct.

15  Q.   Now, there's four people in this car, correct?

16  A.   I didn't know that at the time.

17  Q.   Well, you saw someone in the driver's seat, right?

18  A.   Right.

19  Q.   And you saw a female in the front passenger seat, correct?

20  A.   Not before I walked up to the car.  Are we at the window

21  right now, or where are we?

22  Q.   We're at the window now.

23  A.   Okay.

24  Q.   At the window, you looked into the car, didn't you?

25  A.   I remember at one -- I remember at some point seeing a

1    female passenger.  I can't remember at what point I saw her.

2    **Q.**  At some point, did you see her?

3    **A.**  Yes.

4    **Q.**  I mean, I take it it's your normal practice, if you're

5    going to stop a car, to look into the car to see who's in the

6    car?

7    **A.**  Yeah.  I couldn't see the back passenger seats.  The

8    windows were tinted, and I believe they were only rolled down

9    a little bit.

10   **Q.**  So are you saying that you never looked into the back even

11   through the front window portion as you're looking into the

12   car?

13   **A.**  When they were in the Wienerschnitzel?

14   **Q.**  No.  When you were standing at the driver's door of the

15   car having a conversation with Mr. Lewis.

16   **A.**  No.  I did not see anybody in the back seat.

17   **Q.**  Did you look in the back seat?

18   **A.**  I don't believe I did.

19   **Q.**  But at some point you noticed a female in the front

20   passenger seat?

21   **A.**  Yes.

22   **Q.**  And did you tell Mr. Lewis why you had stopped him at that

23   point?

24   **A.**  I told him my intention was to conduct a search,

25   basically.

1    Q.  At the door?  At the door -- I'm at the door right now.

2    A.  Yes.

3    Q.  I'm trying to take this in order.

4    A.  Right.

5    Q.  Did you tell him at the door you want to conduct a search?

6    A.  I believe I told him, "I know you're on probation.  Please

7    step out of the car."  Basically, yeah.

8    Q.  Words to that effect?

9    A.  Words to that effect.

10   Q.  You didn't have a body-worn camera on?

11   A.  No.  We did not have them assigned to us out in that area.

12   Q.  Any dash cam on your vehicle?

13   A.  Also, we did not have those.

14   Q.  Any audio recording device?

15   A.  Same answer.  We didn't have anything.

16   Q.  And Mr. Lewis gets out of the car?

17   A.  Yes.

18   Q.  And you walk somewhere to the back of the black SUV?

19   A.  Yes.

20   Q.  And he's complying up to this point, right?

21   A.  Yes, he is.

22   Q.  He didn't, for example, come out of the car with a gun,

23   did he?

24   A.  No.  Not when I asked him to step out, no.

25   Q.  Did he verbally threaten to harm you at all at that point?

1    A.  No.

2    Q.  And you do a search of his person at some point, correct?

3    A.  Yes.

4    Q.  Where was he in relation to the vehicles we see on

5    Exhibit 5, page 2, when you did this search?

6    A.  It was towards the back of his SUV.

7    Q.  And what did you ask him to do to do the search?

8    A.  So we do a search called the standing modified.

9    Basically, he puts his hands on his head and spreads his feet

10   apart.

11   Q.  Did he do that?

12   A.  Yes.

13   Q.  And what do you -- and he's wearing what?  Basketball

14   shorts and a white shirt?

15   A.  He had some type of shorts and a T-shirt.

16   Q.  And what do you do to do the search?

17   A.  So you would grab his hands on top of his head and hold

18   them and use your other hand to do the search.

19   Q.  Okay.  And did you see any weapons protruding from his

20   clothing?

21   A.  No.

22   Q.  Did you feel any weapons when you did the search?

23   A.  No.

24   Q.  Were you fairly confident, based on what you observed and

25   what you felt or didn't feel, that he had no weapons on him at

1    that point?

2    A.   Yes.

3    Q.   And then at some point do you tell him you want to search

4    the car?

5    A.   Yes.

6    Q.   And where were you standing when you told him that?

7    A.   I had walked him from the back of his vehicle to the

8    passenger rear of my vehicle.

9    Q.   So were you thinking, "I'm going to handcuff him and put

10   him in the back of my car" at that point while --

11   A.   Yes.

12   Q.   Sorry.  You already anticipated my question.

13            Handcuff him, put him in the back of your car, while

14   you're searching the vehicle?

15   A.   Yes.

16   Q.   And if you put him in the back of your car and close the

17   door, is he able to open the door from the inside?

18   A.   No.

19   Q.   And with handcuffs behind his back, it would be probably

20   even more difficult to open the door?

21   A.   Yes.

22   Q.   But even without handcuffs, if I tried to open it, you're

23   saying it wouldn't open?

24   A.   Right.

25   Q.   And at some point, you hear him, according to your

1    recollection, say the F word in some fashion?

2    **A.**  Yes.

3    **Q.**  And I know you described that he kind of lunged at you at

4    that point or words to that effect.  Do you remember that?

5    **A.**  Yes.

6    **Q.**  At that point, in that moment or second or two before he

7    ran away from you, did he punch you?

8    **A.**  No.

9    **Q.**  Did he swing at you?

10   **A.**  No.

11   **Q.**  Kick at you?

12   **A.**  No.

13   **Q.**  Tackle you to the ground?  Anything?

14   **A.**  No.

15   **Q.**  Did he verbally threaten to harm you at that time at all?

16   **A.**  No.

17   **Q.**  Now, he was taller than you were; is that fair?

18   **A.**  Yes.

19   **Q.**  And even though you told us you lost some weight, he

20   probably weighed more than you did at the time because of his

21   height, in part?

22   **A.**  I would imagine so, yes.

23   **Q.**  And would you agree that at that point, before he ran

24   away, there was no physical contact in terms of a push, a

25   punch, a kick, between you and him?

PX (Ayala G

80

 1   **A.**  Correct.

 2   **Q.**  And then he ran away from you?

 3   **A.**  Yes.

 4   **Q.**  And you were watching where he went?

 5   **A.**  Yes.

 6   **Q.**  And I guess in part because he had a white T-shirt on, it

 7   made it a little easier to track him?

 8   **A.**  Yes.  It helped.

 9          MR. GALIPO:  I've got Exhibit 5, page 8, by

10   agreement, Your Honor.

11          THE COURT:  No objection?

12          MR. WEAKLEY:  No objection.

13          THE COURT:  It's admitted.

14          MR. GALIPO:  Thank you.

15      (Plaintiffs' Exhibit 5, page 8 was received.)

16   BY MR. GALIPO:

17   **Q.**  And I realize this is the front of it, but is this the

18   front of that big truck that was across the street that we saw

19   in the other photo?

20   **A.**  It appears to be, yes.

21   **Q.**  And I'm going back to Exhibit 5, page 6.  And it's not as

22   clear as I would hope, but can you kind of see from this

23   perspective that portion of that truck?

24   **A.**  Yes.

25   **Q.**  So when Mr. Lewis ran away, did you see him run past his

81

1   car behind the truck?

2   A.   Yes.

3   Q.   So just so we're clear, at that point he didn't try to get

4   back into his car?

5   A.   No.

6   Q.   And you thought at that point he was trying to get away

7   from you?

8   A.   Correct.

9   Q.   And you, in fact, saw him at some point behind that big

10  truck laying down?

11  A.   Yes.

12  Q.   And that truck was hauling hay.  Do you remember that?

13  A.   I don't remember what it was hauling, but it appears to be

14  hauling hay from the picture.

15  Q.   And when he was laying down behind the truck, you

16  estimated he was at least 50 feet away; does that sound right?

17  A.   It could have been 40.  40 or 50.  In the range, yes.

18  Q.   That's just an estimate; is that fair?

19  A.   Yeah.  Estimate.

20  Q.   And one of the things you're thinking is that, you know,

21  "I might go chase him, and he may circle around and get back

22  in the car and take off"?

23  A.   Yes.

24  Q.   So you thought, "I think I'm going to go in the car and

25  take the keys out"?

1    **A.**  Correct.

2    **Q.**  That way, without the keys, it would be hard to drive off.

3    Is that what you were thinking, in part?

4    **A.**  Yes.

5    **Q.**  And you did that, correct?

6    **A.**  Yeah.  I reached in and grabbed the keys.

7    **Q.**  And when you reached in to grab the keys, Mr. Lewis was

8    still laying down in the back of this truck?

9    **A.**  Yes.

10   **Q.**  Now, when you went back in the car to grab the keys, did

11   you notice the female passenger in the car then?

12   **A.**  Yeah.  When I reached in to grab the keys, I believe

13   that's when I first noticed the female passenger.

14   **Q.**  Did you happen to glance and see two young ladies sitting

15   in the back?

16   **A.**  No.  My focus was mostly on Lewis.

17   **Q.**  Now, you knew that he didn't have a weapon on him,

18   correct?

19   **A.**  Correct.

20   **Q.**  Did you reach under the seat or check the center console

21   for a weapon at that time?

22   **A.**  No.  Like I said, my focus was more on him.

23   **Q.**  And then after you have the keys, where do you go?

24   **A.**  After I have the keys, I move from the vehicle more

25   towards the center of the street.  And that's when I told him

1    I have his keys and he was under arrest.

2    Q.  Okay.  When you told him that, he's still behind the

3    truck, first of all, true?

4    A.  Yes.

5    Q.  And looking at Exhibit 5, page 13, we see the door of the

6    SUV open there, true?

7    A.  Yes.

8    Q.  Was it open, to your knowledge, from the time -- well,

9    strike that.

10          When Mr. Lewis first got out of the car the first

11   time before you walked him back to search him, was the door

12   open or closed, if you know?

13   A.  I believe it stayed open.

14   Q.  Stayed open.  So when you went back in to get the keys,

15   the door was already open?

16   A.  Yes.

17   Q.  And, then, you left it open, after getting out?

18   A.  I never got in.

19   Q.  Well, I thought you said you reached in to get the keys?

20   A.  I reached in.  It sounded like I was inside the car.

21   Q.  Oh, no.  I didn't mean that --

22   A.  Okay.

23   Q.  -- you were sitting down taking a cruise.

24   A.  Right.

25   Q.  I mean, you had to reach in to get the keys?

1  I don't -- I'm not sure.

2  Q.  You're saying you're not sure whether somebody in the car

3  would have been able to hear that when you yelled it out with

4  the door open?

5  A.  I don't know what was happening in the car, if they were

6  having conversations or whatnot.  My point for saying all that

7  was to have him hear it.

8  Q.  I see.  Did you tell him what he was under arrest for at

9  that time?

10  A.  No.  I believe I just said, "You're under arrest.  I have

11  your keys.  You can't go anywhere."

12  Q.  Okay.  So at some point you see Mr. Lewis coming from

13  behind this truck hauling hay coming in your direction,

14  correct?

15  A.  Yes.

16  Q.  And when he was coming in your direction, did you see any

17  weapons in his hand?

18  A.  I don't remember seeing anything in his hands, no.

19  Q.  Did he try to tackle you to the ground at that point?

20  A.  No.  He had more -- he had -- so when he started running

21  towards me, I took a few steps back towards his bumper.  And

22  he changed direction towards his front -- the open driver's

23  side door.

24  Q.  Okay.  And got in the car?

25  A.  Yes.

1  **Q.**  Showing you -- and the door was already open?

2  **A.**  Yes.

3  **Q.**  Showing you Exhibit 5, page 2, which we previously looked

4  at, before he got back in the car, did he try to assault you

5  or punch you or tackle you to the ground or anything like

6  that?

7  **A.**  No.

8  **Q.**  Did he verbally threaten to harm you?

9  **A.**  No.

10 **Q.**  Did he simulate like he had a weapon or anything like

11 that?

12 **A.**  No.

13 **Q.**  So now he's back in the car, correct?

14 **A.**  Yes.

15 **Q.**  How long would you estimate he was in the car before he

16 got back out?

17 **A.**  I believe in the deposition I was very approximate with my

18 time.  I said approximately five seconds.  I hadn't reviewed

19 any videos at that point.  Since then, with the security

20 cameras and the video, it looks like it was maybe one to two

21 seconds.

22 **Q.**  So you already anticipated my question.  In your

23 deposition, you estimated it was approximately five seconds?

24 **A.**  Yeah.  I emphasized "approximately," yes.

25 **Q.**  I want to be fair to you.  But you're saying now that you

1  reviewed other evidence, you believe it was more like one to

2  two seconds?

3  A.  Yeah.  From the video, it looks like more than -- well, it

4  looks like one to two seconds.

5  Q.  Now, when he's in the car, is he sitting in the driver's

6  seat?

7  A.  Yes.

8  Q.  And where were you positioned at that time relative to the

9  car?

10  A.  So when he started running and turned towards his driver's

11  seat, my anticipation was that he was getting in the driver's

12  seat.  So I moved from his back bumper more at an angle out

13  towards the middle of the street to have a view of what he was

14  doing.

15          MR. GALIPO:  May I approach Mr. Weakley, please?

16          THE COURT:  Yes.

17          MR. GALIPO:  By agreement, Exhibit 5, page 34.

18          MR. WEAKLEY:  No objection.

19          THE COURT:  It's admitted.

20      (Plaintiffs' Exhibit 5, page 34 was received.)

21  BY MR. GALIPO:

22  Q.  Now, this is a view from the rear of the SUV; is that

23  correct?

24  A.  Yes.

25  Q.  Now, when Mr. Lewis got back in this car, for what you're

DX Ayala G

88

1    saying now is one or two seconds, could you see his hands?

2    **A.** No.

3    **Q.** Could you see his right arm?

4    **A.** All I know is his right arm was down. He was leaning

5    forward, and his right arm was down towards the underneath of

6    the seat.

7    **Q.** Right now I'm wondering if you could see his right arm.

8    **A.** No. Just the way his body was leaning forward, I could

9    not.

10   **Q.** So, first of all, is it correct that you could not see his

11   hands; is that correct?

12   **A.** They were under the seat. I could not see them.

13   **Q.** I'm going to get to that in a moment.

14   **A.** Okay.

15   **Q.** You couldn't see his hands at all; is that true?

16   **A.** Correct.

17   **Q.** And you couldn't see his right arm. Is that also correct?

18   **A.** Yes.

19   **Q.** Do you recall in your deposition telling me that you

20   positioned yourself towards the back of his vehicle when he

21   got back in the car?

22   **A.** I don't remember.

23   **Q.** Well, did you position yourself towards the back of his

24   vehicle when he got back in the car?

25   **A.** I positioned myself towards the back of his vehicle when

PX (Ayala G

89

1    he was running towards the front seat, when I anticipated he
2    was going to jump into his seat.
3    Q.  Would you at least agree with me that from your position,
4    you could not see underneath the front seat?
5    A.  Correct.
6    Q.  And would you also agree with me from your position, you
7    could not see the front of the driver's seat?
8    A.  I believe I could see the side.  It's kind of a weird
9    angle.
10   Q.  Okay.  Did you see him pull a gun out from under the
11   driver's seat?
12   A.  No.
13   Q.  Did you see him get out of car with what you could
14   identify as a gun in either hand?
15   A.  I could only see one of his hands, and his left hand was
16   empty.
17   Q.  And I want to ask you now for a moment about these threats
18   that you say he made.  Understanding your testimony, up to the
19   time he got back in the car, he never verbally threatened to
20   harm you?  Do I have that correct?
21   A.  I believe half of the statement was when he was in the car
22   before he got out.
23   Q.  Okay.  Because you heard, I'm sure, when your attorney
24   gave his opening statement, he said that those threats he gave
25   you was after he got out of the car.  Do you remember hearing

1  him say that?

2  **A.**  I do not.  I remember the events as part of it was said

3  while he was still in the car getting out.

4  **Q.**  Okay.  The first thing I want to establish, before he got

5  back in the car, for this one or two seconds, he never

6  verbally threatened to harm you?  Would you agree with that?

7  **A.**  Yes, I would.

8  **Q.**  Now you're saying he got in the car for one or two

9  seconds, correct?

10  **A.**  Correct.  Approximately, yes.

11  **Q.**  Approximately.  And you're saying during this approximate

12  one or two seconds, half of the threatening statements he made

13  against you were while he was in the car?

14  **A.**  Yeah.  It was -- it was -- this is a very quick, short

15  amount of time.  So it's sort of a fluid motion before getting

16  out of the car.  And once he gets out of the car is when it

17  was said.  So part of it was when he was inside getting out.

18  **Q.**  And you gave your statement about five days after the

19  incident, correct?

20  **A.**  Correct.

21  **Q.**  With an attorney present, correct?

22  **A.**  Yes.

23  **Q.**  And then during this statement you gave five days later,

24  with an attorney present, you said he said something to the

25  effect "You're going to have to kill me."  Remember saying

1    that in your statement?

2    A.    Yes.

3    Q.    You didn't even know the exact words at that time, would

4    that be correct?   That's why you said, "something to the

5    effect"?

6    A.    Yes.

7    Q.    Then you claim he said, "You're going to die."   Remember

8    saying that in your statement?

9    A.    Yes, I do.   Yes.

10    Q.    Now, I'm assuming he -- according to you, he said that

11    half while he was in the car and half as he's getting out of

12    the car?

13    A.    Correct.

14    Q.    So, obviously, all the people in the car would have been

15    able to hear it, because they were right there?

16    A.    I would assume so, yes.

17    Q.    So now I want to talk to you about this right hand, left

18    hand.   And let me ask you.   How much time -- now that you're

19    revisiting your approximations, how much time do you think

20    happened from Mr. Lewis getting back out of the car to your

21    first shot?

22    A.    I believe it's in my time estimate of approximately one to

23    two seconds.

24    Q.    I just want to make sure we're clear on what I'm asking

25    and what you're understanding.

PX Ayala G

92

1          Are you saying this all happened within one or two

2   seconds?

3   A.   Yes.  It was very fast, yes.

4   Q.   Okay.  So you're saying that -- because you said he was in

5   the car for one or two seconds before, right?

6   A.   Correct.

7   Q.   Now I'm asking you, just so we're clear, from him getting

8   out or starting to get out to your first shot, are you also

9   saying that's within the same one or two seconds?

10  A.   No.  I believe it's the -- I believe I misunderstood your

11  first question, from my approximation of five seconds.  That

12  was -- that was the whole -- that was the incident from him

13  jumping in and then getting out coming towards me.  That was

14  the approximate five seconds I had given you.

15  Q.   If I may ask a new question.  If you don't understand it,

16  just let me know; and I'll try to ask it in a better way.

17  Okay?

18          Right now I'm wondering from the time he got out the

19  last time to the time you fired your first shot, how much time

20  passed?

21  A.   It was pretty immediate -- it was immediate.  I mean, I

22  don't have seconds for that portion.

23  Q.   It was immediate, meaning within a second?

24  A.   Immediate to me is immediate.  I don't have seconds, if

25  that makes sense.

1  Q.  Well, I don't know if it makes sense or not, but you were

2  there and I wasn't.  So I'm just asking you.  You're giving

3  the estimate about the one or two seconds in the car.  Now I'm

4  asking you how much time passed from him getting out to you

5  shooting him.  Can you give any estimate as to that?

6  A.  I'm going to say immediate.  I don't have -- I don't have

7  an estimate for seconds.

8  Q.  But you would say immediate?

9  A.  Yes.

10  Q.  Okay.  You said he was in the car for one or two seconds,

11  correct?

12  A.  Right.

13  Q.  When he was in the car, did he immediately get out?

14  A.  What do you mean?

15  Q.  I'm just trying to get your idea of "immediate."

16  A.  Right.

17  Q.  When he was in the car for one or two seconds, did he

18  immediately get out?

19  A.  So I think of immediate as -- it's hard to break down this

20  whole situation that happened very quickly into seconds.  The

21  whole thing was very, very fast.  It's hard for me to put

22  seconds to someone charging towards me, if that makes sense.

23  Q.  Well, if you say it was immediate, I guess he couldn't

24  have been charging or sprinting at you very long, if you shot

25  him almost immediately from him getting out; is that fair?

1   A.   Can you say that one more time?

2   Q.   Sure.  If you're saying you shot him immediately after he

3   got out of the car, he couldn't have been running at you or

4   charging at you for very long?

5   A.   So what I said before, my definition of "immediate" is the

6   fluid -- or fluid motion of how everything occurred after he

7   got out of the car.

8   Q.   Okay.  Let me ask you this:  After he got out of the car,

9   but before you fired your first shot, did you give him any

10  commands?

11  A.   No.  I didn't have time.

12  Q.   Did you give him any verbal warning you were going to

13  shoot him if he did or didn't do something?

14  A.   Again, there was no time.

15  Q.   I take it the answer is no to both of those questions?

16  A.   Yes.

17  Q.   Yes, it is no?

18  A.   Yes, it is no.

19  Q.   All right.  Now, you're claiming that his left hand was

20  visible?

21  A.   Yes.

22  Q.   And you could see his left hand was visibly empty,

23  correct?

24  A.   Yes.

25  Q.   Do you recall me asking you at the time of your

1    deposition, "Did he ever reach for your gun?"  Remember that

2    question?

3    A.  Yes.

4    Q.  And you told me, "no, he did not"?

5    A.  Yes.

6    Q.  Was that a correct answer?

7    A.  Yes.

8    Q.  And so, now, the right hand.  Is it your testimony that

9    his right hand was behind his back for all five shots?

10   A.  I couldn't see his right hand the whole time, because he

11   was face-to-face with me at one point for the five shots; and

12   my gun was down low.

13   Q.  Could you ever see, at any time before you started

14   shooting, his right hand visible?

15   A.  No.

16   Q.  According to you, could you ever see his right hand

17   visible during any of the five shots?

18   A.  No.

19   Q.  You would agree that if you could see both hands and they

20   were visibly empty, based on your training, it would have been

21   inappropriate to shoot him, correct?

22   A.  Correct.

23   Q.  Because, as we talked about earlier, in order to shoot

24   someone and possibly kill them, there has to be an immediate

25   or imminent threat of death or serious bodily injury, correct?

DX Ayala G

96

1   **A.**  Yes.

2   **Q.**  And, obviously, you never saw a gun at any time before you

3   shot him, true?

4   **A.**  I did not.

5   **Q.**  Now, at some point, according to you, at least our

6   discussion from your deposition, Mr. Lewis stopped moving

7   forward towards you during the shooting.  Remember telling me

8   that?

9   **A.**  Yes.

10  **Q.**  And, in fact, you told me at your deposition that he

11  stopped running and turned around, correct?

12  **A.**  I don't remember saying "turn around."  I was thinking

13  maybe that was possibly a typo in the transcript.  I think

14  I'm -- and we'd have to go to audio recording for that,

15  because I noticed that as well.  I may have said "ground,"

16  "went to the ground," instead of turned around.  I'm not quite

17  sure that's accurate in the transcript.

18  **Q.**  Okay.  So let me just take it point by point.  You recall

19  reading the transcript recently?

20  **A.**  Yes.

21  **Q.**  And you recall, when you read your deposition transcript,

22  that you said that he stopped running towards you -- no.  You

23  said you saw him stop running towards you and then turned

24  around.  That's what the transcript says?

25  **A.**  Could you give me the page number and line?

PX Ayala G

97

1    Q.   Sure.  Do you have your depo up there?

2    A.   I do.

3    Q.   Let's turn to page 80, lines 13 through 16.

4         MR. GALIPO:  Does the Court have a copy or need a

5    copy?

6         THE COURT:  I do.

7         MR. GALIPO:  Okay.  Thank you.

8    BY MR. GALIPO:

9    Q.   Read that to yourself.  And let me know when you've had a

10   chance to do that.

11        Have you had a chance?

12   A.   Yes.

13   Q.   Does it refresh your recollection at the time of your

14   deposition you said:

15        "After I -- so after I shot and saw him stop running

16   towards me, I stopped shooting; and then he turned around."

17   A.   That's what it says in the transcript.  Like I said

18   before, I think that may be a typo.  We'd have to go to the

19   audio recording for clarification, I believe.

20   Q.   Was his back ever to you during any of the shots?

21   A.   Not that I remember, no.

22   Q.   It's your testimony that he was facing directly towards

23   you for all five shots?  Is that your testimony?

24   A.   Yes.

25   Q.   You're aware now there are two shots to his back; is that

1   correct?

2   A.   Yes.  I believe one was to the side.  Am I mistaken?

3   Q.   Left side of his back and one towards the center of his

4   back?

5   A.   Yes.

6   Q.   According to you, his back was never to you for any of the

7   shots, true?

8   A.   Not that I saw.

9   Q.   And, according to you, you could never see his right hand

10  during any of the shots?

11  A.   Correct.

12  Q.   And, then, after you fired the five shots, you saw him

13  fall down on his back, correct?

14  A.   I don't know if I remember seeing him fall on his back.  I

15  remember looking down, and he was on his back.

16  Q.   He ended up on his back?

17  A.   Yes.

18        MR. GALIPO:  Because we're getting close, can I just

19  ask a few more questions before we break for the day?

20        THE COURT:  Yes.

21        MR. GALIPO:  Like 30 seconds worth?

22        THE COURT:  That's fine.  You tell me when an

23  appropriate time to break is.

24  BY MR. GALIPO:

25  Q.   Okay.  After the shooting, you were at the scene for some

1     THE COURT:  So we will check in at the end of the day

2  tomorrow, see where we are at, and you should plan on the

3  defendant's side to potentially have witnesses available to

4  testify on Friday morning, if needed.  But it sounds like they

5  are likely to go through the end of the middle of the day on

6  Friday.

7     MR. WEAKLEY:  Is Destiny the only person from inside

8  the SUV --

9     MR. GALIPO:  For tomorrow.  And then we're going

10  assess whether we're going to call anyone else from the car in

11  part depending on how it goes.

12     THE COURT:  Okay.  Fine.

13     Anything further.

14     MR. HAMILTON:  Your Honor, the jury lists, what would

15  you like us to do with them?

16     THE COURT:  Just provide them to the courtroom

17  deputy, please.  Thank you.

18     All right.  Court's in recess then.

19     (Proceedings were adjourned at 4:39 p.m.)

20

21

22     I, RACHAEL LUNDY, Official Reporter, do hereby certify the
   foregoing transcript as true and correct.

23

   Dated:  April 1, 2025          /s/ Rachael Lundy_____
24                                 RACHAEL LUNDY, CSR-RMR
                                   CSR No. 13815
25

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. KIRK E. SHERRIFF


MICKEL ERICK LEWIS, JR., et   )
al.,                          )   1:21-cv-00378-KES-CBD
                              )
          Plaintiffs,         )
                              )   JURY TRIAL, DAY 2
     vs.                      )
                              )
COUNTY OF KERN, et al.,       )   Volume 2
                              )   Pgs. 106 - 354, inclusive
          Defendants.         )
_____)
                              )
R.L., et al.,                 )
                              )
          Plaintiffs,         )
                              )
     vs.                      )
                              )
COUNTY OF KERN, et al.,       )
                              )
          Defendants.         )
_____)

Fresno, California              Wednesday, March 12, 2025



REPORTER'S TRANSCRIPT OF PROCEEDINGS







REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

## INDEX

**GOVERNMENT'S WITNESSES**:

**JASON AYALA**                                             112
DIRECT EXAMINATION RESUMED BY MR. GALIPO         112
CROSS-EXAMINATION BY MR. WEAKLEY                 156
REDIRECT EXAMINATION BY MR. GALIPO              200
REDIRECT EXAMINATION BY MR. ALEXANDER           217
RECROSS-EXAMINATION BY MR. WEAKLEY              226


**JESSICA SALCEDO**
DIRECT EXAMINATION BY MR. ALEXANDER             242
CROSS-EXAMINATION BY MS. MARSHALL               262
REDIRECT EXAMINATION BY MR. ALEXANDER           264
RECROSS-EXAMINATION BY MS. MARSHALL             267


**BRIONA LEWIS**
DIRECT EXAMINATION BY MR. ALEXANDER             272


**ORIONA LEWIS**
DIRECT EXAMINATION BY MR. ALEXANDER             308
CROSS-EXAMINATION BY MS. MARSHALL               334
CROSS-EXAMINATION BY MS. GUSTAFSON              338

\* \* \* \* \*

1          THE COURT:  Please proceed.

2                       **JASON AYALA,**

3  called as a witness on behalf of the Plaintiff, having been

4  previously sworn, testified as follows:

5          MR. GALIPO:  Yes.  Thank you, Your Honor.

6          MR. WEAKLEY:  Oh, Your Honor, may I introduce --

7          THE COURT:  Oh, yes.  We have -- please, Mr. Weakly.

8          MR. WEAKLEY:  I just want to introduce Ms. Brande

9  Gustafson from my office representing Deputy Ayala.

10          MS. GUSTAFSON:  Good morning.

11          THE COURT:  Mr. Galipo.

12          MR. GALIPO:  Thank you, Your Honor.

13                  DIRECT EXAMINATION RESUMED

14  BY MR. GALIPO:

15  **Q.**  Good morning, Deputy Ayala.

16  **A.**  Good morning.

17          MR. GALIPO:  Good morning, everyone.

18  BY MR. GALIPO:

19  **Q.**  I want to show you you Exhibit 6, page 4.

20          MR. GALIPO:  By agreement?

21          Your Honor, Exhibit 6, page 4, by agreement.

22          THE COURT:  And no objection?

23          MR. WEAKLEY:  No objection.

24          THE COURT:  It's admitted.

25          And are the jurors' screens on?

1  **A.** Correct.

2  **Q.** And you told us yesterday you pressed the trigger five

3  separate times; is that correct?

4  **A.** Yes.

5  **Q.** I asked you yesterday how much time passed from Mr. Lewis

6  getting out of the car the last time to you firing your first

7  shot. Do you remember that question?

8  **A.** I do.

9  **Q.** And I think you told me in your deposition you estimated

10  that time to be approximately five seconds?

11  **A.** Yes.

12  **Q.** But yesterday, you said upon further review and further

13  consideration you think it was almost immediate; that was the

14  word you used?

15  **A.** I believe I used "immediate" in my deposition as well.

