# EXHIBIT 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. KIRK E. SHERRIFF

| | |
|---|---|
| MICKEL ERICK LEWIS, JR., et al., ) | 1:21-cv-00378-KES-CBD |
| ) | |
| Plaintiffs, ) | |
| ) | JURY TRIAL, DAY 1 |
| vs. ) | |
| ) | |
| COUNTY OF KERN, et al., ) | |
| ) | Volume 1 |
| Defendants. ) | Pgs. 1 - 105, inclusive |
| _____) | |
| ) | |
| R.L., et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| COUNTY OF KERN, et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

Fresno, California                    Tuesday, March 11, 2025


REPORTER'S TRANSCRIPT OF PROCEEDINGS


REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

2

<u>**APPEARANCES OF COUNSEL**</u>:

For Plaintiffs Mickel          Toni Jaramilla,
Erick Lewis, Jr.,              A Professional Law Corp.
Oriona Lewis and              1900 Avenue of the Stars, Suite 900
Briona Lewis:                 Los Angeles, CA 90067
                              BY:  TONI J. JARAMILLA, ESQ.

                              Alexander Morrison + FEHR LLP
                              1900 Avenue of the Stars, Suite 900
                              Los Angeles, CA 90067
                              BY:  J. BERNARD ALEXANDER, III,
                              ESQ.

For Plaintiffs R.L.,          LAW OFFICES OF DALE K. GALIPO
M.L. and H.L., minors,        Attorney at Law
by and through                21800 Burbank Boulevard,
guardian ad litem             Suite 310
Roberta Haro; A.W., a         Woodland Hills, CA 91367
minor, by and through         BY:  DALE K. GALIPO, ESQ.
guardian ad litem
Alisha White:

For Defendant Kern            Kern County Counsel
County:                       1115 Truxton Avenue,
                              4th Floor
                              Bakersfield, CA 93301
                              BY:  ANDREW C. HAMILTON, ESQ.
                                   KIMBERLY L. MARSHALL, ESQ.

For Defendant Ayala:          Kern County Counsel
                              1115 Truxton Avenue,
                              4th Floor
                              Bakersfield, CA 93301
                              BY:  ANDREW C. HAMILTON, ESQ.
                                   KIMBERLY L. MARSHALL, ESQ.

                              Weakley & Arendt, APC
                              5200 N. Palm Avenue
                              Suite 211
                              Fresno, CA 93704
                              BY:  JAMES D. WEAKLEY, ESQ.
                                BRANDE LYNN GUSTAFSON, ESQ.

1    opening statement is not evidence.  It is simply an outline to

2    help you understand what that party expects the evidence will

3    show.  A party is not required to make an opening statement.

4    The plaintiff will then present evidence, and counsel for the

5    defendants may cross-examine.  And then the defendant may --

6    or the defendant -- let me rephrase that.

7         The plaintiffs will then present evidence, and

8    counsel for the defendants may cross-examination, then the

9    defendants may present evidence, and counsel for the

10   plaintiffs may cross-examine.

11        After the evidence has been presented, I will

12   instruct you on the law that applies to the case and the

13   attorneys will make closing arguments.  After that, you will

14   go to the jury room to deliberate on your verdict.

15        So at this time, we will now proceed to opening

16   statements.

17        Counsel for plaintiffs.

18        MR. GALIPO:  Yes, thank you, Your Honor.

19        Just getting organized but, good afternoon to all of

20   you.  I hope you had a nice lunch.  I know you probably didn't

21   realize when you came here this morning you were going to end

22   up on this jury, but here you are, and I think it will be a

23   positive experience when all is said and done.

24        So I'm going to tell you a little bit about the case,

25   a little bit more details about what happened, about what

1  witnesses that I think will be called to help you listen to

2  the evidence.

3        I can assure you that we really value your time, so

4  we're going to try to put this case on as efficiently as

5  possible and hopefully get you out of here before the

6  anticipated two weeks that you've heard about.  So we will try

7  our best to do that.

8        So as you learned a little bit from what the judge

9  said, this case in involves an officer-involved shooting.  It

10 happened on October 2nd, 2020, at about nine o'clock at night.

11 It was dark outside.  It happened in the Mojave, near K Street

12 and Mono.  There's a Denny's and a Wienerschnitzel close by.

13        The decedent, Mickel Lewis, was 39 years old.  He was

14 shot five times, including two shots to the back.  He was

15 unarmed at the time he was shot, and he died as a result of

16 his gunshots.

17        The plaintiffs, as you've heard, are his children and

18 his wife that we are jointly representing.  And the

19 defendants, as you've heard, is Deputy Ayala, who's the

20 officer that fired the five shots; and the County of Kern, and

21 that's, essentially, his employer, who he works for.

22        So I want to tell a little bit about what lead up to

23 the shooting and how it happened and who are some of the

24 witnesses you're going to hear.  You will see some photos

25 during the trial of Mickel Lewis and some of his family

1        So you're going to see some photographs during the

2   trial and even hear from his children about the relationship

3   they had with their dad, and how this has affected them losing

4   their father in these circumstances.

5        And as I said, you'll see various photographs during

6   the trial of Mr. Lewis and his children.  I'm just holding up

7   a few of them.

8        THE COURT:  If you want to approach a little closer

9   to the jury box to show them.

10       MR. GALIPO:  Yeah, I think they can see from here.

11  But anyway, there's various photographs that you will see of

12  him with his children and family.

13       And so as I mentioned, he was 39 years old.  So how

14  does this all start?

15       Deputy Ayala, at some point, pulls over a female for

16  a traffic citation.  And they get to talking, and somehow

17  Deputy Ayala decides that he wants to use this female as an

18  informant, a confidential informant.

19       It turns out -- and this female was staying at some

20  hotel at the time.  And I believe Deputy Ayala, at least on

21  one occasion, went to the hotel where she was staying.  And

22  she happened to the ex-girlfriend of Mr. Lewis.  And she

23  provided information to this deputy.  They had a whole text

24  message thing going back and forth about Mr. Lewis, who was on

25  probation, and she believed he had a gun or access to a gun,

1  and was essentially suggesting to the deputy, It'd really help

2  me out if you can find him, arrest him, and you know, get him

3  out of my life, so to speak.

4          And this was in the month approximately preceding

5  this.  And there's text messages going back and forth to the

6  day of the incident.  That was October 2nd, 2020.  And on that

7  day, this informant told -- or texted the deputy that

8  Mr. Lewis was in the vicinity, he's driving a Chevy Tahoe, and

9  he actually came into my room.  In fact, the communication was

10 that the girlfriend of Mr. Lewis at the time was somehow

11 staying in the motel room next door, in the same motel to the

12 informant, and that allegedly Mr. Lewis came into her room,

13 she saw or believed he had a gun, and said some threatening

14 comments of some kind undescribed.

15         And Deputy Ayala was doing some police work in a

16 neighboring area and was texting back and forth.  And finally

17 he said, I'm on my way -- I'm paraphrasing, I'm on my way, you

18 know, Where's he at?

19         And it turns out that Mr. Lewis is driving an SUV, a

20 black Chevy Tahoe, and he's got a female front passenger and

21 two young ladies in the back.  They were actually the

22 daughters of the female passenger.  They had just went through

23 the drive-thru at Wienerschnitzel that's right close to where

24 this happened.  And Deputy Ayala is the observing this and

25 waiting for his opportunity to pull him over to see if he has

24

1    a gun on him to -- presumably, he could arrest him.

2            And Deputy Ayala is alone in his car.  He's in

3    uniform, in a marked unit.  You'll see photographs of him in

4    his uniform on the day of the incident -- I'm holding stuff up

5    because I don't think our projector is working yet.  But

6    you'll have all of this.

7            So now he decides, he doesn't call in that, Hey, I'm

8    going to stop this guy, or, Hey, can I get a backup unit here

9    so we can approach this guy together?  He decides to do this

10   by himself.

11           You'll hear from police practice experts maybe even

12   Deputy Ayala will admit it's a better thing to do it with two

13   officers, it's safer for everyone, they will describe a

14   contact officer, a cover officer, and officer assigned to less

15   lethal if necessary.  But for whatever reason he decides to do

16   this by himself.

