EXHIBIT 2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. KIRK E. SHERRIFF


| | | |
|---|---|---|
| MICKEL ERICK LEWIS, JR., et al., | ) | 1:21-cv-00378-KES-CBD |
| | ) | |
| Plaintiffs, | ) | |
| | ) | JURY TRIAL, DAY 2 |
| vs. | ) | |
| | ) | |
| COUNTY OF KERN, et al., | ) | Volume 2 |
| | ) | Pgs. 106 - 354, inclusive |
| Defendants. | ) | |
| _____ | ) | |
| R.L., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| COUNTY OF KERN, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Fresno, California                    Wednesday, March 12, 2025


REPORTER'S TRANSCRIPT OF PROCEEDINGS


REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

**<u>APPEARANCES OF COUNSEL</u>**:

| | |
|---|---|
| For Plaintiffs Mickel Erick Lewis, Jr., Oriona Lewis and Briona Lewis: | Toni Jaramilla, A Professional Law Corp. 1900 Avenue of the Stars, Suite 900 Los Angeles, CA 90067 BY:  TONI J. JARAMILLA, ESQ. |
| | Alexander Morrison + FEHR LLP 1900 Avenue of the Stars, Suite 900 Los Angeles, CA 90067 BY:  J. BERNARD ALEXANDER, III, ESQ. |
| For Plaintiffs R.L., M.L. and H.L., minors, by and through guardian ad litem Roberta Haro; A.W., a minor, by and through guardian ad litem Alisha White: | LAW OFFICES OF DALE K. GALIPO Attorney at Law 21800 Burbank Boulevard, Suite 310 Woodland Hills, CA 91367 BY:  DALE K. GALIPO, ESQ. |
| For Defendant Kern County: | Kern County Counsel 1115 Truxton Avenue, 4th Floor Bakersfield, CA 93301 BY:  ANDREW C. HAMILTON, ESQ.    KIMBERLY L. MARSHALL, ESQ. |
| For Defendant Ayala: | Kern County Counsel 1115 Truxton Avenue, 4th Floor Bakersfield, CA 93301 BY:  ANDREW C. HAMILTON, ESQ.    KIMBERLY L. MARSHALL, ESQ. |
| | Weakley & Arendt, APC 5200 N. Palm Avenue Suite 211 Fresno, CA 93704 BY:  JAMES D. WEAKLEY, ESQ.   BRANDE LYNN GUSTAFSON, ESQ. |

1           THE COURT:  Please proceed.

2                        JASON AYALA,

3    called as a witness on behalf of the Plaintiff, having been

4    previously sworn, testified as follows:

5           MR. GALIPO:  Yes.  Thank you, Your Honor.

6           MR. WEAKLEY:  Oh, Your Honor, may I introduce --

7           THE COURT:  Oh, yes.  We have -- please, Mr. Weakly.

8           MR. WEAKLEY:  I just want to introduce Ms. Brande

9    Gustafson from my office representing Deputy Ayala.

10          MS. GUSTAFSON:  Good morning.

11          THE COURT:  Mr. Galipo.

12          MR. GALIPO:  Thank you, Your Honor.

13                  DIRECT EXAMINATION RESUMED

14   BY MR. GALIPO:

15   **Q.**  Good morning, Deputy Ayala.

16   **A.**  Good morning.

17          MR. GALIPO:  Good morning, everyone.

18   BY MR. GALIPO:

19   **Q.**  I want to show you you Exhibit 6, page 4.

20          MR. GALIPO:  By agreement?

21          Your Honor, Exhibit 6, page 4, by agreement.

22          THE COURT:  And no objection?

23          MR. WEAKLEY:  No objection.

24          THE COURT:  It's admitted.

25          And are the jurors' screens on?

1    A.   Yes.

2    Q.   And you ended up shooting five shots, and we know it ended

3    up killing Mr. Lewis, correct?

4    A.   Correct.

5    Q.   And I'm just wondering if you have any estimate as to how

6    many steps he took toward you before you started firing.

7    A.   I do not.

8    Q.   Do you have any estimate as to how much distance he

9    covered towards you from getting out of the car before you

10   started firing?

11   A.   No.

12   Q.   You said that you saw his left hand before you fired; is

13   that correct?

14   A.   Yes.

15   Q.   Did you see his left hand or arm pumping in a running

16   fashion?

17   A.   Not that I can recall, no.

18        MR. GALIPO:  By agreement, Your Honor, Exhibit 6,

19   page 5.

20        THE COURT:  It's admitted.

21        MR. GALIPO:  Thank you.

22        MR. WEAKLEY:  No objection.

23        THE COURT:  No objection.

24     (Plaintiffs' Exhibit 6, page 5 was received.)

25   ///

DX resumed-AYALA-5

122

1   A.   Yes.

2   Q.   And were you aware he gave a statement?

3   A.   I assumed he would.  I didn't know how long he -- he

4   stayed on the scene after I left.

5   Q.   Now, how tall are you, about 5' 10"?

6   A.   Correct.

7   Q.   You weighed about 190 or so at the time?

8   A.   Yes.

9   Q.   I want to talk to you about these threats that you say you

10  heard.

11  A.   Sure.

12  Q.   If I'm understanding your testimony, you didn't hear any

13  verbal threats until Mr. Lewis got back in the car?

14  A.   Correct.

15  Q.   And you're saying he was back in the car at least now for

16  one or two seconds?

17  A.   Approximately, yes.

18  Q.   And your testimony is that half of the threats he had made

19  were made while he was still in the car?

20  A.   Yes.

21  Q.   For this one or two seconds?

22  A.   Yes.  Approximately, yes.

23  Q.   And you were positioned where exactly when he got back in

24  the car?

25  A.   When he jumped into the driver's seat, I was offset from

DX resumed-AYALA-f.

124

1    southeast.

2    Q.   Did you say anything to Mr. Lewis while he was in the car?

3    A.   No.

4    Q.   And were you making eye contact with him, in other words,

5    eye-to-eye contact, while he was in the car for one or two

6    seconds?

7    A.   No.  He was leaning down under the seat.  I couldn't see

8    his eyes.

9    Q.   I see.  He had his head underneath the seat?

10   A.   His head was not underneath the seat.  His body was

11   leaning forward.

12   Q.   And so what exactly are you saying he said to you

13   threatening while he was in the car for one or two seconds and

14   you could not see his face?

15   A.   So, obviously, I don't have a direct quote, because it was

16   something to the effect of --

17   Q.   Something to the effect of what?

18   A.   "I'm going to kill me [sic], you're going to die."  That

19   is what I remembered.

20   Q.   Wait.  Say that again, please.

21   A.   "I'm going to" -- "I'm going to kill you."

22   Q.   "I'm going to kill you"?

23   A.   Or "you're going to have to kill me."  It was something to

24   the effect of that.

25   Q.   During this one or two seconds that he was in the car, you

1    claim reaching under the seat, and you're somewhat offset from
2    the rear the car?
3    A.    Yes.
4    Q.    And at that point, obviously, you were at least aware that
5    there was a front seat passenger in the car?
6    A.    Yes.
7    Q.    And you're saying when he said that you didn't say
8    anything to him?
9    A.    It was very quick.
10   Q.    And you didn't reposition at that point?
11   A.    Well, at what point exactly?
12   Q.    At the point you're saying he was in the car for one to
13   two seconds threatening you.
14   A.    So my point for repositioning is to see what he was doing
15   and from getting under the seat.   So I kept a visual at that
16   point.
17   Q.    Right.   What I'm getting at, if I'm understanding you
18   correctly, you were at the rear bumper of your car.   You saw
19   him -- well, he was running towards you.   You tactically
20   repositioned to the rear bumper of your car?
21   A.    His car.
22   Q.    His car.   I'm sorry.
23   A.    Yes.
24   Q.    He didn't say anything to you.   You saw him get into the
25   car, and then you moved some distance to your left to try to

DX resumed - AYALA, S

126

1  get a visual?

2  **A.**  Yes, correct.

3  **Q.**  Then you're saying when he was in the car for one or two

4  seconds, he made these threats against you?

5  **A.**  Correct.  Half of them were in the car, half of them were

6  out.

7  **Q.**  Well, have you told us the half that were in the car?

8  **A.**  The first part?

9  **Q.**  That's what I asked you.  What was the threats while he

10  was in the car?

11  **A.**  So when I said something to the effect of what he said,

12  part of that was in the car and part was out.

13  **Q.**  I want to know, sir, since you were there, and apparently

14  you're the only one that heard these threats, what threat did

15  he make to you while he was still in the car?

16          MR. WEAKLEY:  Object as argumentative.

17          THE COURT:  Sustained.

18          Why don't you rephrase.

19  BY MR. GALIPO:

20  **Q.**  What threats did he make to you while he was in the car?

21  **A.**  I'll say again, this was a fluid incident that happened

22  very quickly.  I don't know when his words -- I don't know the

23  count or the syllable he was on when he got out of the car.  I

24  just know that part of it was said in the car and the other

25  part was said after he got out and charged towards me.

DX resumed - AYALA

127

1  **Q.**  Okay.  I just want to know what did you hear while he was

2  still in the car or starting to get out.  That's all I'm

3  asking.

4  **A.**  I don't know how else to answer your question than what I

5  have already told you.

6  **Q.**  Is that what you're saying he said while he was in the

7  car, that, "I'm going to kill you," is that what you're saying

8  he said?

9  **A.**  I don't know how else to answer your question.  I [sic]

10  said something to the effect of, "You're going to have it kill

11  me," or, "You're going to die" or "I'm going to kill you."

12  **Q.**  Okay.  And my question to you is, when he said that, in

13  your position, offset from the vehicle, did you immediately

14  reposition yourself to a position of cover now that you've

15  heard of a threat?

16  **A.**  Like I said before, I was keeping a visual of him.  I did

17  not run to cover, because I would have lost visual of what he

18  was doing.

19  **Q.**  Well, you're claiming now someone is threatening your

20  life, correct?

21  **A.**  Yes.

22  **Q.**  You didn't -- you didn't think it was a good idea to

23  tactically reposition after you heard that threat while he was

24  in the car?

25  **A.**  There was no better position.  I would have lost sight of

DX resumed / AYALA 6

128

1    the suspect.

2    **Q.**  You're also saying you thought he was reaching for a gun,

3    right?

4    **A.**  Correct.

5    **Q.**  And you were in a position with no cover; is that right?

6    **A.**  Correct.

7    Q.    And I'm assuming you were looking to see if, in fact, he

8    pulled the gun out from inside the car?

9    A.    Correct.

10   Q.    Including from under the seat or anywhere else?

11   A.    Correct.

12   Q.    And you never saw him pull a gun out, true?

13   A.    I never saw his right hand.

14   Q.    Did you ever see any gun in either hand or anywhere?

15   A.    No.

16   Q.    Did you ever see any object in his hand?

17   A.    No.

18   **Q.**  So now he's getting out.  Are you saying that there were

19   more threats after he got out?

20   **A.**  Like I said before, part of the threats were made inside,

21   part were made outside.

22   Q.    What part was made outside, if you know?

23   A.    I believe I answered that already.  It was one fluid

24   motion, one verbal.  Like I said, I can't remember a syllable

25   where he ended and when he was getting out and when he started

1   charging.

2   **Q.**  So you have used the word a few times, "charging,"

3   correct?

4   **A.**  Yes.

5   **Q.**  And I asked you how many steps he took and you didn't

6   know, true?

7   **A.**  Correct.

8   **Q.**  I asked you if his left arm was in a running motion.  You

9   said, "I didn't remember seeing that," correct?

10  **A.**  Correct.