16  **Q.** Okay. And I asked you what that meant, and I think you

17  said it was a second or two; is that what you're saying?

18  **A.** I believe -- did we talk about when he got into the car

19  the first time or after he got out?

20  **Q.** Okay. I want to be clear on this point.

21  **A.** Me too.

22  **Q.** Good.

23       When he got into his car the last time, you, I think,

24  estimated yesterday that was about one or two seconds?

25  **A.** Correct.

DY_resumed-AYALA, G

115

1   **Q.**  We're on the same page with that?

2   **A.**  We are.

3   **Q.**  Okay.  Now I'm asking you, when he got out, Mr. Lewis got

4   out of his vehicle the last time, from him getting out to you

5   firing your first shot -- do you understand the time frame I'm

6   asking you about?

7   **A.**  I do.

8   **Q.**  Okay.  How much time are you saying passed between

9   Mr. Lewis getting out the last time and your first shot?

10   **A.**  I believe I answered that yesterday.  I said immediately.

11   **Q.**  Right.  That's what I recall.

12   **A.**  Yes.  It's hard for me to put seconds on the definition of

13   the word "immediate," because it happened so quickly.

14   **Q.**  Well, you gave an estimate he was in the car one or two

15   seconds, right?

16   **A.**  Approximately, yes.

17   **Q.**  So you're familiar with seconds?

18   **A.**  Generally.

19   **Q.**  And you're able to -- you're at least able to give an

20   estimate of that?

21   **A.**  Yes.

22   **Q.**  I'm simply asking for the same second estimate from him

23   getting out of the car to you shooting.

24   **A.**  Correct.  When somebody is charging towards you, it's a

25   little different to put a time on it, if that makes sense.

DX - resumed / AYALA, C

116

1   It's a little -- quite a bit stressful, and time -- I don't

2   really believe time in seconds at that point, in a mind frame

3   like that.  I believe it's immediate.

4   Q.  Okay.  You obviously had enough time to get your gun up

5   and shoot it, right?

6   A.  I shot from low.  I didn't bring my gun up like I had said

7   before.  It was shot from low.

8   Q.  Are you suggesting that you shot him with the gun low and

9   the bullets going upward?

10  A.  I don't remember exactly where it was.  I know I had

11  pulled it close to my body.  I don't know the height of the

12  weapon.  I just know I didn't bring it up.  When I -- when

13  someone says "bring up your weapon" I picture bringing up and

14  aiming the sights.

15  Q.  Do you know now he has downward bullet trajectories in his

16  body?

17  A.  I have no idea.

18  Q.  How many steps did he take before you fired?

19  A.  I cannot -- I couldn't count.  I have no idea.  I was

20  running backwards and firing my weapon.

21  Q.  Can you give any estimate at all?

22  A.  No.  I'm sure there's measurements taken at the scene from

23  the front door to his location, but I don't know what those

24  are.

25  Q.  Well, you were there, correct?

1   A.  Yes.

2   Q.  And you ended up shooting five shots, and we know it ended

3   up killing Mr. Lewis, correct?

4   A.  Correct.

5   Q.  And I'm just wondering if you have any estimate as to how

6   many steps he took toward you before you started firing.

7   A.  I do not.

8   Q.  Do you have any estimate as to how much distance he

9   covered towards you from getting out of the car before you

10  started firing?

11  A.  No.

12  Q.  You said that you saw his left hand before you fired; is

13  that correct?

14  A.  Yes.

15  Q.  Did you see his left hand or arm pumping in a running

16  fashion?

17  A.  Not that I can recall, no.

18          MR. GALIPO:  By agreement, Your Honor, Exhibit 6,

19  page 5.

20          THE COURT:  It's admitted.

21          MR. GALIPO:  Thank you.

22          MR. WEAKLEY:  No objection.

23          THE COURT:  No objection.

24      (Plaintiffs' Exhibit 6, page 5 was received.)

25  ///

118

1    BY MR. GALIPO:

2    **Q.**  Are you able to see that on your screen?

3    **A.**  Yes.

4    **Q.**  That's the TASER that you had that we were talking about

5    yesterday?

6    **A.**  Yes.

7    **Q.**  And that you generally carry on your left side?

8    **A.**  Correct.

9    **Q.**  Had you ever used your TASER in the field before the day

10   of the incident?

11   **A.**  Yes.  It was ineffective.

12   **Q.**  I wasn't asking whether it was effective or not.  We'll

13   get into that.  I was asking whether you ever used it.

14   **A.**  Yes.

15   **Q.**  How many times had you used it before?

16   **A.**  Several times.  I don't really have a number.  I believe

17   it was less than ten.

18   **Q.**  Less than ten times?

19   **A.**  Yes.

20   **Q.**  And had you used it before in the probe or dart mode where

21   you can fire your TASER from a distance?

22   **A.**  Yes, both.

23   **Q.**  And you had training on the use of the TASER?

24   **A.**  Yes.

25   **Q.**  How about pepper spray?  You say you had pepper spray on

DX_resumed_AYALA_G

119

1    you.  Do you know what distance that could be used from?

2    A.  Any distance.  It comes out in a stream, so I -- I don't

3    think I would use it any more than eight feet away.

4    Q.  And you have training with the use of pepper spray?

5    A.  Yes.

6    Q.  Had you ever been pepper sprayed as part of training?

7    A.  Yes.

8    Q.  Had you ever been tased as part of training?

9    A.  No.

10   Q.  How did the pepper spray affect you when were pepper

11   sprayed as part of training?

12   A.  It burns.

13   Q.  Burns your eyes?

14   A.  Yes.

15   Q.  Affected your mucous membranes?

16   A.  Yes.

17   Q.  How long did the effect last on you?

18   A.  It wasn't as long as most.  It was maybe 15 minutes.

19   Q.  And you're trained, obviously, that pepper spray is a less

20   than lethal option?

21   A.  Yes.

22   Q.  And the TASER, you're trained, is a less-than-lethal

23   option?

24   A.  Yes.

25   Q.  And the baton that we spoke about yesterday, you're

1  trained, is a less-than-lethal option?

2  **A.** Yes.

3  **Q.** I'd like to ask you a little bit about the passengers in

4  the car.  You indicated yesterday at some point you became

5  aware there was a female front-seat passenger.

6  **A.** Yes.

7  **Q.** And how long did you stay at the scene after the shooting,

8  before you left?

9  **A.** I don't remember how long I was at the scene.  I don't

10  think it was a very long time.  It was long enough to -- I

11  wasn't there when detectives showed up.  I was there until a

12  supervisor showed up, and I don't know the time length of

13  that.

14  **Q.** Do you know if it was more or less than 15 minutes?

15  **A.** I would guess more than 15 minutes.

16  **Q.** Now, did you ever at any time after the shooting see some

17  young ladies get out from the back of that Chevy Tahoe?

18  **A.** I don't recall.  I remember the female passenger, the

19  front female passenger.  I don't remember.  I could refer to

20  my deposition, but I don't remember two females getting out of

21  the back seat unless they exited maybe on the passenger side.

22  **Q.** Were you aware at any time before you left the scene that

23  there were two young ladies in the back seat?

24  **A.** I remember a crowd of people, and I'm not sure who came

25  from where.  Uh, if we're talking about me at the scene and

DY - resumed - AYALA C

122

1    A.  Yes.

2    Q.  And were you aware he gave a statement?

3    A.  I assumed he would.  I didn't know how long he -- he

4    stayed on the scene after I left.

5    Q.  Now, how tall are you, about 5' 10"?

6    A.  Correct.

7    Q.  You weighed about 190 or so at the time?

8    A.  Yes.

9    Q.  I want to talk to you about these threats that you say you

10   heard.

11   A.  Sure.

12   Q.  If I'm understanding your testimony, you didn't hear any

13   verbal threats until Mr. Lewis got back in the car?

14   A.  Correct.

15   Q.  And you're saying he was back in the car at least now for

16   one or two seconds?

17   A.  Approximately, yes.

18   Q.  And your testimony is that half of the threats he had made

19   were made while he was still in the car?

20   A.  Yes.

21   Q.  For this one or two seconds?

22   A.  Yes.  Approximately, yes.

23   Q.  And you were positioned where exactly when he got back in

24   the car?

25   A.  When he jumped into the driver's seat, I was offset from

DX resumed: AYALA, G

123

1    his -- from his vehicle, towards the rear of it.  And I had

2    moved towards his back bumper, kind of fluid as he was jumping

3    in.

4    Q.  Okay.  So you're towards the back bumper and Mr. Lewis is

5    showing you --

6           MR. GALIPO:  I believe this is in, Your Honor, but I

7    can double check, Exhibit 5, page 34.

8           THE COURT:  That's in evidence.

9           MR. GALIPO:  It is?

10          THE COURT:  Yes.

11          MR. GALIPO:  I thought so.  Thank you.

12   BY MR. GALIPO:

13   Q.  So you're saying when Mr. Lewis got back in the car for

14   one or two seconds, you were -- you repositioned towards the

15   back bumper?

16   A.  So when he was running towards me, from behind the

17   semi-truck, I had positioned myself towards the back bumper.

18   When he jumped into his car is when I moved away from the back

19   bumper at an angle out so I could see into the car.

20   Q.  Okay.

21   A.  Yes.

22   Q.  So you would have been kind of in line with the back

23   bumper but some distance into the street?

24   A.  I don't believe it was adjacent to the back bumper.  It

25   was more angled towards the back of the semi-truck.  So maybe

124

1    southeast.

2    Q.  Did you say anything to Mr. Lewis while he was in the car?

3    A.  No.

4    Q.  And were you making eye contact with him, in other words,

5    eye-to-eye contact, while he was in the car for one or two

6    seconds?

7    A.  No.  He was leaning down under the seat.  I couldn't see

8    his eyes.

9    Q.  I see.  He had his head underneath the seat?

10    A.  His head was not underneath the seat.  His body was

11    leaning forward.

12    Q.  And so what exactly are you saying he said to you

13    threatening while he was in the car for one or two seconds and

14    you could not see his face?

15    A.  So, obviously, I don't have a direct quote, because it was

16    something to the effect of --

17    Q.  Something to the effect of what?

18    A.  "I'm going to kill me [sic], you're going to die."  That

19    is what I remembered.

20    Q.  Wait.  Say that again, please.

21    A.  "I'm going to" -- "I'm going to kill you."

22    Q.  "I'm going to kill you"?

23    A.  Or "you're going to have to kill me."  It was something to

24    the effect of that.

25    Q.  During this one or two seconds that he was in the car, you

1    claim reaching under the seat, and you're somewhat offset from

2    the rear the car?

3    **A.**   Yes.

4    **Q.**   And at that point, obviously, you were at least aware that

5    there was a front seat passenger in the car?

6    **A.**   Yes.

7    **Q.**   And you're saying when he said that you didn't say

8    anything to him?

9    **A.**   It was very quick.

10   **Q.**   And you didn't reposition at that point?

11   **A.**   Well, at what point exactly?

12   **Q.**   At the point you're saying he was in the car for one to

13   two seconds threatening you.

14   **A.**   So my point for repositioning is to see what he was doing

15   and from getting under the seat.  So I kept a visual at that

16   point.

17   **Q.**   Right.  What I'm getting at, if I'm understanding you

18   correctly, you were at the rear bumper of your car.  You saw

19   him -- well, he was running towards you.  You tactically

20   repositioned to the rear bumper of your car?

21   **A.**   His car.

22   **Q.**   His car.  I'm sorry.

23   **A.**   Yes.

24   **Q.**   He didn't say anything to you.  You saw him get into the

25   car, and then you moved some distance to your left to try to

DY_resumed-AYALA_G

126

1   get a visual?

2   A.   Yes, correct.

3   Q.   Then you're saying when he was in the car for one or two

4   seconds, he made these threats against you?

5   A.   Correct.   Half of them were in the car, half of them were

6   out.

7   Q.   Well, have you told us the half that were in the car?

8   A.   The first part?

9   Q.   That's what I asked you.   What was the threats while he

10  was in the car?

11  A.   So when I said something to the effect of what he said,

12  part of that was in the car and part was out.

13  Q.   I want to know, sir, since you were there, and apparently

14  you're the only one that heard these threats, what threat did

15  he make to you while he was still in the car?

16          MR. WEAKLEY:   Object as argumentative.

17          THE COURT:   Sustained.

18          Why don't you rephrase.

19  BY MR. GALIPO:

20  Q.   What threats did he make to you while he was in the car?

21  A.   I'll say again, this was a fluid incident that happened

22  very quickly.   I don't know when his words -- I don't know the

23  count or the syllable he was on when he got out of the car.   I

24  just know that part of it was said in the car and the other

25  part was said after he got out and charged towards me.

1    the suspect.

2    **Q.**  You're also saying you thought he was reaching for a gun,

3    right?

4    **A.**  Correct.

5    **Q.**  And you were in a position with no cover; is that right?

6    **A.**  Correct.

7    **Q.**  And I'm assuming you were looking to see if, in fact, he

8    pulled the gun out from inside the car?

9    **A.**  Correct.

10   **Q.**  Including from under the seat or anywhere else?

11   **A.**  Correct.

12   **Q.**  And you never saw him pull a gun out, true?

13   **A.**  I never saw his right hand.

14   **Q.**  Did you ever see any gun in either hand or anywhere?

15   **A.**  No.

16   **Q.**  Did you ever see any object in his hand?

17   **A.**  No.

18   **Q.**  So now he's getting out.  Are you saying that there were

19   more threats after he got out?

20   **A.**  Like I said before, part of the threats were made inside,

21   part were made outside.

22   **Q.**  What part was made outside, if you know?

23   **A.**  I believe I answered that already.  It was one fluid

24   motion, one verbal.  Like I said, I can't remember a syllable

25   where he ended and when he was getting out and when he started

DY resumed 2 AYALA G.

129

1    charging.

2    **Q.**  So you have used the word a few times, "charging,"

3    correct?

4    **A.**  Yes.

5    **Q.**  And I asked you how many steps he took and you didn't

6    know, true?

7    **A.**  Correct.

8    **Q.**  I asked you if his left arm was in a running motion.  You

9    said, "I didn't remember seeing that," correct?

10   **A.**  Correct.

11   **Q.**  I asked you how much distance he traveled before you fired

12   your first shot and you didn't know?

13   **A.**  Correct.

14   **Q.**  Had you started backing up before you started shooting?

15   **A.**  Again, it happened very, very quickly.  I don't remember

16   what happened first:  If I ran backwards and then shot or if I

17   shot while running backwards or if I shot and then started

18   moving backwards.

19   **Q.**  Do you remember if you were shooting at least some of your

20   shots as you were moving back?

21   **A.**  Yes, I was.

22   **Q.**  Where were you positioned in relation to the vehicle that

23   we're looking at in Exhibit 5, page 34, when you fired your

24   first shot?

25   **A.**  I was somewhere between the rear of the car and, I would

DY resumed AYALA G

130

1   say, the front passenger door.  It was somewhere in that area.

2   Q.  Okay.  Let me try to get another photograph that we can

3   look at.

4   A.  Sure.

5        MR. GALIPO:  I think this is in, Your Honor, Exhibit

6   5, page 2.

7        THE COURT:  It's admitted.

8        MR. GALIPO:  Thank you.

9   BY MR. GALIPO:

10  Q.  You could see both vehicles in this photograph?

11  A.  Yes.

12  Q.  So I'm going to try to zoom in, if I can, on the Chevy

13  Tahoe.

14        I know it's not real clear, but can you see the Chevy

15  Tahoe on your screen?

16  A.  Yes.

17  Q.  And it appears the door is open?

18  A.  Yes.

19  Q.  And I just want to -- and I'm looking at the -- we can see

20  the rear tire of the car on the driver's side?

21  A.  Yes.

22  Q.  Where do you think you were in relation to that rear tire

23  on the driver's side when you fired your first shot?

24  A.  I would approximate the rear passenger door.

25  Q.  Okay.  So you were --

DY resumed AYALA C

131

1  A.  Between there and the bumper, yes.

2  Q.  Okay.  I just want to make sure I'm -- I'm asking the

3  right questions here.

4        It's a four-door car?

5  A.  Yes.

6  Q.  We know the front door on the driver's side is open,

7  correct?

8  A.  Yes.

9  Q.  I'm going to show you another exhibit.

10        MR. GALIPO:  I'm not sure if this is in yet,

11  Your Honor, Exhibit 5, page 11, but I'll show it to counsel.

12        MR. WEAKLEY:  Can I see it?  I can't see very well.

13        Yeah.

14        MR. GALIPO:  By agreement, Your Honor.

15        THE COURT:  No objection?

16        MR. WEAKLEY:  No objection.

17        THE COURT:  All right.  It's admitted.

18    (Plaintiffs' Exhibit 5, page 11 was received.)

19  BY MR. GALIPO:

20  Q.  Before I lose my zoom here, the rear tire on the driver's

21  side is behind the passenger door on the driver's side; isn't

22  it?

23  A.  Yes.

24  Q.  So are you saying you were forward of the rear tire, in

25  other words, more in line with the passenger door of the

1    vehicle when you fired your first shot?

2    **A.**   Uh, I approximated between the passenger door and the rear

3    bumper.  I don't remember exactly where I was standing.

4    **Q.**   Okay.  Somewhere between the passenger door and the rear

5    bumper?

6    **A.**   Yes.

7    **Q.**   Would you agree somewhere in the middle of that location

8    would be the rear tire?

9    **A.**   Yes.

10   **Q.**   So do you think you were somewhere in the area of the rear

11   tire on the driver's side when you fired your first shot?

12   **A.**   I was in between, like I said before, the passenger door

13   and the rear bumper.

14   **Q.**   Okay.  And let's talk about the passenger door for a

15   moment.

16   **A.**   Sure.

17   **Q.**   You think you might have been as far up as the passenger

18   door when you started firing?

19   **A.**   So I gave you an approximation.

20   **Q.**   Right.

21   **A.**   Between the passenger door and the rear bumper.

22   **Q.**   I get that.

23   **A.**   I don't remember exactly where I was standing.

24   **Q.**   Okay.  But you think it could have been as far up as the

25   passenger door, that's why you gave me that as one of the

1  bookends?

2  A.  It could have been in that area, yes.

3  Q.  And how -- if someone got out of the car, how many steps

4  do you think they would have to take to get to the passenger

5  door?

6  A.  Would you like me to guess?  I don't have an exact --

7  Q.  Can you give me an estimate?

8  A.  I could guess.

9  Q.  Give me your best estimate, if you can.

10  A.  Four.

11  Q.  Do you have small steps in mind as opposed to larger

12  steps?

13  A.  I don't know how to answer that question.

14  Q.  When you were -- you claim that from him getting out to

15  you firing your first shot was almost immediate, right?

16  A.  Yes.

17  Q.  And so the estimates that we talked about before, about it

18  being four or five seconds, you think those are inaccurate

19  now?

20  A.  Well, that was an approximation.  I don't think what I

21  said was inaccurate.

22          THE COURT:  Mr. Galipo, which exhibit is on the

23  screen?

24          MR. GALIPO:  Oh, it's Exhibit 5, page 34.

25          THE COURT:  And that's in evidence?

DY - resumed - AYALA / G

134

1           MR. GALIPO:  It is, Your Honor.  I just zoomed it in.

2           THE COURT:  Yeah --

3           MR. GALIPO:  I'm going to take it off now.  Okay.

4    BY MR. GALIPO:

5    **Q.**  When you were firing your shots, could you see his left

6    hand?

7    **A.**  I don't remember specifically seeing his left hand.

8    **Q.**  Could you see his waist area?

9    **A.**  I don't remember seeing his waist area, no.

10   **Q.**  Could you see the middle of his chest where his stomach

11   separates from his upper chest when you were firing your five

12   shots?

13   **A.**  I remember seeing his face.  That's how close he was to

14   me.

15   **Q.**  Could you see any other part of his body other than his

16   face when you were firing?

17   **A.**  No.

18   **Q.**  So if I have your testimony correct, you started firing

19   immediately when he got out of the car, and once you started

20   firing, that's all you could see was his face?

21   **A.**  Can you repeat that one more time?  I'm sorry.

22   **Q.**  Sure.  You told me you started firing almost immediately

23   after he got out of the car; is that correct?

24   **A.**  Correct.  When he charged towards me, yes.

25   **Q.**  Well, you said "charging towards you."  And you say you

1    started firing when you were between the passenger door and

2    the back of the car?

3    A.   Approximately, yes.

4    Q.   And after you immediately started firing, if I understand

5    what you're saying, you're saying the only part of his body

6    you can see is his face?

7    A.   When I fired my first shot, correct.

8    Q.   How about the second shot?

9    A.   Well, he would have been closer to me, so I would have

10   seen his face.

11   Q.   Only his face when you fired the second shot?

12   A.   I believe so, yes.

13   Q.   How about the third shot?

14   A.   Same.

15   Q.   Only his face?

16   A.   Yes.

17   Q.   How about the fourth shot?

18   A.   I believe at some point, in that approximation, he had

19   turned towards the ground.  So when I stopped firing is when

20   he stopped charging towards me.

21   Q.   What I'm asking you, when you fired your fourth shot, are

22   you saying you could only see his face, or could you see any

23   other parts of his body?

24   A.   I don't remember.  I just remember he was close enough to

25   me that his face was in my face is what it seemed like.

1    **A.**  Yes.

2    **Q.**  After he was down on the ground and appeared to be

3    bleeding with a wound to his chest, did you go and look under

4    the seat of the car?

5    **A.**  No.

6    **Q.**  Do you recall if anyone got out of the car at that point?

7    **A.**  I believe the female passenger, the front female passenger

8    did, yes.

9    **Q.**  And I think -- showing you Exhibit 5, page 2.  I think we

10   can see this from the exhibit, but were his feet closer, like

11   towards the rear tire and his head further back?

12   **A.**  I believe so, yes.

13   **Q.**  So if he fell on the ground, do you think that his feet

14   were in the area of the rear tire before he fell backwards?

15   **A.**  I don't remember exactly, I don't know the angle of this

16   photograph, if it's -- I don't remember exactly where his rear

17   feet were in relation to the back bumper.

18   **Q.**  Is this the general position that we see in this

19   photograph that you recall him being in after he fell to the

20   ground?

21   **A.**  Generally, I don't know if medical aid moved him at all.

22   So I'm not quite sure.

23   **Q.**  Looking at Exhibit 5, page 34, do you recall there being a

24   lot of blood on the ground?

25   **A.**  No.

1  page 22?

2          MR. GALIPO:  Of the statement.

3          MR. WEAKLEY:  Yes.

4          MR. GALIPO:  Yes, may I approach counsel --

5          THE COURT:  You may.

6          MR. GALIPO:  -- to show him where I'm at.

7      (Discussion was held off the record between counsel.)

8          MR. WEAKLEY:  Apparently, Your Honor, there's two

9  different transcripts of the statement.

10          MR. GALIPO:  Yeah, they have different paginations.

11          THE COURT:  I see.

12          MR. GALIPO:  That was the issue, but I was --

13          THE COURT:  We're using Plaintiffs' Exhibit 3.

14          MR. GALIPO:  Yes.

15          THE COURT:  In at this point.

16  BY MR. GALIPO:

17  Q.  So when you said he stopped moving and he was standing

18  still, this would have been before he fell to the ground?

19  A.  Yes.

20  Q.  And this is something that you obviously saw because you

21  were there, correct?

22  A.  Yes.

23  Q.  When he stopped moving, was standing still, do you recall

24  his back being towards you?

25  A.  No.

1    Q.  Are you saying he was facing you at that time when he

2    stopped moving and was standing still?

3    A.  I don't remember exactly which way he was facing at that

4    point, if he was facing directly at me or at an angle, just

5    that he had stopped moving.

6    Q.  And looking at Exhibit 5, page 2, and looking where his

7    feet are, in this picture, where was he when he stopped moving

8    and was standing still in relation to the car?

9    A.  This -- this picture is hard to tell because it's at an

10   angle.  Like I said before, I don't remember exactly where it

11   was, where he had stopped moving in relation to where this

12   picture was taken and where he's laying in the picture.

13   Q.  And when he stopped moving and was standing still, how far

14   were you from him at that point?

15   A.  I believe we were as close as you could get.  I mean, from

16   what I remember, he was face to face.

17   Q.  Face to face when he stopped moving and was standing

18   still?

19   A.  Yes, in relation to the distance.

20          MR. GALIPO:  May I have one moment to look at my

21   notes, Your Honor?

22          THE COURT:  Yes, you may.

23   BY MR. GALIPO:

24   Q.  The informant, after this incident, did she continue to

25   try to contact you to see if she could give information about

1    **Q.**   And can you describe that contact you had with him.

2    **A.**   Sure.  It was a hit-and-run.  He was run over by an

3    ex-girlfriend, and I responded to the 911 call.

4    **Q.**   And did you -- were you able to talk to him?

5    **A.**   Yes.

6    **Q.**   What was your interaction with him like?

7    **A.**   Uh, nonconfrontational.  It -- it was a peaceful contact.

8    **Q.**   Based upon that, did you feel like you had a fairly good

9    rapport with him?

10   **A.**   Yes.

11   **Q.**   Now, we've talked about this confidential informant that

12   provided information.  Without telling us the name of the

13   confidential informant, your understanding she was another

14   ex-girlfriend of Mr. Lewis?

15   **A.**   Yes.  I did learn that at some point.

16   **Q.**   Did you believe that this confidential informant was

17   reliable?

18   **A.**   Yes.

19   **Q.**   And why did you believe she was reliable?

20   **A.**   Uh, we go through a vetting process with our confidential

21   informants.  Basically, we have information we already know

22   about people in certain areas -- so in this case, it would be

23   Mojave -- who were involved with criminal activity, and we

24   have personal details about those people.  And then to vet a

25   confidential informant, we will ask them questions we already

EX AYALA W

161

1  know the answer to -- to see if they are reliable.

2  Q.  Okay.  And was she able to provide reliable answers to

3  your questions?

4  A.  Yes.

5  Q.  And this is about other people in the Mojave area, not

6  just Mr. Lewis, correct?

7  A.  Correct.

8  Q.  Now, I'm going to --

9        MR. WEAKLEY:  Your Honor.  I'd like to use

10  Defendants' Exhibit MM, page 828.  And I think it's by

11  agreement that we can use this.

12        THE COURT:  MM, page 28?

13        MR. WEAKLEY:  838.

14        THE COURT:  838, any objection?

15        MR. GALIPO:  No objection.

16        THE COURT:  It's -- you're moving it into --

17        MR. WEAKLEY:  I'm moving it.

18        THE COURT:  It's admitted.

19        MR. WEAKLEY:  Thank you, Your Honor.

20     (Defendants' Exhibit MM, pg 838 was received.)

21  BY MR. WEAKLEY:

22  Q.  Deputy Ayala, does this Google Maps depict the area that

23  their shooting occurred in?

24  A.  Yes.

25  Q.  Okay.  And before we get to the shooting itself, did the

EX. AYALA W

164

1           MR. GALIPO:  Yes.  Sorry.

2           THE COURT:  All right.  Let's bring in the jury.

3       (Jury enters the courtroom at 10:37 a.m.)

4           THE COURT:  Welcome back Members of the Jury.  At

5    this time, please be seated.

6           At this time, we'll continue with the examination by

7    Mr. Weakly.

8           MR. WEAKLEY:  Thank you, Your Honor.

9    BY MR. WEAKLEY:

10   Q.  I think we --

11          THE COURT:  Just to be clear, Mr. Ayala remains on

12   the stand.

13   BY MR. WEAKLEY:

14   Q.  Okay.  I think we left off with the confidential informant

15   had provided with you some information sometime before October

16   2nd, 2020; is that correct?

17   A.  Yes.

18   Q.  Just generally, what information did she provide to you?

19   A.  Uh, that -- uh, Lewis was involved in criminal activity

20   and that he had firearms.

21   Q.  Okay.  Did you believe her?

22   A.  Yes.

23   Q.  Did that cause you to do anything with regard to

24   Mr. Lewis?

25   A.  Yes, a background check.

1  Q.  Okay.  What did you do as a background check?

2  A.  Uh, located a probation case as well as other things.

3  Q.  Okay.  What is probation?  "Probation" what does that mean

4  to you?

5  A.  Probation is basically in lieu of.  So instead of going to

6  jail, you are monitored by the sheriff's office, you're

7  subject to search by any peace officer, a search of vehicle or

8  person.

9  Q.  Okay.  So you don't need cause that you would need if

10  you're going to search one of us then, correct?

11  A.  Correct.

12  Q.  So based upon that, then did you believe that you could

13  pull -- if you found Mr. Lewis, that you could pull him over,

14  search him, search his vehicle, that sort of thing?

15  A.  Yes.

16  Q.  Now, on October 2nd were you provided more information

17  there was some communication between you and the confidential

18  informant, correct?

19  A.  Yes.

20  Q.  That's through text messages?

21  A.  Yes.

22  Q.  You've seen -- you've had a chance to go back and review

23  those, correct?

24  A.  Correct.

25  Q.  Can you tell us what the confidential informant was

1    telling you about Mr. Lewis on October 2nd, 2020?

2    A.   Yes.  She said that he had forced his way into her room --

3    her motel room and threatened her and her children, and that

4    she was scared.

5    Q.   Okay.  Did she say anything about him having a gun or

6    guns?

7    A.   Yeah, she did tell me he had guns.

8    Q.   Okay.  Now, is it your understanding that for some reason,

9    somehow that the confidential informant and Mr. Lewis were

10    staying in the same motel room -- or staying in the same

11    motel, not room, but --

12    A.   Yes.

13    Q.   Okay.  And that somehow did he -- did she indicate to you

14    that she had seen him earlier before he broke into her room?

15    A.   I'm sorry.  Can you repeat that one more time?

16    Q.   Yeah.  Did the confidential informant advise you that she

17    had seen him earlier at that motel before he broke into her

18    room?

19    A.   Yes.

20    Q.   Now, where were you when you were getting this

21    information?

22    A.   I was in Rosamond.

23    Q.   What were you doing?

24    A.   I was finishing up a call for service.

25    Q.   Were there other deputies there too?

1    probation search of his vehicle.