17           And he activates his lights.  The vehicle, I believe,

18   was originally going down Mono Street and immediately turns

19   and pulls over on K Street.  And the two vehicles come to a

20   stop, and you'll actually have photographs in evidence of

21   where the two vehicles were in relation to each other.  I'm

22   sorry that I'm not being able to show, but you'll see all

23   this.  You'll see the black SUV and the white police unit.

24           So Deputy Ayala goes to the driver's side of the car,

25   asks Mr. Lewis to step out.  He'll admit there was no traffic

1    violation or anything.  He asked him to step out.  Mr. Lewis

2    steps out --

3            Yeah, feel free to do what you can -- Mr. Lewis --

4            I see hope.

5            THE COURT:  They are working on it.

6            MR. GALIPO:  Thank you.  Where was I?

7            So Mr. Lewis steps out of the vehicle.  He walks him

8    towards the back, and the officer wants to pat him down for

9    weapons to see if he has any weapons.

10           And Mr. Lewis, and I think the officer, will admit

11   that he's cooperative.  Mr. Lewis is cooperative.  Let me pat

12   you down.  He pats him down.  There's no weapons on him.

13           Then -- and I'm paraphrasing.  I know a little about

14   what the officer is going to say because he gave a statement

15   at some point, he gave a deposition at some point, so I'm

16   really going off of that.  He tells Mr. Lewis, Now, look, I

17   know you're on probation, and I want to check your car.  I

18   want to search your car to see if you have any guns or

19   anything in there that's not supposed to be in there.

20           Mr. Lewis -- one witness heard the word -- excuse my

21   language, "fuck," and at some point Mr. Lewis runs away from

22   the officer.

23           Now, the officer will say right before he ran away,

24   he kind of tensed up, almost looked like he was in a fighting

25   stance.  But the officer will admit, never punched me, never

1    tried to punch me, there was no physical contact, never
2    verbally threatened me at that point.  And he runs away.

3           Now you'll hear and you can see it in this photo
4    that -- assuming we're still not working yet -- you'll see in
5    the photo that across from the SUV and the white car is a big
6    semi truck right across the way.  In fact, one of the
7    witnesses you're going to hear from was sitting in that --

8           THE COURT:  Mr. Galipo, you might want to try putting
9    it on right now, see if the jury sees that.

10          Member of the Jury, do you see the photographs?

11          Okay.  We're back working on the projector.

12          MR. GALIPO:  Well, alright.

13          Let's just back up for a second then, because I just
14   want you all to see some of the photos that I put up earlier,
15   all of Mr. Lewis and his family.  And there might be more, but
16   that will give you an idea.

17          And then I also wanted to show you the photos of
18   Deputy Ayala from that night.  You'll see a picture at some
19   point of Deputy Ayala's gun.  He also had a TASER on him,
20   which is yellow in color.

21          And getting back to this photo here, you could see
22   the white sheriff's vehicle and the black SUV, and this truck
23   that I'm talking about is across the street.

24          So Mr. Lewis runs to the back area of this truck and
25   lays down and appears to be hiding, although the officer can

1    kind of see him.

2          The officer, I think, dispatched that there was a

3    foot pursuit or something to that effect, and the officer is

4    thinking, this guy may try and take off.  So he goes briefly

5    in the car, in the Tahoe, and takes the keys out.

6          Now, remember, there's three women sitting in the

7    SUV.  The officer claims, well, I see the person in the right

8    passenger seat.  I wasn't really paying attention whether

9    there was anyone in the back seat, but you'll hear from one or

10   more of them, because they are their witnesses, as to what

11   happened.

12         So then the officer backs up some, and Mr. Lewis

13   starts moving or running, heading towards the driver's seat of

14   the car.  The door's open.

15         And there's the picture of the car.  And Mr. Lewis

16   gets in the car for about a second or two, according to

17   Destiny Salcedo, who's sitting in the back seat, he reached up

18   towards the ignition, like, to see where the keys were.  And

19   the keys were out of the ignition because the officer had

20   taken them out.

21         Now, the officer, I believe, will claim that he

22   yelled out to Mr. Lewis at some point:  I got your keys,

23   you're not going anywhere, and you're under arrest.

24         People in the car never heard that.  The two

25   witnesses never heard that.  But the officer will say that he

1          So first let me give you the officer's version, and

2    I'm going to call him as my first witness in my case so we can

3    get his version out and you can hear it.

4          The officer will first say that, yes, I did pat down

5    and search Mr. Lewis and he didn't have any weapons on him.

6    But when he went back in the car, it looked to me as if he was

7    reaching under the seat of the car with both hands, digging

8    under the seat as if he was looking for a gun, is going to be

9    the suggestion.

10         And the evidence on that point will be, according to

11   the three people in the car and the two other percipient

12   witnesses, nobody saw Mr. Lewis reaching under the seat of the

13   car.

14         In fact, he got in, he went to the ignition with his

15   hand, it was a second or two, and he got out.

16         And the officer, I think, when questioned will admit,

17   I didn't really see his hands or arms underneath the seat, I

18   just presume that maybe they were there.

19         Then the officer will say that Mr. Lewis got out of

20   the car with his right hand behind his back, couldn't see his

21   right hand, implying that, I thought he had a gun in his right

22   hand.

23         In fact, the officer will say for the whole time

24   frame before the shots started whether it was two seconds,

25   three seconds, four seconds, or five, Mr. Lewis' right hand

1   remained behind his back the entire time.  In fact, during all

2   five shots the officer will say, I couldn't see Mr. Lewis'

3   right hand.  It was behind his back.

4        Now, he'll say he started coming forward a little bit

5   towards his waistband but, I never could see.  In fact, I

6   think he'll say, I really couldn't even see his right arm.

7        Now, on that point, there were two witnesses other

8   than the people in the car.  One, as I mentioned, is the

9   gentleman who was in this truck, Mr. Terletter.  He gave a

10  statement.  He gave a deposition.  And I'm not going to go

11  through all of his testimony, but one of the things

12  Mr. Terletter said, more than once, is that after Mr. Lewis

13  got out of the car, his right hand was never behind his back.

14        And both of his hands were in front of him, visible,

15  without anything in them moving towards the officer when the

16  shots occurred.

17        There's another witness, Nicholas Montoya, he's

18  pumping gas at the gas station with his girlfriend, young

19  child.  He's pumping gas.  I think there's an ampm there close

20  by the corner.  He hears some shouting.  He's looking, like,

21  what's going on?  He sees the police car.  He sees the SUV.

22  He thinks something is going on.  His impression was all the

23  shouting was coming from the officer.  He's interested.  He

24  even turned on his phone to start videotaping.  He thought he

25  was videotaping before the shooting, but turns out, according

1  to him or the investigation is his phone wasn't actually on

2  until after the shooting.  He tells his girlfriend, Hey, you

3  pump the gas, and he starts walking a little closer from his

4  position to get a look at what's going on.

5          And he happens to be an ex-EMT, emergency medical

6  technician, because he actually was even providing CPR to

7  Mr. Lewis after this happened.

8          Now, if his testimony is introduced in this trial, I

9  think you're going to get the gist that he's kind of -- I'll

10  just say police-officer friendly, but I'll leave it up to you

11  to decide.  But he will admit that both Mr. Lewis' hands were

12  out in front of him not behind his back when he was shot.

13          Now, what else will Deputy Ayala say?  He will say

14  not only, Did I think he was digging under the seat, and not

15  only did he get out with the his hand behind his back, but

16  before he got out or as he was getting out, he said words to

17  the effect of "you're going to have to f-ing kill me" and

18  "you're going to die."

19          Nobody else heard that.  Three people in the car.  He

20  never said it.  Montoya didn't hear it.  Terletter didn't hear

21  it.  Nobody else heard it.  So the three reasons, essentially,

22  why the deputy gives for shooting him, he was digging under

23  the seat, he had his hand behind his back, he verbally

24  threatened me will be refuted by the evidence.

25          So then the shots start.  According to the deputy,

1  from the time Lewis gets out of the vehicle, moving to his

2  direction, during the time of the shots, he gave no commands

3  and no verbal warning he was going to shoot him.

4      I asked the deputy at his deposition -- you'll

5  probably hear this testimony, Did Mr. Lewis ever reach for

6  your gun?  He said, No, he never reached for my gun.  And then

7  we have the shots.