11  **Q.**  I asked you how much distance he traveled before you fired

12  your first shot and you didn't know?

13  **A.**  Correct.

14  **Q.**  Had you started backing up before you started shooting?

15  **A.**  Again, it happened very, very quickly.  I don't remember

16  what happened first:  If I ran backwards and then shot or if I

17  shot while running backwards or if I shot and then started

18  moving backwards.

19  **Q.**  Do you remember if you were shooting at least some of your

20  shots as you were moving back?

21  **A.**  Yes, I was.

22  **Q.**  Where were you positioned in relation to the vehicle that

23  we're looking at in Exhibit 5, page 34, when you fired your

24  first shot?

25  **A.**  I was somewhere between the rear of the car and, I would

DX-resumed-AYALA[6

134

1        MR. GALIPO:  It is, Your Honor.  I just zoomed it in.

2        THE COURT:  Yeah --

3        MR. GALIPO:  I'm going to take it off now.  Okay.

BY MR. GALIPO:

4  Q.  When you were firing your shots, could you see his left

5  hand?

7  A.  I don't remember specifically seeing his left hand.

8  Q.  Could you see his waist area?

9  A.  I don't remember seeing his waist area, no.

10 Q.  Could you see the middle of his chest where his stomach

11 separates from his upper chest when you were firing your five

12 shots?

13 A.  I remember seeing his face.  That's how close he was to

14 me.

15 Q.  Could you see any other part of his body other than his

16 face when you were firing?

17 A.  No.

18 Q.  So if I have your testimony correct, you started firing

19 immediately when he got out of the car, and once you started

20 firing, that's all you could see was his face?

21 A.  Can you repeat that one more time?  I'm sorry.

22 Q.  Sure.  You told me you started firing almost immediately

23 after he got out of the car; is that correct?

24 A.  Correct.  When he charged towards me, yes.

25 Q.  Well, you said "charging towards you."  And you say you

1  started firing when you were between the passenger door and

2  the back of the car?

3  **A.** Approximately, yes.

4  **Q.** And after you immediately started firing, if I understand

5  what you're saying, you're saying the only part of his body

6  you can see is his face?

7  **A.** When I fired my first shot, correct.

8  **Q.** How about the second shot?

9  **A.** Well, he would have been closer to me, so I would have

10  seen his face.

11  **Q.** Only his face when you fired the second shot?

12  **A.** I believe so, yes.

13  **Q.** How about the third shot?

14  **A.** Same.

15  **Q.** Only his face?

16  **A.** Yes.

17  **Q.** How about the fourth shot?

18  **A.** I believe at some point, in that approximation, he had

19  turned towards the ground.  So when I stopped firing is when

20  he stopped charging towards me.

21  **Q.** What I'm asking you, when you fired your fourth shot, are

22  you saying you could only see his face, or could you see any

23  other parts of his body?

24  **A.** I don't remember.  I just remember he was close enough to

25  me that his face was in my face is what it seemed like.

DX resumed AYALA I6

136

1    Q.   For your fourth shot?

2    A.   For most of the shots.

3    Q.   I'm talking about the fourth and fifth shot right now.

4    Are you saying you can only see his face also at that time?

5    A.   So like I said, it happened very, very quickly.  I

6    don't -- I don't have a frame-by-frame picture of what I saw

7    during each shot.  It was all one -- one quick fluid

8    situation, if that makes any sense to you.  I don't have a

9    breakdown of shots and what I was seeing.

10    Q.   I guess what I'm getting at is, you testified in

11    deposition and I believe yesterday that his hand, meaning

12    Mr. Lewis' right hand, was behind his back for all five shots.

13    Remember testifying to that?

14    A.   I said when he got out of the car I could not see his

15    right hand because he kept it behind his back.

16    Q.   Well, do you recall testifying that his right hand was

17    behind his back in your deposition for all five shots?

18    A.   I could refer to my deposition, if you would provide me

19    with a line so I can get to it faster.

20    Q.   All right.  You reviewed it recently, didn't you?

21    A.   I did, yes.

22    Q.   Do you still have a copy up there?

23    A.   Yes.

24    Q.   Can you turn to page 58 of your deposition, please.  If it

25    helps you, I can read it.

DX resumed - AYALA/G

138

1   testimony presented to you in court in the same way as if the

2   witness had been present to testify.  Although --

3          Well, please proceed.

4          MR. GALIPO:  Thank you.

5          And I'd also like to refer the witness, Court, and

6   counsel to page 12 of your deposition, lines 2 through 7.

7          And I would offer to read that as well, Your Honor.

8          THE COURT:  Any objection?

9          MR. WEAKLEY:  I'm trying to get there, Your Honor.

10         I'm sorry, what lines?

11         MR. GALIPO:  2 through 7, please.

12         MR. WEAKLEY:  No objection.

13         MR. GALIPO:  May I read, Your Honor?

14         THE COURT:  You may.

15  BY MR. GALIPO:

16  Q.   (As read):

17         "QUESTION: Could you see his right hand at the time

18         you fired the shots?

19         "ANSWER:   No.

20         "QUESTION:   Could you see any portion of his right arm

21         when you fired the shots?

22         "ANSWER:   Not that I can remember.   It was behind his

23         back."

24         Do you see that?

25  A.   I do, yes.

DX resumed - AYALA                    139

1    **Q.**  And one of the main reasons that you're saying you shot

2    Mr. Lewis is because you couldn't see his right hand because

3    it was behind your [sic] back.  And you're saying you thought

4    he had a gun in it, right?

5    **A.**  Yes.  It was behind his back, correct.

6    **Q.**  So -- and I just read testimony where I'm asking you

7    whether you could see his right hand during the shots, and

8    you're saying it was -- you could not see it?

9    **A.**  Correct.

10   **Q.**  I even asked you if you can see his right arm and you said

11   you couldn't see that either?

12   **A.**  Correct.

13   **Q.**  And what I'm trying to get to, sir, is you said you shot

14   him almost immediately after he got out of the car, right?

15   **A.**  Yeah.  It seemed immediate.  Like I said, it was one fluid

16   incident.  So it was very quick.

17   **Q.**  And you're telling us at the time you fired your first

18   shot you could only see his face.  That's what you're saying,

19   right?

20   **A.**  That was my perception at the time because of how quickly

21   he moved towards me, yes.

22   **Q.**  Well, I'm not just interested in your perception at the

23   time.  I'm interested in now.  Could you see any other part of

24   his body other than his face what you fired the first shot?

25   **A.**  I know his left hand was empty.

DX resumed - AYALA

140

1   **Q.**   Well, you saw that before you fired a shot, right?

2   **A.**   Sorry, what was that?

3   **Q.**   You saw that his left hand was empty before you fired the

4   first shot?

5   **A.**   Correct.

6   **Q.**   Right now I'm asking you during the shots.  Do you

7   understand the time frame I'm asking you?

8   **A.**   Yes.

9   Q.   And I'll start with shots 1, 2, and 3, if that helps.

10  During your first three shots, could you see any part of his

11  body according to you other than his face?

12  A.   I could not, no.  I couldn't see his right hand.  It was

13  behind his back.

14          Am I missing your question?

15  **Q.**   I'm not sure.   I'm just trying to ask you could you see

16  any other part of his body other than his face for shots 1, 2,

17  and 3, and I want to include everything from the face down,

18  his -- his chest, his stomach, his waist, his left hand, his

19  left arm?   Anything other than his face?

20  **A.**   I know he was holding his right hand behind his back, and

21  his left hand was empty before he started charging towards me.

22  **Q.**   I think you're describing something that you are saying

23  you saw before you fired.

24  A.   Like I said, it was one -- it was -- it was very, very,

25  fast.  It's not broken down in -- like that.  It's very quick,

DX resumed - AYALA [c]

142

1  only see his face.  At any time during the shooting sequence,

2  could you see any part of his body other than his face?

3          MR. WEAKLEY:  Objection.  Asked and answered.

4          THE COURT:  Well, overruled.

5          THE WITNESS:  I can't break down the incident in a

6  frame by frame, much like we were having an issue before with

7  what he was saying when he got out of the car.  A frame by

8  frame with syllables, I can't break that down with what I saw

9  during what shot.  Does that make sense?

10 BY MR. GALIPO:

11 Q.  I'm going to try one last time, and I'll move on.

12 A.  I'll try harder too.

13 Q.  I'm only asking you -- I'm not asking that you have to

14 break it down shot by shot, frame by frame.  I'm only asking

15 you during the time you were firing your five shots, during

16 the shots could you see any part of him other than his face?

17 A.  I don't know how else to answer your question.  I really

18 don't.

19 Q.  It could be yes or no, or something with an explanation.

20 A.  I don't believe it's that simple with the way you're

21 asking the question.

22 Q.  When you indicated in your deposition that when you

23 started firing, you can only see his face, you agree with

24 that, right?

25 A.  Yes.

DX resumed - AYALA
143

1  **Q.** I'm just wondering as you were firing, did any other part

2  of him come into your view other than his face?

3          MR. WEAKLEY:  Objection, asked and answered.

4          THE COURT:  It's been asked.  You can answer.

5          THE WITNESS:  Let's do it one more time.  I'll try

6  very hard.  Can you ask it one more time?

7  BY MR. GALIPO:

8  **Q.** Yes.  In your deposition, you indicate that when you

9  started firing the only part of him you could see was his

10 face.  Do you remember that?

11 **A.** I do, yes.

12 **Q.** So when you say the only part of him you could see is his

13 face when you started firing, that implies that you couldn't

14 see the rest of his body when you started firing; is that

15 fair?

16 **A.** I will say, yes.

17 **Q.** Okay.

18 **A.** I'm sure our stenographer's tired of typing the same thing

19 over and over again.

20 **Q.** She's very good at what she does as long as we talk slowly

21 and one at a time.

22 **A.** Copy and paste, yeah.

23 **Q.** Okay.  So you would at least agree that when you started

24 firing, you could only see his face and you could not see any

25 other part of his body; is that -- you're in agreement with

DX resumed - AYALA

144

1    that?

2    **A.**    Yes.

3    **Q.**    So since you fired five shots -- and I'm not going to ask

4    you to break it down, every shot -- but at any time during the

5    shooting sequence, could you see any part of him other than

6    his face?

7    **A.**    No.

8    **Q.**    Okay.    So would you then at least agree with me, sir, if

9    you could only see his face during the time you were firing

10    the five shots and no other part of his body, you don't know

11    where his right hand was during the time you were firing the

12    five shots.    Because you're focused and only looking at his

13    face?

14    **A.**    Correct.    The only time I saw his right hand, when he

15    jumped out, he was keeping it behind his back.

16    **Q.**    But you've already told us that that was immediately from

17    him getting out to shooting, right?

18    **A.**    I told you, yes, it -- it seemed like immediate.

19    **Q.**    And you would agree, sir, that if both of his hands were

20    visible, and you could see he had nothing in his hands, it

21    would be inappropriate to shoot?

22    **A.**    Correct.    If both hands were empty, yes.

23    **Q.**    And you would also agree even if you started firing, and

24    at some point you saw both hands were visibly empty, it would

25    be appropriate to stop shooting?