2    **Q.**  Okay.  So why don't you go ahead and tell us what happens,

3    how you were able to determine he didn't have any weapons on

4    him.

5    **A.**  Right.  So I walked him back to his vehicle towards the

6    rear of his vehicle and conducted a search of him, a pat down,

7    searched for weapons.

8    **Q.**  Okay.  Was he cooperative?

9    **A.**  Yes.

10   **Q.**  Any problems at all during the pat-down search?

11   **A.**  No.

12   **Q.**  And then what's the next thing that happens?

13   **A.**  I walk him back towards my vehicle, towards the back

14   passenger seat and tell him I'm going to search his vehicle,

15   probation search of his vehicle.

16          He said something to the effect of "fuck you, you

17   can't search my" -- "you can't search my car."

18   **Q.**  Did he say it calmly like you just did it?

19   **A.**  No.  Uh, no.  It was aggressive.

20   **Q.**  Did you walk him on the driver's side or the passenger's

21   side of your patrol vehicle?

22   **A.**  Passenger's side.

23   **Q.**  So was it your -- what was your intention then?

24   **A.**  To place handcuffs on him and secure him in my vehicle.

25   **Q.**  Okay.  And what was the purpose of handcuffing him?

1  A.  Basically officer safety.  Since I'm going to be searching

2  a vehicle, I don't want to have to worry about him behind me,

3  basically, and what he's doing and if he's going to flee or

4  whatnot.  Yeah, that's the reason.

5  Q.  Okay.  After he says, you know, "F you" or however he says

6  it, what's the next thing that happens?

7  A.  Uh, he -- I tell him he's being detained, and I go to put

8  handcuffs on him.  He turns around and kind of takes a bladed

9  stance.  So one foot behind the other, kind of like a fighting

10  stance.

11          MR. WEAKLEY:  Okay.  Your Honor, is it okay if I have

12  Deputy Ayala stand up and kind of demonstrate that?

13          THE COURT:  Yes.

14          THE WITNESS:  (Witness complies.)

15          MR. WEAKLEY:  Why don't you show the jury what

16  Mr. Lewis was doing.

17          THE WITNESS:  So it was more like this (indicating),

18  the latest stance.

19  BY MR. WEAKLEY:

20  Q.  For the record, he's standing up.  And looks like your --

21  you have your hands clenched in fists?

22  A.  Yes.

23  Q.  About elbow-high?

24  A.  Yeah, I can't remember how high his hands were.  I was

25  doing an estimate, but they were -- he was in a fighting

1    stance with his fists clenched, yes.

2    **Q.**  What's the next thing that happens?

3    **A.**  He lunged towards me.

4    **Q.**  What do you mean by lunged?

5    **A.**  He kind of stepped quickly towards me.  How I referred to

6    earlier as he tried to punk me, like, basically to make me

7    think he was going to attack me.

8    **Q.**  What is "punk me"?

9    **A.**  It made me believe he was going to punch me, yeah.

10   **Q.**  Okay.  What's the next thing that happens?

11   **A.**  Uh, I took a step backwards and then he started running

12   north on K Street, around my patrol vehicle.

13   **Q.**  Okay.

14           MR. WEAKLEY:  Your Honor, at this point, I would like

15   to play a portion of a depo -- of a video, which I think was

16   agreed to.

17           MR. GALIPO:  Yes, we are agreeable.

18           MR. WEAKLEY:  It's Exhibit E.  It's the

19   Wienerschnitzel -- one of the Wienerschnitzel videos.  It's

20   called Channel 15.  We're just going to play about three -- a

21   little over three minutes.

22           THE COURT:  And just let's note the time stamped --

23   the amount of time where it starts and ends --

24           MR. WEAKLEY:  And I'll need --

25           THE COURT:  -- for the record.

1          MR. WEAKLEY:  We'll need to switch over.

2          THE COURT:  And there's no objection?

3          MR. GALIPO:  No objection, Your Honor.

4          THE COURT:  All right.  So you're moving that.  Go

5    ahead.

6          MR. WEAKLEY:  I'm sorry?

7          THE COURT:  Please proceed.

8          MR. WEAKLEY:  I'm going to ask Mr. Stanhill --

9          THE COURT:  Let me just go back.  You had mentioned

10   before we switched it out, did you want that image that was on

11   the screen printed?

12         MR. WEAKLEY:  Oh.

13         THE COURT:  To move that --

14         MR. WEAKLEY:  Sure.  If that's okay to move that into

15   evidence.

16         THE COURT:  Okay.  So we'll have to address that on a

17   break with you.  We think we have it saved.

18         MR. WEAKLEY:  Okay.

19         THE COURT:  If we did, then we can address it as an

20   exhibit.

21         THE CLERK:  Your Honor, he sent the image, so we're

22   good.

23         MR. WEAKLEY:  Is this still accurate?

24         THE COURT:  Yes.  Okay.  So now we can switch over to

25   the computer, and let's clear the screen on the video too, at

1   some point.

2               MR. WEAKLEY:  And I can ask Mr. --

3               THE COURT:  Yeah.

4               MR. WEAKLEY:  So Your Honor, we're starting at 00 and

5   we'll be ending at 3:05.  We'll be ending at 3:05.

6   BY MR. WEAKLEY:

7   Q.  Now, I know, Deputy Ayala, you didn't see from this video,

8   but I'll represent to you, there's a video from the

9   Wienerschnitzel restaurant showing basically the direction of

10  where this happens on K Street.

11  A.  Yes.

12  Q.  And as we play the video, I may pause it on occasion and

13  ask you to describe what's going on.

14  A.  Sure.

15              THE COURT:  So just to be clear, there's no objection

16  to Exhibit N [sic] from 0:00 to 3:05 being admitted?

17              MR. GALIPO:  Is that correct?

18              THE COURT:  All right.  It's admitted.  That portion

19  of the video is admitted.

20              MS. GUSTAFSON:  Your Honor, Exhibit E.

21              THE COURT:  I'm sorry.  Exhibit E.

22              With that clarification no objection?

23              MR. GALIPO:  Still no objection.

24              THE COURT:  Okay.

25      (Defendants' Exhibit E was received.)

179

1          THE COURT:  Please proceed.

2          MR. WEAKLEY:  Okay.  Let's pause it there.  And can

3   you give us the time.

4   BY MR. WEAKLEY:

5   Q.  Okay.  This is about 20 seconds into the video.  Do you

6   see those lights that are off in the background?

7   A.  Yes.

8   Q.  Do you know what those are?

9   A.  Yes.

10  Q.  Now, what are they?

11  A.  Those are the lights on my patrol vehicle for conducting

12  traffic stops.

13  Q.  Okay.  Do you see Mr. Lewis' vehicle in this?

14  A.  Yes.

15  Q.  And I don't know if the witness can point it out on his

16  screen.

17  A.  Would you like me to circle it?

18          THE COURT:  I don't -- you can try, but I don't think

19  that it works, because the input is not the same.  But see if

20  it does work.

21          It does work.

22          MR. WEAKLEY:  It does work.

23          THE COURT:  Okay.

24          MR. WEAKLEY:  Great.  Thank you.

25          And I would like to save this and move this

EX AYALA W

180

1   photograph still image into evidence.

2           THE COURT:  All right.  Let's get that saved.  Any

3   objection to the still that -- with the circled item being

4   admitted.

5           MR. GALIPO:  No objection.

6           THE COURT:  All right.  We'll admit that as

7   Exhibit E-1.

8       (Defendants' Exhibit E-1 was received.)

9           MR. WEAKLEY:  Okay.  Thank you.

10          So why don't we go ahead and start again.  Continue

11  on.

12      (Video played in open court.)

13          THE COURT:  Let's do this, you want to clear the

14  circle?

15          MR. WEAKLEY:  Yes, please.  And pause it there,

16  please.

17          THE COURT:  Let's clear the drawing by the witness

18  okay.

19          Please proceed.

20          MR. WEAKLEY:  Thank you.

21  BY MR. WEAKLEY:

22  Q.  Now at this point, Deputy Ayala, do you know what's going

23  on?

24  A.  Yes.

25  Q.  What is going on?

181

1   A.   Mr. Lewis' is yielding to my patrol vehicle.

2   Q.   Okay.  And that's basically in the location that we showed

3   on this Google map, Exhibit MM-828?

4   A.   Yes.

5   Q.   Okay.  And then it's -- this is 34 seconds into the video.

6   Continue please.

7        (Video played in open court.)

8            MR. WEAKLEY:  Okay.  Pause it there.  What are we at?

9            40 seconds.

10  BY MR. WEAKLEY:

11  Q.   Okay.  Do you see a person that -- what appears to be a

12  person moving kind of to our right?

13  A.   Yes.

14  Q.   In the upper portion of the video, do you know who that

15  is?

16  A.   I believe that's me.

17           MR. WEAKLEY:  Let's continue it.

18    (Video played in open court.)

19           MR. WEAKLEY:  Okay.  Pause for a second.

20  BY MR. WEAKLEY:

21  Q.   Now, at this point where are you?

22  A.   I believe I'm at his driver -- I believe I'm at his

23  window, on the driver's side.

24           MR. WEAKLEY:  At 49 seconds, okay.  Let's continue.

25    (Video played in open court.)

EX AYALA W

182

BY MR. WEAKLEY:

Q.  Can you tell us what's going on right now?

A.  This is the brief conversation I had with him.

          MR. WEAKLEY:  At some point -- okay.  Pause here.  It
kind of jumped.  That's okay.

          Where are we?  1 minute 38 seconds.

BY MR. WEAKLEY:

Q.  Okay.  Can you see two figures now that are closer to your
patrol car?

A.  Yes.

Q.  Now, before we get to this point in time, can you tell us
what happened when you can't see the figures on the other side
of the SUV?

A.  Uh, I believe it was the conversation and me walking him
backwards to conduct the pat search.

Q.  Did you conduct the pat search near the rear of his SUV or
closer to your vehicle?

A.  I remember it to be near the rear of the SUV.  I'm not
sure.  The video jumped a little bit.  I'm not sure if it was
in that portion or if it's back here.

Q.  So at this point you're taking him to your patrol car?

A.  Correct.

          MR. WEAKLEY:  Okay.  Let's continue.

     (Video played in open court.)

///

183

1   BY MR. WEAKLEY:

2   Q.   And what's going on now?

3   A.   I believe this is more conversation.  I think he's

4   objecting to --

5           MR. WEAKLEY:  Let's pause it for a second.

6           Okay.  We're paused at 2 minutes and 13 seconds.

7           And in fact if we can -- can you zoom in on this

8   upper corner?

9   BY MR. WEAKLEY:

10  Q.   Okay.  Now, see this is a zoomed-in image.  You can still

11  see the lights on your patrol car.  Can you tell us where

12  Mr. Lewis' SUV is?

13  A.   Would you like me to draw or --

14  Q.   Sure.

15  A.   -- or just -- okay.  I believe it's right here.  It's kind

16  of hard to see.

17  Q.   Yeah.  And then behind that, you could see this truck,

18  right?

19  A.   Yes.

20  Q.   Is that the truck-trailer rig that we've been talking

21  about?

22  A.   Yes.

23          MR. WEAKLEY:  I'd like to preserve this and mark it

24  as Exhibit E2.

25          THE COURT:  All right.  Let's just hold a moment why

1  we do that.

2          THE CLERK:  What are we naming this?  I'm sorry.

3          THE COURT:  E2.

4          THE CLERK:  E2.

5      (Defendant's Exhibit E2 was marked for identification.)

6          THE CLERK:  Okay.

7          THE COURT:  And are you moving that into evidence?

8          MR. WEAKLEY:  Yes, Your Honor.

9          THE COURT:  Any objection?

10          MR. GALIPO:  No, Your Honor.

11          THE COURT:  It's admitted.

12          MR. WEAKLEY:  Thank you, Your Honor.

13      (Defendants' Exhibit E2 was received.)

14          MR. WEAKLEY:  Can we erase the circle?  Thank you.

15          Let's continue on in this zoomed-in version.  And I'm

16  sorry, what -- what was the time of that?  2:13.

17          Okay.  So we're continuing on.

18      (Video played in open court.)

19          MR. WEAKLEY:  Let's pause it there.  Can you tell us

20  the time?  2:27.

21  BY MR. WEAKLEY:

22  Q.  Deputy Ayala, do you know what's going on now?

23  A.  I believe this is the point where I'm telling him to put

24  his hands on his head, and that I was going to put him in the

25  back seat of my patrol car.

CX AYALA W

185

1          MR. WEAKLEY:  Okay.  So why don't we continue on.

2       (Video played in open court.)

3          MR. WEAKLEY:  Pause it there.  Okay.  We're at 2:3.

4    BY MR. WEAKLEY:

5    Q.  Could you see the figure moving in the video?

6    A.  Yes.

7    Q.  Could you tell us what's going on?

8    A.  That was when he was running around my patrol vehicle and

9    starting to run south on K Street.

10          MR. WEAKLEY:  Okay.  Continuing on.

11       (Video played in open court.)

12   BY MR. WEAKLEY:

13   Q.  Is that you pursuing him?

14   A.  Yes.

15   Q.  Oh, let's pause it for a second.  And I'd like to go back

16   to where that figure was moving to the left.  And my problem

17   is, I get focused on this pickup truck, and I lose sight of

18   the SUV.  So that's you pursuing him in that?

19          MR. WEAKLEY:  Stop.  Pause here.  That's good.  2:44?

20   BY MR. WEAKLEY:

21   Q.  Did you see that figure moving to the left?

22   A.  Yes, that was me.

23   Q.  Okay.  And what were you doing?

24   A.  I was going to take the keys out of the ignition.

25   Q.  Okay.  And it's because this video is not very good, the

186

1   SUV is difficult to see here.  You're on the driver's side of

2   the SUV; is that correct?

3   **A.**  Yes.

4           MR. WEAKLEY:  Continue on.

5       (Video played in open court.)

6           MR. WEAKLEY:  Pause.  Where are we?  2 minutes and 58

7   seconds.

8   BY MR. WEAKLEY:

9   **Q.**  Do you see a figure moving to the left?

10  **A.**  Yes.

11  **Q.**  And what's going on now?

12  **A.**  That's when Lewis ran back to get into his vehicle on --

13  in the driver's side.

14  **Q.**  Again, that's -- now he's blocked because he's on the

15  driver's side?

16  **A.**  Correct.

17          MR. WEAKLEY:  Okay.  Can we back up for just a couple

18  of seconds?

19          Okay.  Where are we now?  Same place.

20          Okay.  So what I'm going to do now is run the video

21  from this point when Mr. Lewis is getting into his car until

22  we can see you again.

23      (Video played in open court.)

24          MR. WEAKLEY:  Focusing on the SUV.  Stop.

25  BY MR. WEAKLEY:

187

1   **Q.**  Did you see that flash through the SUV?

2   **A.**  Yes.

3   **Q.**  At that point what was happening?

4   **A.**  I believe that was the first shot or when they started,

5   yes.

6   **Q.**  And there's some figure that's moving to the left, do you

7   know who that is?

8   **A.**  On the far left?  The furthest figure?

9   **Q.**  Yes.

10  **A.**  Yes.  That's me.

11  **Q.**  What are you doing?

12  **A.**  I was running backwards.

13          MR. WEAKLEY:  Okay.  Let's -- could we back up to

14  where we were.

15          MR. GALIPO:  I'm sorry.  Could we just have a time

16  stamp for this?

17          MR. WEAKLEY:  Yes.  I'm sorry.  It's 3:04.  This is

18  basically the end.

19          MR. GALIPO:  3:04?

20          MR. WEAKLEY:  Yeah.

21          MR. GALIPO:  Thank you.

22          MR. WEAKLEY:  So can we back it up to the last spot

23  that you were before this one, and this was -

24  BY MR. WEAKLEY:

25  **Q.**  Okay.  So at 2:58, you can still see Mr. Lewis.  He hasn't

1    entered his car yet, correct?

2    A.   Correct.

3    Q.   Okay.   Just run it through to the end.   So -- but now all

4    the shots are done, correct --

5    A.   Yes.

6    Q.   -- at 3:04?

7             Now --

8             MR. GALIPO:   Can we get a time sequence?

9             MR. WEAKLEY:   At 3:08.   I'm sorry.

10            Is it possible to back up to where that flash was?

11   BY MR. WEAKLEY:

12   Q.   Do you see that flash?

13   A.   Yes.

14   Q.   It appears to be through the windows of the SUV, and what

15   time is that now?

16   A.   3:03.

17   Q.   Okay.   We're at 3:03, which is just after the flash.   Do

18   you think that was your first shot?

19            MR. GALIPO:   I'm going to object as lacks foundation

20   and lacks foundation as to whether that was a muzzle flash or

21   some other -- something else.

22            THE COURT:   Sustained.

23            Why don't you rephrase the question and lay the

24   foundation.

25   ///

BY MR. WEAKLEY:

Q.  Yeah.

    When you see that flash -- your gun did have that muzzle flash, right?

A.  Correct.

Q.  It's at nighttime?

A.  Yes.

Q.  And muzzle -- how bright is that muzzle flash?

    MR. GALIPO:  Objection.  Lacks foundation.

    THE COURT:  Take a step at a time.  Sustained.

BY MR. WEAKLEY:

Q.  Was that flash consistent with what you have experienced as a muzzle flash?

A.  Yes.

Q.  Okay.  Okay.  I'm going to go back to when you first pulled Mr. Lewis over and when he stepped out of the car of his SUV, how was acting?

A.  He was speaking very fast and he had -- he had rigid movements.

Q.  Did that cause you any concern?

A.  Yes.

Q.  Why was that?

A.  Based on the -- based on the area we were, uh, and signs and symptoms of drug use, I had formed a suspicion.

Q.  Of what?

EX PARTE W

190

1    A.   That he was under the influence of methamphetamine.

2    Q.   You've had experience with individuals under the influence

3    of methamphetamine?

4    A.   Yes.

5    Q.   Was his conduct consistent with your experience?

6    A.   Yes.

7    Q.   Otherwise was he cooperative during that first part of

8    the -- when you were first getting out of the SUV?

9    A.   Yes.

10   Q.   Okay.  Going back to when you were at the back of your

11   patrol car, when Mr. Lewis lunged at you and took off running,

12   did you do anything or did you communicate with anybody or

13   anything like that?

14   A.   Yes.

15   Q.   What did you do?

16   A.   I used my radio to communicate to dispatch that there was

17   a foot pursuit, basically somebody was running from me, and I

18   gave the direction that he -- that him and I were running

19   south on south K Street.

20   Q.   What was your understanding of the effect of that

21   dispatch?

22   A.   So when somebody puts out -- when a deputy or officer puts

23   out that information, partners or other deputies in the area

24   will immediately start coming to help.

25   Q.   So were you anticipating that you were going to be getting

1    backup?

2    A.   Yes.

3    Q.   When you went to the SUV -- this is, again, when Mr. Lewis

4    is back behind the truck, the truck wheel, you go to the SUV

5    to take the keys out.  I think you've already testified about

6    this, but you yelled something at Mr. Lewis about you had the

7    keys and he couldn't go anywhere; is that correct?

8    A.   Yes.

9    Q.   Did you -- in your opinion, did you yell it loudly enough

10   that somebody in your vicinity could hear it?

11   A.   Yes.

12   Q.   And that's when Mr. Lewis then ran and jumped into his

13   SUV?

14   A.   Yes.

15   Q.   When he jumped into his SUV, he left the door open,

16   correct, the driver's door?

17   A.   Yes.

18   Q.   Did you see him try to close the driver's door at all?

19   A.   No.

20   Q.   Now I'd like to --

21        MR. WEAKLEY:  Your Honor, I'd like to ask if he can

22   demonstrate the best we can.  We don't have an SUV driver's

23   seat here?

24   BY MR. WEAKLEY:

25   Q.   But I'd like you to demonstrate for the jury his movement

1    from where you're seeing him reaching under the seat to where

2    he comes out.  Can you do that?

3    A.  Is there a way you want me to face or --

4    Q.  Yeah.  If -- well, I'd like you to -- the jury -- maybe

5    have the jury be where you were, so they can see.

6            MR. GALIPO:  Your Honor, I'm going to object to him

7    putting his arms and hands and reaching under his seat,

8    because he said he could never see his arms and hands in the

9    car.

10           MR. WEAKLEY:  Maybe you can just do what you saw.

11           THE COURT:  Okay.  So with that clarification,

12   overruled, but let's take this step by step.

13           MR. WEAKLEY:  Yes.

14           MR. GALIPO:  May I step to the right, so I can see?

15           THE COURT:  You may, you may.

16   BY MR. WEAKLEY:

17   Q.  I realize this was several years ago, but the best that

18   you can remember what you saw, can you demonstrate for the

19   jury what Mr. Lewis was doing?

20   A.  Are we talking about when he got -- jumped into the car

21   the first time or when he gets out?

22   Q.  Let's talk about when he gets out.

23   A.  Okay.  (Witness complies.)  So like this.

24   Q.  That slow?

25   A.  I did it kind of slow.

EX AYALA W

193

1    Q.   Okay.  Show us what you recall Mr. Lewis doing.

2    A.   Sure.  (Witness complies.)

3    Q.   So where were you -- he was facing you now?

4    A.   I think I was a little offset moving this way, to the rear

5    of the car.

6    Q.   Okay.  And how quickly did that occur?

7    A.   Very, very quickly, like I said before, immediate.

8    Q.   When you're being asked to break down fractions of a

9    second by fractions of a second and what happened and how far

10   you were, do you -- I'll withdraw the question.

11           You said that this was very fluid and everything

12   happened immediate, correct?

13   A.   Yes.

14   Q.   So when you demonstrated that, is that when you fired your

15   first shot?

16   A.   Uh, no.  It was when he started coming towards me.

17   Q.   Okay.

18   A.   Yes.

19   Q.   And how was he coming towards you?

20   A.   Charging.

21   Q.   And we saw in the video, you're backing up.  Is that why

22   you were backing up?

23   A.   Yes.

24   Q.   Now, you were asked too about his statements that you're

25   going to -- I don't know which order they were in, but one is,

EXAMPLE W

194

1   You're going to have to kill me, and, You're going to die.  Do

2   you remember those statements?

3   **A.**  Yes.

4   **Q.**  In the demonstration, can you tell us how -- how he was

5   moving and when he was saying those?

6   **A.**  Sure.  It was in -- in a fluid motion.  So part of it was

7   said in the car and part of it was said out of the car.

8   **Q.**  So it was being said as he was moving?

9   **A.**  Yes.

10  **Q.**  Fluidly, rapidly?

11  **A.**  Yes.

12  **Q.**  And when he was in the car, did you have your service

13  weapon out?

14  **A.**  I don't remember exactly at what point I drew my weapon.

15  I believe it was when he jumped back into the car, because I

16  believe the purpose of that was to retrieve his firearm.

17  **Q.**  Okay.  How were you holding your service weapon?

18  **A.**  All right.  So it's called the "low ready."  Basically

19  it's pointed towards the direction of your intended target but

20  not aimed up, so it's pointed down at the ground.

21  **Q.**  Okay.  Is that how you're trained to handle yourself in a

22  critical situation?

23  **A.**  Yes.

24  **Q.**  When did you first feel that Mr. Lewis was a deadly threat

25  to you?

201

1    A.  Yes.

2    Q.  And you were asked, did you feel -- how did you feel

3    afterwards, and you said "horrible" or something like that,

4    right?

5    A.  Yes.

6    Q.  Because you realized that you had shot an unarmed man,

7    correct?

8    A.  No.

9    Q.  Well, you checked him for weapons after you shot him,

10   didn't you?

11   A.  That's not why I felt horrible.

12   Q.  Did you realize after you shot him and after you checked

13   him, he was unarmed?

14   A.  Yes, at some point, during the second search of him is

15   when I realize he was unarmed.

16   Q.  So the first search he was unarmed, correct?

17   A.  Yes.

18   Q.  The second search he was unarmed, correct?

19   A.  Correct.

20   Q.  And when he was in the car, you never saw a gun in the

21   car, correct?

22   A.  No.

23   Q.  Is that correct?

24   A.  I didn't look in the car.

25   Q.  I see.  I'm talking about before the shooting.  Did you

RDX-AYALA G

204

1          THE COURT:  Sustained.

2    BY MR. GALIPO:

3    **Q.**  Okay.  So you thought these people were immediately going

4    to come after you said foot pursuit, right?

5    **A.**  From Rosamond, yes.

6    **Q.**  But you don't think that they could have come if you had

7    asked for them before?

8    **A.**  Like I had just said, the opportunity would have passed.

9    And -- and we wouldn't -- he would have -- we wouldn't have

10   found him.  Like I said, he was being elusive.

11   **Q.**  Well, there was no crime in progress, was there?

12   **A.**  There was the suspicion of him having firearms and being

13   on probation, which is enough to stop him.

14   **Q.**  But no actual crime in progress, you just saw him going

15   through the drive-thru?

16   **A.**  Correct.

17   **Q.**  When you went to the academy, I take it you also learned

18   that stuff you talked about earlier, about deadly force being

19   the last resort, only to be used in the direst of

20   circumstances, only if there's an imminent threat of death or

21   serious bodily jury?  You learned all of that at the academy?

22   **A.**  Yes.

23   **Q.**  With no other reasonable options, you learned that also?

24   **A.**  Yes.

25   **Q.**  And you give verbal warning when feasible, you learned

1  **Q.**  Well, I would assume, sir, when you went to the driver's
2  side window you were talking to Mr. Lewis, not through a
3  tinted window, but through the open window on the driver's
4  side, weren't you?
5  **A.**  Yes.
6  **Q.**  Did you ever, like, try to look and see if there was
7  anyone in the back seat?
8  **A.**  Do you mean put his head in the window because --
9  **Q.**  Well, just tilt a little bit or angle yourself a little
10  bit to look in the window?
11  **A.**  I think it would have been difficult to see in the back
12  seat from the front window.
13  **Q.**  I see.  So you're stopping the car because you thought
14  there could be a gun in the car, correct?
15  **A.**  Correct.
16  **Q.**  Okay.  And are you saying that when you -- before
17  Mr. Lewis got out of the car, you told him you're stopping the
18  car because he's on probation?
19  **A.**  Yes.
20  **Q.**  You told him that?
21  **A.**  I believe I did.  The reason for the stop, yeah, because I
22  think maybe he had said something like, Why are you pulling me
23  over?
24  **Q.**  And he was being cooperative at that point, right?
25  **A.**  Yes.

1   Q.  Why didn't you ask him, I need to know if there's any guns
2   in this car?
3   A.  That would have been -- I believe that would have been --
4   put him in a heightened situation.  He was still in the car
5   with the car keys.  He was still in the car, in my mind, with
6   a gun.  He would have knew that I knew there was a gun in the
7   car.
8   Q.  And then he's cooperative.  He gets out of the car.  He
9   lets you search him.  He's got no weapons on him, correct?
10  A.  Correct.
11  Q.  And then you want to handcuff him and put him in the back
12  of your car?
13  A.  Yes.
14  Q.  Did you tell him you're going to handcuff him?
15  A.  I don't believe so.  So I believe I told him, You're being
16  detained.  Put your hands on your head.
17  Q.  He wasn't under arrest at that point?
18  A.  No.
19  Q.  Where were your handcuffs when you said that?  When you
20  said, You're being detained, put your hands on your head,
21  where were your handcuffs, in your hand?
22  A.  So we would grab the hands and then get out our handcuffs.
23  They were in the front of my belt.
24  Q.  And that's when he ran from you, shortly after that?
25  A.  Yes.

RDX, AYALA, A

218

1          You had the impression that because the decedent,

2    Mr. Lewis, was speaking fast and was rigid, that, to you, was

3    an indication of an influence of methamphetamines?

4    **A.**  Yes.

5    **Q.**  Now, when people are faced with police officers, they

6    generally don't want to make fast movements, right?

7    **A.**  I would assume so, no.

8    **Q.**  And with regard to speaking fast that can also be

9    accounted for by someone being nervous under the

10   circumstances, right?

11          MR. WEAKLEY:  Objection.  Speculation.

12          THE COURT:  Well, why don't you rephrase the question

13   based on his training and experience.

14   BY MR. ALEXANDER:

15   **Q.**  Based on your training and experience, you understand that

16   when people get nervous, they sometimes speak more quickly?

17   **A.**  Yes.

18   **Q.**  When you gave a demonstration earlier, you were talking

19   about the individual getting out of the car, and it -- the

20   movement that you gave, if I understand correctly is, the

21   person is stepping out with their left foot and turning

22   counterclockwise towards you.

23   **A.**  Yes.

24   **Q.**  So if I understand correctly, the first point at which you

25   unholstered your gun is when the decedent, Mr. Lewis, was

RX, Salcedo, p.

242

1                    JESSICA SALCEDO,

2    called as a witness on behalf of the Plaintiffs, having been

3    first duly sworn, testified as follows:

4              THE WITNESS:  I do.

5              THE CLERK:  Thank you.  Please be seated.  And if you

6    would please state your full name, spelling your last name for

7    the record.

8              THE WITNESS:  My name is Jessica Leslie Salcedo.

9    J-e-s-s-i-c-a.

10             THE CLERK:  And your last name?

11             THE WITNESS:  S-a-l-c-e-d-o.

12                      DIRECT EXAMINATION

13   BY MR. ALEXANDER:

14   Q.  Now, if you could pull the microphone slightly closer to

15   you.

16             What is your date of birth?

17   A.  7-18-2007.

18   Q.  And how old are you today then?

19   A.  I am 17 years old.

20   Q.  17 years old.  And on the day in October of 2020, the

21   incident involving Mr. Lewis, when he was shot, were you

22   present that day?

23   A.  Yes.

24   Q.  Okay.  And with regard to that day, how old were you then?

25   A.  I was probably 15 years old.

245

1  earlier?

2  **A.**  Yes.

3  **Q.**  Okay.  That day, where else had you gone in the car other

4  than to the scene where this incident happened?

5  **A.**  We went to Family Dollar in Mojave.