8      Now, the deputy is backing up as he's shooting.

9  There's some video, but it doesn't really show it very well.

10 It's from a distance.  You can't really see much.  I'm sure of

11 some of it will be shown to you.  You'll make of it what you

12 can.

13     Five shots.  Now his gun is a semi automatic weapon,

14 so you've got to intentionally press the trigger for each

15 shot.  Five shots.

16     The trajectory evidence is interesting.  Where did

17 the shots strike him?  It turns out that two shots struck him

18 in the chest with a downward trajectory in the body indicating

19 that the upper body was slumped forward to some extent when

20 those shots entered.

21     Now, you'll hear Mr. Lewis is a tall guy, about

22 six-foot-five.  Two shots to the chest.  When I say "downward

23 trajectory" I'm meaning a body with the anatomical position

24 the bullets entered and went down within the body.  So two

25 ways to get that, you'll hear from the evidence, if I'm

1    standing straight up and someone is shooting down, you can get

2    a downward trajectory.  But if I'm leaning forward, as I am

3    now, you can also get a downward trajectory.

4        One shot to the right shoulder, almost straight

5    through as if the right shoulder would have had to be

6    perpendicular or to the shooter.  This way.

7        Now, you remember, according to him, the right hand

8    is behind his back the entire time.  And two shots to the

9    back, one to the middle of the back, one on the left side of

10   the back, behind.  So there might be some discussion about

11   were the shots to the front first, were the shots to the back

12   first?  How was the ordering of the shot?  Nobody knows for

13   sure.  And from the plaintiffs' perspective, although it's

14   interesting to talk about, it really doesn't matter because

15   from the plaintiffs' perspective and the experts, the shooting

16   was inappropriate either way you look at it.

17       Mr. Lewis fell on his back.  And you could see

18   photographs showing -- it's partially covered there, of

19   course -- his partial position after the shooting.  I'll take

20   those down now out of respect for the family.

21       So one possibility, he was struck in the chest first,

22   he rotated, his right shoulder was struck, he continued to

23   rotate, he was shot in the back in the left side and fell on

24   his back.  It's one possibility.

25       Another possibility, he was shot initially on his

1  back, he rotated to the right shoulder to the front, continued

2  to rotate and fall on his back.  What's undisputed is two

3  shots to the back, one shot to the right shoulder.

4         Now, what happens immediately afterwards?  The three

5  ladies in the car are hysterical, in shock.  What just

6  happened?  This is the same person that just took them through

7  the drive-thru to get them something to eat a few minutes

8  earlier.

9         Mr. Lewis' daughter and son were nearby, heard the

10  shots, and came over to see their father lying there bleeding

11  to death.  The EMT guy -- who's now filming actually.  There

12  is some filming after the shooting -- and he approaches and

13  tells Ayala, who hasn't given any medical care at that point,

14  and a crowd was forming.  And Ayala is going to tell you, Boy,

15  I was concerned about other people coming.  He says, I'm an

16  EMT, you want me to give the guy CPR?  And Ayala said, Yeah,

17  fine.

18         What's kind of interesting, as you'll hear through

19  the evidence, Ayala didn't tell anyone at the scene he

20  verbally threatened him, I think there's a gun underneath the

21  seat of the car, he was reaching there, you better check it

22  out, he had a hand behind his back.  Never made it.

23         Several days later, he gives a formal statement, he

24  has an attorney.  He met the attorney that night.  Attorney

25  was with him, and that's the first time, I think about five

37

1    days later, that you hear about this verbal threat and hand

2    behind the back and digging under the seat.

3             So as I said, from the police practice experts on the

4    plaintiffs' side they will tell you, look, if it happened the

5    way Ayala said, it would still be inappropriate, he never saw

6    a gun, he never saw anything that looked like a gun, and

7    there's no shots to the back, and he gave no commands and he

8    gave no warning.  However, as I said, you're going to have

9    evidence that it didn't happen that way.

10            So like I told you, two parts to the case, one part

11   liability:  Was it excessive?  Was it necessary to defend

12   human life or not?

13            Second part:  Damages.

14            So you're going to hear from the family members, at

15   some point, you'll hear from the medical examiner, and other

16   people.  And you're going to be asked to value the damages in

17   a case like this.  And we'll talk about that more at the end

18   of the case after you've heard everything and after you get

19   the law from the judge.  So I'm going to call Ayala first.  We

20   may get one of the witnesses from the car here tomorrow to

21   give you her perspective on what happened.

22            We're going to have the medical examiner here.  We're

23   going to have the police practice expert here.  And we're

24   going to put on the family members as quickly as we can.

25            We're going to try to get through our case by Friday

50

1   fact that he actually had a gun in the car, because that

2   wasn't something that Deputy Ayala knew.  Deputy Ayala also

3   did not know that he was unarmed.  So if -- if we can't get in

4   information about the gun, they've just said the -- that he

5   was unarmed to impeach our client, and I think that that's

6   opening the door, so we should be able to get in the fact that

7   there, in fact, was a gun.

8           THE COURT:  Well, you brought out the fact that the

9   informant had told --

10          MR. WEAKLEY:  Right.

11          THE COURT:  -- Deputy Ayala that Mr. Lewis was armed.

12          MR. WEAKLEY:  Right.

13          THE COURT:  And so that fact that he's approaching

14  the vehicle with that belief and understanding is in the

15  opening, and that's certainly something you can address in

16  your in the evidence.

17          Based on the evidence before me on the motion in

18  limine, there was no evidence that Mr. Lewis had the weapon.

19  And now if -- if the evidence develops differently, there was

20  evidence that a passenger in the car had a weapon and did

21  something with it afterwards, as I understand it from the

22  argument in evidence that was presented in connection with the

23  motion in limine, and so the ruling is that there's -- unless

24  there's some different evidence that was before me on the

25  motion in limine, I don't -- there id no evidence that

1    Mr. Lewis had the weapon on him.

2          MR. WEAKLEY:  Right.  He didn't have it on him, but I

3    think the fact that they said he was unarmed now has raised a

4    doubt in the jury's mind about the accuracy of the information

5    provided to Deputy Ayala.

6          MR. GALIPO:  Your Honor, I said he was unarmed at the

7    time of the shooting which was corroborated by Deputy Ayala

8    searching him immediately after the shooting, there was no

9    weapon on him.  I think jury is allowed to know that he was

10   unarmed at the time he was shot.  That's what I said.

11         THE COURT:  Yeah, look, I think the evidence, as I

12   understand it, is un --  I mean, we'll see, but it seems

13   undisputed from the parties that he was patted down and

14   searched as he stepped -- initially stepped out of the car,

15   had no weapon on him.  Then there was the interaction that led

16   to the shots being fired, and no weapon was ultimately found

17   on him after the shooting.  Now, based on that, there's

18   nothing improper in what was stated in the opening.

19         MS. MARSHALL:  Your Honor, if I may, Mr. Galipo said

20   that Deputy Ayala didn't tell anyone to go look under the seat

21   because he was digging under the seat, maybe that would have

22   been important to look for a gun.

23         THE COURT:  I'm sorry.  So -- meaning that he did not

24   say that to anyone -- what I heard was he did not say that to

25   anyone at the scene that evening.

1          MS. MARSHALL:  Correct.  Inferring that no one went

2    and looked for a gun, which they did do, and they found a gun

3    in the field.

4          MR. GALIPO:  The purpose of what I said was that if

5    he thought there was a gun underneath the seat and he was

6    reaching underneath the seat, he never told anyone that that

7    the fellow officers arriving.  That's what I said.

8          MR. ALEXANDER:  We understand the Court's ruling.

9          What we've dealt with are the objective facts.  At

10   the scene of the accident, there was no statement made by

11   Officer Ayala, Look under the seat, do this or that.  All

12   we've done is deal with objective facts.  The fact of a gun,

13   there was no gun.  That was determined.

14         Throughout the trial it appears is there's going to

15   be an attempt at every instance to try and say that we've

16   opened the door.  We're going out of our way to make sure we

17   did not open the door, and it was not opened here.  In fact,

18   he did not have a gun on him.  In fact, Deputy Ayala did not

19   make a statement at the scene, Please check the car, he was

20   reaching for a gun.  It's factually just impeaching him as to

21   what -- the statement that he gave later, not bringing any

22   issue as to the gun.