DX resumed / AYALA |6

145

```
 1   A.  Correct.
 2   Q.  And you've also told us already he never reached for your
 3   weapon?
 4   A.  I believe I had a fear that he was going to, just based on
 5   a close proximity, but I don't know if I ever stated that,
 6   that he tried to reach for it.  I don't remember him reaching
 7   for my weapon.  I think this was just a mindset thing of
 8   pulling it closer to me because he was close.
 9   Q.  Well, let's look at page 72 of your deposition since you
10   have it handy.
11   A.  Sure.
12   Q.  And you could read it to yourself.  It will help refresh
13   your recollection, or I could read it if you prefer, lines 14
14   through 16.
15           Have you had a chance to read that, lines 14 through
16   16?
17   A.  Yes.
18   Q.  Okay.  Would you agree that Mr. Lewis never actually
19   reached for your gun?
20   A.  It says the same thing I already said.  It says I thought
21   he may try to grab it.
22   Q.  Okay.
23   A.  So I pulled it closer to me.
24   Q.  I'd like to read now lines 14 through 16, please.
25           THE COURT:  Any objection?
```

146

1          MR. WEAKLEY:  No.  But I would like to include lines

2     3 through 6.

3          THE COURT:  Well --

4          MR. GALIPO:  I'll allow counsel to do that in his

5     question --

6          THE COURT:  That's right.  You may proceed.

7     BY MR. GALIPO:

8     Q.  (As read):

9          "QUESTION:  You would agree that Mr. Lewis never

10         actually reached for your gun.  Would you at least

11         agree with that?

12         "ANSWER:  Yes."

13    A.  Yes.  That's what I had said before as well.

14    Q.  So he never reached for your gun.  You would agree, if

15    both hands were visibly empty, it would be inappropriate to

16    shoot, correct?

17    A.  Correct.

18    Q.  And you've just told us or admitted that during your five

19    shots you either couldn't see or not looking at his hands at

20    all, you were only looking at his face, correct?

21    A.  Correct.

22    Q.  Aren't officers trained to observe the hands?

23    A.  Yes.

24    Q.  Did you do anything, sir, to try to look at his hands

25    during the shooting?

DX resumed / AYALA

147

1   **A.**   He was too close to me to see.

2   **Q.**   Can you turn to page 80.

3   **A.**   Sure.

4   **Q.**   Do you recall talking yesterday about your responses in

5   lines 15 through 16?

6   **A.**   Yes.

7   **Q.**   Let me ask this:  At some point, did you observe him stop

8   running towards you?

9   **A.**   Yes.

10  **Q.**   Would that be before he fell to the ground?

11  **A.**   Yes.

12  **Q.**   And when you observed him stop running towards you, was he

13  standing upright as opposed to falling?

14  **A.**   I don't remember his body position.  I remember I stopped

15  shooting when I saw the threat end, when he stopped charging

16  towards me.

17  **Q.**   And when you observed him stop running towards you, could

18  you see his hands at that point?

19  **A.**   At some point I saw his hands.  I don't remember exactly

20  when it was.

21  **Q.**   And when you saw his hands, did he have anything in them?

22  **A.**   No.

23  **Q.**   Now, you also say here:  And then he turned around.

24          And you told me that you see that in the transcript,

25  but you believe maybe your words were mistaken?

DX resumed - AYALA III

148

1   **A.**  Yes, I believe they were.

2   **Q.**  Have you listened to the audio recording?

3   **A.**  Yes.

4   **Q.**  What do you think you actually said?

5   **A.**  The audio recording says I went -- I believe it says

6   something -- I won't quote it, because I don't -- it said

7   "went to the ground," or "fell to the ground," something to

8   that effect.

9   **Q.**  Okay.  You're claiming that all five of your shots were

10  fired as he was -- his front of his body, his face was facing

11  towards you, correct?

12  **A.**  That's what I remember.

13  **Q.**  And you're claiming that you fired all of your shots at

14  his front chest area?

15  **A.**  I remember I told you that I was shooting from not aiming

16  at my sights while running backwards.  So my gun was pointed

17  towards him.

18  **Q.**  Well, you were trying to strike him, weren't you?

19  **A.**  Yes.

20  **Q.**  You were trying to strike him in his upper body, correct?

21  **A.**  I was trying to stop the threat.  Like I said, I wasn't

22  aiming in a specific region of his body, just towards him.

23  **Q.**  And you don't know how two of your shots ended up in his

24  back?

25  **A.**  No, I do not.

DX - resumed - AYALA

149

1    **Q.** So -- and during this entire sequence after he got out of
2    the car until you stopped shooting, you're saying you gave no
3    commands and no warning; is that correct?
4    **A.** Correct.
5    Q.   Now, when he went to the ground, he would have went to the
6    ground on his back, or do you even know?
7    A.   I'm sorry, can you repeat the question?
8    **Q.** Did he go to the ground and land on his back?
9    **A.** Yes.
10   **Q.** And then, when he went to the ground, did you see any guns
11   in his hands or around him?
12   **A.** No.
13   **Q.** Did you go up and search?
14   **A.** Yes.
15   **Q.** Were there any guns on him?
16   **A.** No.
17   Q.   Could you see that he was bleeding?
18   A.   Yes.
19   Q.   Did it appear he had been struck by one or more bullets?
20   A.   I know there was one, yes.
21   Q.   You saw at least one wound?
22   A.   Yes.
23   Q.   While he was lying on his back?
24   A.   Yes.
25   Q.   And the wound you saw, was it somewhere in the chest area?

DX - resumed - AYALA/G

152

1    you had at the time and the detectives were asking you

2    questions?

3    A.   Yes.

4    Q.   There's an exhibit book, I think, there.  And I believe --

5    I'm trying to remember.  I think your statement is Exhibit 3.

6    It could be 4, but I believe it -- see if Exhibit 3 appears to

7    be your statement, a transcript of your statement.

8    A.   Yes.

9    Q.   Okay.  And I think you told us earlier that you reviewed

10   that several times just in preparation for the trial?

11   A.   Yes.  I remember reading it one time for sure and then --

12   Q.   Okay.

13   A.   Yes.

14   Q.   So can you turn to page 22 of your statement, please.

15   A.   Sure.

16        Ready.

17   Q.   Okay.  You're on page 22?

18   A.   Yes.

19   Q.   So at the bottom, lines 23 through 25 -- the last line

20   actually, you say that you saw him stop moving, he was

21   standing still?

22   A.   I see that, yes.

23   Q.   This is something you observed?

24   A.   Yes.

25        MR. WEAKLEY:  I'm sorry to interrupt.  Are we on

DX resumed - AYALA

153

1    page 22?

2              MR. GALIPO:  Of the statement.

3              MR. WEAKLEY:  Yes.

4              MR. GALIPO:  Yes, may I approach counsel --

5              THE COURT:  You may.

6              MR. GALIPO:  -- to show him where I'm at.

7         (Discussion was held off the record between counsel.)

8              MR. WEAKLEY:  Apparently, Your Honor, there's two

9    different transcripts of the statement.

10             MR. GALIPO:  Yeah, they have different paginations.

11             THE COURT:  I see.

12             MR. GALIPO:  That was the issue, but I was --

13             THE COURT:  We're using Plaintiffs' Exhibit 3.

14             MR. GALIPO:  Yes.

15             THE COURT:  In at this point.

16   BY MR. GALIPO:

17   Q.  So when you said he stopped moving and he was standing

18   still, this would have been before he fell to the ground?

19   A.  Yes.

20   Q.  And this is something that you obviously saw because you

21   were there, correct?

22   A.  Yes.

23   Q.  When he stopped moving, was standing still, do you recall

24   his back being towards you?

25   A.  No.

200

1                    REDIRECT EXAMINATION

2    BY MR. GALIPO:

3    Q.  So you were afraid of Mr. Lewis, correct?

4    A.  Yes.

5    Q.  And you were afraid of this crowd after the shooting,

6    correct?

7    A.  Correct.

8    Q.  Did that include the daughter and the son, were you afraid

9    of them?

10   A.  I don't believe I knew that they were specifically

11   daughter and son.  I just knew the crowd was there.

12   Q.  Well, weren't the -- wasn't the crowd yelling out, "Why

13   did you shoot him"?

14   A.  I don't remember what was being yelled at us.  I just

15   remember the nature, the aggressive nature.

16   Q.  Aggressive nature.  Did you see anybody with weapons in

17   the crowd?

18   A.  No, just their -- their yelling towards me, and -- yes.

19   Q.  What were they yelling?

20   A.  I don't remember.  I just remember them yelling.

21   Q.  Did they try to attack you?

22   A.  No.

23   Q.  Did they verbally threaten to harm you?

24   A.  Not that I can remember hearing.  It was just yelling.

25   Q.  But you were afraid of them?

201

1    A.   Yes.

2    Q.   And you were asked, did you feel -- how did you feel

3    afterwards, and you said "horrible" or something like that,

4    right?

5    A.   Yes.

6    Q.   Because you realized that you had shot an unarmed man,

7    correct?

8    A.   No.

9    Q.   Well, you checked him for weapons after you shot him,

10   didn't you?

11   A.   That's not why I felt horrible.

12   Q.   Did you realize after you shot him and after you checked

13   him, he was unarmed?

14   A.   Yes, at some point, during the second search of him is

15   when I realize he was unarmed.

16   Q.   So the first search he was unarmed, correct?

17   A.   Yes.

18   Q.   The second search he was unarmed, correct?

19   A.   Correct.

20   Q.   And when he was in the car, you never saw a gun in the

21   car, correct?

22   A.   No.

23   Q.   Is that correct?

24   A.   I didn't look in the car.

25   Q.   I see.  I'm talking about before the shooting.  Did you

1    ever see a gun in the car before the shooting?

2    A.   I do not see under the seat or in the car.

3    Q.   Okay.   And then when he got out of the car you've already

4    told us you never saw a gun, correct?

5    A.   Correct.

6    Q.   And in watching this video and you have Mr. Lewis in your

7    face, do you remember seeing a screenshot when you and him are

8    in the same shot one foot apart?

9    A.   I believe there's a lot that happened.   Behind the SUV

10   that wasn't -- we weren't able to see from the video.

11   Q.   Can you -- yet we see you backing up at some point,

12   correct?

13   A.   Running backwards, yes.

14   Q.   Running backwards?

15   A.   Yes.

16   Q.   Do we see Mr. Lewis running after you?

17   A.   I believe he was behind the SUV during that part.

18   Q.   And the part you're talking about is the shooting, right?

19   A.   Yes.

20   Q.   You were asked whether you went to the academy and

21   obviously you did, correct?

22   A.   Yes.

23   Q.   And one of the things you learned at the academy is if you

24   think someone has a gun, possibly to take cover when you can,

25   correct?

203

1   **A.**   When possible.

2   **Q.**   And to call backup when you can, correct?

3   **A.**   Yes, when possible.

4   **Q.**   When possible.   So I guess you're saying it was impossible

5   for you to take cover or call backup in this situation; is

6   that what you're saying?

7   **A.**   Based on the circumstances, like I said it before, when I

8   put out radio traffic or saying to dispatch that I was chasing

9   somebody, I knew that my partners were going to start coming

10  towards me.

11  **Q.**   Right.   That's what I wanted to ask you about.

12          You knew your partners were -- would be on their way

13  immediately once you said that a foot pursuit or something to

14  that effect, right?

15  **A.**   Correct.

16  **Q.**   So why didn't you tell them beforehand, hey, I think I'm

17  pulling over someone that might have a gun.   I want to make

18  sure for our safety and the occupants of this vehicle's safety

19  that I have another officer here with me before I do it?

20  **A.**   Like I said before, they were in Rosamond.   My concern was

21  if I tried to pull him over then and waited for backup, and

22  followed him, let's say, he would have fled, which would have

23  led to a vehicle pursuit and put other people at risk.

24  **Q.**   I see.   So better to shoot him?

25          MR. WEAKLEY:   Objection.   Argumentative.

204

1          THE COURT:  Sustained.

2    BY MR. GALIPO:

3    **Q.**  Okay.  So you thought these people were immediately going

4    to come after you said foot pursuit, right?