6  **Q.**  So you went to Family Dollar in Mojave.  Approximately

7  what time was that?

8  **A.**  Seven or eight.

9  **Q.**  Seven or eight o'clock?

10  **A.**  Yes.

11  **Q.**  Was it light or dark outside?

12  **A.**  It was dark.

13  **Q.**  Dark.  And inside the vehicle at the point when you were

14  driving to the Family Dollar, where were you seated inside the

15  car?

16  **A.**  Uh, behind the passenger's seat.

17  **Q.**  In the -- where were you seated inside the car?

18  **A.**  Behind the passenger's seat.

19  **Q.**  Behind the -- behind the passenger seat or behind the

20  driver's seat?

21  **A.**  The driver's seat, I'm sorry.

22  **Q.**  Okay.  And where was your sister?

23  **A.**  She was behind the passenger seat.

24  **Q.**  And who was in the passenger seat in the front?

25  **A.**  My mother.

1   A.   Behind ours.

2   Q.   So the police car was behind your car?

3   A.   Yes.

4   Q.   And Mickel went in between the two cars?

5   A.   Yes.

6   Q.   And he was with the officer?

7   A.   Yes.

8   Q.   Were you able to hear anything that was said while Mickel

9   and the officer were behind the SUV?

10  A.   No.

11  Q.   Did you ever hear anything -- anyone scream or say

12  something loud?

13  A.   Yes.

14  Q.   Okay.  And who did you hear say something loud?

15  A.   Mickel.

16  Q.   And just for today, even though I know that you're in high

17  school, can you use the words that you heard in the back seat

18  of the car?

19  A.   I heard "fuck no."

20  Q.   And then what happened after you heard that?

21  A.   We seen him run.  He ran behind a diesel truck.

22  Q.   So you saw Mickel run behind a semi truck --

23  A.   Yes.

24  Q.   -- that was where?

25  A.   Right across the street from us.

1   **Q.**  So when Mickel pulled over, he was on one side of the

2   street and the semi truck was on the other side of the street,

3   right?

4   **A.**  Yes.

5   **Q.**  And the semi truck -- the vehicle you were in was facing

6   one direction, south; the semi truck was facing the other

7   opposite direction, north?

8   **A.**  Yes.

9   **Q.**  Okay.  And so you were saying that Mickel ran.  Where did

10  he run to?

11  **A.**  He ran behind the semi truck.

12  **Q.**  And did you see what he did when he got behind the semi

13  truck?

14  **A.**  No.  He just -- no.

15  **Q.**  Okay.  And do you recall how long he stayed behind the

16  semi truck?

17  **A.**  No.  It was quick.

18  **Q.**  After he went over by the semi truck, do you recall

19  anything that the officer did?

20  **A.**  He got the key from the ignition.

21  **Q.**  You remember the officer reaching in and getting the keys

22  from the ignition?

23  **A.**  Yes.

24  **Q.**  And then what happened next?

25  **A.**  That's when Mickel came back to the car.

RX - Salcedo - A

254

1    Q.  Now, in between the point when the officer took the key

2    out of the ignition and the point when Mickel ran back from

3    the semi truck to the door, did you ever hear the police

4    officer yell anything?

5    A.  No.

6    Q.  Didn't hear the police officer yell "I've got your keys"?

7    A.  No.

8    Q.  Nothing like that?

9    A.  No.

10   Q.  So when Mickel came from the back of that semi and ran

11   back to the car, you were still seated behind the driver's

12   side seat, right?

13   A.  Yes.

14   Q.  And when Mickel got back to the car, what did he do?

15   A.  He tried to see if the keys were in the ignition.

16   Q.  Now, can you describe what he did with his body?

17   A.  I was only able to see the upper body part.  So I just

18   seen him with his hand trying to look for the key.

19   Q.  When you say trying to look for his keys, where was he

20   looking?  Where was his hand inside the car?

21   A.  On top of the -- where the driver is.  Where the wheel is,

22   sorry.

23   Q.  There's a place where you put a key called the ignition.

24   A.  Yes.

25   Q.  When he reached in, was he reaching to the ignition area?

RX Salcedo p.

255

1  A.  Yes.

2  Q.  Do you recall which hand he was using to reach to do that?

3  A.  I think it was his -- I don't remember.

4  Q.  So you're sure you saw his key -- his hand reaching to the

5  ignition area, you just can't remember which hand?

6  A.  Yes, I'm sure.  I just don't remember what hand.

7  Q.  Now, you were sitting behind the driver's seat.  How is it

8  that you could see him reaching his hand to the ignition?

9  A.  Well, I was trying to see what was happening, so I was

10  leaning over the seat to see what he was doing.

11  Q.  So you were leaning around the seat to see what was going

12  on in front?

13  A.  Yes.

14  Q.  And so leaning around, you could see him reach with the

15  hand to the ignition area?

16  A.  Yes.

17  Q.  Did you ever see him reach under the seat?

18  A.  No.

19  Q.  At all, either hand, ever see him reach under the seat?

20  A.  No.

21  Q.  Now, when you saw him reaching with his hand, do you know

22  whether or not his bottom had sat on to the seat?

23  A.  I don't.

24  Q.  Because from where you were leaning around the seat, you

25  couldn't see his lower body?

RX, Salcedo pl

256

1    A.  Yes.

2    Q.  Okay.  Now, while Mickel was inside the car, reaching for

3    the ignition, did he say anything?

4    A.  I don't remember.

5    Q.  You don't remember whether he said anything or not?

6    A.  No.

7    Q.  Well, let me ask you this, if he'd have said "You're going

8    to have to kill me" or "I'm going to kill you," do you think

9    that's something you would have remembered?

10   A.  Yes.

11          MS. MARSHALL:  Objection.  Calls for speculation.

12          THE COURT:  Overruled.

13   BY MR. ALEXANDER:

14   Q.  And with regard to either of these phrases or anything

15   close to that, did Mickel ever say that in between the point

16   when he stuck his hand inside the car and the point when he

17   pulled it out?

18   A.  No.

19   Q.  He never said that?

20   A.  He never said that.

21   Q.  So now, after he reached around and fumbled to try and

22   find the keys, what did Mickel do next?

23   A.  He realized the keys weren't there, so he stepped out, and

24   that's when everything happened.

25   Q.  And when you say "that's when everything happened," that's

1    when he got shot?

2    **A.**   Yes.

3    **Q.**   Now, have you ever witnessed anyone getting shot before?

4    **A.**   No.

5    **Q.**   And when this happened, were you surprised?

6    **A.**   Yes.

7    **Q.**   And at the point when you first heard the gunshot, could

8    you see where Mickel was?

9    **A.**   Yes.

10   **Q.**   Where was Mickel when you heard the gunshot?

11   **A.**   He right besides the -- out the door.

12   **Q.**   All right.  So you were sitting in the back seat, behind

13   the driver's seat, right?

14   **A.**   Yes.

15   **Q.**   There's a window next to you?

16   **A.**   Correct.

17   **Q.**   And there's a window associated with the driver's side

18   door, right?

19   **A.**   Yes.

20   **Q.**   When you say he was right next to you, I can't tell which

21   window you were looking out of.  At the point when you looked

22   out the window and saw that Mickel was right next to you,

23   right before the gunshot, which window was he closest to?

24   **A.**   His window.

25          MS. MARSHALL:  I'm sorry, Your Honor.  I can't hear

RX, Salcedo pf.

258

1  her.

2         THE WITNESS:  His window.  Sorry.

3  BY MR. ALEXANDER:

4  Q.  His window.

5         THE COURT:  Yeah, if we can just make sure the

6  microphone is a little bit closer to you.

7         THE WITNESS:  Okay.

8  BY MR. ALEXANDER:

9  Q.  So at the point when you first heard the gunshot, Mickel

10  was standing just outside his window?

11  A.  Yes.

12  Q.  Do you know what direction he was facing?

13  A.  He was facing the back of the car.

14  Q.  So his face was looking back towards where the police

15  officer's car would have been?

16  A.  Yes.

17  Q.  At the point when you heard the gunshot, could you see

18  where Mickel's hands were?

19  A.  They were on the side of his body.

20  Q.  Down by his side?  That's what you remember?

21  A.  Yes.

22  Q.  After the gunshot, the three of you -- you, your mother,

23  your sister -- were inside the car.  Tell me the very next

24  thing that you did.

25  A.  We got out the car.

Ex. Salcedo pt

263

1  **Q.**  I have a few questions for you.  I'm going to start with

2  you said that you were scared when this happened and when you

3  were talking to the detectives?

4  **A.**  Yes.

5  **Q.**  Were you scared when Mickel got back into the car?

6  **A.**  No.

7  **Q.**  Did you -- did he actually get seated in the car or did he

8  lean into the car?

9  **A.**  I didn't see his lower body.  I just see his upper body,

10  so I'm not -- I don't know.

11  **Q.**  Okay.  Do you recall Detective Wong asking you, "Did he

12  ever go into the car at any time?" and you say "no"?

13  **A.**  Yes.

14  **Q.**  Okay.  And did Detective Wong ask you, "Was there anything

15  as far as anything that your -- that he said to your mother

16  when -- or, I'm sorry, your -- your mother when he ran back to

17  the car?"  And you said, "Not that I remember.  I was scared.

18  I don't know what I did and didn't do"?

19        Did you say that?

20  **A.**  Yes.

21  **Q.**  Okay.  So it was pretty frightening to have him run from

22  the police officer, correct?

23  **A.**  Correct.

24  **Q.**  Okay.  And you said you don't remember what was said to

25  your mom that was right before the shooting, correct?

264

1    A.  Correct.

2    Q.  And so you don't know if the deputy yelled out and said,

3    "I have your keys," correct?

4    A.  Correct.

5    Q.  And you don't know if Mr. Lewis yelled to the deputy, "I'm

6    going to kill you"?  You don't know, do you?

7    A.  No.

8              MS. MARSHALL:  Thank you.  No further questions.

9              THE COURT:  Any redirect -- or any further questions

10   from defense counsel?  Mr. Weakley?

11             MR. WEAKLEY:  No, Your Honor.

12             THE COURT:  All right.

13             Any redirect?

14             MR. GALIPO:  Yes, Your Honor.

15             THE COURT:  Okay.

16                    REDIRECT EXAMINATION

17   BY MR. GALIPO:

18   Q.  Are you a little nervous now?

19   A.  Just a little.

20   Q.  These people here, I can assure you, are very nice people,

21   so try not to be more nervous than you have to be, okay?

22   A.  Okay.

23   Q.  First of all, I take it that this night is something you

24   remember and think about.  Is that fair?

25   A.  Yes.

RCX Salgedo M

269

1          THE COURT:  Well, why don't you rephrase the

2   question.

3   BY MS. MARSHALL:

4   **Q.**  Okay.  When Mickel was shot, where was he?

5   **A.**  Besides his door.

6   **Q.**  And -- beside his door or beside your door?

7   **A.**  His door.

8   **Q.**  Okay.  And did you have a good view of his hand?

9   **A.**  Yes.

10  **Q.**  Did you see Mickel running or moving in the direction of

11  the deputy just prior to him being shot?

12  **A.**  No.

13  **Q.**  Were you asked by Detective Wong, "So he ran in the

14  direction of the deputy, or walked -- moved towards the

15  direction of the deputy, is that what you're telling me?"  And

16  your answer was, "Yeah"?

17  **A.**  Correct.

18  **Q.**  Correct.

19          Now, you said you couldn't see whether he got in the

20  car or just leaned into the car, correct?

21  **A.**  Yes.

22  **Q.**  So how could you tell if he put his left hand -- or his --

23  excuse me, that would have been his right hand under the seat?

24  How come you couldn't tell?  Or could you tell?  I should

25  rephrase that.

RCX Salgedorf

270

```
1          THE COURT:  Why don't you rephrase that.
2          MS. MARSHALL:  Yeah.
3   BY MS. MARSHALL:
4   Q.  So when Mickel came to the car and reached in for, as you
5   said, the ignition, how could you tell he never reached under
6   the seat?
7   A.  When I was -- I was leaning around, so I could see both of
8   his hands.
9   Q.  But you couldn't see whether his body was in the vehicle?
10  A.  No.
11  Q.  But you could see both of his hands?
12  A.  Yes.
13          MS. MARSHALL:  I have nothing -- actually, let me
14  check.
15  BY MS. MARSHALL:
16  Q.  When the deputy first came to the window, was he friendly
17  or was he hostile?
18  A.  I don't remember.
19  Q.  Okay.  You said that Mickel got out of car because he was
20  on probation?
21  A.  Yes.
22  Q.  And did the deputy tell him he was on probation and that
23  he was subject to a search?
24  A.  Yes.
25          MS. MARSHALL:  Thank you.  I have nothing further.
```

284

1        (Plaintiffs' Exhibit 10, page 2 was received.)

2              MR. ALEXANDER:  And can we shift it to projection?

3              THE CLERK:  It's ready.

4              MR. ALEXANDER:  It's ready.  Good.

5    BY MR. ALEXANDER:

6    Q.  Do you recognize this photograph?

7    A.  Yes.

8    Q.  And I take it that's your father?

9    A.  Yes.

10   Q.  I think I referred to him as being 6'4, but I think he's

11   6'6, right?

12   A.  6'6.  I specifically remember because we were in his

13   garage and we wanted to know how tall he was and if he was

14   still growing.  And we measured him on the garage and he was

15   6'6".

16   Q.  And the person clutching the purse, who's that?

17   A.  Me.

18   Q.  How old do you think you are in this photograph?

19   A.  Uh, I think I still had my braces on, so I want to say,

20   like, maybe 14 -- no, like --

21   Q.  And the woman --

22   A.  -- 15.

23   Q.  The woman on the right as you look at the photograph, who

24   would that be?

25   A.  That's my Auntie --

354

1    Friday morning's schedule.  And then it's sounds like we may

2    well be closing as early as Tuesday, depending on how long you

3    have.

4            MR. WEAKLEY:  That could happen.

5            THE COURT:  Okay.

6            MR. GALIPO:  I'm all for efficiency, Your Honor.

7            THE COURT:  All right.  Very good.  Okay.  I'll see

8    you tomorrow morning at 8:30 then.  All right.  We're off the

9    record.

10       (Proceedings were adjourned at 4:32 p.m.)

11

12

13

14

15

16       I, RACHAEL LUNDY, Official Reporter, do hereby certify the

17   foregoing transcript as true and correct.

18

19   Dated:  April 1, 2025            /s/ Rachael Lundy
                                      RACHAEL LUNDY, CSR-RMR
20                                    CSR No. 13815

21

22

23

24

25

355

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. KIRK E. SHERRIFF

MICKEL ERICK LEWIS, JR., et          )
al.,                                 ) 1:21-cv-00378-KES-CBD
                                     )
          Plaintiffs,                )
                                     ) JURY TRIAL, DAY 3
     vs.                             )
                                     )
COUNTY OF KERN, et al.,              ) Volume 3
                                     ) Pgs. 355 - 625, inclusive
          Defendants.                )
_____     )
                                     )
R.L., et al.,                        )
                                     )
          Plaintiffs,                )
                                     )
     vs.                             )
                                     )
COUNTY OF KERN, et al.,              )
                                     )
          Defendants.                )
_____     )

Fresno, California                   Thursday, March 13, 2025


               REPORTER'S TRANSCRIPT OF PROCEEDINGS




REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

357

**INDEX**

**PLAINTIFFS' WITNESSES**:

  **MICKEL LEWIS, JR.**
  DIRECT EXAMINATION BY MS. JARAMILLA          377
  CROSS-EXAMINATION BY MR. HAMILTON            403

  **DR. EUGENE CARPENTER**
  DIRECT EXAMINATION MR. GALIPO                412
  CROSS-EXAMINATION MS. MARSHALL               450
  CROSS-EXAMINATION MR. WEAKLEY                452
  REDIRECT EXAMINATION MR. GALIPO              457
  RECROSS-EXAMINATION BY MS. MARSHALL          462
  FURTHER REDIRECT EXAMINATION BY MR. GALIPO   464

  **SCOTT DEFOE**
  DIRECT EXAMINATION BY MR. GALIPO             486
  CROSS-EXAMINATION BY MR. WEAKLEY             521
  REDIRECT EXAMINATION BY MR. GALIPO           554

  **A.W.**
  DIRECT EXAMINATION BY MR. GALIPO             559

  **R.L.**
  DIRECT EXAMINATION BY MR. GALIPO             565

  **M.L.**
  DIRECT EXAMINATION BY MR. GALIPO             570

  **H.L.**
  DIRECT EXAMINATION BY MR. GALIPO             573


**DEFENDANTS' WITNESSES**:

  **ALISHA WHITE**
  DIRECT EXAMINATION BY MR. WEAKLEY            599
  DIRECT EXAMINATION BY MS. GUSTAFSON          610
  CROSS-EXAMINATION BY MR. GALIPO              614

\* \* \* \* \*

1                    DR. EUGENE CARPENTER,

2    called as a witness on behalf of the Plaintiffs, having been

3    first duly sworn, testified as follows:

4                    THE CLERK:  Thank you.

5                    If you would please be seated and state your name,

6    spelling your last name for the record.

7                    THE WITNESS:  Eugene Carpenter, Jr.,

8    C-A-R-P-E-N-T-E-R.

9                    MR. GALIPO:  May I inquire, Your Honor?

10                   THE COURT:  You may.

11                   MR. GALIPO:  Thank you.

12                            DIRECT EXAMINATION

13   BY MR. GALIPO:

14   Q.  Good morning, Dr. Carpenter.

15                   I don't want to age you in any way, but when did you

16   go to medical school?

17   A.  First two years at the University of North Dakota School

18   of Medicine.  The last two years at Tulane School of Medicine.

19   Q.  And what years were that?

20   A.  From '68, '69, '70 to '72.  So I was graduated in '72.

21   Q.  Back then, did they have residency and fellowship and

22   things of that nature?

23   A.  Yes.

24   Q.  Can you tell the ladies and gentlemen of the jury what you

25   did your residence and fellowship in?

RX Dr. Carpenter 6

422

1   Judge to look at your report, and most likely he'll allow you.

2   But that's usually our procedure.

3           But how many gunshot wounds were there with respect

4   to Mr. Lewis?

5   A.   Five.

6   Q.   And did you talk about them or discuss them in your report

7   each separately?

8   A.   Yes.

9   Q.   And when you were discussing them in your report, were you

10  necessarily attempting to say, this is the order they occurred

11  in?  Meaning number 1 had to have happened first, and number 2

12  second?  Or you were just enumerating them for discussion

13  purposes?

14  A.   The numbering system is arbitrary basically from top to

15  bottom, may or main coincide with the sequence of shots.  I do

16  not know the sequence of shots.

17  Q.   Okay.  And did you necessarily, for discussion purposes,

18  in your report start at the gunshot wound that was closest to

19  the top of the head and work your way down?

20  A.   Yes.

21  Q.   Is that sometimes how medical examiners do it?

22  A.   That's the convention in general, to start with the front

23  of the body, top to bottom, and then go to the back, top to

24  bottom, then to the sides, top to bottom.

25  Q.   Okay.  So I want to talk to you about what you identified

1  in your report as gunshot wound number 1.

2          Could you tell the ladies and gentlemen of the jury

3  where that impacted Mr. Lewis's body?

4  **A.**  That hit at the upper lateral or side of the right arm.

5  **Q.**  And could you possibly point on your and -- well,

6  actually, I think I have a -- I have it an exhibit here.  It

7  is Exhibit 9, page 4, that we discussed.

8          MS. MARSHALL:  Yes, Your Honor, for the record, no

9  objection.

10          THE COURT:  All right.  9-4 is admitted.

11     (Plaintiffs' Exhibit 9, page 4 was received.)

12          MR. GALIPO:  And I want to caution the family members

13  that I'm going to show some photos in case they want to look

14  down or leave for this part.

15          I think we need to switch it back maybe.  And are the

16  jury's -- is it on?  No.

17          THE COURT:  We're going to get the jury screens on.

18          MR. GALIPO:  That might be better.  Maybe if you

19  switch it back, I'll just have our technician put it --

20          THE COURT:  As you choose.

21          MR. GALIPO:  Okay.  Is the screens on for the jury

22  now?

23          Thank you.

24  BY MR. GALIPO:

25  **Q.**  Okay.  So this is Exhibit 9, page 4.  Does this show,

1   wound, have to be exposed to the muzzle of the gun in order to

2   get the entry?

3   **A.**  Yes.

4   **Q.**  Was that particular wound fatal?

5   **A.**  It's considered a lethal wound as it enters into to the

6   chest and pierces through the lung.

7   **Q.**  Why would that be fatal or potentially fatal?

8   **A.**  Well, because as it goes through the lung, it hits

9   vessels, and it's not predictable as to how much bleeding

10  occurs.  It is considered the type of wound that must -- that

11  hospitalization must be attempted, if it is the only wound.

12  If left alone, the chances are high that it may cause death

13  within hours.

14  **Q.**  Would that be through mostly a mechanism of internal

15  bleeding?

16  **A.**  Yes.

17  **Q.**  Let's talk about gunshot wounds to 2 and 3 together, if we

18  can.  But we'll start with Exhibit -- gunshot wound 2.

19          Where did that enter the body?

20  **A.**  Arbitrary number gunshot wound 2 hits at the right chest,

21  near the central chest, in the front of the chest.  It travels

22  toward the back, downward, and a bit to the right.

23  **Q.**  And what did it pass through?

24  **A.**  It goes through -- if I may --

25  **Q.**  Would you like to refer to your report to refresh your

RX Dr. Carpenter 6

429

1   consistent or inconsistent with certain scenarios, perhaps?

2   **A.** Yes. Given the position of either the handgun or the

3   body, I can tell what the other must be, assuming the almost

4   always true fact that the projectile travels in a straight

5   line.

6   **Q.** And at a pretty fast speed?

7   **A.** Yes.

8   **Q.** So just assuming hypothetically -- in this case I think

9   you noted the height of Mr. Lewis to be 6 foot 6 in the

10   autopsy, 78 inches. Does that sound right?

11   **A.** Yes.

12   **Q.** And assuming that someone who's 5 foot 10 is shooting from

13   somewhere around chest level, maybe even lower chest level,

14   and is on the same ground plane as -- the same road surface as

15   Mr. Lewis -- are you with me so far?

16   **A.** Yes.

17   **Q.** To get the shot to the chest, first of all, obviously the

18   front of the body would have to be exposed to the gun at that

19   point. Is that a fair statement?

20   **A.** Yes.

21   **Q.** And then, to get a downward trajectory, is one possible

22   way to do it if the upper body is canted or tilted forward at

23   the time of the shot striking the body?

24   **A.** Yes.

25   **Q.** Let's talk about gunshot wound number 3. Where is that?

DX - Dr. Carpenter - 6

433

1          At this time we'll continue with the examination of

2     Dr. Carpenter.

3          Mr. Galipo.

4          MR. GALIPO:  Thank you, Your Honor.

5     BY MR. GALIPO:

6     Q.  Okay.  So gunshot wound number 1 was the right shoulder.

7     Gunshot wounds 2 and 3 were the upper chest.  We've talked

8     about those three, correct?

9     A.  Correct.

10    Q.  Tell us about gunshot wound number 4, please.

11    A.  Gunshot wound number 4 hits at the upper left back, and

12    travels slightly downward through the lung, and almost exits

13    the body but is trapped underneath the skin.  It's a lethal

14    wound.

15    Q.  What did it pass through -- what did it pass through in

16    the body?

17    A.  The lung.

18    Q.  And is there something sometimes used by medical examiners

19    such as yourself, an anterior or posterior midline, meaning an

20    imaginary line going down the middle of the body?

21    A.  Yes.  One can just say the midline.

22    Q.  Okay.  This shot number 4 to the back of the back, how far

23    was it from the midline or the center of the back?

24    A.  Okay.  That, if I may look at my technical page, is a

25    technical detail collected on the diagram.  And it is 2 inches

434

1    to the midline of the back, 12 inches from the top of the head

2    for it's location.

3            Then I also give the wound size and the marginal

4    abrasion, if anybody is interested in that.

5    **Q.**  Okay.  I think we're probably okay with that.  But

6    abrasion collars are normally associated with entry wounds?

7    **A.**  Yes.  Very rarely on occasion with an exit wound.

8    **Q.**  And since --

9            MR. WEAKLEY:  Your Honor, I'm sorry to interrupt.

10           Can I come over and see what he's looking at?

11           THE COURT:  Yes, you may approach.  Just briefly.

12           MS. MARSHALL:  Can I approach as well, Your Honor.

13           THE COURT:  Just to clarify, Mr. Galipo, if you want

14   to share with the --

15           MR. GALIPO:  I think I'm okay.  They want to look at

16   what the doctor is looking at?

17           THE COURT:  I believe so.

18           MR. GALIPO:  They could have asked.

19           THE WITNESS:  This is for the front of the body, and

20   this one, the next page is --

21           THE COURT:  Let's wait until we have a question.

22           MR. GALIPO:  Right, because I'm not sure if this is

23   on the record or off.

24           THE COURT:  Right.

25           Mr. Weakley -- Mr. Weakley, we need to --

RX Dr. Carpenter 6

437

1  A.  Because it enters the left chest, goes through the lung.

2  Q.  I take it, medically speaking, bullets going through the

3  lungs is not a good thing for the person?

4  A.  Correct.  Plus, when a projectile goes through the chest

5  wall, it is a good probability that it will hit an important

6  artery that runs underneath the ribs, and if that's the only

7  thing hit, that can cause death.

8  Q.  That, again, would be a problem with the substantial

9  internal bleeding?

10  A.  Yes.

11  Q.  Now I'm going to leave this photo up for a moment.  And

12  can you tell the jury about gunshot wound number 5, where that

13  is and whether we can see it on this photograph?

14  A.  Yes, number 5 is at the left side of the chest.  And if I

15  may, I'll circle it.

16  Q.  Yes, please.

17  A.  (Witness complies.)

18  Q.  Thank you.

19        And tell us -- tell the jury about that gunshot

20  wound, what it passed through the body and what its trajectory

21  was in the body.

22  A.  Yes.  Number 5 -- and I'm referring now again to my page 4

23  of 6 of the typed report -- it hits at the lateral left, mid

24  back and proceeds to the right, and toward the front, and a

25  bit upward through the tissues near the upper part of the left

RX Dr. Carpenter 6

438

1    kidney.  And then, it completely destroys the aorta.  And the

2    aorta is the main vessel in the body that carries blood from

3    the heart through the rest of the body.

4    **Q.**  All right.  You mentioned that a bullet going through the

5    lung could cause serious medical complications for a person.

6    How about the bullet going through the aorta, how does that

7    affect someone medically?

8    **A.**  Yes.  This is a lethal wound, and is the most immediately

9    lethal of the five projectile wounding events.  This the type

10   of death -- this is the type of wound that can cause death

11   within a few minutes.

12   **Q.**  And you're talking about the gunshot wound number 5 to the

13   left side of the back?

14   **A.**  Yes.

15   **Q.**  I think you already said this, but what was the trajectory

16   of that shot within the body, was it left to right or some

17   other trajectory?

18   **A.**  Left to right, towards the front and slightly upward.

19   **Q.**  And when you say "left to right," for example, Doctor,

20   would that -- would that wound be consistent with the -- the

21   left -- the left back side -- and I'm standing with my left

22   side to you -- the left back side being exposed to the muzzle

23   of the gun so that the wound could enter the left back and

24   come across the body left to right?

25   **A.**  Yes.  One can imagine the projectile traveling in a

1    straight line, like a spear.

2    **Q.**   Okay.  Now -- thank you for that.

3          MR. GALIPO:  We can take that photo down, please.

4    And try to erase, if that's possible.

5    BY MR. GALIPO:

6    **Q.**   Now he mentioned earlier that -- and by the way, as part

7    of these autopsies do you take an X-ray of the body?

8    **A.**   Yes.  On gunshot wounds cases we take total body X-rays.

9    Or at the time this case was done, those X-rays were taken for

10   us by Kern Medical Center about two blocks away from the small

11   coroner's office in the old days of the Kern coroner.  We have

12   a new office now.

13   **Q.**   And you would have an opportunity to look at the X-rays or

14   the reports?

15   **A.**   Yes.

16   **Q.**   And is one the purposes to see whether they are bullets or

17   bullet fragments in the body and where they are?

18   **A.**   Yes.

19   **Q.**   You also could document, even though it's post death,

20   broken bones?

21   **A.**   Yes.

22   **Q.**   Now you mentioned at the earlier part of your testimony

23   that you also ran probes in the body to show the trajectory --

24   general trajectory of the different wounds in the body; is

25   that correct?

443

1    Q.  And as we talked about earlier, we can see the shot to the

2    nipple, it has a -- looks like a substantial downward

3    trajectory.  Is that fair?

4    A.  Yes.

5    Q.  And again, as I indicated earlier, that would be

6    consistent with the body canted forward at the time of the

7    shot?

8    A.  Yes.

9         MR. GALIPO:  Okay.  We can take that down, please.

10   Just have a couple more.

11        Exhibit 9, page 11, previously discussed.

12        MS. MARSHALL:  We object, 403, for the record.

13        THE COURT:  Objection is overruled.

14        It's admitted.

15     (Plaintiffs' Exhibit 9, page 11 was received.)

16   BY MR. GALIPO:

17   Q.  This would be the shot, I think -- or gunshot wound number

18   4 that you identified to the back?

19   A.  Yes.

20   Q.  And this also had somewhat of a downward trajectory?

21   A.  Yes.

22        MR. GALIPO:  And then I wanted to be clear on this,

23   Your Honor, I think we were talking about pages 14 and 15 of

24   the exhibit, and I -- my notes indicate that 15 was the one we

25   were going to use, but I wanted to double check with

DX Dr. Carpenter 6

447

1    **A.**   Yes.   None of the entrance wounds -- none of the wounds

2    had any stippling or soot.

3    **Q.**   Okay.   Let me give you hype hypothetical, Doctor, and you

4    tell me whether this is consistent or inconsistent with the

5    five bullet wounds we have and their trajectory in the body.