23         THE COURT:  The reality is that that -- I think that

24   the defense is presenting the case -- we'll see, but my

25   understanding of what the defense case is is that is the

1  deputy, Deputy Ayala, is going to testify, presumably, that he

2  believed that Mr. Lewis was reaching for a gun.

3           MR. WEAKLEY:  And retrieved one.  And retrieved a

4  gun.

5           THE COURT:  Well -- well, the point of the opening,

6  the comment in the statement in the opening by Mr. Galipo, as

7  I understood it, was that that statement is highly relevant to

8  the defendants' case as to why he reacted the way he did, that

9  he believed that he had retrieved a gun and was coming out

10 with it.

11          MR. WEAKLEY:  Correct.

12          THE COURT:  And that is relevant to his actions that

13 he took next.

14          Mr. Galipo's point in opening was -- what I took from

15 that, was not raising the issue whether anyone in the car had

16 a gun or whether there was a gun somewhere in the car at any

17 point that evening.  But that the point that Mr. Ayala -- or

18 Deputy Ayala did not make that statement at the scene, it was

19 something that was first stated sometime later.  That's what I

20 understood the opening to be.  And I think that's -- assuming

21 that is, in fact, the facts that the plaintiffs intend to

22 present and have some evidence to support, then that doesn't

23 implicate the issue with Mrs. -- the other passenger in the

24 car doing something with a gun at a later time.  So I don't

25 think the door is opened on that.

1          MR. WEAKLEY:  Okay.  We think it's -- the cumulative

2     affect of impeaching Deputy Ayala, and the fact that there's

3     was a gun in the car.

4          THE COURT:  Well, the issue is not --

5          MR. ALEXANDER:  If I could.  The issue isn't whether

6     there was in the car.  The issue is whether the decedent had a

7     gun on his person when he was shot.

8          THE COURT:  That and whether the defendant reasonably

9     believed that he did, whether he did or not.  And the

10    reasonableness of the belief is -- let's put it this way, the

11    conduct of Ms. Cominez, if I've got that name correct, after

12    the fact is, at least as I understand it, now raises a 403

13    issue.  And I don't see any basis to change that at this --

14    that ruling at this point.

15         MR. WEAKLEY:  Okay.  I just request that the --

16         MR. GALIPO:  Thank you, Your Honor.

17         MR. WEAKLEY:  -- look at the Cruz case that we cited.

18    I think it's factually very, very similar to this.

19         THE COURT:  All right.

20         MR. GALIPO:  Thank you, Your Honor.

21         THE COURT:  Okay.  We're -- we've got -- I think I

22    told the jury 3:25.  If you need more than five minutes on the

23    break, I'll give that to you, but let's plan to bring them

24    back by 3:30 at the latest.

25         (Recess taken from 3:20 p.m. 3:31 p.m.)

1          THE COURT:  Are we ready for the jury?

2          MR. GALIPO:  Yes, Your Honor.

3          THE COURT:  All right.  Let's bring in the jury.

4       (Jury enters the courtroom at 1:33 p.m.)

5          THE COURT:  Welcome back, Members of the Jury.  At

6    this time we're ready to proceed with plaintiffs' case.

7          Mr. Galipo.

8          MR. GALIPO:  Yes.  Thank you, Your Honor.

9          The plaintiffs would like to call the defendant

10   Deputy Jason Ayala, please.

11         THE COURT:  So, Mr. Ayala, if you'll just come to the

12   stand and raise your right hand and be sworn.

13                        JASON AYALA,

14   called as a witness on behalf of the Plaintiffs, having been

15   first duly sworn, testified as follows:

16         THE CLERK:  Please be seated, if you can.  Please

17   state your full name, spelling your last name for the record.

18         THE WITNESS:  Jason Ayala, A-y-a-l-a.

19         MR. GALIPO:  May I inquire, Your Honor?

20         THE COURT:  Yes, you may.  Please proceed.

21         MR. GALIPO:  Thank you.

22                    DIRECT EXAMINATION

23   BY MR. GALIPO:

24   Q.  Good afternoon, Deputy Ayala.

25   A.  Good afternoon.

1  that baton could potentially break bones?

2  **A.**  It's possible.

3  **Q.**  With respect to the deadly force, you also had training on

4  deadly force, is that correct, before this incident?

5  **A.**  Yes.

6  **Q.**  Some of it was at the academy, and some of it was with

7  your time at the sheriff's department?

8  **A.**  Yes.

9  **Q.**  Were you trained that deadly force is the highest level of

10 force an officer can use?

11 **A.**  Yes.

12 **Q.**  Were you trained that the expectation, if you're shooting

13 someone center mass, meaning their upper body, it's likely to

14 cause death or serious bodily injury?

15 **A.**  Yes.

16 **Q.**  And were you essentially trained that deadly force should

17 only be used as a last resort if there are no other reasonable

18 options?

19 **A.**  Can you say that one more time?  I'm sorry.

20 **Q.**  Sure.

21         Were you trained that deadly force should only be

22 used as a last resort when there's an imminent threat of death

23 or serious bodily injury?

24 **A.**  Yes.

25 **Q.**  And when there are no other reasonable options?

1   **A.**  Correct, yes.

2   **Q.**  Were you trained that a verbal warning that you're going

3   to use deadly force should be given when feasible?

4   **A.**  When feasible, yes.

5   **Q.**  Were you trained about the concept of reverence for human

6   life?

7   **A.**  Yes.

8   **Q.**  And were you trained that in terms of using deadly force,

9   you're responsibile to justify every shot?

10  **A.**  Correct.

11  **Q.**  You fired five shots; is that correct?

12  **A.**  Yes.

13  **Q.**  What type of weapon, in terms of caliber, did you fire the

14  shots from?

15  **A.**  A .40 caliber.

16  **Q.**  Is that considered a semiautomatic weapon?

17  **A.**  Yes.

18  **Q.**  And to fire five shots with that weapon, do you have to

19  press the trigger for each shot?

20  **A.**  Yes.

21  **Q.**  So in this case, you would have pressed the trigger five

22  times?

23  **A.**  Correct.

24  **Q.**  And did you intentionally press the trigger each time, as

25  opposed to accidental discharge?

1   **A.** There's no accidental discharge.

2   **Q.** It was intentional?

3   **A.** Yes.

4   **Q.** Now, you were having some communications with an

5   informant, a female informant; is that correct?

6   **A.** Yes.

7   **Q.** I just want to ask you a few questions about her.

8   **A.** Sure.

9   **Q.** Is it correct that you initially met her at a traffic

10  stop?

11  **A.** Yes.

12  **Q.** Do you recall what the traffic stop was for?

13  **A.** I don't.  I don't recall.

14  **Q.** And did the conversation about her being an informant come

15  up during that traffic stop?

16  **A.** I believe it was towards the end and then after, yes.

17  **Q.** And after the traffic stop, at some point did you go to

18  the motel or hotel where she was staying at?

19  **A.** Yes.  With several other deputies.

20  **Q.** Was there conversations about paying her money if she gave

21  information?

22  **A.** I believe it was light at that point.  It wasn't actually

23  discussed, I don't believe.  It was kind of a lighter meeting

24  than that.  It was nothing set, if that makes sense.

25  **Q.** Yeah.  Let me ask you this:  Was it later discussed with

DX Ayala G

65

1   A.  Yes.

2   Q.  Now, in your deposition, do you recall telling me that

3   nobody else used her as an informant?

4   A.  I don't specifically -- I think I said I didn't have any

5   knowledge of anyone specifically using her as an informant.

6   Q.  Okay.  So I want to ask you a little bit about information

7   that you had or didn't have regarding Mr. Lewis before you

8   pulled his car over.

9   A.  Sure.

10  Q.  Okay.  You did know he was on probation; is that correct?

11  A.  Yes.

12  Q.  And, to your knowledge, did Mr. Lewis ever make any

13  negative comments about law enforcement?

14  A.  Not that I knew of, no.

15  Q.  In fact, you had one prior contact with him, correct?

16  A.  Yes, I did.

17  Q.  And the nature of that contact that you had with him, he

18  was the victim of someone who had been hit by a car?

19  A.  Yes.  He had been hit by a vehicle.

20  Q.  And he was cooperative at that time; is that fair?

21  A.  Yes, he was.

22  Q.  And that was your only prior contact with him, when he had

23  been hit by the car?