5    **A.**  From Rosamond, yes.

6    **Q.**  But you don't think that they could have come if you had

7    asked for them before?

8    **A.**  Like I had just said, the opportunity would have passed.

9    And -- and we wouldn't -- he would have -- we wouldn't have

10   found him.  Like I said, he was being elusive.

11   **Q.**  Well, there was no crime in progress, was there?

12   **A.**  There was the suspicion of him having firearms and being

13   on probation, which is enough to stop him.

14   **Q.**  But no actual crime in progress, you just saw him going

15   through the drive-thru?

16   **A.**  Correct.

17   **Q.**  When you went to the academy, I take it you also learned

18   that stuff you talked about earlier, about deadly force being

19   the last resort, only to be used in the direst of

20   circumstances, only if there's an imminent threat of death or

21   serious bodily jury?  You learned all of that at the academy?

22   **A.**  Yes.

23   **Q.**  With no other reasonable options, you learned that also?

24   **A.**  Yes.

25   **Q.**  And you give verbal warning when feasible, you learned

205

1    that also?

2    A.   Yes.

3    Q.   Now, regarding this informant, you said you understood she

4    was an ex-girlfriend?

5    A.   Yes, I did learn that at some point.

6    Q.   And in your prior contact with Mr. Lewis, you said that it

7    was your understanding an ex-girlfriend tried to run him over?

8    A.   Yes.

9    Q.   So did you get the sense that there might be some

10   animosity between some of his ex-girlfriends and him?

11   A.   I didn't.

12            MR. WEAKLEY:   Objection.

13            THE COURT:   Was there an objection?

14            MR. WEAKLEY:   Vague and speculative.

15            THE COURT:   Well, we're not there yet.  It's -- it's

16   the answer.

17            The question was:  "Did you get the sense there might

18   be some animosity between some of his ex-girlfriends and him?"

19            And his answer is:  "I didn't."

20            MR. WEAKLEY:   Okay.  I didn't hear the answer.  Okay.

21   BY MR. GALIPO:

22   Q.   The informant ex-girlfriend who was looking for money from

23   information basically gave you the impression she wanted you

24   to take him into custody; is that true?

25   A.   I believe she was doing her duty as an informant providing

1   me with information.

2   **Q.**  Right.  But in the text messages she basically implied to

3   you or explicitly said it would be good if you can come get

4   him?

5   **A.**  Correct.  She had said she was scared of him.

6   **Q.**  Right.

7   **A.**  And that she wished he was off the street.

8   **Q.**  Right.  And your only communication with her on that day

9   was by text, correct?

10  **A.**  Yes.

11  **Q.**  So I want to be clear on the nature of this threat.

12  You're saying --

13  **A.**  Sure.

14  **Q.**  -- she never said he broke into her room, did she?

15  **A.**  No, she didn't use that word.

16  **Q.**  And she never said that he had a gun on him when she

17  came -- when he came into her room; isn't that true?

18  **A.**  No.  In text messages she did not specify that he was

19  armed.

20  **Q.**  Right.

21          There certainly was no injury reported, would you

22  agree with that?

23  **A.**  Yes, she did not report an injury.

24  **Q.**  In fact, you even asked her, Do you want to make a report?

25  And she said, "No"?

ROXSAXADA G

207

1   A.  Correct.

2   Q.  So you said in response to counsel's question, you shot

3   Mr. Lewis because you thought he was going to kill you, right?

4   A.  Correct.

5   Q.  All right.  So I want to ask you about that.

6          You realize from your training in order to shoot

7   another one, it does have to be immediately life threatening,

8   correct?

9   A.  Correct.

10  Q.  Your prior contact with him before that day he was a

11  victim, correct?

12  A.  Yes.

13  Q.  And he was nice and cooperative with you?

14  A.  Correct.

15  Q.  Before that day -- and you told us this yesterday, you had

16  no information he ever injured anyone, he never committed a

17  violent crime in his whole life, right?  You told us that?

18  A.  I said I didn't have any knowledge of that.  I don't know.

19  Q.  But you had no knowledge of it, that's my question?

20  A.  Yes, I didn't have any knowledge of a violent crime, just

21  the information from the informant.

22  Q.  Right.  It's not as if you were -- you were told, Hey,

23  this person has a gun, he shot people, he's pointed guns at

24  people, he's beaten people, you didn't have anything like

25  that; did you?

208

1   **A.**  Just the guns part.

2   **Q.**  Right.

3   **A.**  Yes.

4   **Q.**  And we've already talked about yesterday you can't shoot

5   someone because you think they have a gun, right?

6   **A.**  Correct.

7   **Q.**  And you can't shoot someone even if you -- if they have a

8   gun in their hand.  That fact alone is not enough to shoot

9   someone, true?

10  **A.**  If they are not aggressive or anything like that, if they

11  are just standing there with a gun in their hand, yes.

12  **Q.**  And you claim that you pulled him over, you had a

13  conversation with him, and he was generally cooperative,

14  right?

15  **A.**  Yes.

16  **Q.**  This is the guy that you're saying was going to kill you a

17  few seconds or minutes later, right?

18  **A.**  Yes.

19  **Q.**  And so when you went up to the car and you claim you

20  weren't aware during the time you were there that there were

21  back seat passengers -- let me ask you, aren't you trained if

22  you're coming up to a car and you think there might be a gun

23  in it to look in the back seat to see if there's anyone back

24  there?

25  A.  I couldn't see through those tinted windows at nighttime.

209

1  **Q.** Well, I would assume, sir, when you went to the driver's
2  side window you were talking to Mr. Lewis, not through a
3  tinted window, but through the open window on the driver's
4  side, weren't you?
5  **A.** Yes.
6  **Q.** Did you ever, like, try to look and see if there was
7  anyone in the back seat?
8  **A.** Do you mean put his head in the window because --
9  **Q.** Well, just tilt a little bit or angle yourself a little
10 bit to look in the window?
11 **A.** I think it would have been difficult to see in the back
12 seat from the front window.
13 **Q.** I see.  So you're stopping the car because you thought
14 there could be a gun in the car, correct?
15 **A.** Correct.
16 **Q.** Okay.  And are you saying that when you -- before
17 Mr. Lewis got out of the car, you told him you're stopping the
18 car because he's on probation?
19 **A.** Yes.
20 **Q.** You told him that?
21 **A.** I believe I did.  The reason for the stop, yeah, because I
22 think maybe he had said something like, Why are you pulling me
23 over?
24 **Q.** And he was being cooperative at that point, right?
25 **A.** Yes.

211

1   Q.  And you've already told us, although you thought he punked

2   you he never tried to actually strike you at that point,

3   correct?

4   A.  Correct.

5   Q.  He's running away from you?

6   A.  Yes.

7   Q.  This is the same guy that you thought was going to kill

8   you?

9   A.  Later, yes.

10  Q.  So we looked at some of those video clips.  They were

11  coming out, the time's -- 2:58 I believe was the time when

12  Mr. Lewis got back to the driver's side of the car.  Do you

13  remember that?

14  A.  I don't remember the time stamps for the exhibits.

15  Q.  That's okay.  But would you at least agree at some point

16  we see you backing up?

17  A.  Yes.

18  Q.  And after seeing Mr. Lewis at about 2:58 approaching or

19  nearby the driver's door, we don't see him anymore, correct?

20  A.  Correct.

21  Q.  Regarding muzzle flash, do you know what your muzzle flash

22  looks like at night from a distance on a video?

23  A.  That's the first time I have seen my own muzzle flash on a

24  video.

25  Q.  Right.  Are you aware that other experts have looked at

1    the video trying to determine what those flashes are?

2    A.   No.

3    Q.   You talked about you thought he had these movements that

4    made you think he was under the influence of methamphetamine;

5    do you remember saying that?

6    A.   Yes.

7    Q.   Would you agree, sir -- first of all, had you ever asked

8    him, Are you under the influence of anything?  Did you ask him

9    that?

10   A.   No.

11   Q.   Did you ever dispatch out over the radio, I'm out with

12   one, I think he has a gun in the car.  I think he's under the

13   influence of drugs?

14   A.   No.

15   Q.   Did you ever say, sir, in your original statement that you

16   thought he was -- that he had these rigid movements that

17   you're describing now in your original view?

18   A.   Yes.

19   Q.   You think you did?

20   A.   Yes.

21   Q.   Let me ask you this:  Do you think for officer safety

22   purposes if other officers arrived on scene after the

23   shooting, it would be okay for you to tell them, I think

24   there's a gun underneath the seat of the car, be careful?

25   A.   No.

215

1    **Q.**  Let's assume hypothetically we've got all the same facts

2    in this case that you're saying occurred from your perspective

3    and there was no threat, no verbal threat for him saying

4    "you're going to have to kill me" or "you're going to die"?

5    **A.**  No verbal threat, correct, yes.

6    **Q.**  Are you saying based on your training you still would have

7    shot him, or you're saying that that would have made a

8    difference?

9    **A.**  I would have still shot.

10   **Q.**  You would have still shot?

11   **A.**  Yes.

12   **Q.**  Okay.  And by the way, these statements that you give and

13   the department policy, Mr. Weakly asked you, well, if someone

14   asked you to give a statement that night, would you have?  And

15   you said -- I forget exactly, you said "probably not"?

16   **A.**  Correct.

17   **Q.**  Are you aware that witnesses to an incident like this are

18   asked to give statements immediately that same day?  Are you

19   aware of that?

20   **A.**  Yes.  In most situations, I think they do.

21   **Q.**  Okay.  So witnesses that see traumatic events are asked to

22   give statements immediately that day, but your understanding

23   of the policy of your department is the officers don't give

24   statements until, like, five days later?

25   **A.**  That's how they do it, yes.

216

1    **Q.**  With an attorney present?

2    **A.**  Yes, they provided me with an attorney, the union.

3    **Q.**  I see.

4             And I think you already told us this, but it was then

5    five days later with your attorney present and after you had

6    an opportunity to confer with the attorney that you stated he

7    made these threats and had his right hand behind his back,

8    correct?

9    **A.**  That was my first opportunity to give the details of what

10   happened, yes.

11   **Q.**  Is it your understanding that the reason the department

12   wants you to wait three days or five days to give an

13   interview, and after you have a chance to consult with a

14   lawyer to make sure that you don't have inconsistent

15   statements or say something that might not be good for the

16   case?

17           MR. WEAKLEY:  Objection.  Speculation.

18   Argumentative.

19           THE COURT:  Well, it's asking his understanding.

20           Overruled.

21           THE WITNESS:  Could you repeat that one more time.

22   BY MR. GALIPO:

23   **Q.**  Sure.

24   **A.**  Thank you.

25   **Q.**  Is it your understanding that the reason your department

217

1   doesn't want you to say anything on the day of the incident

2   about why you shot, and wants you to wait three or five days

3   until you have a lawyer, and have a chance to consult with the

4   lawyer until after all the other witness statements are taken

5   so you don't say anything that might be hurtful to your case?

6   **A.** I don't believe that's the reason.

7   **Q.** And lastly, this charging that you're talking about --

8   **A.** Yes.

9   **Q.** -- you don't know how many steps and you don't know the

10  distance, correct?

11  **A.** Correct.

12  **Q.** And it all happened -- this charging you're talking about

13  all happened on the driver's side of the Chevy, correct?

14  **A.** Yes.

15  **Q.** Somewhere between the door and the rear tire of the car?

16  **A.** Yes.

17          MR. GALIPO:  Thank you.  That's all I have,

18  Your Honor.

19          THE COURT:  Thank you.

20          THE COURT:  Mr. Alexander?

21                     REDIRECT EXAMINATION

22  BY MR. ALEXANDER:

23  **Q.** Good morning, Deputy Ayala.