6    I'm going to give you a hypothetical.   You let me know if you

7    can answer or need more information.   Is that okay?

8    **A.**   Yes.

9    **Q.**   I want you to assume for purposes of my hypothetical that

10   the decedent gets into a car and is either reach into the car

11   or temporarily sitting down in the car before getting out.

12   And it's a -- happens to be a Chevy Tahoe SUV.

13          Are you with me so far?

14   **A.**   Yes.

15   **Q.**   And it's parked on the street.   And the shooter is on the

16   street surface some distance behind the open driver's door on

17   the driver's side more towards the rear of the car.

18          Are you with me so far?

19   **A.**   Yes.

20   **Q.**   If the -- and I'm demonstrating now.   If the decedent got

21   out of the car, and turned -- the car -- and turned

22   counterclockwise initially, so that his left side was exposed

23   to the shooter as I am here, would that be at least consistent

24   with the trajectory entry wound that we see to the left back

25   side?

DX Dr. Carpenter 6

448

1  A.  It would be consistent with the trajectory, yes.

2  Q.  Okay.  And let's assume that the decedent continued to

3  rotate counterclockwise, now facing towards the shooter, but

4  having been struck with the first shot to the left side of his

5  back, he starts bending forward, so his upper body is tilted

6  or canted forward.

7         Are you with me so far?

8  A.  Yes.

9  Q.  And let's, for purposes of my hypothetical, assume the

10  next two shots 2 and 3 are to the chest.

11  A.  Okay.

12  Q.  Would that at least be consistent with the downward

13  trajectory we see of shots 2 and 3?

14  A.  Yes.

15  Q.  And let's say under any hypothetical, after receiving the

16  first shot to the left side of his back, and him rotating and

17  bending forward to get shots to 2 and 3, his body continues to

18  rotate so that now his right shoulder is to the shooter.

19         Are you with me?

20  A.  Yes.

21  Q.  Would that be consistent and an explanation for the entry

22  wound and trajectory of the shot to the right shoulder that's

23  going right to left across the body?

24  A.  Consistent.

25  Q.  And finally, after sustaining the shot to the left side of

RX Dr. Carpenter 6

449

1    the back, turning and bending forward, to get the two shots to

2    the chest, continuing to rotate to pick up the shot to the

3    right shoulder, assume he continues to rotate so now that his

4    back is to the shooter.

5            Are you with me?

6    A.  Yes.

7    Q.  Would that be at least an explanation or consistent with

8    the -- the shot we see to his back two inches from the

9    midline?

10   A.  No.

11   Q.  He'd have to start falling back?

12   A.  Yes.  He would have to be tilted back towards the gun.

13   Q.  Okay.

14   A.  Because it has a downward -- at least a slightly downward.

15   Q.  Good point.

16           So let's assume that his back is to the shooter and

17   he's starting to fall backwards.

18           Are you with me?

19   A.  Yeah.

20   Q.  Starting to fall backwards towards his back, would that be

21   consistent with the entry wound and trajectory of gunshot

22   wound number -- what you listed as number 4 to the back?

23   A.  Yes.

24   Q.  And let's assume his momentum continued forward and he

25   fell on his back.

CX - Dr. Carpenter M

450

1          Are you with me in the hypothetical?

2   A.  Yes.

3   Q.  So starting again with my hypothetical, if he gets out,

4   his left side is initially to the shooter, he sustains the

5   initial shot to the left side of his back, continues to rotate

6   but now bending forward for shots 2 and 3 to the chest,

7   continues to rotate, gets the shot to the right side of the

8   arm, that's right to left, continues to rotate and starting to

9   fall backwards and gets to the shot to the back, and he ends

10  up on his back, is that hypothetical at least consistent with

11  the five bullet wounds and trajectories we see in this case?

12  A.  Yes.

13          MR. GALIPO:  Thank you.  That's all I have.

14          THE COURT:  Cross-examination.

15          Well, were there any other questions from other

16  plaintiffs' counsel?

17          MR. ALEXANDER:  No.

18          THE COURT:  All right.  Cross-examination.

19                      CROSS-EXAMINATION

20  BY MS. MARSHALL:

21  Q.  Good morning, Dr. Carpenter.

22  A.  Good morning.

23  Q.  Could you define for us "medical homicide"?

24  A.  Uh, a medical homicide, to be clearly distinguished from a

25  legal homicide, is a medical term meaning death at the hands

CX - Dr. Carpenter - W

452

1  **Q.**  Okay.  And then rotates and starts to fall back and can

2  get number 5?

3  **A.**  Yeah, yeah.

4        But as I say this, it seems to me quite awkward for

5  me to say that number 4 would be consistent with my own

6  hypothetical.  It's -- it's fairly straightforward only

7  slightly downward.

8        So your hypothetical, let's go over it again, is that

9  2 and 3 was facing the deputy and bending over, and then turns

10 around and is -- the back is inclined so that you get a

11 slightly downward, so the projectile hits the back, but the

12 back is bent more backward towards the deputy as the body is

13 turning, then you get the slightly downward.

14       And my interjection, as I heard myself saying it, it

15 was not consistent.

16       MS. MARSHALL:  Okay.  You've clarified that now.

17       Okay.  Thank you, Doctor.

18       THE WITNESS:  You're welcome.

19       MS. MARSHALL:  I believe co-counsel has a few

20 questions.

21       THE COURT:  Okay.  Mr. Weakley.

22       MR. WEAKLEY:  Thank you, Your Honor.

23                     CROSS-EXAMINATION

24 BY MR. WEAKLEY:

25 **Q.**  Bottom line, Doctor, is with trajectories you can't -- you

CX - Dr. Carpenter W

453

1   can't say which shot was first and which shot was last; is

2   that correct?

3       Can you hear me?

4   A.  Yeah, that's -- yeah, I heard you.

5       No, I can't.  I can only point out that number 5 is

6   so lethal, if we start -- if -- and I don't think it applies,

7   but number 5 is going to be causing unconsciousness and

8   incapacity within just a few minutes.  But if all five shots

9   are coming rapidly, it doesn't help to distinguish anything.

10  Q.  Okay.

11  A.  But without number 5, the person is not going to

12  necessarily get stopped by anything.

13  Q.  Okay.

14  A.  The other wounds, it takes 30 minutes, an hour, even

15  before unconsciousness might supervene.  It's number 5 that is

16  the immediately lethal wound, where the others can take

17  sometime before there's enough bleeding to cause loss of

18  consciousness.

19  Q.  Okay.  Number 5 then, would you -- is it possible that

20  could be lethal almost immediately?

21  A.  Uh, it would be within minutes.  It's -- in hari-kari, the

22  sword goes right across the aorta and so people know that

23  those deaths come very quickly.

24      This projectile number 5 just took out the aorta

25  completely, so there's a sudden loss of blood pressure,

CX - Dr. Carpenter - W

454

1    there's a massive hemorrhaging from this one gunshot wound.

2    It's just a fact that needs to be brought out.

3         The others, through the lung, even through the liver,

4    it takes time.  There's time for maybe an ambulance to arrive,

5    and transportation to the hospital for these other four.

6    Q.  Okay.  Understood.

7         Now any of these trajectories, you could put your

8    body -- it's -- the bottom line is for any of these, however

9    you're body is rotated, the shooter would be there.  So

10   your -- he can be here, here, here, correct?  In other words,

11   can -- if there's a wound to the -- I guess it was the right

12   shoulder.  I don't want to put my back -- let's assume there's

13   a wound to the left shoulder.

14   A.  If the wound is to the right shoulder, you're right.

15   Q.  I don't want to put my back to the jury, so --

16   A.  Okay.

17   Q.  Hypothetically, if the wound was to the left shoulder, the

18   left shoulder would have to be in this position, correct?

19   A.  Yes.

20   Q.  And the rest of the body can be in any position, correct?

21   A.  Yeah.

22   Q.  I mean, so that's -- when we look at these wound

23   trajectories, what you're talking about is that portion of the

24   body, would be facing the shooter, the rest of the body can be

25   in almost any configuration?

461

1  **Q.**  That you thought that wasn't very likely?

2  **A.**  Correct.

3  **Q.**  Okay.  So the other way to get the shot to the back would

4  be to have the decedent turning after the shots to the chest

5  in their hypothetical and then getting shot in the back?

6  **A.**  Correct.

7  **Q.**  But you're saying that in order to account for the

8  trajectory of the shot to the back, the person then would have

9  to be falling backwards, starting to fall backwards?

10  **A.**  Yes, as in your hypothetical for number 4.  You both have

11  the same hypothetical for number 4.

12  **Q.**  Falling backwards?

13  **A.**  Yes.

14  **Q.**  Okay.  So let me just ask you a few more questions.

15       Are the bullets wounds, in your mind, consistent with

16  the decedent in this case facing front to front to the shooter

17  for all five shots?

18  **A.**  No.

19  **Q.**  And you would agree for at least two of the shots the back

20  had to be exposed?

21  **A.**  Yes -- uh, the side of the back, the left side of the back

22  for one of those two, and the full back for number 4.

23       For number 5, it's the side of the back, the left

24  side of the back.

25  **Q.**  Understood.

462

1          And you're saying, that particular shot to the left
2    side of the back, is that the one that went through the aorta?
3    **A.** Yes.
4    **Q.** And if a shot went through the aorta, do you think it
5    could cause someone who, let's say hypothetically, was
6    standing up with their back to the shooter, could that shot
7    through the aorta that caused the damage that you explained
8    cause someone to pass out and fall backwards?
9    **A.** Yes.  But it would take a few minutes.
10   **Q.** Okay.  So you're saying that all the other shots would
11   take more than a few minutes for him to die, but the shot to
12   the aorta was the most rapidly fatal?
13   **A.** Yes.  All the other shots are not going to be a cause of
14   rapid unconsciousness or fatality.  It's number 5 that's going
15   to cause loss of consciousness and fatality.
16   **Q.** And you're saying that that could happen in a few minutes?
17   **A.** Yes.
18          MR. GALIPO:  Thank you very much, Doctor.  That's all
19   I have.
20          THE WITNESS:  You're welcome.
21          THE COURT:  Any recross?
22          MS. MARSHALL:  Yes, I do.
23                      RECROSS-EXAMINATION
24   BY MS. MARSHALL:
25   **Q.** Good afternoon.

Rex Dr. Carpenter M

463

1   A.  Hello.

2   Q.  Let's try and redo the hypothetical.  I guess I was a

3   little incomplete.

4           Are you having trouble hearing me?

5   A.  Yes.

6   Q.  Okay.

7   A.  Now I'm not.

8   Q.  Now you're not or you are?

9   A.  No.  I hear you now.

10  Q.  Okay.  Good.

11          So I'm hard of hearing too, so I get that.

12  A.  Yeah.

13  Q.  Let's say the first two shots were to the front of

14  Mr. Lewis while he was leaning forward, and then he spins.  Is

15  his spinning consistent with being hit in the right arm?

16  A.  Yes.

17  Q.  And then he's spins to the back and he's got two shots to

18  the back.  Would that be consistent with the two shots to the

19  back if he was falling backwards or forwards?

20  A.  Yes, that accounts for four out of five.

21  Q.  Okay.  And what about -- then he continues to spin and

22  he's shot in the -- in the side back?

23  A.  Yes.

24  Q.  Is that consistent with --

25  A.  Yes.

464

1           MS. MARSHALL:  Okay.  Thank you.

2           THE COURT:  Anything further, Mr. Weakley?

3           MR. WEAKLEY:  No, Your Honor.

4           THE COURT:  May this witness be excused?

5           MR. GALIPO:  Unless I'm allowed to ask one question,

6    yes.

7           THE COURT:  If it's following up on the recross, you

8    may.

9                 FURTHER REDIRECT EXAMINATION

10   BY MR. GALIPO:

11   Q.  So under that last hypothetical that you just got, the

12   shot that you say was most fatal would have been the last

13   shot?

14   A.  Right.

15          MR. GALIPO:  Thank you.

16          THE COURT:  All right.  May this witness be excused?

17          MS. MARSHALL:  Yes.

18          MR. GALIPO:  Yes.

19          THE COURT:  Not subject to recall?

20          MR. GALIPO:  Yes.

21          MS. MARSHALL:  Not subject to recall.

22          THE COURT:  All right.  Dr. Carpenter, you're

23   excused.

24          THE WITNESS:  Thank you, Your Honor.

25          THE COURT:  Not subject to recall.

FRDX DT Carpenter C

465

1          All right.  Next witness.

2          MR. GALIPO:  Yes.  Your Honor, with the Court's

3    permission, there is a witness by the name of Jeremy

4    Terletter, who the parties agree is unavailable to testify at

5    trial.  His deposition was taken, and the parties have agreed

6    to certain portions of his deposition to be read to the jury.

7    And I, along with Mr. Alexander -- I'm going to read the

8    questions, and Mr. Alexander has been kind enough to volunteer

9    to read the answers.  And we'd like to do now if that's okay.

10          THE COURT:  Okay.  Do you we need to approach or is

11    there --

12          MR. WEAKLEY:  No, I would just like to talk to them.

13          THE COURT:  So Mr. Alexander will be at the stand.

14          Ladies and gentlemen, Members of the Jury, I have an

15    instruction for you.

16          A deposition is the sworn testimony of a witness

17    taken before trial.  The witness is placed under oath to tell

18    the truth, and lawyers for each party may ask questions.  The

19    questions and answers are recorded.

20          When a person is unavailable to testify at trial, the

21    deposition of that person may be used at the trial.

22          The deposition of Jeremy Terletter was taken on

23    August 15, 2022.  Insofar as possible, you should consider

24    deposition testimony presented to you in court in lieu of live

25    testimony in the same way as if the witness had been present

466

1    to testify.

2         Do not place any significance on the behavior or tone

3    of voice of any person reading the questions or answers.

4         You may proceed.

5         MR. GALIPO:  Yes, Your Honor.

6         Before I start the reading, the parties have an

7    agreement that both sides at deposition asked this witness

8    questions.  And although I'm not going to identify every time

9    who asked, it's both sides asked questions.

10        And I understand we're also going to lodge this later

11   with the Court so that the Court has it as an exhibit.

12        And for our court reporter, I'm going to each time

13   say the page number and line number where I'm starting and

14   stopping each segment so we have that in the record as well.

15        THE COURT:  Okay.  So the court reporter does not

16   need to take down the transcript questions and answers, but

17   you're going to reference what the page and line numbers are?

18        MR. GALIPO:  Can we go off the record for a moment?

19        THE COURT:  We can.

20        MR. GALIPO:  Because I defer to the court reporter.

21   I think they normally do take it down, but have the exhibit

22   later for reference.  But I'll totally defer to the court

23   reporter as she's keeping the record for us.

24      (Discussion was had off the record.)

25        THE COURT:  We'll proceed as recommended by the court

470

1    enforcement arrived and provided them with a statement of what

2    you witnessed?

3    **A.**  Yes."

4         MR. GALIPO:  I'm going to page 11, line 25, and we'll

5    read to page 14, line 18.

6    (As read:)

7    "Q.  When the shots were fired, did you see Mr. Lewis with his

8    hands up like this?

9    **A.**  No.

10   **Q.**  When the shots were fired, did you see Mr. Lewis with his

11   back to the deputy?

12   **A.**  No.

13   **Q.**  Can you estimate for me the time from when you saw

14   Mr. Lewis -- you said you saw him get back into his driver's

15   seat, stay there for seconds, and then get out and charge at

16   the deputy, and then ultimately he was shot.  Can you estimate

17   for me the length of time from when he first got out of his

18   vehicle to when he was shot?

19   **A.**  Well, it's hard to say.  Less than five minutes.  Less

20   than five minutes.  Five minutes would seem like a long time.

21   But it's a traumatic experience, so time kind of loses its

22   perspective in it, you know.

23   **Q.**  Right.

24   **A.**  It happened pretty quick.

25   **Q.**  Okay.  So taking you back, just to make is sure we're

471

1   talking about the same timeline.  So what I'm referring to is

2   after Mr. Lewis ran behind your truck.

3   **A.**  Oh, okay.  Okay.

4   **Q.**  Yeah, right.  So --

5   **A.**  Just the time from when he reentered his vehicle to

6   getting out.

7   **Q.**  Yes.

8   **A.**  And being shot.

9   **Q.**  So let me just interrupt you there.

10          Not with reentering his vehicle.  So he enters his

11  vehicle.  From the time he gets out of the vehicle to the time

12  he was shot, what's that time?

13  **A.**  Five seconds, ten seconds at the most.

14  **Q.**  Okay.  I'm going to -- on my phone I'm going to do a

15  timer.  And so I want -- and so I want you to, you know, as

16  best you can, take yourself back to that time, so picturing

17  Mr. Lewis getting out of his vehicle, charging the deputy, as

18  you said, and then from the first shot that was fired.  So I'm

19  going to start the seconds, and I'll tell you when, and you

20  tell me when to stop when the first shot was fired.  Okay?

21  **A.**  Okay.

22  **Q.**  So when I say "when," it's when Mr. Lewis stepped out of

23  his car.  Okay.

24          So when --

25  **A.**  Now.

472

1    Q.  Okay.  So I have 4.01 seconds.  Does that sound accurate

2    to you?

3    A.  Yes.

4    Q.  Okay.  You said that Mr. Lewis was close enough he could

5    have grabbed the deputy's shoulders.  In your estimation, was

6    he close enough that he could have grabbed Deputy Ayala's

7    firearm?

8    A.  Yes.

9    Q.  When Mr. Lewis was in his driver's seat, so after he ran

10   around your truck and he gets back in in his drivers's seat,

11   did you see what he was doing?

12   A.  I thought he was preparing to flee, like drive away.

13   Q.  Okay.  Can you remember back to what it was he did that

14   gave you that impression?

15   A.  Just, he got in the driver's seat, and it looked like

16   somebody who was getting ready to drive away, you know.

17   Q.  Okay.  So just the fact of getting in the driver's seat it

18   seemed that he was going to drive away?

19   A.  Yes.

20   Q.  Okay.  Could you see what he was doing with his hands

21   while he was in the driver's seat for that short period of

22   time?

23   A.  No."

24        MR. GALIPO:  I'm next going to go to page 18, line

25   14, and read to page 20, line 22.

1  hands up?

2  **A.**  No.

3  **Q.**  While he was outside the vehicle?

4  **A.**  No.

5  **Q.**  At any point did you see any of the -- either of the hands

6  of the person from the SUV at their waist?

7  **A.**  Not that I can recall.

8  **Q.**  At the point when you saw the person inside the SUV start

9  to turn from his vehicle, where was the officer, the sheriff's

10  officer?

11  **A.**  To the driver's side rear quarter panel of the vehicle

12  like, between the rear left tire and the rear left taillight

13  area.

14  **Q.**  So if I understand correctly, because your window was

15  closed because it may have been windy and because your engine

16  was on, you don't believe that you were able to hear the

17  actual gunshot, right?

18  **A.**  Either I didn't hear it, or just -- you know, the brains

19  trauma response kind of blocks that out.  I don't know.

20  **Q.**  Okay.  And when you -- with regard to the occupant, the

21  person who was coming from the SUV, your testimony was that it

22  appeared he was trying to tackle the officer before he --

23  between the point when the occupant of the SUV started running

24  and the point you felt like he was able to reach out and touch

25  the officer's shoulders, did you see the person, the occupant

478

1   in the SUV, pump his arms at any point?

2   A.  Somewhat.  They were mostly outstretched in front of him.

3   Q.  So it's your recollection that they were more outstretched

4   than pumping as though he was trying it gain momentum, right?

5   A.  Yes.  Yes.

6   Q.  It was your testimony that you thought that the officer

7   had shot at least twice.  Your impression of him having

8   shot -- having shot twice, can you tell us what it was that

9   caused you to believe there was a recoil as opposed to the

10  officer stepping back or something else?

11  A.  Just, you know, I've served in the military, I've

12  witnessed people discharging firearms, it appeared that

13  somebody was discharging a firearm.

14  Q.  In terms of a discharge of a firearm, strike that.

15          With regards to the decedent, the person from the SUV

16  reaching out, you indicated that his hands were close to the

17  officer's shoulders.  Is that the height of where his hands

18  were at the point where you saw them?

19  A.  Yeah.  That's the visual in my mind, is that he was

20  reaching out as if he was going to grab him by the shoulders.

21  Q.  And so the hands at like at the point when you can recall

22  them were actually at the height of the officer's shoulders?

23  A.  Yes.

24  Q.  Now, at the point when you saw the decedent's hands at the

25  height of the shoulders, did you have a recollection that his

DX-DeFoe C

486

1                          SCOTT DeFoe,

2    called as a witness on behalf of the Plaintiffs, having been

3    first duly sworn, testified as follows:

4              THE WITNESS:  I do.

5              THE CLERK:  Thank you.  If you would please be

6    seated.  State your full name, spelling your last name for the

7    record.

8              THE WITNESS:  Yes, ma'am.

9              My name is Scott DeFoe.  That's S-C-O-T-T, D-E,

10   capital F, O-E.

11                       DIRECT EXAMINATION

12   BY MR. GALIPO:

13   **Q.**  You're coming over loud and clear.  Usually we tell people

14   to get closer to the microphone, but you might be good at an

15   inch or two further away.

16   **A.**  Yes, sir.

17   **Q.**  Good afternoon.

18   **A.**  Good afternoon.

19   **Q.**  Do you have a background in law enforcement?

20   **A.**  I do.

21   **Q.**  And have you been, over the last several years, we'll get

22   into the specifics, been serving as an expert witness

23   including in courts like this regarding police cases?

24   **A.**  I have.

25   **Q.**  And does that include cases involving different types of

504

1   that Mr. Lewis is reaching under the seat of a car -- of the

2   car, the front seat, to get a gun.  You've read that in some

3   of the materials that claim or allegation?

4   **A.**  Yes.

5   **Q.**  For a moment, let's just assume that that's true, that's

6   something that Deputy Ayala actually saw and actually believed

7   at the time.  What would be the tactics of an officer if you

8   really thought someone was reaching for a gun underneath the

9   seat?

10  **A.**  I'm going to tacitly retreat, which means I'm going to go

11  back towards my police vehicle and use that as cover.  Once

12  again, I'm going to now elevate that call that, you know, if

13  people are responding to an expedited response.

14          At that point, obviously, I'm going to take my

15  firearm out of its holster.  I'll be in a low-ready position,

16  which is basically your pistol pointing at a 45-degree angle.

17          And I'm going to give him commands.  If I see him

18  come out with an object such as a firearm, it would have to be

19  a firearm, I'm going to give him commands as to drop the

20  firearm.  If he does not comply with the dropping the firearm,

21  then I'm going to use reasonable force once again to deal with

22  the life threatening threat at the time.

23  **Q.**  Why would it be a good idea if you think someone is

24  reaching for a weapon to get cover as opposed to standing out

25  in the open?

1    already patted you down.  There's no weapon.  If he did, in

2    fact, retrieve a weapon, and you're going to cause me harm, I

3    would be thinking, why would you not -- why would you have it

4    behind your back.  If you're looking to take an offensive

5    action with a handgun, you're going to produce it and use it.

6         The idea of someone running at me, which has happened

7    many times in my past, I'm going to use defensive tactics and

8    other things that I've learned to stop that person as they

9    advance on me, none which would include shooting based on the

10   hypothetical.

11   Q.  Under the facts of this case, do you have an opinion as to

12   whether or not to justify the use of deadly force Deputy Ayala

13   would have had to specifically see and identify a firearm?

14   A.  Yes.

15   Q.  What is your opinion in that regard?

16   A.  Based on my review of the facts, he never did see and

17   identify a firearm prior to firing his five rounds from his

18   GLOCK model 22 .40 caliber pistol.

19   Q.  And do you have an opinion as to whether he would have had

20   to at least identify a firearm in the hand before firing?

21   A.  Yes, not pointing at the officer.  We're not going to wait

22   until someone points a gun at us.  But an object that would

23   resemble a firearm, based on his review of watching what's in

24   the hands.  Once I saw an object that would -- once again

25   officers are trained what a firearm looks like, so it wouldn't

DX6 DeFoe C

516

1  be a black object, it would be handgun, the person that's

2  coming in an offensive action, the use of lethal force would

3  be reasonable.

4  Q.  Now, in terms of this claim by Deputy Ayala that Mr. Lewis

5  was advancing towards him with his right hand behind his back,

6  did you look in the record, other witnesses' statements,

7  depositions to see if anyone else said, Mr. Lewis had his hand

8  behind his back?

9  A.  I did.

10  Q.  Did you find any corroboration from any other statement or

11  witness?

12  A.  No.

13  Q.  So is the only person based on your review of the records

14  that said that Mr. Lewis was reaching under the seat, made

15  threatening statements, and had his hand behind his back

16  Deputy Ayala?

17  A.  Yes.

18  Q.  The jury this morning heard some testimony read regarding

19  Mr. Terletter's deposition.  You reviewed that as one of the

20  documents?

21  A.  Yes.

22  Q.  And Mr. Terletter -- and I'm just paraphrasing in part,

23  saw Mr. Lewis approaching Deputy Ayala with both hands in

24  front of him, outstretched, I think he might have said he

25  thought maybe he was going to tackle him or grab his shoulders

1    or something like that.  Can you assume that for a moment?

2    A.   Yeah, actually, testified that he never saw his hands in

3    his front waistband or rear waistband at any point.

4    Q.   Right.  And I think the jury heard it this morning.  You

5    recall, he said he never saw Mr. Lewis's hand behind his back?

6    A.   I wasn't here this morning but based on the deposition

7    testimony.

8    Q.   Yeah, we read the deposition this morning, because

9    Mr. Terletter was not available to come to trial.

10   A.   Okay.  That's --

11   Q.   What I'm getting at, but do you recall Mr. Terletter -- I

12   agree he said what you said.  But do you recall him also

13   saying that he saw both of Mr. Lewis' hands in front of him,

14   outstretched towards Deputy Ayala just before, during the

15   shooting?

16   A.   Yes, sir.

17   Q.   So let's just assume for hypothetical purposes that's

18   true, that Mr. Lewis was rapidly approaching Deputy Ayala, he

19   had his hands both outstretched, close to Deputy Ayala, would

20   that justify shooting him?

21   A.   No.

22   Q.   Why not?

23   A.   Because there's no object in his hands and definitely not

24   a firearm or gun in his hands.

25   Q.   And the jury hasn't heard yet from another witness that I

CX - DeFoe - W

521

1                      CROSS-EXAMINATION

2    BY MR. WEAKLEY:

3    Q.  Good afternoon, Mr. DeFoe.

4    A.  Good afternoon.

5    Q.  Do we have the defendant's exhibit binders up there?

6          THE COURT:  They would.

7          THE WITNESS:  For plaintiffs' exhibit binder, if

8    that's what you're referring to.

9          THE COURT:  They are defense exhibit binders are

10   behind you, Mr. DeFoe.

11         THE WITNESS:  Which one?  There's three of them here.

12         THE COURT:  Which one?

13         MR. WEAKLEY:  Exhibit A, page 117.  It's actually

14   00117.

15         THE WITNESS:  00117.

16   BY MR. WEAKLEY:

17   Q.  Yes.

18   A.  Got it.

19   Q.  Do you recognize that as the Kern County Sheriff's report

20   on this case, as a page of that report?

21   A.  Yes.  It starts at "physical evidence."

22   Q.  Yes.

23   A.  Yes, sir.

24   Q.  That's something you reviewed and formulated your opinions

25   on; isn't it?

CX - DeFoe - W

522

1   A.  Yes, sir.

2   Q.  This is a narrative of one of the witnesses named Destiny

3   Salcedo; isn't it?

4   A.  It is.

5   Q.  Earlier to plaintiffs' question you said, in reviewing the

6   records there was nothing supporting the statement Deputy

7   Ayala heard from Lewis that, You're going to have to kill me,

8   You're going to die.  Do you remember that?

9   A.  Yes.

10  Q.  Look in the third paragraph, the last sentence.

11         MR. GALIPO:  Your Honor, I'm going to object to this

12  as calling for hearsay.  And I know this is a narrative.  It's

13  nowhere in her recorded statement.

14         THE COURT:  Okay.  Let me -- let's go to sidebar on

15  this.

16     (Sidebar commences):

17         THE COURT:  We're at sidebar.  Plaintiffs counsel are

18  present.  Defense counsel are present.

19         This report indicates that the interviewer activated

20  his digital recorder.  Is this purporting to be a summary of a

21  recorded statement or --

22         MR. WEAKLEY:  It's going to impeach Mr. DeFoe when he

23  said there's nothing that he's reviewed that supports Ayala's

24  statement, and this directly impeaches that testimony.

25         THE COURT:  I understand the form.  I guess what's --

523

1      the reason I have you all here is I'm -- there's a

2      representation that it's not in her recorded statement, but it

3      is in that document.  Is that --

4              MR. WEAKLEY:  I don't know if it's in her recorded

5      statement.

6              MS. MARSHALL:  I don't think it is in the recorded

7      statements, but it is in this document.  And he was provided

8      and reviewed this document.

9              MR. WEAKLEY:  He even testified to that --

10             MS. MARSHALL:  We're not asking --

11             COURT REPORTER:  One at a time, please.

12             MR. GALIPO:  So I think it appears that everyone's in

13     agreement that it's not in her recorded statement.

14             So this, I assume, is supposed to be a summary of a

15     recorded statement and if it is, it's a very unfair summary to

16     say that she said something in her statement that she did not

17     say.

18             MR. WEAKLEY:  It's not offered for the truth.

19             MR. GALIPO:  I know that but --

20             MR. WEAKLEY:  It's offered to impeach him.

21             THE COURT:  Well, I know, but it seems to me if

22     there's universe agreement of both parties that she did not in

23     fact make that statement --

24             MR. WEAKLEY:  I can't say that.  It's not recorded.

25             THE COURT:  Well, if, in the same paragraph, the

524

1    officer indicates that he activated the digital recorder prior

2    to speaking to her and then he has quotes, and I'm being told

3    by both parties that the quoted sentence at the end of the

4    paragraph is not in the record statement -- no, let me finish

5    -- my concern is that there may be a document in which

6    somebody says something that blatantly untrue based on the

7    recorded statement.  It seems a 403 issue if -- as asked.  But

8    I'll hear you.

9            MR. WEAKLEY:  Well, he said he's reviewed the records

10   and there's nothing to support Ayala.  Whether this is true or

11   not, it does support Ayala.