24  A.  Yes.

25  Q.  And I asked you these questions at your deposition, but I

DX Ayala G

66

1   want to ask you again.  Did you have any information prior to

2   pulling him out of the car on the day of the stop that

3   Mr. Lewis had ever physically injured anyone?

4   A.  No, I did not.

5   Q.  That he had ever pointed a weapon at anyone?

6   A.  No, I did not.

7   Q.  Shot anyone?

8   A.  No.

9   Q.  That he had any prior act of violence?

10  A.  Not that I can remember, no.

11  Q.  Any violent felony that you were aware of?

12  A.  No.

13  Q.  Did you get the feeling that the informant, the

14  ex-girlfriend of Mr. Lewis, that they had broken up, first of

15  all?

16  A.  Yes.

17  Q.  You even asked her on the text, "Are you guys still

18  together?"  Or words to that effect?  Remember that?

19  A.  Yes.

20  Q.  Did you get the feeling from the text messages that she

21  was hopeful that you would contact him and take him into

22  custody?

23  A.  I don't know how hopeful she was.  We had been trying for

24  some time.  I'm not sure if she had hope or not.

25  Q.  Well, do you recall her in the text messages saying words

1   BY MR. GALIPO:

2   **Q.**  I can show some of this.  Do you recognize the person in

3   this photograph?

4   **A.**  I was a little chunkier back then, but that is me.

5   **Q.**  You lost weight.  That's probably a good thing for your

6   health.  That's the uniform you were wearing at the time?

7   **A.**  Yes.

8   **Q.**  You're right-handed?

9   **A.**  Yes.

10  **Q.**  So your duty holster is on your right side?

11  **A.**  Correct.

12  **Q.**  When we see something yellow on your left side, would that

13  be your TASER?

14  **A.**  Yes.

15  **Q.**  That's the X26 TASER you spoke of earlier?

16  **A.**  Yes.

17          MR. GALIPO:  And, then, I have Exhibit 6-2 and 6-3.

18          MR. WEAKLEY:  No problem.

19          MR. GALIPO:  By agreement, Your Honor.

20          THE COURT:  No objection?

21          MR. WEAKLEY:  No objection.

22          THE COURT:  They're both admitted.

23      (Plaintiffs' Exhibits 6-2 and 6-3 were received.)

24  BY MR. GALIPO:

25  **Q.**  That would be a photograph taken of you.  Was it taken the

1   night of the incident afterwards?

2   A.   Yes.

3   Q.   That is Exhibit 6, page 2.  And then Exhibit 6, page 3,

4   that would be another photograph taken of you; is that

5   correct?

6   A.   Yes.

7   Q.   Now, you mentioned that it's generally better if you think

8   someone might have a gun, for example, to have another officer

9   present with you to do a traffic stop; is that true?

10  A.   Yeah.  If possible, yes.

11  Q.   And you had at least some information from the informant

12  that Mr. Lewis had a gun?

13  A.   Yes.

14  Q.   And what you were thinking is that if he does have a gun,

15  that would be a violation of his probation, for example?

16  A.   Yes.

17  Q.   And you also were thinking, because he's on probation, I

18  could stop him without any reason and search his vehicle, even

19  if I don't have, you know, the normal probable cause or

20  reasonable suspicion, because it's part of his probation?

21  A.   I had a reason.  Yes, I don't need a traffic infraction in

22  order to stop him if he's on probation.

23  Q.   Okay.  Now, did you take any steps to try to arrange to

24  have another deputy present with you when you did this stop?

25  A.   So the other deputies that were working were still on the

1    call that I had left.  So they were still tied up on a call

2    for service in Rosamond.  So there was no available deputies

3    to go with me.

4    Q.  I guess what I'm asking you, did you try to talk to a

5    supervisor or anyone to see if you can get someone available?

6    A.  So in Mojave, if it's not people that were in Rosamond,

7    then the next help would be Ridgecrest, which is maybe an hour

8    north.  So, no, I did not.

9    Q.  Did you tell any supervisor that you were planning on

10   pulling this vehicle over and you believed there was a gun in

11   the vehicle?

12   A.  We don't notify supervisors of that, no.

13   Q.  Did you tell dispatch that you're going to pull this car

14   over in advance?

15   A.  We don't do that either.  We do it at the time of the

16   stop.

17   Q.  So would it be fair to say that you didn't try to get any

18   other deputies to assist you in the stop; and your reason, I

19   guess, is because you thought they were too far away?

20   A.  Yes.  They were too far away to assist.

21   Q.  So you decided you were going to try to stop the vehicle

22   by yourself?

23   A.  Yes.

24   Q.  You thought your backup, you told me in your deposition,

25   was 10 or 15 minutes away?

1   female passenger.  I can't remember at what point I saw her.

2   Q.  At some point, did you see her?

3   A.  Yes.

4   Q.  I mean, I take it it's your normal practice, if you're

5   going to stop a car, to look into the car to see who's in the

6   car?

7   A.  Yeah.  I couldn't see the back passenger seats.  The

8   windows were tinted, and I believe they were only rolled down

9   a little bit.

10  Q.  So are you saying that you never looked into the back even

11  through the front window portion as you're looking into the

12  car?

13  A.  When they were in the Wienerschnitzel?

14  Q.  No.  When you were standing at the driver's door of the

15  car having a conversation with Mr. Lewis.

16  A.  No.  I did not see anybody in the back seat.

17  Q.  Did you look in the back seat?

18  A.  I don't believe I did.

19  Q.  But at some point you noticed a female in the front

20  passenger seat?

21  A.  Yes.

22  Q.  And did you tell Mr. Lewis why you had stopped him at that

23  point?

24  A.  I told him my intention was to conduct a search,

25  basically.

1  **Q.**  At the door?  At the door -- I'm at the door right now.

2  **A.**  Yes.

3  **Q.**  I'm trying to take this in order.

4  **A.**  Right.

5  **Q.**  Did you tell him at the door you want to conduct a search?

6  **A.**  I believe I told him, "I know you're on probation.  Please

7  step out of the car."  Basically, yeah.

8  **Q.**  Words to that effect?

9  **A.**  Words to that effect.

10 **Q.**  You didn't have a body-worn camera on?

11 **A.**  No.  We did not have them assigned to us out in that area.

12 **Q.**  Any dash cam on your vehicle?

13 **A.**  Also, we did not have those.

14 **Q.**  Any audio recording device?

15 **A.**  Same answer.  We didn't have anything.

16 **Q.**  And Mr. Lewis gets out of the car?

17 **A.**  Yes.

18 **Q.**  And you walk somewhere to the back of the black SUV?

19 **A.**  Yes.

20 **Q.**  And he's complying up to this point, right?

21 **A.**  Yes, he is.

22 **Q.**  He didn't, for example, come out of the car with a gun,

23 did he?

24 **A.**  No.  Not when I asked him to step out, no.

25 **Q.**  Did he verbally threaten to harm you at all at that point?

1   **A.**  No.

2   **Q.**  And you do a search of his person at some point, correct?

3   **A.**  Yes.

4   Q.  Where was he in relation to the vehicles we see on

5   Exhibit 5, page 2, when you did this search?

6   A.  It was towards the back of his SUV.

7   Q.  And what did you ask him to do to do the search?

8   A.  So we do a search called the standing modified.

9   Basically, he puts his hands on his head and spreads his feet

10  apart.

11  Q.  Did he do that?

12  A.  Yes.

13  Q.  And what do you -- and he's wearing what?  Basketball

14  shorts and a white shirt?

15  A.  He had some type of shorts and a T-shirt.

16  Q.  And what do you do to do the search?

17  **A.**  So you would grab his hands on top of his head and hold

18  them and use your other hand to do the search.

19  **Q.**  Okay.  And did you see any weapons protruding from his

20  clothing?

21  **A.**  No.

22  **Q.**  Did you feel any weapons when you did the search?

23  **A.**  No.

24  **Q.**  Were you fairly confident, based on what you observed and

25  what you felt or didn't feel, that he had no weapons on him at

1   that point?

2   A.   Yes.

3   Q.   And then at some point do you tell him you want to search

4   the car?

5   A.   Yes.

6   Q.   And where were you standing when you told him that?

7   A.   I had walked him from the back of his vehicle to the

8   passenger rear of my vehicle.