24  **A.** Good morning.

25  **Q.** I have questions for you.

218

1         You had the impression that because the decedent,

2    Mr. Lewis, was speaking fast and was rigid, that, to you, was

3    an indication of an influence of methamphetamines?

4    A.  Yes.

5    Q.  Now, when people are faced with police officers, they

6    generally don't want to make fast movements, right?

7    A.  I would assume so, no.

8    Q.  And with regard to speaking fast that can also be

9    accounted for by someone being nervous under the

10   circumstances, right?

11        MR. WEAKLEY:  Objection.  Speculation.

12        THE COURT:  Well, why don't you rephrase the question

13   based on his training and experience.

14   BY MR. ALEXANDER:

15   Q.  Based on your training and experience, you understand that

16   when people get nervous, they sometimes speak more quickly?

17   A.  Yes.

18   Q.  When you gave a demonstration earlier, you were talking

19   about the individual getting out of the car, and it -- the

20   movement that you gave, if I understand correctly is, the

21   person is stepping out with their left foot and turning

22   counterclockwise towards you.

23   A.  Yes.

24   Q.  So if I understand correctly, the first point at which you

25   unholstered your gun is when the decedent, Mr. Lewis, was

220

1          gun?
2          "ANSWER:  When I saw him reaching under the seat."
3          Do you see that testimony?
4    A.  Yes.
5    Q.  And you believed it was accurate at the time?
6    A.  Right.
7    Q.  So there's no time which you corrected that testimony
8    before today in written form, correct?
9    A.  Correct.
10   Q.  And if I understand correctly, if the point at which you
11   unholstered your gun was the point at which you saw Mr. Lewis
12   reaching as though he was reaching underneath the seat,
13   correct?
14   A.  Yeah, it was in the time -- sometime in there.  Like,
15   again, I said, this deposition was two years after the fact.
16   It was the best of my recollection was my deposition.
17   Q.  And during the deposition you said he did a deep reach
18   under the seat.  Do you recall?
19   A.  Yes.
20   Q.  And it was your testimony that he -- you could see his
21   left arm and part of his right arm, going in the direction
22   under the seat?
23   A.  Yes.
24   Q.  Do you recall that Mr. Lewis was approximately 6' 4",
25   right?

1   inside the car.

2   Q.   Originally, when he went -- when he went towards the car,

3   you shifted to the left towards the center of the street so

4   that you can get an angle looking inside the car door,

5   correct?

6   A.   Yes.

7   Q.   The car door was open, right?

8   A.   Yes.

9   Q.   And you were able to see that the -- uh, the decedent,

10  Mr. Lewis, had sat himself inside the car, and that's when you

11  saw him reaching with both hands with a deep reach under the

12  seat, correct?

13  A.   Yes.

14  Q.   And that's the point at which you unholstered your gun,

15  yes?

16  A.   It was sometime in there, yes.

17  Q.   And sometime in there, that's when you claim that the

18  decedent made the statement, either -- or something to the

19  effect of "you're going to have to kill me" or "you're going

20  to die," or one of the words that you've described, correct?

21  A.   Yes, during that incident between when he jumped in and

22  when he got out.

23  Q.   And is that the point where you unholstered your gun

24  because you had seen the decedent reach underneath the seat

25  with a deep -- a deep dive, you had an opportunity to

223

1   reposition yourself but you chose instead of going behind the
2   vehicle so you could look, to stay essentially out in the
3   open, correct?
4   A.  Yeah.  If I lost sight of him, he could have ran around
5   the vehicle and come behind me, so I chose to keep a constant
6   visual of him.
7   Q.  And you're saying from standing behind the driver's side
8   rear corner of the vehicle, looking to the left, with his door
9   being open you thought there was some danger that he -- you
10  would not be able to see him get out of the car, run around
11  the car, and come behind you; is that my -- is my
12  understanding, correct?
13  A.  There's a lot of possibilities.  He could have climbed
14  over the passenger and gotten out her door.  Uh, I didn't want
15  to lose sight of him.
16  Q.  Okay.  So at the point when you had your -- your gun now
17  pulled and you said it was in the -- in the down-ready
18  position, at that point, that's when the decedent stepped out
19  of the car, correct?
20  A.  Yes.
21  Q.  And it's your testimony that he stepped out with his left
22  foot, right?
23  A.  Yes.  That would be the normal way to get out, I think.  I
24  think it would be hard to get out with your right foot
25  leading.

1                           JESSICA SALCEDO,

2   called as a witness on behalf of the Plaintiffs, having been

3   first duly sworn, testified as follows:

4              THE WITNESS:  I do.

5              THE CLERK:  Thank you.  Please be seated.  And if you

6   would please state your full name, spelling your last name for

7   the record.

8              THE WITNESS:  My name is Jessica Leslie Salcedo.

9   J-e-s-s-i-c-a.

10             THE CLERK:  And your last name?

11             THE WITNESS:  S-a-l-c-e-d-o.

12                      DIRECT EXAMINATION

13  BY MR. ALEXANDER:

14  Q.  Now, if you could pull the microphone slightly closer to

15  you.

16        What is your date of birth?

17  A.  7-18-2007.

18  Q.  And how old are you today then?

19  A.  I am 17 years old.

20  Q.  17 years old.  And on the day in October of 2020, the

21  incident involving Mr. Lewis, when he was shot, were you

22  present that day?

23  A.  Yes.

24  Q.  Okay.  And with regard to that day, how old were you then?

25  A.  I was probably 15 years old.

DX Salcedo A

250

1   BY MR. ALEXANDER:

2   Q.  So did she --

3        THE COURT:  The court reporter is taking down the

4   questions and the answers, so you need to --

5   BY MR. ALEXANDER:

6   Q.  So you have to give an actual verbal response.  So I'm

7   going to ask that question again for you, okay?

8        At the point when Briona was inside the

9   Wienerschnitzel talking to people outside, did she speak to

10  everyone in the car?

11  A.  Yes.

12  Q.  Okay.  And so she -- you recall her speaking to you from

13  where you were sitting in the back seat behind the driver?

14  A.  Yes.

15  Q.  So she said hello to everyone?

16  A.  Yes.

17  Q.  So then Mickel, he drove out of the Wienerschnitzel,

18  right?

19  A.  Correct.

20  Q.  And after he drove out of the Wienerschnitzel, what

21  happened next?

22  A.  That's when the cop got behind us and flashed the lights.

23  Q.  And then ultimately, did Mickel comply?

24  A.  Yes.

25  Q.  And by complying, he pulled to the side of the road?

DX Salcedo A

251

1   A.   Yes, he did.

2   Q.   And at the point when he pulled to the side of the road,

3   you were sitting directly behind him in the driver's seat

4   still, right?

5   A.   Yes.

6   Q.   Did you ever see an officer come up to the driver's side

7   door of the car?

8   A.   Yes.

9   Q.   And did the officer have any conversation with the driver,

10  Mickel?

11  A.   Yes.

12  Q.   Were you able to hear that conversation?

13  A.   Uh, I was, but I don't remember the conversation.

14  Q.   Was Mickel cooperative?

15  A.   Yes.

16  Q.   What happened after they had that conversation?

17  A.   Uh, he stepped out the car because he was on probation.

18  Q.   So Mickel stepped out of the car?

19  A.   Yes.

20  Q.   And when he got out of the car, where did he go?

21  A.   To the back of the car.

22  Q.   He went to the back of your car?

23  A.   Yes.

24  Q.   And where was the police car in relationship to the car

25  that -- the SUV that you were in?

1   **A.**  Behind ours.

2   **Q.**  So the police car was behind your car?

3   **A.**  Yes.

4   **Q.**  And Mickel went in between the two cars?

5   **A.**  Yes.

6   **Q.**  And he was with the officer?

7   **A.**  Yes.

8   **Q.**  Were you able to hear anything that was said while Mickel

9   and the officer were behind the SUV?

10  **A.**  No.

11  **Q.**  Did you ever hear anything -- anyone scream or say

12  something loud?

13  **A.**  Yes.

14  **Q.**  Okay.  And who did you hear say something loud?

15  **A.**  Mickel.

16  **Q.**  And just for today, even though I know that you're in high

17  school, can you use the words that you heard in the back seat

18  of the car?

19  **A.**  I heard "fuck no."

20  **Q.**  And then what happened after you heard that?

21  **A.**  We seen him run.  He ran behind a diesel truck.

22  **Q.**  So you saw Mickel run behind a semi truck --

23  **A.**  Yes.

24  **Q.**  -- that was where?

25  **A.**  Right across the street from us.

DX Salcedo A

253

1   **Q.** So when Mickel pulled over, he was on one side of the
2   street and the semi truck was on the other side of the street,
3   right?
4   **A.** Yes.
5   **Q.** And the semi truck -- the vehicle you were in was facing
6   one direction, south; the semi truck was facing the other
7   opposite direction, north?
8   **A.** Yes.
9   **Q.** Okay. And so you were saying that Mickel ran. Where did
10  he run to?
11  **A.** He ran behind the semi truck.
12  **Q.** And did you see what he did when he got behind the semi
13  truck?
14  **A.** No. He just -- no.
15  **Q.** Okay. And do you recall how long he stayed behind the
16  semi truck?
17  **A.** No. It was quick.
18  **Q.** After he went over by the semi truck, do you recall
19  anything that the officer did?
20  **A.** He got the key from the ignition.
21  **Q.** You remember the officer reaching in and getting the keys
22  from the ignition?
23  **A.** Yes.
24  **Q.** And then what happened next?
25  **A.** That's when Mickel came back to the car.

DX Salcedo  A

254

1   **Q.**  Now, in between the point when the officer took the key

2   out of the ignition and the point when Mickel ran back from

3   the semi truck to the door, did you ever hear the police

4   officer yell anything?

5   **A.**  No.

6   **Q.**  Didn't hear the police officer yell "I've got your keys"?

7   **A.**  No.

8   **Q.**  Nothing like that?

9   **A.**  No.

10  **Q.**  So when Mickel came from the back of that semi and ran

11  back to the car, you were still seated behind the driver's

12  side seat, right?

13  **A.**  Yes.

14  **Q.**  And when Mickel got back to the car, what did he do?

15  **A.**  He tried to see if the keys were in the ignition.

16  **Q.**  Now, can you describe what he did with his body?

17  **A.**  I was only able to see the upper body part.  So I just

18  seen him with his hand trying to look for the key.

19  **Q.**  When you say trying to look for his keys, where was he

20  looking?  Where was his hand inside the car?

21  **A.**  On top of the -- where the driver is.  Where the wheel is,

22  sorry.

23  **Q.**  There's a place where you put a key called the ignition.

24  **A.**  Yes.

25  **Q.**  When he reached in, was he reaching to the ignition area?

DX Salcedo A

255

1    A.   Yes.

2    Q.   Do you recall which hand he was using to reach to do that?

3    A.   I think it was his -- I don't remember.

4    Q.   So you're sure you saw his key -- his hand reaching to the

5    ignition area, you just can't remember which hand?

6    A.   Yes, I'm sure.   I just don't remember what hand.

7    Q.   Now, you were sitting behind the driver's seat.   How is it

8    that you could see him reaching his hand to the ignition?

9    A.   Well, I was trying to see what was happening, so I was

10   leaning over the seat to see what he was doing.

11   Q.   So you were leaning around the seat to see what was going

12   on in front?

13   A.   Yes.

14   Q.   And so leaning around, you could see him reach with the

15   hand to the ignition area?