12           MR. GALIPO:  Yeah, but --

13           THE COURT:  We're going to get into a whole.

14           MR. GALIPO:  The problem is --

15           THE COURT:  As I've understood it so far, correct me

16   if I'm wrong, the recorded statement does not include the

17   purported quote in this summary.

18           MR. WEAKLEY:  That's my understanding.

19           MS. MARSHALL:  My understanding is the recording was

20   lost.  So there isn't a recorded statement, but there is

21   Deputy Guerrero.

22           THE COURT:  Okay.  So there is no recorded statement

23   of Salcedo.

24           MS. MARSHALL:  No.

25           THE COURT:  All right.

CX6-DeFoe-W

525

1          MS. GUSTAFSON:  Well, what she's saying is there was

2     once upon a time, but we no longer have it.

3          THE COURT:  Who lost it?

4          MS. MARSHALL:  The sheriff's department.

5          MS. GUSTAFSON:  Yeah.

6          THE COURT:  Well, I --

7          MS. MARSHALL:  But he testified there was nothing in

8     the record, which is not true.  This was in the records he

9     reviewed.  So he -- all he's asking him is --

10         MS. GUSTAFSON:  And he --

11         MS. MARSHALL:  -- to review that and, Are you

12    mistaken.

13         MR. GALIPO:  Well --

14         MS. MARSHALL:  So that's not hearsay.

15         MR. GALIPO:  -- the problem is, she did give a

16    recorded statement that we all do have --

17         MR. WEAKLEY:  Here's a solution.

18         MR. GALIPO:  Let me finish -- but it's not referenced

19    in.

20         Your office took her deposition where this was never

21    referenced, ever.  So I think it's very misleading to the jury

22    to try to get through Mr. DeFoe that there was some summary

23    that she allegedly said on a recorded statement that has been

24    lost for the same department that Deputy Ayala works for,

25    leading this jury to believe that she did say that.

526

1          MR. MARSHALL:  But you're leading the jury to believe

2   that she didn't.

3          MR. WEAKLEY:  The counter to that is that he has now,

4   on the witness stand, not telling the truth.  So what I'm

5   willing to do is drop it as long as we strike that portion of

6   his testimony.

7          THE COURT:  What's the plaintiffs' position as to

8   that?

9          MR. GALIPO:  What's the position that we strike?

10         MR. WEAKLEY:  That he reviewed the records, there's

11  nothing supporting the statements of Deputy Ayala that he

12  heard Lewis saying, You're going to have to kill me, you're

13  going to die -- or you're F'ing going to die.  That's

14  paraphrasing.

15         MR. GALIPO:  Well, let me ask you this, if this comes

16  in, are you comfortable with establishing or stipulating that

17  this alleged recorded statement where that was said has been

18  lost.

19         MR. WEAKLEY:  No.  Because all I want to do is point

20  out to the jury that he's not telling the truth.  I don't care

21  what she said, if she didn't say it-

22         MR. GALIPO:  I'm --

23         THE COURT:  The problem I have with this is that

24  it's not clear to me from this statement what she's saying.

25  It's, is that something an officer just told her, and then she

1    says, "Well, I guess he said that because you said he said
2    that"?  Is it something she saying he said, quote, I don't
3    know.  I don't -- you know, if she was on the stand, and she
4    testified, and she was asked upon direct, cross-examination
5    about what she heard and didn't hear and that did not come in.
6          MS. GUSTAFSON:  No, that was Jessica.
7          THE COURT:  Oh, this is two different --
8          MS. GUSTAFSON:  Yeah.
9          THE COURT:  All right.
10         MR. GALIPO:  But the point I'm making in her recorded
11   statement and her deposition, which we're both making, this
12   was never a part of that record.  And it's very troubling that
13   they claim she said it while it was allegedly being recorded,
14   this was somehow lost.
15         THE COURT:  I --
16         MS. MARSHALL:  Whether it was lost or not, Mr. DeFoe
17   testified there was nothing in what he reviewed that said that
18   supported this Deputy Ayala's position that Mr. Lewis
19   threatened him.  And this right here supports that he
20   reviewed --
21         THE COURT:  How does that support that?  Let me ask
22   you this, it supports that she is saying that, I guess he said
23   that.  It's -- there's no basis for it without recording.  I
24   don't know if she's saying that because she was told that by
25   the officer, and she's saying, Well -- you know, or she's --

528

1     there's an "I guess" in there.  I find that a 403 issue

2     because of the "I guess," and because of the context where we

3     can refer specifically to the additional recordings which the

4     County apparently lost.

5          And I understand, Mr. Weakley, you're not the County

6     here.  You're your client's --

7          MR. WEAKLEY:  Right.

8          THE COURT:  -- individual officer, and I appreciate

9     that.  But if this is all there is, then that's a 403 issue.

10          MR. GALIPO:  Thank you, Your Honor.

11          THE COURT:  That's --

12          MR. WEAKLEY:  I want to make a record.

13          THE COURT:  You can make a record.

14          MR. WEAKLEY:  So Exhibit A-00117, the sentence is:

15     Ms. Destiny Salcedo, narrative of apparently what Destiny

16     Salcedo told the detective, she said, "I guess my stepdad said

17     he was going to shoot him, comma, but he had nothing on him

18     period, he didn't do nothing wrong."  End of quote.

19          THE COURT:  We've got a double hearsay issue here.

20     What's not here, to me, is that that's something she heard as

21     opposed to something that she has been allegedly told by

22     someone other hearsay source.  So you've got a 403 issue where

23     the purported statement is -- it's hearsay.  But --

24          MR. WEAKLEY:  Understood.

25          THE COURT:  -- implies it's a double layer of

529

1    hearsay.  And the proof of what was actually said in the

2    context of which it was said and the question to which it was

3    responding to would have been on a digital recording that the

4    County lost.  So this is a 403 issue.

5              MR. WEAKLEY:  Okay.  But I want to make a point.

6              THE COURT:  Make your record.

7              MR. WEAKLEY:  I'm not offering it for hearsay.  I'm

8    not offering it for the truth.

9              THE COURT:  I know you're offering it to --

10             MR. WEAKLEY:  Rehabilitate Deputy Ayala.  Because he

11   made a blank -- a blatant statement, there's nothing in the

12   record --

13             THE COURT:  But let me just say, I don't find this

14   corroborating for a Deputy Ayala statement.  It -- this

15   appears to be a double hearsay statement.  And the actual

16   context of it that would have been clear if we had the

17   recording, but I don't think that it is -- directly

18   contradicts his prior statement.

19             MR. WEAKLEY:  Okay.  Thank you.

20             MR. GALIPO:  Thank you, Your Honor.

21             MS. MARSHALL:  Thank you.

22        (Sidebar ends.)

23             THE COURT:  You may proceed.

24             MR. WEAKLEY:  Thank you, Your Honor.

25   BY MR. WEAKLEY:

1    **A.**  No.

2    **Q.**  Okay.  At the time that Deputy Ayala discharged the

3    firearm at Mr. Lewis, you were asked what crimes had

4    Deputy Ayala witness Mr. Lewis committing, and you stated:

5              "He was going to" -- you said "he," meaning Deputy

6    Ayala --

7              MR. GALIPO:  Is it possible to get a page and line

8    number?

9              MR. WEAKLEY:  Yeah, page 37.

10             MR. GALIPO:  What lines?

11             MR. WEAKLEY:  Starting at line 10.

12             MR. GALIPO:  Thank you.

13   BY MR. WEAKLEY:

14   **Q.**  When Mr. Lewis was told that by Deputy Ayala that, I'm

15   going to search your car.  And Mr. Lewis says, something like,

16   F no, you're not, you're going to search my car, and lunges,

17   actually takes a bladed stance, and then lunges at Deputy

18   Ayala; isn't that a crime of Penal Code 148?

19   **A.**  It is.

20   **Q.**  Which is obstructing and delaying the investigation of a

21   peace officer?

22   **A.**  Yes.

23   **Q.**  And so at that point in time Deputy Ayala could have taken

24   Lewis into custody?

25   **A.**  He could have, yes.

1    movements as if he's going to shoot?

2    **A.**  No.

3    **Q.**  In fact, as a officer, do you even have to wait to until

4    he sees a gun, if the person -- if the officer reasonably

5    believes he has a gun, and the person is acting like he's

6    coming around with his hand, does the officer have to wait

7    until he actually sees a gun before he shoots?

8           MR. GALIPO:  I'm going to object as an incomplete

9    hypothetical.

10          THE COURT:  Well, I think you need to be more

11   specifically, Mr. Weakley.  So sustained, but rephrase.

12   BY MR. WEAKLEY:

13   **Q.**  Okay.  Going back to the things I've asked you about the

14   officers knowledge, about this guy having a gun, he's provided

15   information by reliable informant, the officer reasonably

16   believes he has gun, and the person is making a movement with

17   his arm, coming around his side rapidly, does the officer have

18   to wait until he actually sees the gun?

19   **A.**  Yes.

20   **Q.**  Before the officer shoots?

21   **A.**  Yes.

22   **Q.**  Now, you've already said that a trained officer would be

23   in a low-ready position, right?

24   **A.**  Depending on where they're at, if based on the

25   hypothetical asked earlier by Mr. Galipo, yes, a position of

1  cover and low-ready position based on the totality

2  circumstances.

3  **Q.**  So before you can shoot, you would have to actually see

4  the gun?

5  **A.**  See the gun or an object that resembled a gun coming in my

6  direction, correct.

7  **Q.**  How long does it take for someone to spin around and shoot

8  you?

9  **A.**  Depends on the person.  Depends on the level of training.

10  **Q.**  Okay.  I think I just shot you, Mr. DeFoe.  You're dead.

11  **A.**  Hopefully, not.  I've been shot before, and it hurts.

12  **Q.**  Isn't that -- I mean, that's how quickly the officer had

13  to make a decision, right, what I just demonstrated?

14  **A.**  Officers are taught proper tactics, time and distance, and

15  deescalation.  Once again, for people oftentimes don't keep

16  their hands behind their back, they swing their arms forward.

17  Once again, you have to consider that, that's why officers are

18  trained with properly with tactics, distance and deescalation.

19       MR. WEAKLEY:  Going to move to strike as

20  nonresponsive.

21       THE COURT:  Well, I'm not sure -- the question -- the

22  answer is stricken, but the -- I don't think the question was

23  clear.  Why don't you rephrase the question.

24       MR. WEAKLEY:  Okay.  Can I have my question read

25  back?

625

1          MR. GALIPO:  No.  Thank you, Your Honor.

2          THE COURT:  All right.  We'll be back on the record

3    at 8:30 in the morning, and then we'll begin at 9:00 a.m. as

4    discussed with the jury.

5          MR. GALIPO:  Thank you, Your Honor.

6          MR. WEAKLEY:  Thank you, Your Honor.

7          THE COURT:  All right.

8       (Proceedings were concluded at 5:18 p.m.)

9

10      I, RACHAEL LUNDY, Official Reporter, do hereby certify the

11   foregoing transcript as true and correct.

12

13   Dated:  April 2, 2025            /s/ Rachael Lundy_____
                                      RACHAEL LUNDY, CSR-RMR
14                                    CSR No. 13815

15

16

17

18

19

20

21

22

23

24

25

626

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. KIRK E. SHERRIFF


MICKEL ERICK LEWIS, JR., et al.,          )
                                          )   1:21-cv-00378-KES-CBD
                                          )
            Plaintiffs,                   )
                                          )   JURY TRIAL, DAY 4
       vs.                                )
                                          )
COUNTY OF KERN, et al.,                   )   Volume 4
                                          )   Pgs. 626 - 727, inclusive
            Defendants.                   )
_____     )
                                          )
R.L., et al.,                             )
                                          )
            Plaintiffs,                   )
                                          )
       vs.                                )
                                          )
COUNTY OF KERN, et al.,                   )
                                          )
            Defendants.                   )
_____     )

Fresno, California                        Friday, March 14, 2025



                REPORTER'S TRANSCRIPT OF PROCEEDINGS







REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

644

1          Sorry, Dr. Sheridan.  Can you hear the courtroom

2    deputy?

3          THE WITNESS:  Yes, I think so.  Yes.

4          THE COURT:  Okay.

5          THE WITNESS:  Yeah, I can.  Yeah.

6                    DR. FRANK SHERIDAN:

7    called as a witness on behalf of the Defendants, having been

8    first duly sworn, testified as follows:

9          THE WITNESS:  I do.

10          THE CLERK:  If you could please state your full name,

11    spelling your last name for the record, please.

12          THE WITNESS:  My first name is Frank, middle name

13    Patrick, and my last name is Sheridan, S-h-e-r-i-d-a-n.

14          THE COURT:  Ms. Marshall.

15          MS. MARSHALL:  Thank you.

16          THE COURT:  Ms. Marshall, please proceed.

17          MS. MARSHALL:  Thank you.

18                    DIRECT EXAMINATION

19    BY MS. MARSHALL:

20    **Q.**  Can you hear me, Dr. Sheridan?

21    **A.**  Yes.

22    **Q.**  Let's start with a little bit about your background.  What

23    is your occupation?

24    **A.**  I'm a forensic pathologist.

25    **Q.**  How long have you been a forensic pathologist?

652

1    was prepared by Kern County and it's -- it had a label on it,

2    Mojave OIS final video, that's the one that was probably the

3    most helpful.

4    Q.   Okay.  Did you review a Wienerschnitzel video that

5    involved the incident in this case?

6    A.   Yes, uh-huh.

7    Q.   Based on your review of the autopsy, did Dr. Carpenter

8    perform both an external and internal examination of Mickel

9    Lewis' body?

10   A.   He did, yes.

11   Q.   Did he note any wounds?

12   A.   Yes, he did.  He -- primarily the most important, the main

13   wounds were gunshot wounds.  There were a total of five

14   entrance wounds.

15   Q.   And did you review his photographs as well as his reports

16   regarding those wounds?

17   A.   I did, yes.

18   Q.   And did you make an opinion as to whether the -- the

19   autopsy was accurate?

20   A.   Yes.  It appeared to be an accurate autopsy performed.

21   Q.   Okay.  And let's talk about wounds 2 and 3.  Are those

22   wounds consistent with Mr. Lewis body being tilted forward in

23   a lunging motion?

24   A.   They are, yes.

25   Q.   Okay.  And can you describe wound number 5 for us?

653

1   A.   Number 5 the entrance wound was in the back, the lower

2   back on the -- of the back of -- of the decedent on the left

3   side, the lower chest area, basically the upper abdomen lower,

4   chest area.  And that wound went basically from left to right,

5   angled slightly upwards.  And in -- on the internal

6   examination it was wound to go through the kidney, but, most

7   importantly, through the aorta which is the largest artery in

8   the body.

9   Q.   And did he -- did Dr. Carpenter describe it a certain way?

10  A.   He described the injury to the aorta in terms of he used

11  the term the aorta was "destroyed" was the word that he

12  actually used.

13  Q.   And do you have an opinion as to how long it would take

14  someone to lose consciousness if their aorta was completely

15  destroyed?

16  A.   Almost immediately.  It's probably the -- along with

17  gunshot wounds through the brain, which we don't have here --

18  but the aorta is the other area of the body where wounds like

19  that will cause the person to go down, essentially,

20  instantaneously because the entire pressure is taken out of

21  the circulation system.  So there's effectively no circulation

22  at all even though the heart may be trying to beat, but

23  there's no circulation into the organs.

24  Q.   So that wound was fatal?

25  A.   Absolutely, yes.

654

1   Q.  Would someone have been able to pivot and lunge at another
2   individual if they were shot in that area first or second?
3         MR. GALIPO:  Object to the question as vague as
4   phrased.  And compound, pivot and lunge.
5         THE COURT:  Sustained.  Why don't you rephrase.
6   BY MR. MARSHALL:
7   Q.  Okay.  After reviewing all the evidence in this case, and
8   based on your medical opinion, would someone have been able to
9   pivot towards the direction of the deputy?
10  A.  I mean after sustaining wound number 5 --
11  Q.  Yes.
12  A.  -- that's what you're asking?
13        No, the person would not be capable of any further
14  action at all.  They would have gone down to the ground.
15  Q.  Okay.  So would they have been able to lunge at
16  Deputy Ayala?
17  A.  No.
18  Q.  Do you have any opinion as to the sequence of the
19  gunshots?
20  A.  Take the autopsy findings with conjunction of the video --
21  you have to do both, I think that shots numbered -- wounds
22  number 2 and 3 were the first ones and then the rest followed
23  from that.  I don't know the exact sequence of the other ones,
24  as to what order they came in individually.  But I do believe
25  that wounds 2 and 3 were the first ones, and then the rest

655

1  followed.

2  Q.  Thank you, Dr. Carpenter [sic].

3          MS. MARSHALL:  May I have a minute?

4          THE COURT:  You may.

5          MS. MARSHALL:  Thank you.

6          I have no further questions of Dr. Carpenter at this

7  time.

8          THE WITNESS:  Dr. Sheridan is my name.

9          MS. MARSHALL:  Oh, I'm sorry.  Dr. Sheridan, I

10  apologize for that.

11          THE COURT:  Any questions by other defense counsel as

12  to Dr. Sheridan?

13          MR. WEAKLEY:  No, Your Honor.

14          THE COURT:  All right.  Cross-examination?

15          MR. GALIPO:  Thank you, Your Honor.

16                        CROSS-EXAMINATION

17  BY MR. GALIPO:

18  Q.  Good morning, Dr. Sheridan.

19  A.  Good morning, Mr. Galipo.

20  Q.  You knew, or had an occasion to know, Dr. Carpenter

21  because you think for a short time you worked together?

22  A.  Yes.  There was a period several years ago -- I've

23  forgotten the exact dates, but I used to do part-time work at

24  our office in San Bernardino.

25  Q.  Okay.  And you have been retained as an expert in this

656

1    case by the defense; is that your understanding?

2    **A.**  That's my understanding, yes.

3    **Q.**  And I won't get into the dollars, but you're being

4    compensated for your time by the defense?

5    **A.**  I hope so.

6    **Q.**  I hope so.  Okay.

7         The jury has heard a lot about the gunshot wounds

8    already.  So let's just go through them again quickly.  And if

9    you need to look at your notes, that's fine.

10        Was gunshot wound number 1 to the right, upper arm

11   shoulder area?

12   **A.**  It was, yes.

13   **Q.**  And gunshot wounds 2 and 3 to the chest?

14   **A.**  Yes, it's the front of the chest.

15   **Q.**  And gunshots 4 and 5 to the back?

16   **A.**  4 and 5 were to the back, correct, uh-huh.

17   **Q.**  In the video footage you looked at, did you have the

18   impression at some point the officer who was shooting was

19   backing up or away from the decedent?

20   **A.**  Yes, I did.

21   **Q.**  And in any of the video footage that you looked at, did

22   you see both the officer and the decedent in the same video

23   frame at the time of the shooting?

24   **A.**  Uh, just before the actual shooting, yes, but then it's a

25   little bit obscured at the exact instance of the shooting.  So

1  **A.**  That is right.  If the bullets go through clothing, then

2  the residue will all be -- whatever there is, whether it be

3  soot or stippling, especially soot, it would be on the

4  clothing not on the skin.

5  **Q.**  Right.  If it's close.  If the shooting is close range,

6  you would have it; but after a certain distance, you would not

7  see that necessarily?

8  **A.**  That's correct.  That's true.  And "necessarily" is an

9  important word, yes.

10  **Q.**  And I take it sometimes like someone is wearing a black

11  t-shirt the gunshot residue might not show up as well as if

12  they are wearing a white t-shirt; is that generally a fair

13  statement?

14  **A.**  Yes, that's very definitely true.  It's very hard to see

15  soot, especially against dark clothing, especially black

16  clothing.

17  **Q.**  Yes.  And in terms of video, did you ever hear any audio

18  of the gunshots?  In other words, to determine by audio

19  whether there was a pause between any of the shots or anything

20  like that?

21  **A.**  No.  There was no sounds on the video to that -- well at

22  least on that video there was no sound that I could detect.

23  **Q.**  So your opinion, I take it, is that the first two shots

24  that struck him were shots 2 and 3?

25  **A.**  Yes, I believe so.  Uh-huh.

659

1    **Q.** And you believe that Mr. Lewis would have been facing in
2    the direction of the officer at the time of those shots?
3    **A.** Yes, uh-huh, and probably apparently bent forward as well,
4    at least his torso bent towards Deputy Ayala.
5    **Q.** Or --
6    **A.** To some extent.
7    **Q.** Right.
8    **A.** Uh-huh.
9    **Q.** But you obviously don't know the exact distance between
10   them at that point based on your forensic analysis, correct?
11   **A.** No, I don't know the exact distance with any of the shots
12   quite honestly.
13   **Q.** And you indicated in response to counsel's question that
14   two of the depositions you reviewed were Terletter, the
15   gentleman in the truck; and Montoya, the gentleman coming from
16   the gas station; is that correct?
17   **A.** Yes. But I have to say, I haven't reviewed them in
18   preparation for today. Again, I reviewed them back in when I
19   wrote my report. So I don't remember details of those
20   depositions right now. I remember who these people were, but
21   I don't remember the details.
22   **Q.** Okay. Do you generally recall that they both have
23   Mr. Lewis's -- when he was facing the officer, Mr. Lewis'
24   hands in front of him?
25   **A.** I don't remember that unfortunately. I'm sorry.

661

1  A.  Yes.  That's where it started, yes.  And then it went into
2  the chest.  Uh-huh.
3  Q.  Right, which was my next point.  That shot goes from right
4  to left across the body; is that true?
5  A.  Right to left, and slightly downwards as well -- as well.
6  But basically right to left, yeah.
7  Q.  So would it be fair to say that at the time of that shot,
8  the shot to the right shoulder, the right shoulder and the
9  right side of the body of Mr. Lewis would be to the shooter?
10  A.  Correct.  Uh-huh.
11  Q.  So I guess one possibility under your analysis would be if
12  the first two shots hit him in the chest as he's bent forward,
13  the body could rotate then to the right so that the right
14  shoulder picks up the shoulder shot with the right to left
15  trajectory; is that one possible scenario?
16  A.  Yes.  That's one possible scenario, at least as the start
17  to these other three shots, yes.  If that is possible, uh-huh.
18  Q.  Okay.  And if that was possible, then you would have the
19  body, after the first two shots, rotating to the left or
20  counterclockwise; is that correct?
21  A.  If that shot in the shoulder is the next one after the 2
22  and 3.  But as I said in my report, too, I cannot be sure
23  about the exact sequence of these last three shots because I
24  think the body -- the trajectory of each one of them taken
25  together, I should say, taken collectively would indicate that

662

1  the body was actually rotating or pivoting if you want to use

2  that word.  And that's rather unpredictable as far as the way

3  the -- it's hard to reconstruct that with certainty.

4  Q.  Okay.  But I thought that I heard you say with respect to

5  shot 5, the one that blew out the aorta, you believe that

6  Mr. Lewis would almost go immediately unconscious and not be

7  able to rotate after that shot.  Did I hear you correctly?

8  A.  After that shot, yes.  That is correct, yeah, he wouldn't

9  be able to.

10        Well, when you say "rotate" there, by the way, he

11 wouldn't be able to consciously do anything, no.  Now, if he

12 has some momentum -- let's just suppose he was running

13 towards -- or not necessarily running but moving rapidly

14 towards the deputy, once he's -- once the shots begin,

15 including the first two that happened, 2 and 3, he's going to

16 start falling.  And as he does, he can rotate, and just by his

17 momentum.

18        So you see what I'm trying to say.  I'm sorry.  I'm

19 not making it very clear.  So let me try to ask [sic] that

20 question again so hopefully I can make it clearer.

21 Q.  Let me ask you a different question.

22        You indicated that you reviewed Deputy Ayala's

23 deposition, correct?

24 A.  I did, yes.  Uh-huh.

25 Q.  Do you recall in his deposition Deputy Ayala said at some

665

1   **Q**.  And would that be consistent, in your mind, with

2   explaining the shots to the right shoulder, and under your

3   analysis, the last two shots to the back?

4   **A**.  Yes.

5   **Q**.  Okay.  Can you repeat your -- the court reporter is having

6   a little difficulty in part because of the Zoom connection.

7   So can you repeat your last answer.  I thought it was "okay,"

8   but I'm not sure.

9   **A**.  Basically, yes, because I was agreeing with your

10  hypothetical question.  Uh-huh.

11  **Q**.  Okay.  So one scenario, under your assumption, if the

12  first two shots hit him in the chest, as he's canted or

13  leaning forward, he rotates to his left or counterclockwise.

14  The third shot hits him in the right shoulder with a right to

15  left trajectory, he continues to rotate, and now his back is

16  exposed for the last two shots; that would be one scenario,

17  correct?

18  **A**.  In general, yes, that is correct.  Although the two shots

19  to the back have rather slightly different trajectories in the

20  sense of they're up and down.  But in general, yes.  Uh-huh.

21  **Q**.  Okay.  So let's talk about the two shots to the back.

22  **A**.  Okay.

23  **Q**.  Because it sounds like you're saying after shot 5, he

24  would have almost immediately went unconscious and fell to the

25  ground; isn't that what you're saying?

1    A.   Yeah.  Of course, you have to remember, according to my --

2    my opinion here, he's already received the first two, 2 and 3.

3         And those wounds in themselves are going to cause

4    some disabling effect, not as rapidly as wound 5, but wound 5

5    would certainly be devastating, immediately devastating.

6    Q.   Right.  Because I thought you said in response to

7    counsel's question as soon as he received that gunshot wound,

8    he would have almost immediately lost consciousness because it

9    blew out his aorta and you would expect him to immediately go

10   to the ground?

11   A.   If he was upright at the time, if he wasn't already shot

12   and if -- okay.  Let's just imagine wound 5 happening in

13   isolation.  That's probably one way of looking at this.  I

14   mean, in theory, let's imagine that a person standing and

15   receives wound number 5, then they will go down immediately,

16   yes.

17   Q.   Right.  But I take it someone would go down immediately

18   from wound number 5 whether that was the only shot or even if

19   they had been shot previously?

20   A.   That's true, yes.  Uh-huh, yeah.

21   Q.   Okay.  So does it make sense since Deputy Ayala in his

22   deposition said before Mr. Lewis went to the ground he stopped

23   and was standing still, does it make sense and is it

24   consistent forensically that the last shot could have been

25   shot number 5?

667

1   **A.**  It could have been number -- yeah, the last shot could

2   have been 5.

3          Although, as I said, 4 -- 1, 4 and 5, as far as I'm

4   concerned, any one of them -- as I said in my report, I

5   don't -- you're offering one scenario for the sequence, but

6   it's not the only possible one.

7   **Q.**  I'm not saying it is.  I'm only asking you, Doctor,

8   whether you think it's forensically consistent with the

9   gunshot wounds?

10  **A.**  What's specifically is consistent?  I'm sorry, what's the

11  analysis of description, is that what you're asking?

12  **Q.**  Yes.  The first two shots hitting Mr. Lewis in the chest

13  with him bent forward, his body rotating to the left

14  counterclockwise.  He gets the third shot in the right

15  shoulder.  His body continues to rotate away from Deputy

16  Ayala.  His back is now exposed.  He's shot in the upper back

17  for shot 4.  He continues to rotate.  Now his left back side

18  is exposed to the shooter.  He gets gunshot wound number 5 and

19  immediately falls to the ground.  Is that consistent?

20  **A.**  Yes.  But he's falling anyway because of the first two

21  shots because they are going to start having an effect as

22  well.

23  **Q.**  Well --

24  **A.**  It's not as rapidly as 5, but what I see happen is that 2

25  and 3, as I said, are the first ones, they are to the front of

1   the chest.  They are both serious wounds.  They won't have the

2   immediate effect of wound 5 would have, but they are going to

3   be fairly rapid just the same.

4   **Q.**  Okay.  But you would agree that my sequencing in my

5   hypothetical is at least consistent with the forensic and

6   medical evidence?

7   **A.**  Yes.  Generally, yes.  It is -- it's definitely one

8   possibility.

9   **Q.**  And you understand he fell on his back, correct?

10   **A.**  I think so.  He ended up on his back, yes, that is right.

11   **Q.**  And you also indicated, I believe, in your deposition that

12   some of the other wounds may have been treatable at a

13   hospital, with timely medical care he may have survived but

14   not wound number 5; is that correct?

15   **A.**  That is right.  I think I applied -- I can look at my

16   report, but wounds 1 and 4, I've said, I think, were -- if

17   they were the only wounds, let's put it that way, they were

18   potentially -- with rapid medical care, they were potentially

19   survivable.  But they could have been fatal also without rapid

20   medical care.

21   **Q.**  But the shot to the back, as we discussed, that was the

22   most immediately fatal; is that correct --

23   **A.**  When you say --

24   **Q.**  -- number 5?

25   **A.**  Number 5, yes.  Exactly, yes.  Uh-huh.

669

1    Q.   And you said he was already falling but isn't shot 1 to

2    the shoulder almost straight across?

3    A.   Yes.  But that doesn't mean that he's not falling, because

4    he could be -- it depended on the exact position of Ayala and

5    his gun, obviously.  But the gun is the most important thing.

6    So --

7            So he could be falling even then but you could still

8    have a trajectory that goes across the body.  Even if you're

9    falling, if the gun is in the right position to do that,

10   it's -- you're looking at the relationship all the time

11   between the gun and the body.

12   Q.   And --

13   A.   And --

14   Q.   Sorry.  Can you repeat the last part of your response for

15   the court reporter, please.  I cut you off again.  I'm sorry,

16   Dr. Sheridan.  I thought you were done.

17   A.   Maybe I better answer it again completely, because I can't

18   remember my exact words.