9   Q.   So were you thinking, "I'm going to handcuff him and put

10  him in the back of my car" at that point while --

11  A.   Yes.

12  Q.   Sorry.   You already anticipated my question.

13       Handcuff him, put him in the back of your car, while

14  you're searching the vehicle?

15  A.   Yes.

16  Q.   And if you put him in the back of your car and close the

17  door, is he able to open the door from the inside?

18  A.   No.

19  Q.   And with handcuffs behind his back, it would be probably

20  even more difficult to open the door?

21  A.   Yes.

22  Q.   But even without handcuffs, if I tried to open it, you're

23  saying it wouldn't open?

24  A.   Right.

25  Q.   And at some point, you hear him, according to your

1  recollection, say the F word in some fashion?

2  A.  Yes.

3  Q.  And I know you described that he kind of lunged at you at

4  that point or words to that effect.  Do you remember that?

5  A.  Yes.

6  Q.  At that point, in that moment or second or two before he

7  ran away from you, did he punch you?

8  A.  No.

9  Q.  Did he swing at you?

10  A.  No.

11  Q.  Kick at you?

12  A.  No.

13  Q.  Tackle you to the ground?  Anything?

14  A.  No.

15  Q.  Did he verbally threaten to harm you at that time at all?

16  A.  No.

17  Q.  Now, he was taller than you were; is that fair?

18  A.  Yes.

19  Q.  And even though you told us you lost some weight, he

20  probably weighed more than you did at the time because of his

21  height, in part?

22  A.  I would imagine so, yes.

23  Q.  And would you agree that at that point, before he ran

24  away, there was no physical contact in terms of a push, a

25  punch, a kick, between you and him?

1    **A.**   Correct.

2    **Q.**   And then he ran away from you?

3    **A.**   Yes.

4    **Q.**   And you were watching where he went?

5    **A.**   Yes.

6    **Q.**   And I guess in part because he had a white T-shirt on, it

7    made it a little easier to track him?

8    **A.**   Yes.  It helped.

9           MR. GALIPO:  I've got Exhibit 5, page 8, by

10   agreement, Your Honor.

11          THE COURT:  No objection?

12          MR. WEAKLEY:  No objection.

13          THE COURT:  It's admitted.

14          MR. GALIPO:  Thank you.

15      (Plaintiffs' Exhibit 5, page 8 was received.)

16   BY MR. GALIPO:

17   **Q.**   And I realize this is the front of it, but is this the

18   front of that big truck that was across the street that we saw

19   in the other photo?

20   **A.**   It appears to be, yes.

21   **Q.**   And I'm going back to Exhibit 5, page 6.  And it's not as

22   clear as I would hope, but can you kind of see from this

23   perspective that portion of that truck?

24   **A.**   Yes.

25   **Q.**   So when Mr. Lewis ran away, did you see him run past his

1  car behind the truck?

2  A.  Yes.

3  Q.  So just so we're clear, at that point he didn't try to get

4  back into his car?

5  A.  No.

6  Q.  And you thought at that point he was trying to get away

7  from you?

8  A.  Correct.

9  Q.  And you, in fact, saw him at some point behind that big

10  truck laying down?

11  A.  Yes.

12  Q.  And that truck was hauling hay.  Do you remember that?

13  A.  I don't remember what it was hauling, but it appears to be

14  hauling hay from the picture.

15  Q.  And when he was laying down behind the truck, you

16  estimated he was at least 50 feet away; does that sound right?

17  A.  It could have been 40.  40 or 50.  In the range, yes.

18  Q.  That's just an estimate; is that fair?

19  A.  Yeah.  Estimate.

20  Q.  And one of the things you're thinking is that, you know,

21  "I might go chase him, and he may circle around and get back

22  in the car and take off"?

23  A.  Yes.

24  Q.  So you thought, "I think I'm going to go in the car and

25  take the keys out"?

1    A.   Correct.

2    Q.   That way, without the keys, it would be hard to drive off.

3    Is that what you were thinking, in part?

4    A.   Yes.

5    Q.   And you did that, correct?

6    A.   Yeah.  I reached in and grabbed the keys.

7    Q.   And when you reached in to grab the keys, Mr. Lewis was

8    still laying down in the back of this truck?

9    A.   Yes.

10   Q.   Now, when you went back in the car to grab the keys, did

11   you notice the female passenger in the car then?

12   A.   Yeah.  When I reached in to grab the keys, I believe

13   that's when I first noticed the female passenger.

14   Q.   Did you happen to glance and see two young ladies sitting

15   in the back?

16   A.   No.  My focus was mostly on Lewis.

17   Q.   Now, you knew that he didn't have a weapon on him,

18   correct?

19   A.   Correct.

20   Q.   Did you reach under the seat or check the center console

21   for a weapon at that time?

22   A.   No.  Like I said, my focus was more on him.

23   Q.   And then after you have the keys, where do you go?

24   A.   After I have the keys, I move from the vehicle more

25   towards the center of the street.  And that's when I told him

83

1    I have his keys and he was under arrest.

2    **Q.**  Okay.  When you told him that, he's still behind the

3    truck, first of all, true?

4    **A.**  Yes.

5    **Q.**  And looking at Exhibit 5, page 13, we see the door of the

6    SUV open there, true?

7    **A.**  Yes.

8    **Q.**  Was it open, to your knowledge, from the time -- well,

9    strike that.

10          When Mr. Lewis first got out of the car the first

11   time before you walked him back to search him, was the door

12   open or closed, if you know?

13   **A.**  I believe it stayed open.

14   **Q.**  Stayed open.  So when you went back in to get the keys,

15   the door was already open?

16   **A.**  Yes.

17   **Q.**  And, then, you left it open, after getting out?

18   **A.**  I never got in.

19   **Q.**  Well, I thought you said you reached in to get the keys?

20   **A.**  I reached in.  It sounded like I was inside the car.

21   **Q.**  Oh, no.  I didn't mean that --

22   **A.**  Okay.

23   **Q.**  -- you were sitting down taking a cruise.

24   **A.**  Right.

25   **Q.**  I mean, you had to reach in to get the keys?

1   A.   Yes.

2   Q.   Okay.  So after you did that, the door was still open?

3   A.   Correct.

4   Q.   So when you, according to you, yelled out "I have your

5   keys, you're under arrest," you weren't too far from this open

6   door?

7   A.   Correct.

8   Q.   So presumably the people in the car would have been able

9   to hear you say that, because they were closer to you than

10  Mr. Lewis, some 40 or 50 feet away, true?

11         MR. WEAKLEY:  Objection.  Speculation.

12  Argumentative.

13         THE COURT:  Well --

14         MR. GALIPO:  I can rephrase.

15         THE COURT:  Rephrase.  Sustained.  Rephrase, please.

16         MR. GALIPO:  I'll rephrase.  Thank you, Your Honor.

17  BY MR. GALIPO:

18  Q.   Do you think that your volume was loud enough so that the

19  people in the car that was fairly close to you would have been

20  able to hear that?

21  A.   Like I said, I was in the middle, more towards the center

22  of the street.  I'm sure Mickel would have heard me, because

23  he wasn't inside of the vehicle or anything.  He was out in

24  the open.  And, like I said, the back windows were partially

25  rolled down in the back, but not all the way rolled down.  So

85

1  I don't -- I'm not sure.

2  Q.  You're saying you're not sure whether somebody in the car

3  would have been able to hear that when you yelled it out with

4  the door open?

5  A.  I don't know what was happening in the car, if they were

6  having conversations or whatnot.  My point for saying all that

7  was to have him hear it.

8  Q.  I see.  Did you tell him what he was under arrest for at

9  that time?

10  A.  No.  I believe I just said, "You're under arrest.  I have

11  your keys.  You can't go anywhere."

12  Q.  Okay.  So at some point you see Mr. Lewis coming from

13  behind this truck hauling hay coming in your direction,

14  correct?

15  A.  Yes.

16  Q.  And when he was coming in your direction, did you see any

17  weapons in his hand?

18  A.  I don't remember seeing anything in his hands, no.

19  Q.  Did he try to tackle you to the ground at that point?

20  A.  No.  He had more -- he had -- so when he started running

21  towards me, I took a few steps back towards his bumper.  And

22  he changed direction towards his front -- the open driver's

23  side door.