16   A.   Yes.

17   Q.   Did you ever see him reach under the seat?

18   A.   No.

19   Q.   At all, either hand, ever see him reach under the seat?

20   A.   No.

21   Q.   Now, when you saw him reaching with his hand, do you know

22   whether or not his bottom had sat on to the seat?

23   A.   I don't.

24   Q.   Because from where you were leaning around the seat, you

25   couldn't see his lower body?

1    A.  Yes.

2    Q.  Okay.  Now, while Mickel was inside the car, reaching for

3    the ignition, did he say anything?

4    A.  I don't remember.

5    Q.  You don't remember whether he said anything or not?

6    A.  No.

7    Q.  Well, let me ask you this, if he'd have said "You're going

8    to have to kill me" or "I'm going to kill you," do you think

9    that's something you would have remembered?

10   A.  Yes.

11           MS. MARSHALL:  Objection.  Calls for speculation.

12           THE COURT:  Overruled.

13   BY MR. ALEXANDER:

14   Q.  And with regard to either of these phrases or anything

15   close to that, did Mickel ever say that in between the point

16   when he stuck his hand inside the car and the point when he

17   pulled it out?

18   A.  No.

19   Q.  He never said that?

20   A.  He never said that.

21   Q.  So now, after he reached around and fumbled to try and

22   find the keys, what did Mickel do next?

23   A.  He realized the keys weren't there, so he stepped out, and

24   that's when everything happened.

25   Q.  And when you say "that's when everything happened," that's

1  when he got shot?

2  A.  Yes.

3  Q.  Now, have you ever witnessed anyone getting shot before?

4  A.  No.

5  Q.  And when this happened, were you surprised?

6  A.  Yes.

7  Q.  And at the point when you first heard the gunshot, could

8  you see where Mickel was?

9  A.  Yes.

10  Q.  Where was Mickel when you heard the gunshot?

11  A.  He right besides the -- out the door.

12  Q.  All right.  So you were sitting in the back seat, behind

13  the driver's seat, right?

14  A.  Yes.

15  Q.  There's a window next to you?

16  A.  Correct.

17  Q.  And there's a window associated with the driver's side

18  door, right?

19  A.  Yes.

20  Q.  When you say he was right next to you, I can't tell which

21  window you were looking out of.  At the point when you looked

22  out the window and saw that Mickel was right next to you,

23  right before the gunshot, which window was he closest to?

24  A.  His window.

25       MS. MARSHALL:  I'm sorry, Your Honor.  I can't hear

DX Salcedo A

258

1    her.

2              THE WITNESS:  His window.  Sorry.

3    BY MR. ALEXANDER:

4    Q.   His window.

5              THE COURT:  Yeah, if we can just make sure the

6    microphone is a little bit closer to you.

7              THE WITNESS:  Okay.

8    BY MR. ALEXANDER:

9    Q.   So at the point when you first heard the gunshot, Mickel

10   was standing just outside his window?

11   A.   Yes.

12   Q.   Do you know what direction he was facing?

13   A.   He was facing the back of the car.

14   Q.   So his face was looking back towards where the police

15   officer's car would have been?

16   A.   Yes.

17   Q.   At the point when you heard the gunshot, could you see

18   where Mickel's hands were?

19   A.   They were on the side of his body.

20   Q.   Down by his side?  That's what you remember?

21   A.   Yes.

22   Q.   After the gunshot, the three of you -- you, your mother,

23   your sister -- were inside the car.  Tell me the very next

24   thing that you did.

25   A.   We got out the car.

1  **Q.**  I have a few questions for you.  I'm going to start with

2  you said that you were scared when this happened and when you

3  were talking to the detectives?

4  **A.**  Yes.

5  **Q.**  Were you scared when Mickel got back into the car?

6  **A.**  No.

7  **Q.**  Did you -- did he actually get seated in the car or did he

8  lean into the car?

9  **A.**  I didn't see his lower body.  I just see his upper body,

10  so I'm not -- I don't know.

11  **Q.**  Okay.  Do you recall Detective Wong asking you, "Did he

12  ever go into the car at any time?" and you say "no"?

13  **A.**  Yes.

14  **Q.**  Okay.  And did Detective Wong ask you, "Was there anything

15  as far as anything that your -- that he said to your mother

16  when -- or, I'm sorry, your -- your mother when he ran back to

17  the car?"  And you said, "Not that I remember.  I was scared.

18  I don't know what I did and didn't do"?

19       Did you say that?

20  **A.**  Yes.

21  **Q.**  Okay.  So it was pretty frightening to have him run from

22  the police officer, correct?

23  **A.**  Correct.

24  **Q.**  Okay.  And you said you don't remember what was said to

25  your mom that was right before the shooting, correct?

BDX Salcedo E

265

1  **Q.**  And you knew Mickel and you knew his voice?

2  **A.**  Yes.

3  **Q.**  Did Mickel ever yell out to the officer, "You're going to

4  have to fucking kill me"?  Did he ever say that?

5  **A.**  No.

6  **Q.**  Are you positive he never said that?

7  **A.**  I am positive.

8  **Q.**  Okay.  Did he ever say to the officer, yell out, "You're

9  going to die"?

10  **A.**  No.

11  **Q.**  You were sitting right behind him.  You never heard him

12  say that?

13  **A.**  No.

14  **Q.**  And you indicated that you saw his hand -- one of his

15  hands go towards where the keys would be, correct?

16  **A.**  Correct.

17  **Q.**  And based on your observation, when it was -- his hand was

18  going to where the keys were, was he at the same time with the

19  same hand reaching underneath the seat of the car?

20  **A.**  No.

21  **Q.**  Did you ever hear the officer yell out, "Mickel, I got

22  your keys.  You're under arrest"?

23  **A.**  No.

24  **Q.**  And now the shots.  You recall Mickel getting out of the

25  car after he reached towards the place where the keys are?

1   **A.**  Yes.

2   **Q.**  And you indicated that you saw him standing there?

3   **A.**  Yes.

4   **Q.**  And you were looking outside your window?

5   **A.**  Yes.

6   **Q.**  And you said you could see his hands?

7   **A.**  Yes.

8   **Q.**  Were either one of his hands behind his back?

9   **A.**  No.

10  **Q.**  Were you expecting the shots when they happened?

11  **A.**  No.

12  **Q.**  Did you hear any warning or commands that the shots were

13  going to take place?

14  **A.**  No.

15  **Q.**  And when you gave this statement, did the detective tell

16  you, "We don't take statements the same day.  We're going to

17  give you five days to relax and then we'll come talk to you"?

18  **A.**  No.

19  **Q.**  Do you recall telling the detective in your statement that

20  you actually saw Mickel at the time he was shot when you were

21  looking out your window?

22  **A.**  Yes.

23  **Q.**  I'm just going to make one correction.  It's minor.  But

24  you're 17 now, right?

25  **A.**  Yes.

1          THE COURT:  Why don't you rephrase that.

2          MS. MARSHALL:  Yeah.

3   BY MS. MARSHALL:

4   Q.  So when Mickel came to the car and reached in for, as you

5   said, the ignition, how could you tell he never reached under

6   the seat?

7   A.  When I was -- I was leaning around, so I could see both of

8   his hands.

9   Q.  But you couldn't see whether his body was in the vehicle?

10  A.  No.

11  Q.  But you could see both of his hands?

12  A.  Yes.

13          MS. MARSHALL:  I have nothing -- actually, let me

14  check.

15  BY MS. MARSHALL:

16  Q.  When the deputy first came to the window, was he friendly

17  or was he hostile?

18  A.  I don't remember.

19  Q.  Okay.  You said that Mickel got out of car because he was

20  on probation?

21  A.  Yes.

22  Q.  And did the deputy tell him he was on probation and that

23  he was subject to a search?

24  A.  Yes.

25          MS. MARSHALL:  Thank you.  I have nothing further.

DX Bolewis A

272

1        THE WITNESS:  My full name is Briona Zumora Lewis,

2  B-r-i-o-n-a, Z-u-m-o-r-a, L-e-w-i-s.

3                      DIRECT EXAMINATION

4  BY MR. ALEXANDER:

5  **Q.**  Good afternoon.

6  **A.**  Good afternoon.

7  **Q.**  What is your date of birth?

8  **A.**  My date of birth is February 16, 2003.

9  **Q.**  And that makes you how old today?

10  **A.**  I'm 22.

11  **Q.**  And how are you related to Mickel Lewis, Sr.?

12  **A.**  He's my father.

13  **Q.**  I want to get some background about you.

14  **A.**  Okay.

15  **Q.**  Where did you grow up?

16  **A.**  Uh, I grew up -- are you referencing, like, when I was a

17  child or a teenager?

18  **Q.**  What are the different places that you lived?  What cities

19  have you lived in?

20  **A.**  I lived in Las Vegas, Nevada; I've lived in Mojave,

21  California.  Mainly those two.

22  **Q.**  And with regard to education, what's the highest level of

23  education that you've received?

24  **A.**  I graduated high school.  And while I was in high school,

25  I was taking college classes.

DX Beavis A

274

1    that time.

2    Q.  Did he visit you while you were in Las Vegas?

3    A.  Yes.

4    Q.  Once or twice or more than that?

5    A.  I believe it was two -- two to three times.  It was

6    majority for the summers, when we're not in school.  The first

7    summer -- or not the first summer, but I believe it was the

8    second summer that we were out there he visited us.

9    Las Vegas, there's not much for kids.  We were, like, young.

10   So he only took us to Adventuredome and to some of the parks

11   out there.  And the second summer he actually took us back to

12   Arizona with him the whole time, and we just did everything.

13   There was a pool, so we can go swimming.  And he would make us

14   food and just hang out.

15   Q.  And so that second summer when he took you to Arizona,

16   were you there for the entire summer?

17   A.  Yes, we were there for the entire summer.

18   Q.  And what types of things did he do with you?

19   A.  With me specifically?

20   Q.  Yes.

21   A.  In Arizona?

22   Q.  No, in general.

23   A.  Uh, we're basically like the same person -- I'm sorry.

24   Q.  Let's talk about camping.

25   A.  Uh --

DY R. Lewis A

275

1    **Q.**  Did you ever go camping with your father?

2    **A.**  Yes.  We went camping about, like, two to three times.

3    **Q.**  And on the occasions that you went camping, did you go

4    with other people?

5    **A.**  Uh, the first time that we went camping we went by

6    ourselves and it was all of my sisters and brothers.  And we

7    went to the Castiac Lake.  And we had a really big tent

8    because he had to fit his king-size air mattress and two queen

9    air mattresses for all of us.

10   **Q.**  When you say "all of us," there's you, and then there's

11   your sister, Oriona, and then there's your brother, Mickel,

12   Mike --

13   **A.**  Yes.

14   **Q.**  -- Junior?

15   **A.**  Yes.

16   **Q.**  Were there children in addition to the three of you?

17   **A.**  Yes.  It was R.L., M.L., H.L., and A.L..

18   **Q.**  And who planned this camping trip to bring all these kids

19   from different moms?

20   **A.**  Uh, it was my dad and Roberta.

21   **Q.**  With regard to all these kids, approximately how old were

22   you when this trip happened?

23   **A.**  The first one, honestly, I'm not sure, but I know I was

24   young because I didn't know how to do my hair.

25   **Q.**  So about what grade was that?

DX Bolanis A

276

1  **A.**  Maybe like 7th or 8th grade.

2  **Q.**  So you're there with all these other kids.  Was there any

3  animosity?

4  **A.**  No.  We all --

5  **Q.**  Any friction?

6  **A.**  No.  We were -- it was regular.  We all got along.