19           But anyway, what I was saying is, this right to left

20   trajectory of wound number 1, could happen in a variety of

21   circumstances where the body -- it all depended on the

22   relationship of the body's position in relation to the gun;

23   that's the important thing.  So it doesn't mean that he has to

24   be upright by any means.

25   Q.   Okay.  Just want to make sure you're finished.  So just

670

1   one moment now.

2          But you would agree with me that assuming the gun is

3   still somewhere in the chest area of the officer, then the

4   entry wound and trajectory to the right shoulder is consistent

5   if the gun is at officer's chest level with that shot to the

6   shoulder happening before the decedent falls down?

7   A.  It's possible, but it's not necessarily the case.  Because

8   you say the gun is at Ayala's chest level, yes, but the angle

9   of that gun can still be other than horizontal, it could be

10  pointing downwards, for example, for all we know.

11  Q.  You mean firing shots as Mr. Lewis' is going to the

12  ground, pointing down at him as he's going to the ground; is

13  that what you're referring to?

14  A.  Yes.  That's a very definite possibility to explain some

15  of these shots.

16  Q.  Okay.  And then lastly, another scenario, you understand

17  as Mr. Lewis was getting out of the SUV, before he was shot,

18  as he was turning and getting out, his back left side would be

19  to the shooter; do you understand that?

20  A.  I would have -- when you say the left back, left side --

21  well, his back in general could be -- anyway, oh, yes, I would

22  have thought -- my understanding of the relationship between

23  them, that would have been more of the right, right back.

24  However, it could be the left back.  It all depends on the

25  exact position of Mr. Lewis at that moment.

671

1  **Q.**  Are you saying that your understanding, when Mr. Lewis

2  initially gets out of the car his back would be to the

3  shooter?

4  **A.**  Yes.  Yes.  It would, uh-huh.

5  **Q.**  And you're saying your impression was more his right back

6  initially?

7  **A.**  Initially, I think that was the case.  Yeah, because

8  the -- I mean, from what I could see on the video and the

9  description of the whole scene and everything and the scene

10  photographs taken afterwards, yeah, it could have been the

11  right for a moment.  But then -- you know, Mr. Lewis could

12  turn slightly and then it's the left.

13  **Q.**  Right, that's what I'm getting to.

14       So if his back is to the shooter initially, at least

15  his back would have been exposed for the possibility of

16  gunshot wound number 4 happening at that time, true?

17  **A.**  Theoretically, yes, but 4 has a slightly downward

18  trajectory as well as being from back to front.  And that's

19  hard to explain in the circumstances that you're describing

20  here.

21  **Q.**  Okay.  And then, again, this is just another hypothetical,

22  if he's rotating to his left, then his back left side would be

23  exposed to the shooter; is that correct?

24  **A.**  That is correct, yes.

25  **Q.**  Which is at least consistent with gunshot wound number 5?

1  A.  With number 5, yes.  Because -- yeah, it is.

2  Q.  And if he's -- continuing to rotate to his left, this is

3  under this hypothetical, at some point his front will be to

4  the shooter, correct?

5  A.  Yes, if he were to continue turning.

6  Q.  And if he was continuing to rotate, and he was bent

7  forward, that would be one explanation for picking up shots 2

8  and 3?

9  A.  In general, yes, that's possible.

10  Q.  And if he continued to rotate exposing his right shoulder,

11  that could be an explanation for shot 1?

12  A.  For shot -- yes, that's possible.

13  Q.  And if he continued to rotate and fall on his back that

14  could also explain how he fell on his back?

15  A.  Yes.  But his body ends up towards the back of his

16  vehicle, I mean, some distance -- a short distance, but still

17  some distance from that driver's side door.

18       And I do not believe he could have moved that much if

19  he had received shot number 5 as one of the first shots.

20  Q.  And just to address that lastly, you indicated in your

21  deposition you think at some point he took a few steps,

22  correct?

23  A.  I do.  Oh, yes, uh-huh.

24  Q.  And you're saying that because shot 5 was so devastating

25  and would have rendered him unconscious almost immediately you

673

1    think that was most likely the last shot?

2    A.  I didn't necessarily say the last one, but it's after 2

3    and 3 for sure.

4              As I've said more than once, I don't know the exact

5    sequence but -- I know we've discussed it here right now, but

6    I don't know the exact sequence of shots 1, 4 and 5 but they

7    are all, I believe, after 2 and 3.

8    Q.  But it's sounding like you're saying that after shot 5 he

9    would be incapable of voluntary movement?

10   A.  Absolutely, yeah.

11   Q.  Thank you.

12             MR. GALIPO:  That's all I have, Your Honor.

13             THE COURT:  Anything further?  Mr. Alexander?

14             MR. ALEXANDER:  Thank you, Your Honor.

15                           CROSS-EXAMINATION

16   BY MR. ALEXANDER:

17   Q.  Dr. Sheridan, I believe that you indicated that you

18   reviewed the deposition transcript of Officer Ayala, Deputy

19   Ayala, correct?

20   A.  I did, yes.  Uh-huh, I did.

21   Q.  And inside his testimony, he indicates that he was face to

22   face with the shooter at the point when he was shooting, you

23   recall that?

24   A.  As he started shooting, yes.  Uh-huh.

25   Q.  And you also reviewed testimony of Mr. Terletter, the

702

1    deposition of that person may be used at the trial.

2            The deposition of Nicholas Montoya was taken on

3    August 19, 2022.  Insofar as possible, you should consider

4    deposition testimony presented to you in court in lieu of live

5    testimony in the same way as if the witness had been present

6    to testify.

7            One moment.

8            Do not place any significance on the behavior or tone

9    of voice of any person reading the questions or answers.

10           Please proceed.

11           MR. GALIPO:  Thank you, Your Honor.

12           I have been asked to and I've agreed to read the

13   question.

14           And for the record, this deposition was taken on

15   August 19th, 2022.

16           MR. GALIPO:  Going to page 8, lines 4 through 7:

17           (As read):

18   Q.  "The court reporter when she placed you under oath, that

19   is an oath to tell the truth as if you were in a courtroom,

20   present; do you understand that?

21   A.  "I do."

22           MR. GALIPO:  Going to page 10, line 16 to page 13,

23   line 8:

24   Q.  "Okay.  So the deputy involved in this shooting was named

25   Deputy [sic] Ayala, and I may refer to him shorthand as Deputy

714

1          MR. GALIPO:  Page 29, lines 10 through 12:

2   Q.  "Did you ever see Mr. Lewis with his back turned to the

3   deputy at the time he was shot?

4   A.  "No."

5          MR. GALIPO:  Page 30, line 5 to page 31, line 5:

6   Q.  "First, if I understand correctly, when you first saw

7   something that drew your attention to this, you were standing

8   in the ampm?

9   A.  "No, I was walking to my vehicle after paying for gas.

10  Q.  "And was that in the ampm lot though?

11  A.  "Well, I was actually standing right -- I was getting

12  ready to unplug the pump and put it in my vehicle when I

13  started hearing the ruckus.

14          "I saw the deputy pulling him over but didn't think

15  anything of it.  As I went to go start pumping gas, I heard

16  the shouting.  That's when I looked over.

17  Q.  "And at that point when you looked over, you were still in

18  the gas station itself?

19  A.  "Correct.

20  Q.  "You said that you pulled out your phone and started to --

21  started to, what you believe, videotape, right?

22  A.  "Correct.

23  Q.  "But you were, essentially, pointing it at the direction

24  but you hadn't pushed the button you thought had pushed the

25  button, but you hadn't, right?

719

1    **Q.**  "All right.  So when you say you saw him getting out of

2    the vehicle, what is it that you were able to see?  What part

3    of the decedent's body were you able to see as he was getting

4    out of the vehicle?

5    **A.**  "He was a big male.  I saw his entire -- his arms, his

6    chest, his face -- I mean, his head, a little bit of his

7    entire body when he got out of the car.

8    **Q.**  "And at the point when the decedent got out of the car, do

9    you know whether he turned in any way?  In other words, he

10   stood and do you know whether he turned one direct direction

11   or the other?

12   **A.**  "He turned towards the deputy.

13   **Q.**  "And do you know whether he turned to his left or his

14   right?

15   **A.**  "I believe it was his left.

16   **Q.**  "And at the point when he turned to his left, did you

17   see -- were you able to see the decedent's hands?

18   **A.**  "Not immediately.  It wasn't until he got towards the rear

19   of his vehicle, and I still couldn't see if he had anything in

20   his hands, but it looked like he was in a running motion like

21   this.

22   **Q.**  "When you say a "running motion"?

23   **A.**  "I mean running motion.

24   **Q.**  "When people run typically, their arms are not in the same

25   position.  So did you see his arms moving?

720

1   A.   "I saw his hands in this -- how you're looking at me right
2   now.
3   Q.   "So your hands are in a match grip up, at your chest
4   level, extended a little bit?
5   A.   "I don't know how you were run, but that's how it appeared
6   to him to be.  He wasn't running.
7          "Now you're messing me up.  That's what it looked
8   like.  It looked like he was charging the deputy faster than
9   walking speed.  His hands were in front of him like this."
10         MR. GALIPO:  Page 39, lines 3 through 17:
11  Q.   "What I'm trying to do is, because we're on video, it's
12  difficult for the court reporter to take down where your hands
13  are.  So what I'm trying do is I'm trying to represent my
14  indicate what you're showing me in the video so that you --
15  A.   "More like a boxing stance than a running stance.  I'm
16  just being polite.
17  Q.   "And both hands were at the same location approximately in
18  front of him?
19  A.   "Approximately.
20  Q.   "Okay.  And you said that the officer moved back.  How
21  many steps did the officer move?
22  A.   "Come on, man, I have no idea how many steps he took back.
23  I know he was retreating backward yelling "stop" when the
24  shots -- shots were fired."
25         MR. GALIPO:  I think we go to page 40 next.  Page 40,

721

1    line 1 to page 41, line 13.

2         We're almost done:

3    **Q.** "Okay.

4    **A.** "But he was walking backwards.

5    **Q.** "You had a recollection that approximately four shots were

6    fired, right?

7    **A.** "Correct.

8    **Q.** "When the first shot was fired, do you know what distance

9    separated the officer and the -- and the decedent?  Do you

10   have an estimate as to what distance?

11   **A.** "Like I said, from as far away as it looked like they were

12   right up in each other's faces.  So within ten feet.  It looks

13   to me, again -- you know, I have to go off of what I told

14   the -- said in my interview with the detective.  It's been two

15   years.

16   **Q.** "Right.  And I understand.  So it's fine if you don't

17   remember or you don't know.  I just want to make sure that I

18   understand what you can recall now.

19        "So at the point when the first bullet was shot, it's

20   your belief that the distance that separated the two of them

21   was approximately ten feet?

22   **A.** "From -- correct.

23   **Q.** "And" -- or -- sorry.

24        "And at the point when the first shot was made, was

25   any part of the SUV blocking your view of the decedent as he

727

1          THE COURT:  Very good.  Have a good weekend.

2       (Proceedings were adjourned at 12:00 p.m.)

3

4

5

6

7

8

9

10     I, RACHAEL LUNDY, Official Reporter, do hereby certify the

11   foregoing transcript as true and correct.

12

13   Dated:  April 10, 2025          /s/ Rachael Lundy_____
                                      RACHAEL LUNDY, CSR-RMR
14                                    CSR No. 13815

15

16

17

18

19

20

21

22

23

24

25

728

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. KIRK E. SHERRIFF


MICKEL ERICK LEWIS, JR., et   )
al.,                          ) 1:21-cv-00378-KES-CDB
                              )
          Plaintiffs,         )
                              ) JURY TRIAL, DAY 5
     vs.                      )
                              )
COUNTY OF KERN, et al.,       ) Volume 5
                              ) Pgs. 728 - 986, inclusive
          Defendants.         )
_____ )
                              )
R.L., et al.,                 )
                              )
          Plaintiffs,         )
                              )
     vs.                      )
                              )
COUNTY OF KERN, et al.,       )
                              )
          Defendants.         )
_____ )

Fresno, California            Tuesday, March 18, 2025



REPORTER'S TRANSCRIPT OF PROCEEDINGS






REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

732

 1   discussed off the record, by a reckless disregard for the

 2   rights.

 3          And we also are not seeking nominal damages, and we

 4   had a discussion about that off the record as well.

 5          THE COURT:  All right.  And that is correct.  We'll

 6   address the Bane Act instruction in just a minute.

 7          We are not -- so that's affecting -- the changes in

 8   the verdict form and the instructions to reflect those changes

 9   will be made.

10          Do you wish to be heard on any of those issues,

11   Mr. Weakley?

12          MR. WEAKLEY:  Yes.  Starting with the Fourth

13   Amendment jury instruction number 10.

14          THE COURT:  Yes.

15          MR. WEAKLEY:  We had submitted a proposed

16   instructions -- our proposed instructions on the Docket Number

17   106, instructions 13 and 14, on lesser force.  I understand

18   that the Court's Instruction Number 10 is taken almost

19   directly right out of the Ninth Circuit model instructions.

20          But my concern is that that model instruction,

21   especially when state law is also involved in the case, is a

22   little bit misleading and that it -- the jurors can be

23   confused and say that for the Fourth Amendment, that the

24   jurors' are entitled to look at alternatives that the officer

25   had, as a question of liability and that there could be lesser

733

1   force used on the question of liability.

2          And our proposed jury instructions, I think, clear

3   that up.  Because I think the way that the Ninth Circuit

4   instruction is written right now is a little bit misleading on

5   whether or not the officer has to use a lessor force, if

6   available.

7          That's on jury instruction number 10.

8          On jury instruction number 21 --

9          THE COURT:  Well, let's address number 10 first and

10  then turn to you for your further objection.

11         First, the jury instructions do delineate the

12  relevant instructions.  They separate out the relevant

13  instructions for the federal claims and state law claims with

14  a specific one-line instruction indicating that these

15  following instructions apply to the federal claims.

16         This instruction that we're referring to, which is

17  currently number 10, pertains to the Fourth Amendment claim.

18  And it is not just a general Fourth Amendment instruction;

19  it's specific to the context -- the model Ninth Circuit

20  instruction is specific to the context of a police officer

21  who's alleged to have used excessive force.

22         And it -- I do think it sufficiently addresses the

23  issues and provides sufficient information to the jury,

24  instruction to the jury on the factors that they are to

25  consider, including the availability of alternative methods to

734

1    take the decedent into custody or subdue the decedent, whether

2    it was practical to give warning of the imminent use of force

3    and whether such warning was given and whether there was --

4    and the relationship between the need for the use of force and

5    the amount of force used.

6            It doesn't -- I think that those -- that the general

7    instruction sufficiently addresses those issues.

8            Would you like to be heard further on this,

9    Mr. Galipo?

10           MR. GALIPO:  No.  It's not necessary.

11           THE COURT:  Okay.  All right.  And your further

12   objection -- so the request for -- the proposed instructions

13   at document 106 that were defendant's proposed instructions

14   number 13 and number 14 entitled "Lesser force, one" and

15   "Lesser force, two," that request is overruled or denied.

16           It seems to me that highlighting those specific

17   provisions would unduly weight certain issues for the jury

18   that are already sufficiently and neutrally addressed in the

19   model instruction.  So that's -- and next objection,

20   Mr. Weakley.

21           MR. WEAKLEY:  No.  Just to make sure that -- I think

22   we're on the record, that the Court intends to add language to

23   jury instruction 21, which is the damage instruction.  I think

24   these numbers are all going to change.  But this is the

25   instruction on damages for the plaintiffs.

737

1        THE COURT:  Understood.

2        MR. GALIPO:  Thank you.

3        THE COURT:  Okay.  With respect to the jury

4   instructions, anything else, Mr. Weakley?

5        MR. WEAKLEY:  No.  Unless we're going to talk about

6   the special interrogatories.

7        THE COURT:  So there's the Bane Act instruction.

8        I do intend to include a reference in the instruction

9   on the Bane Act, which is currently number 17.  The numbering

10  will change.  First, we're going to -- before I get to that,

11  the language "or attempted to interfere with" will be removed

12  from the first line, as proposed by the plaintiffs.  And

13  there's no objection to that, I understand.

14        The remainder of the Bane Act instruction will be the

15  same, except that a sentence will be added at the end that "a

16  reckless disregard for a person's constitutional rights is

17  evidence of an intent to deprive that person of those rights."

18        MS. GUSTAFSON:  Your Honor, if I may be heard, what

19  we had discussed off the record was that we have some concern

20  with the addition of this language, specifically with regard

21  to the terminology "reckless disregard."  Because the average

22  juror may not have an understanding of what that entails and

23  what that means.

24        So we would propose, then, including an instruction

25  either separate from this or in addition to this instruction

738

1    that would help define "reckless disregard."  In a quick

2    review of the CACI, there's a definition for reckless

3    disregard under "Intentional infliction of emotional

4    distress," CACI 1603, which reads:

5         "(Name of defendant) gave little or no thought to the

6    probable effects of his/her," nonbinary pronoun, "conduct."

7         THE COURT:  Why don't -- that doesn't sound like a

8    definition; it sounds like a statement.  But what would the

9    definition read?  Reckless disregard is?  A reckless disregard

10   is?

11        MS. GUSTAFSON:  I apologize.  The first part of it

12   reads that "the defendant acted with reckless disregard."

13   Granted, this is tailored towards the emotional distress, but

14   it would be "the defendant acted with disregard."

15        It would tie in with Your Honor's addition of number

16   5 to jury instruction number 17, regarding reckless disregard

17   as being evidence of specific intent to deprive of the --

18        THE COURT:  Why don't we do this:  I -- I wouldn't

19   necessarily be against including a model instruction

20   definition of reckless disregard, but I'll ask the parties to

21   meet and see if you can craft the language on that definition

22   of reckless disregard that would be appropriate in here.  Or

23   either here or as a separate -- most likely as a separate one-

24   line instruction.

25        MS. GUSTAFSON:  Thank you.  That's all.

1          MR. GALIPO:  We would be willing -- I think it's
2    almost self-explanatory.
3          THE COURT:  I think it probably is, but it seems like
4    there ought to be some agreed language based on a model
5    instruction that you can all agree on.
6          MR. GALIPO:  We will try.
7          THE COURT:  Very good.  Anything further the parties
8    wanted to make a record on regarding the jury instructions?
9          MR. GALIPO:  Well, again, it's time for our jury.
10          THE COURT:  It is.
11          MR. GALIPO:  And I don't want to keep them waiting.
12    I do appreciate the Court looking at the Reese case and the
13    Bane Act.  Quite frankly, the Bane Act has a complicated
14    history.  I'll just say that.
15          And the current model instruction, although it may
16    apply to some cases, it doesn't apply to others.  And from the
17    plaintiffs' perspective, as Reese says, which we believe is
18    binding on this Court, we really just have to prove that first
19    element would be that the officer used excessive force.  And
20    then the second element would be as what you have here.
21          Well, adding the language about the reckless
22    disregard.  It starts getting confusing under the context of
23    this case when someone is acting violently to prevent someone
24    from exercising a particular constitutional right.
25          I mean, that may exist in certain cases where

740

1    someone's exercising their freedom of speech, for example, and

2    then someone is retaliating against them by using excessive

3    force.

4            And it's probably a little late in the game to make

5    all these changes.  I know we want to get the case to the jury

6    today.  But I do think just -- that's all, really, that we

7    have to prove would be element one, that there was excessive

8    force used; and element two, as the Court has it.  And some of

9    this other language, honestly, from my perspective, is more

10   confusing than helpful.

11           But I just wanted to state that for the Court's

12   consideration, not only in this case, but in future cases I'm

13   sure that you'll come across this issue.

14           THE COURT:  That's fair.  Is there an objection from

15   the defense to modifying element 1 to more simply state that

16   Deputy Ayala used excessive force against Mickel Lewis, Sr.?

17           MR. WEAKLEY:  Yes.

18           MS. GUSTAFSON:  Yes, Your Honor.

19           THE COURT:  All right.  Given the objection, I am

20   inclined -- and we did address these instructions off record,

21   in our conference.  I'm inclined to keep the model language

22   there as we have it in instruction -- in element 1 in the

23   instruction.

24           MR. GALIPO:  Understood.  Thank you, Your Honor.

25           MS. GUSTAFSON:  Briefly, I just want to make it clear

741

1    for the record that the defense does oppose the additional

2    language that the Court is proposing, the addition of

3    paragraph 5 with regard to reckless disregard.  And we believe

4    that as --

5            THE COURT:  It's not a separate 5, but it would be a

6    line at the end, yes.

7            MS. GUSTAFSON:  Fair enough, Your Honor.  I

8    misunderstood that.

9            We just want to make it clear for the record that we

10   oppose the inclusion of that additional language and that the

11   currently proposed language from CACI relating to the Bane Act

12   is sufficient and covers the issues.  However, we understand

13   the Court's position and its intent to include the additional

14   information.

15           And with that, we'll -- if the Court intends to

16   include that, we would like to have the additional instruction

17   with regard to the definition of reckless disregard.

18           THE COURT:  Noted.  I will note that there's

19   currently pending a proposed modification to the CACI

20   instruction that would specifically include the reckless

21   disregard language to bring the instruction up to date with

22   existing case law and that this language regarding reckless

23   disregard is drawn directly from the Reese case, Ninth Circuit

24   case, 888, F.3d 1030, Ninth Circuit 2018.

25           MR. GALIPO:  Thank you, Your Honor.

745

1    different views on the very same scene who have testified.

2         And those are issues that the jury is going to have

3    to decide.

4         I will note with respect to qualified immunity, it is

5    clearly established that deadly force is not justified where

6    the suspect poses no immediate threat.  That's been clearly

7    established for decades.  Among others, I'll cite the Garner

8    case, 471 U.S. at 11, which I -- I don't actually have the

9    date of that before me, but I believe it goes to back to the

10   1980s.

11        It's also clearly established that if an officer,

12   without warning, shot and killed an individual -- in this

13   instance I'm referring to the Hayes case from 736 F.3d 1223,

14   Ninth Circuit 2013.  An officer, without warning, shot and

15   killed an individual who was holding a knife, a weapon, but

16   not threatening, the deputy was standing 6 to 8 feet away,

17   that was excessive force.

18        Here we have a situation where there's a dispute --

19   it's undisputed that, ultimately, there was nothing in

20   Mr. Lewis's hand.  But the issue is whether his hands were

21   displayed, whether he was making what types of movements he

22   was making.  These are -- these are issues that the jury has

23   to consider and has to decide.  And the Court cannot at this

24   time find a basis to grant the Rule 50(a) motion.

25        Would either party like to be heard further?

746

1            MR. GALIPO:  No.  Thank you, Your Honor.

2            MR. WEAKLEY:  Very briefly, Your Honor.  We

3   understand, because the facts are in dispute here.  But under

4   qualified immunity, even though a Rule 50(a) motion is denied,

5   a Rule 50(b) motion may be appropriate.  But we need to be

6   able to understand the disputed facts, get a jury's decision

7   on them, which is why we submitted special interrogatories or

8   request the Court's assistance in drafting special

9   interrogatories to satisfy the Court's concern.

10           On clearly established -- that's the key, clearly

11  established law needs to be particularized to the case, not

12  just general statements that excessive force is unreasonable

13  if you shoot someone that's unarmed.

14           You need to know the facts of this case.  And those

15  facts are dependant upon how the jury sees Mr. Lewis' conduct.

16  So I think in order for us to be able to argue a qualified

17  immunity argument, we need to know what the jury thinks about

18  Mr. Lewis' conduct, particularly this case, not just a general

19  statement.

20           THE COURT:  Well, it seems to me that there's really

21  two versions here.  And that if -- Deputy Ayala has testified

22  as to everything that he perceived.  And his record is there.

23  And the issue is going to be whether the jury credits his

24  testimony and his statements or whether they credit the

25  plaintiffs' testimony -- I shouldn't say the plaintiffs'.

747

1    That's not the right word -- the testimony of other witnesses.

2    And to the extent there's some -- but even to the extent they

3    credit some portions of what a witness says and not other

4    portions, it's not -- this really is a situation in which you

5    have different versions of how these few seconds unfolded.

6              And I don't -- I don't see how -- I'm not convinced,

7    I'll put it that way, as to how the questions would help you

8    on that.  I'm not --

9              Let me also state this, the questions, as worded,

10   don't seem proper to me in that they assume a belief that is

11   in dispute.  So the questions assume that Deputy Ayala, for

12   example, believed that Lewis had a gun in his hand when he got

13   out of the car the second time.

14             I understand there was testimony, but the jury could

15   certainly infer that and could find that.  But that is -- to

16   ask them in a question that presumes that that is an

17   undisputed fact is not appropriate.

18             MR. WEAKLEY:  Understood, Your Honor.  That's why we

19   would request the Court's assistance, which can be done later

20   in the trial.  We don't know -- when we put these together, we

21   don't know what questions you have.

22             THE COURT:  All right.  Is there --

23             MS. GUSTAFSON:  Your Honor, I may have an example

24   that may assist you.  Considering your ruling on the Rule 50,

25   you just referenced Hayes and the fact of a deputy or an

748

1    officer not making a warning prior to -- or not having the

2    time to make a warning.

3            It might be reasonable to include a special

4    interrogatory that goes to that effect of whether or not there

5    was -- it was feasible, or insert the appropriate terminology

6    with regards to Deputy Ayala and whether it was feasible or

7    practical for him to give a warning in this situation.

8            THE COURT:  Well, I -- what I have before me are the

9    proposed interrogatories that you all have proposed and have

10   identified some concerns.  The concern is -- one of my

11   concerns is, as this is currently worded, they presume that

12   there -- certain facts that are in dispute, and then ask the

13   jury to find whether a belief that's in dispute, but that the

14   instructions ask them to presume is true and undisputed.  And

15   they're asking the jury to find whether that's reasonable

16   under the circumstances.

17           And so the questions before me are not appropriately

18   worded.  I don't -- with the jury waiting, I'm not going to

19   kind of try and craft questions on the fly here.  I'll

20   entertain other questions, if you think that there's a

21   specific question or two that could be more appropriately

22   worded.

23           But, Mr. Galipo, did you want to be heard on this?

24           MR. GALIPO:  Just briefly, Your Honor.

25           Plaintiffs agree with the Court that these proposed

749

1   questions are not appropriate.  They are not going to --

2   they're objectionable on several grounds.  And, as the Court

3   stated, given the factual scenario of this case, the jury is

4   going to go with one scenario or the other.  And we don't

5   believe the special interrogatories should be given at all.

6   And we think it's somewhat unfair to ask the Court to, you

7   know, figure out what questions, if any, should be given.  So

8   for those reasons, we don't think these questions should be

9   given.

10           THE COURT:  Okay.  All right.  Is there anything

11   further at this time before we bring the jury in?

12           MR. WEAKLEY:  Not with regard to the instructions.  I

13   do have a comment about the verdict form, but that can wait

14   until a break.

15           THE COURT:  Okay.  We can certainly address it on the

16   break, but I would -- but I would, if it's brief, like to

17   address it now, because I'd like to get those being worked on

18   while we're in trial.

19           MR. WEAKLEY:  Okay.  It is very brief, Your Honor,

20   but it deals with the question of state law damages.  And the

21   way the verdict form is now, it's breaking down damages as to

22   each plaintiff, asking the jury to award an amount for each

23   plaintiff.

24           And I believe under California wrongful death

25   damages, which is what the plaintiffs are seeking, the jury is

750

1    supposed to award one amount for all heirs.  And then later
2    the Court decides how that should be divided.  And so we would
3    propose that we follow CACI and the California law on the
4    California wrongful death question.
5              THE COURT:  Would you like to be heard on that,
6    Mr. Galipo, briefly?
7              MR. GALIPO:  Yes.  I think we discussed this perhaps
8    off the record.  There is no federal case that says the Court
9    procedurally cannot have separate lines.  I think in this case
10   you have multiple plaintiffs.  There were three different
11   mothers involved, a lot of evidence about the nature of their
12   relationships.
13             At the end of the day, it's really the same thing,
14   because presumably the total would be the separate.  But I
15   don't think it's fair to put this Court in a position later to
16   decide whether those should be divided equally or in some
17   other manner or what that breakdown would be.
18             So I see no harm to the defense, and I think to err
19   on the side of caution, we should keep the lines separately.
20   And although I'll acknowledge there's some state authority for
21   having one line, I could just tell the Court, based on my
22   experience with the federal courts, including in this building
23   with multiple cases, there always have been separate lines.
24             THE COURT:  I am going to overrule that objection or
25   deny the request to have one line.  I do think it's much more

1    objectively -- let me be clear.  It should not make any

2    difference.  If the jury has been instructed or will be

3    instructed appropriately and whether it's one line or it's

4    broken into individual lines for the separate plaintiffs could

5    not make any difference as to the total amount that's found.

6    And it certainly would be much more efficient and helpful,

7    from the Court's perspective, to have it identified plaintiff

8    by plaintiff.  So I'm going to keep the verdict form as

9    written in that respect.  Anything further?

10           MR. GALIPO:  No, Your Honor.  Is it possible to have

11   three minutes?

12           THE COURT:  It certainly is.  We can bring the jury

13   in at 9:25 or 9:30.  You tell me how long you need.  We've

14   been going since eight o'clock.  Why don't we say 9:30.

15           MR. GALIPO:  That will be fine.  Thank you,

16   Your Honor.

17           MR. HAMILTON:  Thank you, Your Honor.

18           MS. GUSTAFSON:  Thank you, Your Honor.

19           THE COURT:  So we're off the record.

20      (Recess taken from 9:20 a.m. to 9:33 a.m.)

21           THE COURT:  Before we bring the jury in, I did want

22   to just touch on the verdict form and the question about

23   damages and the breakdown.

24           What is the parties' position if I put in one line

25   for damages and then ask the jury to do a percentage breakdown

RX, Chapman pt

756

1  it was accidental.  If that is the case, please raise your

2  hand.

3          And I see no jurors raising your hand.  Thank you for

4  your very careful following of my admonitions.  At this time

5  we'll proceed and continue with the defendant's case.