24  Q.  Okay.  And got in the car?

25  A.  Yes.

DX 1 Ayala G

86

1  Q.  Showing you -- and the door was already open?

2  A.  Yes.

3  Q.  Showing you Exhibit 5, page 2, which we previously looked

4  at, before he got back in the car, did he try to assault you

5  or punch you or tackle you to the ground or anything like

6  that?

7  A.  No.

8  Q.  Did he verbally threaten to harm you?

9  A.  No.

10  Q.  Did he simulate like he had a weapon or anything like

11  that?

12  A.  No.

13  Q.  So now he's back in the car, correct?

14  A.  Yes.

15  Q.  How long would you estimate he was in the car before he

16  got back out?

17  A.  I believe in the deposition I was very approximate with my

18  time.  I said approximately five seconds.  I hadn't reviewed

19  any videos at that point.  Since then, with the security

20  cameras and the video, it looks like it was maybe one to two

21  seconds.

22  Q.  So you already anticipated my question.  In your

23  deposition, you estimated it was approximately five seconds?

24  A.  Yeah.  I emphasized "approximately," yes.

25  Q.  I want to be fair to you.  But you're saying now that you

1  reviewed other evidence, you believe it was more like one to

2  two seconds?

3  A.  Yeah.  From the video, it looks like more than -- well, it

4  looks like one to two seconds.

5  Q.  Now, when he's in the car, is he sitting in the driver's

6  seat?

7  A.  Yes.

8  Q.  And where were you positioned at that time relative to the

9  car?

10  A.  So when he started running and turned towards his driver's

11  seat, my anticipation was that he was getting in the driver's

12  seat.  So I moved from his back bumper more at an angle out

13  towards the middle of the street to have a view of what he was

14  doing.

15          MR. GALIPO:  May I approach Mr. Weakley, please?

16          THE COURT:  Yes.

17          MR. GALIPO:  By agreement, Exhibit 5, page 34.

18          MR. WEAKLEY:  No objection.

19          THE COURT:  It's admitted.

20      (Plaintiffs' Exhibit 5, page 34 was received.)

21  BY MR. GALIPO:

22  Q.  Now, this is a view from the rear of the SUV; is that

23  correct?

24  A.  Yes.

25  Q.  Now, when Mr. Lewis got back in this car, for what you're

1   saying now is one or two seconds, could you see his hands?

2   A.   No.

3   Q.   Could you see his right arm?

4   A.   All I know is his right arm was down.  He was leaning

5   forward, and his right arm was down towards the underneath of

6   the seat.

7   Q.   Right now I'm wondering if you could see his right arm.

8   A.   No.  Just the way his body was leaning forward, I could

9   not.

10   Q.   So, first of all, is it correct that you could not see his

11   hands; is that correct?

12   A.   They were under the seat.  I could not see them.

13   Q.   I'm going to get to that in a moment.

14   A.   Okay.

15   Q.   You couldn't see his hands at all; is that true?

16   A.   Correct.

17   Q.   And you couldn't see his right arm.  Is that also correct?

18   A.   Yes.

19   Q.   Do you recall in your deposition telling me that you

20   positioned yourself towards the back of his vehicle when he

21   got back in the car?

22   A.   I don't remember.

23   Q.   Well, did you position yourself towards the back of his

24   vehicle when he got back in the car?

25   A.   I positioned myself towards the back of his vehicle when

DX Ayala G

1  he was running towards the front seat, when I anticipated he

2  was going to jump into his seat.

3  **Q.**  Would you at least agree with me that from your position,

4  you could not see underneath the front seat?

5  **A.**  Correct.

6  **Q.**  And would you also agree with me from your position, you

7  could not see the front of the driver's seat?

8  **A.**  I believe I could see the side.  It's kind of a weird

9  angle.

10  **Q.**  Okay.  Did you see him pull a gun out from under the

11  driver's seat?

12  **A.**  No.

13  **Q.**  Did you see him get out of car with what you could

14  identify as a gun in either hand?

15  **A.**  I could only see one of his hands, and his left hand was

16  empty.

17  **Q.**  And I want to ask you now for a moment about these threats

18  that you say he made.  Understanding your testimony, up to the

19  time he got back in the car, he never verbally threatened to

20  harm you?  Do I have that correct?

21  **A.**  I believe half of the statement was when he was in the car

22  before he got out.

23  **Q.**  Okay.  Because you heard, I'm sure, when your attorney

24  gave his opening statement, he said that those threats he gave

25  you was after he got out of the car.  Do you remember hearing

90

1  him say that?

2  **A.**  I do not.  I remember the events as part of it was said

3  while he was still in the car getting out.

4  **Q.**  Okay.  The first thing I want to establish, before he got

5  back in the car, for this one or two seconds, he never

6  verbally threatened to harm you?  Would you agree with that?

7  **A.**  Yes, I would.

8  **Q.**  Now you're saying he got in the car for one or two

9  seconds, correct?

10  **A.**  Correct.  Approximately, yes.

11  **Q.**  Approximately.  And you're saying during this approximate

12  one or two seconds, half of the threatening statements he made

13  against you were while he was in the car?

14  **A.**  Yeah.  It was -- it was -- this is a very quick, short

15  amount of time.  So it's sort of a fluid motion before getting

16  out of the car.  And once he gets out of the car is when it

17  was said.  So part of it was when he was inside getting out.

18  **Q.**  And you gave your statement about five days after the

19  incident, correct?

20  **A.**  Correct.

21  **Q.**  With an attorney present, correct?

22  **A.**  Yes.

23  **Q.**  And then during this statement you gave five days later,

24  with an attorney present, you said he said something to the

25  effect "You're going to have to kill me."  Remember saying

1    that in your statement?

2    A.    Yes.

3    Q.    You didn't even know the exact words at that time, would

4    that be correct?    That's why you said, "something to the

5    effect"?

6    A.    Yes.

7    Q.    Then you claim he said, "You're going to die."    Remember

8    saying that in your statement?

9    A.    Yes, I do.    Yes.

10   Q.    Now, I'm assuming he -- according to you, he said that

11   half while he was in the car and half as he's getting out of

12   the car?

13   A.    Correct.

14   Q.    So, obviously, all the people in the car would have been

15   able to hear it, because they were right there?

16   A.    I would assume so, yes.

17   Q.    So now I want to talk to you about this right hand, left

18   hand.    And let me ask you.    How much time -- now that you're

19   revisiting your approximations, how much time do you think

20   happened from Mr. Lewis getting back out of the car to your

21   first shot?

22   A.    I believe it's in my time estimate of approximately one to

23   two seconds.

24   Q.    I just want to make sure we're clear on what I'm asking

25   and what you're understanding.

DX Avala G

92

1       Are you saying this all happened within one or two

2  seconds?

3  A.  Yes.  It was very fast, yes.

4  Q.  Okay.  So you're saying that -- because you said he was in

5  the car for one or two seconds before, right?

6  A.  Correct.

7  Q.  Now I'm asking you, just so we're clear, from him getting

8  out or starting to get out to your first shot, are you also

9  saying that's within the same one or two seconds?

10 A.  No.  I believe it's the -- I believe I misunderstood your

11 first question, from my approximation of five seconds.  That

12 was -- that was the whole -- that was the incident from him

13 jumping in and then getting out coming towards me.  That was

14 the approximate five seconds I had given you.

15 Q.  If I may ask a new question.  If you don't understand it,

16 just let me know; and I'll try to ask it in a better way.

17 Okay?

18      Right now I'm wondering from the time he got out the

19 last time to the time you fired your first shot, how much time

20 passed?

21 A.  It was pretty immediate -- it was immediate.  I mean, I

22 don't have seconds for that portion.

23 Q.  It was immediate, meaning within a second?

24 A.  Immediate to me is immediate.  I don't have seconds, if

25 that makes sense.

1  A.  Can you say that one more time?

2  Q.  Sure.  If you're saying you shot him immediately after he

3  got out of the car, he couldn't have been running at you or

4  charging at you for very long?

5  A.  So what I said before, my definition of "immediate" is the

6  fluid -- or fluid motion of how everything occurred after he

7  got out of the car.

8  Q.  Okay.  Let me ask you this:  After he got out of the car,

9  but before you fired your first shot, did you give him any

10  commands?