7  **Q.**  All the --

8  **A.**  Nobody looked at anybody different.  Nobody slept in the

9  corner.  We were all together.  We all slept together in two

10  air mattresses, and we were all -- there was a lot of us, but

11  there was nobody on the sideline.

12  **Q.**  And so tell me, on this camping trip with all these kids,

13  what kind of stuff did you do?

14  **A.**  Well, it was camping, but we -- we had, like, everything,

15  like the stuff to make breakfast.  And we would go over to the

16  other side where there was, like the -- like, lagoon area.

17  And we would go to, like, the beach.

18        And I remember because I was afraid of, like, the

19  little algae.  And he was telling me, "Oh, like, it's natural.

20  Just get in there.  Go have fun."

21  **Q.**  Did you ever go fishing?

22  **A.**  Yes.  We went fishing two to three times.

23  **Q.**  And what's the earliest date that you recall going

24  fishing?

25  **A.**  I don't -- I'd probably say, like, 5th grade maybe.

RY Lewis A

277

1  **Q.**  And did you actually learn how to fish?

2  **A.**  No.  I just had a pretty, like, fishing rod.  And we had

3  it set up -- well, we went fishing multiple times.  So there's

4  a lake, I believe it's Apollo Lake.  And we would set the

5  sticks on the floor and just, like, hang out, but we didn't

6  ever catch anything.  It was --

7  **Q.**  So even though you called it going fishing --

8  **A.**  Yeah.

9  **Q.**  -- it turns out that you and your father would just,

10  essentially, talk?

11  **A.**  Yeah.  We would just hang out and look at the water and

12  feed the birds.  He would always get us, like, loafs of bread

13  and we would all split it up and give to the birds, ride our

14  scooters and stuff.

15  **Q.**  Did you have conversations with your father?

16  **A.**  All the time.  He gives really good advice.  And I know I

17  wasn't his oldest daughter, but we were really close.  And he

18  would always remind me to be a lady and, you know, be classy

19  and keep my legs closed and, you know, act like a lady.

20  Q.  So there's some point -- is there some point at which you

21  stopped living in Las Vegas and you were living in the

22  Lancaster/Mojave area?

23  A.  Yes.  We moved after I was in the fourth grade.  So we

24  went back to California.  And we were in Mojave from fifth

25  grade all the way up.

DX - Lewis A

278

1  **Q.**  And while you were in the Lancaster, did your father see

2  you regularly?

3  **A.**  I was in Mojave and he lived in Lancaster.  And it's like

4  a 30-minute drive.  And we would go -- all of my siblings, me

5  and Mickel and Ori, because we lived with my mom, we would all

6  go visit my dad every weekend.

7  **Q.**  And where was your dad living?

8  **A.**  He was living in Lancaster.

9  Q.  Within his own place or --

10  A.  Yes.  He had his own house.

11  **Q.**  Okay.  And what types of things did he do -- I'm sorry,

12  what types of things did you do with your father in Lancaster?

13  **A.**  Honestly, because we would be at school for the majority

14  of the week, he really tried to make sure that we did

15  something every weekend that we came.  So swimming was like

16  literally every time.  If there wasn't a pool around, he would

17  get us a room.  We would, like, use their pool.  And he did

18  this thing that he did with all of us where he would, like,

19  stand in the pool, like he would get on his knees, because

20  he's very tall, and we would stand on his shoulder and we

21  would jump off.  And it would be like he was our personal

22  diving board.

23          We went bowling a lot of the times.  And there was

24  like an underground bowling area in Lancaster.  And he would,

25  like, give us money for the jukebox.  We would play music.

DY Bl Lewis A

279

1          And he took us snowing in Califor- -- and in Mojave
2    especially, the snow doesn't stick.  So it was like my first
3    experience of, like, really deep snow.  And he took us high
4    into the mountains.  And we all had a good time playing in,
5    like, the sheds and stuff like that.
6          I learned about, like, frostbite because my fingers
7    were frozen.  And as soon as I got in the car, he told me not
8    to put my fingers near the heater.  And I did it anyway, and
9    my fingers were really hurting.  And we just, like, laughed
10   about it.
11         He loved to eat.  So we would always go out to
12   restaurants.  And we'd have to put the tables together so that
13   we could all sit together.  But we would still have, like, a
14   good time laughing, enjoying ourselves, making jokes, because
15   we're all really goofy.
16         We did go on that boat he bought.  He had a boat for
17   a short period of time, and every chance he got, he made sure
18   we got on that boat.  And we went back down to Castaic Lake.
19   And I remember because we had -- we all had life vests on and
20   we were scared to jump in the water because it was green.  And
21   he jumped in the water to tell us, like, it's okay, you can
22   get in.  And we all jumped in.  And I'm happy that I did it
23   because I have that experience.
24   Q.   So you learned how to swim from him?
25   A.   Yes.

DX By Lewis A

280

1   **Q.   How about holidays?  Did he do things for the -- for you**
2   **for holidays?**
3   **A.   Yes.   We usually spent the holidays with him in Lancaster.**
4   **Christmas was always good because we know they give good**
5   **gifts.**
6           But it was one specific holiday that I'll never
7   forget.  It was Halloween, and he's dressed up as a lantern.
8   And he's super tall.  And we're all in the house getting
9   ready, putting our costumes on and there's, like, spooky music
10  playing through the house -- sorry.
11          There's, like, music.  You know, we're having a good
12  time.  And then after that, because the girls were still
13  little, we went trick-or-treating for them, but all of us
14  older ones wanted to go haunted-house hunting.  So we all went
15  looking for haunted houses.  And we went through and it was
16  just a really good Halloween for me.
17          Sorry.
18  **Q.   I just want to go over a couple of more things that you**
19  **did.   Do you remember going to Universal Walk?**
20  **A.   Yes.   That was on New Year's Eve, I believe.**
21  **Q.   What year was that?**
22  A.   I'm sorry, I don't remember the year, but I was young, I
23  think.  But yeah, we went to the Universal City Walk.  And
24  even though we didn't go inside of the amusement park we still
25  had a really good time.  We were laughing, joking.  I think

DX - Lewis A

281

1   there was like a -- like a Dots in there.  And we all got ice

2   cream and screamed "Happy New Year's" at 12:00.

3   Q.   So he -- you said he liked food, right?

4   A.   Yeah.

5   Q.   And did he ever cook for you?

6   A.   Yeah.

7   Q.   How did he do that?

8   A.   Uh, honestly, he was a creative chef.  Whatever we had in

9   the fridge, he would make it go together, even if it didn't go

10  together, hotdogs and eggs, and make into like a burrito or

11  something.  And it always turned out good.

12          And I specifically remember when he ate his Ramen

13  noodles, he liked stale chips.  It was, like, really weird.

14  He didn't like fresh chips.  It had to be, like, three days

15  old.

16  Q.   Some people -- some parents do fun things.  Did he do fun

17  things with you, like challenges?

18  A.   Yes.

19  Q.   Tell us about the challenges.

20  A.   I forgot what year that was, but it was, like, going

21  around.  Everybody was doing, like -- I forgot -- like, the

22  Hot Cheetos challenge and, like, different stuff like that.

23  And I remember one time we just stayed in that weekend and

24  tried all the challenges.  It was a while ago, so I don't

25  exactly remember what was trending at the time.  But I know we

1   ate the Hot Cheetos with the stuff.  But it was really cool.

2          And then --

3   **Q.**  Your father, if I understood correctly, liked cars?

4   **A.**  Yes.

5   **Q.**  Did he try and get you involved in cars?

6   **A.**  He didn't try, he did.  Like I said, we're the same

7   person.  ==That was my best friend.==  ==We would always work on his==

8   ==cars together, whether I understood it== or not.  And he was

9   really hands -- hands-on.  And he liked to show me how to

10  change the tire, change my oil, and that was really important.

11         And he had motorcycles as well, like, little dirt

12  bikes.  And we would ride them and we would -- he would buy

13  them broken and then he would show us how to fix them and then

14  we would ride them together.

15         I used all the tissue.

16  **Q.**  So -- so your father tried to get you involved in cars.

17  Did that take?

18  **A.**  Uh, no, because it's not the same anymore.

19  **Q.**  Okay.  Well, your father liked motorcycles though, right?

20  **A.**  Yes.

21  **Q.**  And did he teach you how to ride a motorcycle?

22  **A.**  He did.  He did teach me how to ride it.  And it was

23  really -- I really want to do it more because his smile was so

24  contagious and he -- and I wanted to see him smile.  I wanted

25  to make him happy.  I didn't do it because I didn't want to,

DX Brewis A

288

1    **A.**  Yeah, his sunglasses.

2    **Q.**  Who's the little girl that he's holding in his left arm?

3    **A.**  A.L..

4    **Q.**  That's A.L.?

5    **A.**  That's A.L., my youngest sister, yes.

6    **Q.**  And you're all smiling in this picture despite the fact

7    different moms, right?

8    **A.**  And we went out to eat that day, too.

9    **Q.**  Your father has a smile in all these pictures.  Was he

10   smiling all the time?

11   **A.**  Yeah, laughing, smiling.

12   **Q.**  Just a couple more pictures.

13            MR. ALEXANDER:  Exhibit 10-18.  Your Honor, I'd ask

14   that we admit Exhibit 10-18 by agreement.

15            THE COURT:  No objection?

16            MS. MARSHALL:  No, Your Honor.

17            THE COURT:  Okay.  It's admitted.

18            MR. ALEXANDER:  Thank you.

19       (Plaintiffs' Exhibit 10-18 was received.)

20   BY MR. ALEXANDER:

21   **Q.**  Now, in this photograph, do you know where you are?

22   **A.**  I know we're in Lancaster at a park.  This is really old.

23   We're in Lancaster at a park.

24   **Q.**  So the -- the kid with the shorts leaning -- leaning in on

25   the left, who's that person?

DX Banshee A

305

1   turned to him for everything.  I talked to him for everything.

2   We did everything together.  I don't have that person anymore.

3   He was my protector.

4   **Q.**  Your -- your father, when he was alive, did he help you

5   substantively financially?

6   **A.**  Yes.

7   **Q.**  What types of things did he do in that regard?

8   **A.**  He did everything around the board.  If I ever asked him

9   for anything he would give it to me.  At the time that we were

10  going to his house every other weekend he would -- with my

11  maintenance, he would get my nails done.  He would make sure

12  my hair was done for school.  He paid for my phone bill at the

13  time.  And my teeth were more crooked, and he actually helped

14  me get braces, which ended up being on longer than they were

15  supposed to be because he's no longer there to help me and I

16  turned of age and they only see you if you paid.

17          He would give us -- he would give me lunch money to

18  take -- to take to school.  And because Mojave was a smaller

19  town, when he lived there, he would bring me, like, McDonalds

20  or Jack in the Box during lunchtime and made me cooler.

21          ==Anything I needed, I can ask my dad.==  ==He paid for my==

22  ==very first car all by himself.==  It was a surprise.  He told me

23  to meet him around the corner because it was walking distance.

24  And he's looking at cars, and I'm not thinking anything of it.

25  And he's like, "It's yours.  It's going to be yours."  And I

1                          ORIONA LEWIS,

2    called as a witness on behalf of the Plaintiffs, having been

3    first duly sworn, testified as follows:

4              THE WITNESS:  I do.

5              THE CLERK:  Thank you.  Please be seated.  And if you

6    can state your full name, spelling your last for the record.

7              THE WITNESS:  Oriona Lewis.  Can you hear me okay?

8              THE COURT:  Yeah.  If you just approach a little

9    closer to the mic.  Thank you.