6          MR. WEAKLEY:  Thank you, Your Honor.  The defendants

7  would like to call Clarence Chapman.

8          THE COURT:  Mr. Chapman, please approach the witness

9  stand.  And when you get there, raise your right hand and be

10  sworn.

11                      **CLARENCE CHAPMAN,**

12  **called as a witness on behalf of the Defendants, having been**

13  **first duly sworn, testified as follows:**

14          THE WITNESS:  I do.

15          THE CLERK:  Thank you.  Please be seated.  And if you

16  could state your full name, spelling your last name for the

17  record.

18          THE WITNESS:  Your Honor.

19          Clarence Robert Chapman, C-h-a-p-m-a-n.

20          MR. WEAKLEY:  May I --

21          THE COURT:  Please proceed.

22          MR. WEAKLEY:  Thank you.

23                      DIRECT EXAMINATION

24  BY MR. WEAKLEY:

25  **Q.**  Chief Chapman, why don't you tell us what your occupation

795

1    device.  A car is not dangerous, unless you drive it that way.

2           So the goal is to get the operator of the item, which

3    is the suspect, which in this case was Mr. Lewis.  So to

4    prioritize, it's my opinion that Deputy Ayala properly

5    prioritized in leaving where the gun may have been to pursue

6    the apprehension of the suspect.  Because we already

7    established, you said even from Mr. DeFoe, that Mr. Lewis had

8    committed a crime of 148.

9    Q.  Okay.  Let's assume, too, that Deputy Ayala went to the

10   SUV to take the keys out, he then noticed that there's a

11   passenger in the SUV.  So he now takes the keys.

12          What would you expect a well-trained law enforcement

13   officer to do with that information?  There's a passenger in

14   the SUV.  There might be guns in the SUV.  I've got a suspect

15   hiding out.

16          What should an officer do at that point?

17   A.  The officer is sort of restricted and confined to

18   operating on the information that he or she has at the time.

19          What was that information?  The information that

20   Deputy Ayala had was that it was Mr. Lewis who was illegally

21   in possession of a handgun.  Now he coupled that with the

22   conditions of probation.  That's why I say "illegally."

23          So, yes, there's another person in the car.  But that

24   was not consistent with the original information that the

25   deputy received.  The deputy received information that that

RX, Chapman, pt.

802

1    appropriately respond.

2    **Q.**  Okay.  Up to this point in time, are there any

3    alternatives available to Deputy Ayala to use other than --

4    well, now, I should point out, too, at this point he pulls his

5    service weapon out and has it at a low ready position.  Is

6    that appropriate?

7    **A.**  Well, yeah.  If the officer can articulate that he

8    believes that an individual is in the process of obtaining a

9    gun, then the officer can, what we call, overcome the reaction

10   time gap.  In other words, it takes time to take your gun out

11   of the holster.

12           If the officer and if this is credible -- when I say

13   "credible," I mean if another officer would believe the same

14   thing.  That's all I'm saying -- is that the suspect is trying

15   to get a gun, then you want to shorten that reaction time.

16           So, I mean, that's -- that's kind of why football

17   players jump offside.  They're trying to reduce that reaction

18   time gap from when the quarterback snaps the ball.  It gives

19   them the advantage, if they're quicker.

20           Same thing.  You take the gun out of the holster.

21   You put it at the low ready.  You're moving up to the line of

22   scrimmage, and you're getting ready to jump off that line.

23   You can't jump off that line until there's a critical threat

24   present.

25   **Q.**  Okay.  Up to this point in time, Deputy Ayala now has his

RX, Chapman pl

803

1   service weapon out in low ready.  Mr. Lewis is in the vehicle

2   searching under the seat.

3            Are there any viable alternatives that Deputy Ayala

4   has available to him that you can imagine?

5   **A.**  Well, you got to understand what goal he's trying to

6   accomplish at the time.  So there's no alternatives if there's

7   no goal.  The only goal at that time is for the officer to

8   effect an arrest, the lawful arrest of Mr. Lewis.  Second goal

9   is to protect his safety.  Okay?

10           There's no alternative to that.  There's nothing else

11  he could do to effect the arrest of Mr. Lewis until Mr. Lewis

12  decides to comply with the lawful orders of the officer.

13           There's nothing -- there's no other tactic that the

14  deputy could take to protect his safety, other than waiting

15  for Mr. Lewis to comply and giving him the latitude, Mr. Lewis

16  the latitude to be compliant with his lawful order to submit.

17  **Q.**  Okay.  Now, let's assume that while Deputy Ayala is

18  watching Mr. Lewis in the SUV, he hasn't retreated to cover.

19  He's still watching him.  Mr. Lewis suddenly jumps out of the

20  SUV and yells something like, "You're going to have to kill

21  me.  I'm going to kill you," some words to that effect.  And

22  starts to charge at Deputy Ayala.

23           And Deputy Ayala cannot see Mr. Lewis' hand, his

24  right hand.  Does Deputy Ayala have to wait until he actually

25  sees a gun before he can use deadly force?

RX, Chapman pt

804

1   A.   No.

2   Q.   Why?

3   A.   Well, now we're talking about alternatives, because now

4   we're talking about actions.  We're not talking about a

5   suspicion.  We're talking about the suspect coming out of the

6   car in a manner.  It has to be consistent with the officer's

7   training and experience.  Is this the manner in which an

8   individual would agress someone while attempting to pull a

9   gun?

10          Okay.  If the answer to that is yes, then you go down

11  to, what are your alternatives?  Now we get into alternatives,

12  because now we don't have suspicion; now we have action.

13          The alternatives, well, you could have a baton, you

14  could have a police dog, you could have pepper spray, you

15  could have an electronic control device, a taser, kinetic

16  munitions, rubber bullets.  I mean, there's all kinds of

17  things that you could have.

18          But what is most practical to accomplish the mission

19  at the time?  Stay with the mission.  The mission now goes

20  from apprehension of the suspect to officer safety.  It's just

21  switched.

22          Now, we have -- I said now it's switched.  I saw

23  that.  So now we go from an apprehension operation or goal to

24  officer safety.  It just reverted.  And at that point there

25  are no alternatives, because now we consider time and

Rx, Chapman pk

805

1    distance.

2           If the suspect is across the room, now we got

3    alternatives.  We got time.  We got distance.  We can draw

4    other things.  We can get our tasers out.  We can let the dog

5    out of the back of the car.  There's a lot of things.  But if

6    we're within seven to ten feet, now we got time.

7           If the individual is actually charging -- and I think

8    I read that word "charging," and I think there was "lunging"

9    there someplace -- now we have time.  So now you don't have

10   distance, and you don't have time, and it's happening right

11   now.  No alternatives.  At that point there are no

12   alternatives.

13   Q.  What about a taser?  Couldn't he have used a taser?

14   A.  If you look at the nomenclature -- I don't want to get

15   into that.

16          Anyway, how does a taser work?  Okay.  A taser

17   spreads at the one inch per foot.  So, ultimately, when you

18   want to get neuromuscular incapacitation, you want to get

19   across the biggest muscle mass on the torso, but it has to

20   have a spread of 7 to 12 inches.

21          Well, if one inch of spread is equal to one foot of

22   the distance, then that means the person has to 12 feet away.

23   12 feet, 12 inches.  If the person is running at you, okay,

24   10, 9, 8, 7, 6.  Anything under 7 is ineffective.

25          In the best conditions on tasers -- and I've used

1  them, been around them thousands of times -- they don't work

2  most of the time.  Less than 50 percent of the time.

3      We have them because 50 percent is better than none.

4  Tasers are junk.  And they're coming out with a new version

5  now that's going to a little bit better.  The old ones, the

6  ones that this officer had, which was called an Axon X26, is

7  junk.  And if your life is hanging in the balance, you don't

8  want to come to a gunfight with a piece of junk.

9      So tasers are totally out of the realm of any

10  possibility to afford self-defense of any police officer.

11  Q.  Are you familiar with pepper spray or OC spray?

12  A.  Oh, yes.  Used it many times.

13  Q.  Would that have been appropriate in this case?

14  A.  No.  Nope.  I've been sprayed with pepper spray many times

15  when I tried to use it.  Because if you're outside and the

16  wind changes -- I understand the wind blows in Mojave.  I

17  don't know.  I wasn't there that night.

18      But pepper spray -- an individual who's charging --

19  words in this case, not my words -- is totally inappropriate

20  because of what we call cross-contamination.  If you got

21  somebody threatening you and you use pepper spray and it gets

22  in your eyes, guess who gets taken out of the fight?  You do.

23  So now you can't see.  And so pepper spray is totally out of

24  the realm of any consideration for self-defense.

25  Q.  Okay.  Let's assume that Deputy Ayala reasonably believed

1  that Mr. Lewis, in fact, did have a gun and he was bringing

2  his hand around.  Should Deputy Ayala have considered using a

3  baton?

4  **A**.  No.  Because, there again, a baton is distance.  So how

5  big is a baton?  It's what, 18 inches long?  So you got to be

6  within 18 inches of an individual, considering what your arm

7  length is.

8          So do you really want to go to a gunfight with a

9  stick?  I don't think there's any training that recommends

10  that.  A baton is what we call an impact weapon.  So it's only

11  pain compliance.  Batons don't make anybody do anything.

12          Batons make you stop doing things because it hurts.

13  So a baton is not what we would call a positive defense

14  against an aggressive act.  A baton makes you not want to do

15  the act any more, because now we've hurt you.

16          Pepper spray is pain.  Dog bites are pain.  You have

17  to understand these alternatives you're talking about don't

18  really stop an activity.  They cause extreme discomfort that

19  causes your opponent to not want to fight, to get out of the

20  fight.  So you've got to understand what is effective and what

21  is not effective when a life hangs in the balance.

22  **Q**.  Let me ask you this, then.  Up to this point in time when

23  Mr. Lewis is jumping out of his SUV and charging at Deputy

24  Ayala, Deputy Ayala believed -- reasonably believes he has a

25  gun.  From the first part of the encounter up to that moment

1  in time, was there any time at all that a taser would have

2  been appropriate?

3  A.  No.

4  Q.  What about a baton?

5  A.  No.  There again, you don't have the distance.  In other

6  words, that would mean that the deputy would have to run up

7  behind Mr. Lewis as he's bending down in the ground -- in the

8  car.  And I understand that only took what?  One or two

9  seconds?  So can the officer cover that distance in one or two

10  seconds?  In other words, to hit him with a baton?

11        No.  I don't think that's going to be appropriate.  I

12  wouldn't approve it, as a supervisor.

13        THE COURT:  Mr. Weakley, how much more time do you

14  have?

15        MR. WEAKLEY:  I don't have too much.

16        THE COURT:  Under a couple minutes?  Within a couple

17  minutes?

18        MR. WEAKLEY:  Probably within five.  But I'm willing

19  to do whatever the Court wants.

20        THE COURT:  Why don't we continue for about five.

21        MR. WEAKLEY:  Okay.

22        THE COURT:  Then we'll take a break.

23  BY MR. WEAKLEY:

24  Q.  Chief Chapman, you've already said that Deputy Ayala does

25  not need to wait until he actually sees a gun before he can

RX_Chapman_pk

809

1  defend himself with deadly force; is that correct?

2  **A.**  That's correct.

3  **Q.**  And why is that?

4  **A.**  Well, we talked about the reaction time gap.  So the

5  advantage of action/reaction, I can always do something to you

6  before you can do it and defend yourself against what I'm

7  doing.  That's just the way it is.

8         And if you wait to see a gun, probably that's the

9  last thing a police officer is going to see.  Even if a police

10  officer has their gun up and on target and another individual

11  pulls a gun, the individual who pulls the gun is going to have

12  the advantage, because the officer doesn't know it's going to

13  happen until he sees it happen.

14        The individual who pulls the gun knows it's going to

15  happen.  He doesn't have to think about it.  The person

16  viewing the activity has to think about it and then has to

17  react.

18        If you wait to see a gun, it's going to be the last

19  thing you see.  And let me emphasize.  I'm an expert on police

20  policy.  I'm an expert on POST standards.  There is nowhere in

21  POST standards -- I'm a graduate of the FBI academy.  There's

22  no standard in federal law enforcement.

23        I was a member of the California legislature as a

24  consultant.  There's nowhere in the legislature that says that

25  an officer must see a gun before the officer can use deadly

RX, Chapman ph

810

1    force to protect his or her life.  It doesn't exist.

2           There's no training.  There's no policy.  There's no

3    expectation in that regard.

4    **Q.**  Now, after this event, after the shooting, Deputy Ayala

5    was asked, Well, did you tell the responding deputies who came

6    to the scene, did you tell them, Hey, there could be a gun in

7    the car; you should search the car.  Would that have been an

8    appropriate statement for Deputy Ayala to make at that point

9    in time?

10   **A.**  I don't believe so.

11   **Q.**  Why?

12   **A.**  Well, a couple things.  Number one, based on the

13   information that the deputy had at the time, it was Mr. Lewis

14   who initiated the violation of the person with the gun.

15          To assume that anybody else was involved in that

16   would be based on insufficient or nonexistent information in

17   specificity.  Okay.

18          Number 2, in viewing the video evidence, it seemed to

19   me that the people got out of the car --

20          MR. GALIPO:  Your Honor, I'm going to object on 403

21   and motion in limine.

22          THE COURT:  So do we need a sidebar on this,

23   Mr. Weakley?

24          MR. WEAKLEY:  I hate it do it, but maybe so, because

25   I'm not sure that --

866

1    form.

2          With respect to the rest of the defense case, are you

3    intending -- once we've clarified any issue with respect to

4    this subpoena issue, you're intending to rest.

5          MR. WEAKLEY:  Yes.

6          MS. MARSHALL:  Yeah.

7          THE COURT:  Okay.  And do the plaintiffs have any

8    rebuttal testimony or evidence?

9          MR. GALIPO:  No.  Thank you, Your Honor.

10         MR. ALEXANDER:  No.

11         THE COURT:  Okay.  So we really do need to confirm

12   that the jury instructions are good to go.  I would ask you to

13   take a look, and what my intention would be is -- I told the

14   jury to come back at 1:50.  My intention would be to read

15   through jury instruction 20, as currently numbered before

16   closing arguments, and then to read the final five

17   instructions after your closing arguments.

18         MR. GALIPO:  That's fine, Your Honor.

19         MR. WEAKLEY:  That's fine.

20         THE COURT:  Okay.  But because we're going to do that

21   pretty closely after the noon recess, I would ask you to take

22   a look at them now and let me know before you all leave on the

23   noon recess if there's any further issue we need to address

24   with respect to the jury instructions.

25         MS. GUSTAFSON:  Your Honor, there was the issue of

1    possibly crafting an instruction with regard to the term

2    "reckless disregard" or "recklessness."

3          And with the assistance of co-counsel here, he

4    pointed out that CACI has jury instruction 3113, recklessness

5    explained, which might be a good option.  And I have it up

6    here, if counsel wants to review what I've --

7          MR. GALIPO:  Can you read it to us?

8          MS. GUSTAFSON:  Yes, I can.  I know I'm an unofficial

9    person, so I apologize.  So I have taken the liberty of

10    inserting the language that might be appropriate for this

11    particular case:

12          "Deputy Ayala acted with recklessness if he knew it

13    was highly probable that his conduct would cause harm and he

14    knowingly disregarded this risk.  'Recklessness' is more than

15    just" --

16          THE COURT:  What -- so one moment.

17          Okay.  Please proceed.

18          MS. GUSTAFSON:  Yes, Your Honor.  "'Recklessness' is

19    more than just the failure to use reasonable care."

20          THE COURT:  Is that it?

21          MS. GUSTAFSON:  That's it, short and sweet.

22          THE COURT:  Let me reread that.

23          "Deputy Ayala acted with recklessness if he knew it

24    was highly probable that his conduct would cause harm and he

25    knowingly disregarded that risk.  'Recklessness' is more than

868

1    just the failure to use reasonable care."

2            MR. GALIPO:  Was it "ordinary care" or "reasonable

3    care"?

4            MS. GUSTAFSON:  Just "reasonable care."

5            MR. GALIPO:  Oh, "reasonable care."  I would be okay

6    with that if that's -- if the Court thinks that's appropriate,

7    I think that's probably okay.

8            THE COURT:  All right.  Mr. Alexander?  Ms. Jaramilla?

9            MR. ALEXANDER:  Yes.  That CACI number is 3013?

10           MS. GUSTAFSON:  3113.  So 3-1-1-3.

11           MR. ALEXANDER:  No objection.

12           THE COURT:  Okay.  So we will -- Ms. Jaramilla?

13           MS. JARAMILLA:  No objection.

14           THE COURT:  All right.  So we will add that

15   instruction.  I think the logical place for that would be --

16           MR. GALIPO:  In the Bane Act instruction.

17           THE COURT:  Either in it or right after it.

18           MR. GALIPO:  I think we should probably include it

19   within it, because it just makes sense that it all --

20           THE COURT:  Yeah.

21           MR. GALIPO:  -- applies to that.

22           THE COURT:  Agreed.  Right at the end of that

23   instruction.

24           MR. WEAKLEY:  That's fine.

25           MS. GUSTAFSON:  That's fine, Your Honor.

898

1          What else did you learn?  An overreaction is

2     excessive force.  And that's what I think the evidence mostly

3     supports happening here.  Deputy Ayala overreacted.  He

4     overreacted.  He might have had fear.  He might have been

5     scared.  But it wasn't life-threatening.  It wasn't to that

6     level that he should have killed this person, who was so

7     beloved by his family and his children.

8          And that's why we get to this concept of reverence

9     for human life.  Because the reality is everyone's life has

10    value and is important, because people love them, care about

11    them, whether they're brothers and sisters, parents, children,

12    friends.  People love other people, care about other people.

13    And that's why we have to have value for human life.

14          So you heard about all that.  And you might have

15    noticed in the instructions -- for example, instruction 10 is

16    the Fourth Amendment instruction.  You may wonder, why are we

17    in federal court?

18          Well, the reason we're in federal court is because

19    under the Fourth Amendment to the United States Constitution,

20    all of us have a right to be free from excessive force by the

21    police.  It's a constitutional right.  It's a very important

22    constitutional right, just like other important constitutional

23    rights like freedom of speech, freedom of religion, freedom to

24    bear arms and all the other constitutional rights we enjoy.

25          It's a right we all have to be free from excessive

905

1  Deputy Ayala.  And when did Deputy Ayala first say he was

2  reaching under the seat?  Five days later, with his attorney,

3  when he's giving a statement.

4        And the reality is, if the officer really thought

5  there was a weapon under the seat or he was trying to reach

6  under the seat, wouldn't it make sense to tell a fellow

7  officer coming to the scene, Hey, you might want to check

8  under that seat; he was just reaching under it.  That's the

9  reason I brought that up.  What makes common sense for officer

10 safety?

11       So he claims he's reaching under the seat.  No one

12 else corroborates that, not one person.  Then he says he makes

13 these threats.  And I told you what the threats are.  There's

14 no evidence in this trial by way of deposition or testimony

15 that anyone heard him make these threats.

16       Jessica Salcedo said he never made those threats.

17 There is no evidence that he ever made those threats.  Again,

18 the first time he ever said that he made these threats, five

19 days later in a statement with an attorney.

20       You have to decide how credible that is.  You have to

21 decide whether he really yelled this out that, I'm going to

22 F'ing kill you and you're going to die, whether someone else

23 would have heard it.

24       And does it make any sense?  All of a sudden, he's

25 going to kill the police officer?  And then what's the third

906

1 reason he gives?  Hand behind the back.  His hand was behind
2 the back the entire time from getting out to the first shot.
3 For all five shots, his hand behind his back.  I couldn't see
4 his hand.  Well, of course, he's got to say that because we
5 all know he's unarmed.  And he had nothing in his hands.  So
6 just say his hand was behind the back the whole time and say
7 you thought it was a gun in it.  And the jury will buy that.
8 They'll give us a pass.  We're law enforcement.

9         Now, let's think about the evidence, the testimony
10 you heard.  And you might remember during jury selection, you
11 were asked by the Court or counsel, Do you think police
12 officers are more truthful than other people just because
13 they're police officers?  Are you more inclined to believe
14 them?

15         We have to judge everybody equally.  So Jessica
16 Salcedo, she saw him get out of the car.  She's looking right
17 out her window.  She sees him standing there with his hands to
18 his side.  Visibly empty.  No gun.  No hand behind the back.
19 And at some point the shots started.

20         How about Terletter?  He's the guy in the truck.  We
21 read his deposition.  You probably -- a reasonable inference,
22 you probably understand if someone is unavailable to come to
23 trial, we can read their deposition.  Either side has the
24 right to do that.

25         Now, Terletter and Montoya, I would submit -- I even

911

1    essentially you need -- you need excessive force, plus the

2    officer acted with a reckless disregard.

3              And I think this might not be the final version.  So

4    a reckless disregard for the rights, as defined by the judge.

5    And I would suggest everyone has a right to be free from

6    excessive force.  And if you're shooting someone, the

7    expectation is you're going to cause death or serious bodily

8    injury.

9              So you're shooting someone in the back.  You're

10   shooting someone without seeing a gun.  We believe that

11   supports a reckless disregard for that person's rights.  And

12   that's what happened in this case.  It doesn't make Deputy

13   Ayala a bad person.  I'm not trying to say that.

14             What I'm trying to say is he overreacted in this

15   case.  It wasn't necessary to kill this man.  That is what we

16   are saying.  And that's based on the evidence and the law.

17             So a couple other instructions, and then I'll look

18   back at the verdict form with you.

19             For the state claims of battery, negligence and

20   violation of the Bane Act, a person's conduct may combine with

21   another factor to cause harm.  If you find that Jason Ayala's

22   conduct was a substantial factor in causing Mickel Lewis,

23   Sr.'s, harm, then Jason Ayala is responsible for the harm.

24             Jason Ayala cannot avoid responsibility just because

25   some other person, condition or event was also a substantial

917

1    go on a high-speed pursuit.  He pulls over.

2              The cop comes and says, Hey, I want you to come out

3    of the car.  He doesn't refuse.  He comes out.  I need to

4    search you.  He doesn't say no.  He searches him.  Now, at

5    some point he panicked or freaked out, okay?  He did.  But he

6    didn't deserve to be killed for a misdemeanor.

7              So he panicked.  Maybe he thought, maybe I can drive

8    away from this situation.  We don't know what he was thinking,

9    because he's not here.  And then he got back out.  And within

10   a few seconds, he's shot.  And presumably he knew he was shot,

11   and he fell on the street.  And a reasonable inference is he

12   knew he was dying.

13             The last thoughts through his mind, I'm going to die

14   right here on this street.  I'm dying.  I just saw my

15   daughter.  My son lives close by.  And I'll guarantee you what

16   was on his mind -- and I say this because of the evidence you

17   have in this case.  And, quite frankly, I can't remember a

18   case with this many beautiful family pictures, one after

19   another, after another, beautiful pictures with his children,

20   all of them.  There's probably 30 pictures, one more beautiful

21   and loving than the next.  You'll have them all.  This man

22   loved his children.

23             In fact, as my colleague will let you know, he loved

24   his children so much he tattooed each one of their names on

25   his chest.  And I can assure you while he was laying there,

918

1    knowing he was unarmed, knowing he was bleeding to death, he

2    was thinking in his mind, I'm never going to see my children

3    again.  I'm going to die right here at 39 years old.

4           It's horrible.  It really is horrible.  And just

5    imagine, the daughter, who just saw her dad, being told, Hey,

6    your dad's been shot.  The son driving up, seeing his father,

7    wanting to come help him, give him CPR, dying in the street.

8    Imagine, you can't go to your own loved one to try to help

9    them.  Stay back.  Put him in the car.

10          So pre-death pain and suffering?  I don't know.  I

11   guess the defense will say, Well, it wasn't that long, so

12   don't give them much.  Shot five times.  Knowing you're dying.

13   I would submit that number should be $1 to $2 million.  It's

14   totally up to you.

15          It can't get worse than that.  And how about the loss

16   of his life?  I would submit nothing really should be more

17   valuable than human life.  All of our lives, everyone.  The

18   value of human life.  Every one of these pictures, he's happy.

19   He's smiling.  He loves his children.  He loves his family.

20   He's got his whole life to look forward to.

21          He wanted some of his children to have grandchildren.

22   Two of them have, since he's died.  But he's not here to see

23   them.  The value of his life.  He died at 39 years old.  At

24   least 40 years too soon, maybe more, depending on whether he

25   would have lived -- if he had lived to be 89, 50 years; 79,

921

1    affection, society and moral support.  That's what the law

2    says.

3            All these different things that a father provides.

4    So it happened October 2020.  So it's been about four and a

5    half years.  Four and a half years to date.  This family has

6    suffered without their father.  And to think about the manner

7    in which he lost his life.

8            Every one of them has been here with us every day.

9    They know he was unarmed.  They know he was shot five times,

10   without commands, without warning, shot in the back.  They

11   know.  And that's all they can do is sit here and hope to God

12   that this jury will see the truth.

13           And then we got the rest of their lives; 20, 30,

14   40 years plus without their dad.  Graduation, new job,

15   marriage.  Who's going to walk these ladies down the aisle?

16   Child, you never met your grandfather.  Holidays, Father's

17   Day, I can go on and on.  You get the idea.  For the rest of

18   their life, taken away from them.

19           I would say, if you combine past, the last four and a

20   half years, and the rest of their life, they deserve, based on

21   the law and the evidence, at least $3 million each.  It's up

22   to you.  You have the ultimate decision on everything.

23           I thank you for listening to me.  I know I've been

24   talking a while.  And sometimes, as a lawyer, I feel it's

25   important to put it out there, because you're going to be

938

1    If you go to 1045.  This is an early picture of the
2  family when there were only three; Briona, Oriona and -- I'm
3  off with names.  I apologize -- and Mickel Jr.  And this is --
4  this is who he was.  Because you would have thought this would
5  have been enough, and then you see all these other kids
6  behind.

7    If we could show 1017.  This is an early Halloween.
8  This is Briona inside this picture.  This is a picture of her
9  and her half-sisters, being able to refer to each other as
10  half-sisters.  It's, they're sisters, all right.  And it's one
11  of the things that the youngest will not be able to see, will
12  not be able to experience.

13    If we could go to 1038.  Oriona and her father.  She
14  will not be able to experience that during the years of his
15  latter years, nor will the younger ones be able to experience
16  that.

17    1029.  I only represent -- we only represent three of
18  the people, but we think we all should get the same amount.
19  And -- I disagree with Mr. Galipo.  I don't think $3 million
20  is anywhere near what it should be.  I'm afraid to tell you
21  what I think the number should be, based on the loss to this
22  family.  But I think the numbers should start with five for
23  each one of them, for what they lost, for what they had the
24  right to expect they would have in the future.  Thank you.

25    THE COURT:  Mr. Weakley, do you --

1    ridiculous story.  And the juries will buy it, because we're

2    law enforcement.  And we'll go on to our next case.  That

3    can't be how our justice system works.  And I feel you people

4    are better than that.

5            And sometimes, you know what?  It takes character and

6    it takes courage, whether you're a lawyer or a juror, in life

7    to stand up and say, This is wrong.  This is wrong.

8            Deputy Ayala overreacted.  The reality is he saw a

9    big black man, taller than him and bigger than him, coming at

10   him.  He was scared.  He freaked out.  He overreacted and

11   started shooting him.

12           And then they realized they got a huge problem,

13   because they just killed someone who was unarmed.  And they

14   got to come up with a story.  And we've heard a lot of

15   football analogies.  I think in part because we have a juror

16   who was an ex-football coach.  So a lineman is coming after a

17   quarterback.  Let's kill them.  Let's start shooting people.

18           How many steps could he have taken if he only went

19   six feet?  Two?  Three?  Our theory is not he had to be shot

20   in the left side of the back first.  That's one possibility.

21   It doesn't matter.  It doesn't matter, because he was visibly

22   unarmed.

23           And everyone agrees you can't shoot someone for being

24   visibly unarmed.  And even if he was resistive, you can't

25   shoot.  Assaultive, can't shoot.  You remember Scott DeFoe

973

1    said it has to be immediately life-threatening.

2            So this argument is he controlled everything.  The

3    reality is Deputy Ayala was supposed to control his fear.

4    Because when you don't control fear, you overreact.  And if

5    you overreact with using deadly force, the damage is

6    irreparable.

7            I'm not going to have time to go over everything that

8    counsel said, because we want to get you home.  But I will say

9    some things.  The burden of proof is 50.01 percent.  In this

10   case it's over 80 percent.  This is an overwhelming case.

11   This is a horrible shooting.

12           This is a clear case of excessive force.  And the

13   evidence is so strong it should be yes on every question.

14   That's number one.

15           20/20 vision of hindsight, that's very misleading how

16   counsel is trying to suggest that.  I'll give you a case of

17   20/20 vision of hindsight.  You're in a dark alley.  Someone

18   points what you think is a real gun at you, and you shoot in

19   self-defense.  And you could see the gun, it's pointed right

20   at you, and you find out later it was not a real gun.  That's

21   20/20 vision of hindsight.  This isn't 20/20 vision of

22   hindsight.  There is no gun.  And he never saw one.

23           We want you to follow the law.  Then they talk about

24   the text messages, and they talk about what witnesses maybe

25   testified to.  And they want to talk about what's his

986

1          MR. GALIPO:  No concern.  That's agreed.

2          THE COURT:  Okay.  Very good.

3          MR. WEAKLEY:  That's fine.  Thank you.

4          MS. GUSTAFSON:  Thank you, Your Honor.

5          THE COURT:  Very good.  Okay.  Thank you all.

6       (Proceedings were adjourned at 5:27 p.m.)

7

8

9

10

11

12

13      I, RACHAEL LUNDY, Official Reporter, do hereby certify the

14   foregoing transcript as true and correct.

15

16   Dated:  April 9, 2025            /s/ Rachael Lundy_____
                                      RACHAEL LUNDY, CSR-RMR
17                                    CSR No. 13815

18

19

20

21

22

23

24

25