11  A.  No.  I didn't have time.

12  Q.  Did you give him any verbal warning you were going to

13  shoot him if he did or didn't do something?

14  A.  Again, there was no time.

15  Q.  I take it the answer is no to both of those questions?

16  A.  Yes.

17  Q.  Yes, it is no?

18  A.  Yes, it is no.

19  Q.  All right.  Now, you're claiming that his left hand was

20  visible?

21  A.  Yes.

22  Q.  And you could see his left hand was visibly empty,

23  correct?

24  A.  Yes.

25  Q.  Do you recall me asking you at the time of your

1    deposition, "Did he ever reach for your gun?"  Remember that

2    question?

3    A.   Yes.

4    Q.   And you told me, "no, he did not"?

5    A.   Yes.

6    Q.   Was that a correct answer?

7    A.   Yes.

8    Q.   And so, now, the right hand.  Is it your testimony that

9    his right hand was behind his back for all five shots?

10   A.   I couldn't see his right hand the whole time, because he

11   was face-to-face with me at one point for the five shots; and

12   my gun was down low.

13   Q.   Could you ever see, at any time before you started

14   shooting, his right hand visible?

15   A.   No.

16   Q.   According to you, could you ever see his right hand

17   visible during any of the five shots?

18   A.   No.

19   Q.   You would agree that if you could see both hands and they

20   were visibly empty, based on your training, it would have been

21   inappropriate to shoot him, correct?

22   A.   Correct.

23   Q.   Because, as we talked about earlier, in order to shoot

24   someone and possibly kill them, there has to be an immediate

25   or imminent threat of death or serious bodily injury, correct?

1    **A.**  Yes.

2    **Q.**  And, obviously, you never saw a gun at any time before you

3    shot him, true?

4    **A.**  I did not.

5    **Q.**  Now, at some point, according to you, at least our

6    discussion from your deposition, Mr. Lewis stopped moving

7    forward towards you during the shooting.  Remember telling me

8    that?

9    **A.**  Yes.

10   **Q.**  And, in fact, you told me at your deposition that he

11   stopped running and turned around, correct?

12   **A.**  I don't remember saying "turn around."  I was thinking

13   maybe that was possibly a typo in the transcript.  I think

14   I'm -- and we'd have to go to audio recording for that,

15   because I noticed that as well.  I may have said "ground,"

16   "went to the ground," instead of turned around.  I'm not quite

17   sure that's accurate in the transcript.

18   **Q.**  Okay.  So let me just take it point by point.  You recall

19   reading the transcript recently?

20   **A.**  Yes.

21   **Q.**  And you recall, when you read your deposition transcript,

22   that you said that he stopped running towards you -- no.  You

23   said you saw him stop running towards you and then turned

24   around.  That's what the transcript says?

25   **A.**  Could you give me the page number and line?

1    **Q.**  Sure.  Do you have your depo up there?

2    **A.**  I do.

3    **Q.**  Let's turn to page 80, lines 13 through 16.

4         MR. GALIPO:  Does the Court have a copy or need a

5    copy?

6         THE COURT:  I do.

7         MR. GALIPO:  Okay.  Thank you.

8    BY MR. GALIPO:

9    **Q.**  Read that to yourself.  And let me know when you've had a

10   chance to do that.

11        Have you had a chance?

12   **A.**  Yes.

13   **Q.**  Does it refresh your recollection at the time of your

14   deposition you said:

15        "After I -- so after I shot and saw him stop running

16   towards me, I stopped shooting; and then he turned around."

17   **A.**  That's what it says in the transcript.  Like I said

18   before, I think that may be a typo.  We'd have to go to the

19   audio recording for clarification, I believe.

20   **Q.**  Was his back ever to you during any of the shots?

21   **A.**  Not that I remember, no.

22   **Q.**  It's your testimony that he was facing directly towards

23   you for all five shots?  Is that your testimony?

24   **A.**  Yes.

25   **Q.**  You're aware now there are two shots to his back; is that

98

1    correct?

2    A.   Yes.   I believe one was to the side.   Am I mistaken?

3    Q.   Left side of his back and one towards the center of his

4    back?

5    A.   Yes.

6    Q.   According to you, his back was never to you for any of the

7    shots, true?

8    A.   Not that I saw.

9    Q.   And, according to you, you could never see his right hand

10   during any of the shots?

11   A.   Correct.

12   Q.   And, then, after you fired the five shots, you saw him

13   fall down on his back, correct?

14   A.   I don't know if I remember seeing him fall on his back.   I

15   remember looking down, and he was on his back.

16   Q.   He ended up on his back?

17   A.   Yes.

18          MR. GALIPO:  Because we're getting close, can I just

19   ask a few more questions before we break for the day?

20          THE COURT:  Yes.

21          MR. GALIPO:  Like 30 seconds worth?

22          THE COURT:  That's fine.  You tell me when an

23   appropriate time to break is.

24   BY MR. GALIPO:

25   Q.   Okay.  After the shooting, you were at the scene for some

99

1  period of time, correct?

2  A.  Yes.

3  Q.  Did you tell anyone at the scene, "Hey, I saw him reaching

4  under the seat of the car.  I believe he was looking for a

5  gun"?

6  A.  We -- so after a shooting, we don't --

7  Q.  Did you tell anyone that?

8  A.  No.

9  Q.  Did you tell anyone at the scene or after you went to the

10  station that, "Man, I shot him.  His right hand was behind his

11  back the whole time.  I thought he had a gun in it"?

12  A.  We don't give that information at the scene.

13  Q.  How about this idea that he verbally threatened you?  Did

14  you tell anyone that?

15  A.  Same answer.

16  Q.  In fact, would you agree that the first time that you ever

17  stated that his right hand was behind his back when you shot

18  him, he verbally threatened to harm you or he's reaching under

19  the seat of the car before he got out was when you gave your

20  statement?

21  A.  Yeah.  That was the first opportunity I had.

22  Q.  Five days later?

23  A.  Yes.

24  Q.  With your attorney -- was it Mr. Perry present?

25  A.  Yes.  Correct.

1    **Q.**   And you had contact with him on the day of the incident,
2    right?
3    **A.**   Yeah.   The union had sent him.
4           MR. GALIPO:  I think this is probably a good time, if
5    it's good for Your Honor and the jury.
6           THE COURT:  That's fine.  So, ladies and gentlemen,
7    Members of the jury, we're going to take our evening break at
8    this point.
9           I am going to ask you to remember my prior
10   admonitions and I'm going to also give you a little more right
11   now:
12          As I indicated before this trial started, you as
13   jurors will decided this case based solely on the evidence
14   presented in this courtroom.  And this means that after you
15   leave here for the night, you must not conduct any independent
16   research about this case, the matters in the case, the legal
17   issues in the case, or the individuals, or their entities in
18   the case.  It's important for the same reasons that jurors
19   have long been instructed to limit their exposure to
20   traditional information such as media information, such as
21   television and newspapers.
22          You must also not communicate with anyone in any way
23   about the case, and you must ignore any information about the
24   case that you may see while browsing the internet, while on
25   your social media feeds.

105

1     THE COURT:  So we will check in at the end of the day

2  tomorrow, see where we are at, and you should plan on the

3  defendant's side to potentially have witnesses available to

4  testify on Friday morning, if needed.  But it sounds like they

5  are likely to go through the end of the middle of the day on

6  Friday.

7     MR. WEAKLEY:  Is Destiny the only person from inside

8  the SUV --

9     MR. GALIPO:  For tomorrow.  And then we're going

10  assess whether we're going to call anyone else from the car in

11  part depending on how it goes.

12     THE COURT:  Okay.  Fine.

13     Anything further.

14     MR. HAMILTON:  Your Honor, the jury lists, what would

15  you like us to do with them?

16     THE COURT:  Just provide them to the courtroom

17  deputy, please.  Thank you.

18     All right.  Court's in recess then.

19     (Proceedings were adjourned at 4:39 p.m.)

20

21

22     I, RACHAEL LUNDY, Official Reporter, do hereby certify the
   foregoing transcript as true and correct.

23
   Dated:  April 1, 2025          /s/ Rachael Lundy_____

24                                 RACHAEL LUNDY, CSR-RMR
                                   CSR No. 13815

25