10             THE WITNESS:  Oriona Lewis.

11             MS. MARSHALL:  I still am having trouble hearing.

12             THE WITNESS:  Oriona Lewis.

13             THE COURT:  There you go.

14             THE WITNESS:  O-r-i-o-n-a, L-e-w-i-s.

15                         DIRECT EXAMINATION

16   BY MR. ALEXANDER:

17   Q.  Good afternoon.

18   A.  Good afternoon.

19   Q.  What is your date of birth?

20   A.  9-6-2000.  September 6, 2000.

21   Q.  And what is your relationship to Mickel Lewis?

22   A.  My dad.

23   Q.  Let's get a little background about you.  Where did you

24   grow up?

25   A.  Las Vegas, Lancaster, back and forth.

1    Q.   And we've heard the history of where you live from your
2    sister, so we're going to follow the same -- but before we do
3    that, where did you attend high school?
4    A.   Mojave Junior/Senior High School.
5    Q.   And did you graduate from there?
6    A.   I did.
7    Q.   When did you graduated from high school?
8    A.   2018.
9    Q.   And have you gotten any education after -- after that?
10   A.   Some college, yes.
11   Q.   Some college.  Where?  Where did you attend some college?
12   A.   Antelope Valley College in Lancaster.
13   Q.   Excellent.  And in terms of Antelope Valley, did your
14   father help you in any way there?
15   A.   He did.
16   Q.   How did he help you there?
17   A.   He helped with my books.  He drove me every morning.  He
18   helped me with my tuition.
19   Q.   And you've lived at different locations.  When you lived
20   in Las Vegas, your father was living in, from previous
21   testimony, Lancaster and Mojave, right?
22   A.   Yes.
23   Q.   Did your father visit you in Las Vegas while you were --
24   while he was living there?
25   A.   Yes.

1  **Q.** Often?

2  **A.** In summers, yes.

3  **Q.** And we heard the story from your sister about him taking

4  her to Arizona.  Did you go on that trip as well?

5  **A.** I did, yes.

6  **Q.** Okay.  And how many times did he take you to Arizona?

7  **A.** Once.

8  **Q.** And was -- for the entire summer?

9  **A.** Yes.

10 **Q.** Tell me, what are the types of things -- I'm sorry.

11 Before we do that, are you currently employed?

12 **A.** I am.

13 **Q.** Where are you currently employed?

14 **A.** Foundever in Las Vegas.  I'm a customer service rep

15 mentor.

16 **Q.** Okay.  And were you -- how long have you been employed

17 with them?

18 **A.** About eight months.

19 **Q.** Were you employed before that?

20 **A.** Yes.

21 **Q.** With who?

22 **A.** TTEC, customer service rep.

23 **Q.** And how long, approximately, were you employed with them?

24 **A.** A few months.  I'm not too sure.

25 **Q.** And then you, too, were employed by the Las Vegas airport,

DX of Lewis A

311

1    right?

2    **A.**    Yes.

3    **Q.**    And what jobs did you hold there?

4    **A.**    I was the wheelchair assistant, like my sister, and I also

5    was a security screener at the airport.

6    **Q.**    And approximately how long did you have a job at the

7    airport?

8    **A.**    About a year.

9    **Q.**    And then you also worked at, is it Walmart?

10   **A.**    Yes.

11   **Q.**    Approximately how long did you do that?

12   **A.**    That was about a year and a half.

13   **Q.**    So since high school you have been gainfully employed in a

14   number of jobs, right?

15   **A.**    Yes.

16   **Q.**    So with regard to your father, we've heard about the

17   Arizona trip and we've heard about the experiences that --

18   that your sister had.  Tell me about the experiences that you

19   had with your father that were special for you.

20   **A.**    We had -- we had a lot of different -- my dad, he was very

21   adventurous, so, like, we always -- he always had something

22   planned.  It was always something different every weekend,

23   every time we went with him.  Like we went to -- we went to

24   the Adventuredome in Las Vegas.  We always fed the ducks when

25   we went to the park.  It was always something different with

312

1    him.

2    **Q.**  And holidays, did you spend holidays with your father?

3    **A.**  Yes.

4    **Q.**  What type of holidays?  What did you do for the holidays

5    with him?

6    **A.**  So, like, Christmas, Thanksgiving.  Thanksgiving one year,

7    actually, he came to my house and I cooked for him because he

8    felt like -- he said that I was a really good cook so he

9    wanted to eat at my house.

10        Yeah, Christmas, we always had Christmas together.

11   Halloween, we used to go in Lancaster down the boulevard and

12   get candy and stuff like that.

13   **Q.**  Even though you didn't live in the same household, was

14   there a routine that he had in terms of how often he would

15   visit with you?

16   **A.**  Yes, every weekend we would go to his house in Lancaster.

17   **Q.**  While you were in high school, did you play sports?

18   **A.**  I did.  I played softball, basketball, I played in band --

19   **Q.**  Soccer?

20   **A.**  -- and soccer.

21   **Q.**  And with regard to those extracurricular activities, did

22   your father attend those?

23   **A.**  Yes.

24   **Q.**  Occasionally or --

25   **A.**  Often.  He came to a lot of the football games.  Yeah, he

DX - Lewis A

313

1    was at my soccer game, a few of them, basketball games, yes.

2    Q.  And did your father have some type of interest in art?

3    A.  He did.  He really liked tattoos.  And I was a really good

4    artist, so he wanted me to design some of his tattoos so he

5    can take to the tattoo artist.

6           Also, he was very into music.  And I tried to get him

7    to listen to the music that I listen to, but he was not -- he

8    didn't like it.  He was an oldies guy, and I wasn't an oldies

9    girl.  So, yeah, I would try to get him to listen to what I

10   listen to, and he was, "No.  No, thank you."

11   Q.  And did you share hobbies together?

12   A.  He tried to get me into the cars, but I didn't -- I

13   wasn't -- it wasn't really, like, clicking, because it was

14   frustrating me.  But he -- I definitely did try.  And he

15   seemed like he enjoyed it, so I wanted to keep going with him.

16   Q.  And when you did activities together, were they mostly

17   indoor activities, outdoor activities?

18   A.  Both.  We went camping.  Indoor, we would kind of just

19   hang out, do different things, like work on the cars and stuff

20   with him.  Outdoor, yeah, we went to go, like, feed the ducks

21   and stuff like that.  We'd always, like, hang outside in front

22   of the house and just barbecue and stuff like that.

23   Q.  And in terms of assistance, in terms of helping you out,

24   did your father help out in that way as well?

25   A.  Absolutely.  Once I -- once I graduated high school, I

1   moved out, and he helped with my rent.  He helped pay my phone
2   bill.  He got me my first car.  It wasn't as nice as my
3   sister's.  It was a -- it was kind of a bucket, but he wanted
4   us to work on it together.
5           I was really interested.  I kind of was on the
6   sidelines watching, but I was there.  We were all hanging out.
7   That was actually the same day -- it was a funny story,
8   actually.
9           So I have a lot of wigs.  And it was my sister's, we
10  were all together, all of us.  And we all were trying on my
11  wigs.  They were little.
12          You guys remember, huh?  Yeah.
13          And my dad just like -- because he's bald.  So out of
14  nowhere he just grabbed one of my wigs and put it on.  I said,
15  "Oh, geez.  You look cute."  And, yeah, he was rocking it.  I
16  loved that.
17  Q.  Let me show you some photographs.  I'm going to
18  reference -- I'm going to withdraw that.
19          Can we -- we're going to start with Exhibit 10-38.
20          MR. ALEXANDER:  By agreement?
21          MS. MARSHALL:  By agreement.  No objection.
22          THE COURT:  It's admitted.
23      (Plaintiffs' Exhibit 10-38 was received.)
24  BY MR. ALEXANDER:
25  Q.  Why does this photograph make you laugh?

317

1   A.   Yeah.

2   Q.   And do you remember what occasion this is where your

3   father is smiling with all these women -- all these people

4   around him?

5   A.   Not specifically, but I know we were -- we went out

6   somewhere to eat.  We're always eating.  We're a big family.

7   We're eating, always.

8   Q.   And was it -- was this a one-time occasion or was it

9   normal for him to have all these people from different moms

10  together?

11  A.   It was normal.  I think it would have been weird to not

12  have everybody together, honestly.

13  Q.   And when you had these dinners together, what were people

14  doing?

15  A.   Goofing, laughing.  It was always a fun time with

16  everybody because it was just constant laughter.  Like, you

17  know those laughs where, like, you feel it in your stomach

18  and, like, it just hurts to laugh?  Like it's always like that

19  every single time.

20       MR. ALEXANDER:  I want to ask to have admitted

21  Exhibit Number 10-28.

22       THE COURT:  Any objection?

23       MS. MARSHALL:  No objection.

24       MS. GUSTAFSON:  No, Your Honor.

25       THE COURT:  It's admitted.

DX - Lewis A

318

1           MR. ALEXANDER:  Thank you.

2       (Plaintiffs' Exhibit 10-28 was received.)

3   BY MR. ALEXANDER:

4   Q.  And this is a shot of everyone -- or of people at the

5   beach, right?

6   A.  Yeah.  Yes.

7   Q.  And once again, it's got your father in the middle, right?

8   A.  Yes.

9   Q.  And he's got his -- there's a child closet to his shoulder

10  that's buried in there.  Who's that child?

11  A.  Can you push it back?  Zoom it back out?

12          That's Roberta's daughter.  Both of them.

13  Q.  There's a person who's in a headlock.  That's Roberta's

14  daughter?

15  A.  Yes.

16  Q.  The person who has her in the headlock, who's that?

17  A.  That's her other daughter.

18  Q.  And then who's in the middle right underneath your

19  father's chin?

20  A.  That's me.

21  Q.  That's you?

22  A.  That's me.

23  Q.  Nice.  And -- and who's the person with the white hat on?

24  A.  That's Roberta.

25  Q.  And then there's a girl with the hair sticking up with the

1    girl on her hip.  Who's that?

2    A.  Briona.

3    Q.  Briona is the -- is the one holding the girl on her hip?

4    A.  Yeah.

5    Q.  And then who's the girl on her hip?

6    A.  That's M.L.

7    Q.  M.L.  and who's the girl right in the middle with the

8    bright-color top?

9    A.  R.L..

10   Q.  Briona?

11   A.  R.L..

12   Q.  R.L..  and do you recall when this picture was taken at

13   the beach?

14   A.  Not exactly, because this was a common thing.  So this

15   could have been one of the numerous of times.

16   Q.  So it wasn't -- it was not exception -- your father loved

17   to go to the beach?

18   A.  Oh, yeah.

19   Q.  And he loved to bring the family with him?

20   A.  Yes.

21   Q.  Just a couple more pictures.

22            MR. ALEXANDER:  Exhibit 10-41.

23            THE COURT:  Any objection?

24            MS. MARSHALL:  No objection.

25            MS. GUSTAFSON:  No objection.

354

1    Friday morning's schedule.  And then it's sounds like we may

2    well be closing as early as Tuesday, depending on how long you

3    have.

4            MR. WEAKLEY:  That could happen.

5            THE COURT:  Okay.

6            MR. GALIPO:  I'm all for efficiency, Your Honor.

7            THE COURT:  All right.  Very good.  Okay.  I'll see

8    you tomorrow morning at 8:30 then.  All right.  We're off the

9    record.

10       (Proceedings were adjourned at 4:32 p.m.)

11

12

13

14

15

16       I, RACHAEL LUNDY, Official Reporter, do hereby certify the

17   foregoing transcript as true and correct.

18

19   Dated:  April 1, 2025              /s/ Rachael Lundy_____
                                        RACHAEL LUNDY, CSR-RMR
20                                      CSR No. 13815

21

22

23

24

25