# EXHIBIT 3

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. KIRK E. SHERRIFF


| | |
|---|---|
| MICKEL ERICK LEWIS, JR., et al., | ) 1:21-cv-00378-KES-CBD |
| Plaintiffs, | ) |
| vs. | ) JURY TRIAL, DAY 3 |
| COUNTY OF KERN, et al., | ) Volume 3 |
| Defendants. | ) Pgs. 355 - 625, inclusive |
| R.L., et al., | ) |
| Plaintiffs, | ) |
| vs. | ) |
| COUNTY OF KERN, et al., | ) |
| Defendants. | ) |

Fresno, California                    Thursday, March 13, 2025


REPORTER'S TRANSCRIPT OF PROCEEDINGS


REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

356

**<u>APPEARANCES OF COUNSEL</u>**:

For Plaintiffs Mickel        Toni Jaramilla,
Erick Lewis, Jr.,            A Professional Law Corp.
Oriona Lewis and            1900 Avenue of the Stars, Suite 900
Briona Lewis:               Los Angeles, CA 90067
                            BY:  TONI J. JARAMILLA, ESQ.

                            Alexander Morrison + FEHR LLP
                            1900 Avenue of the Stars, Suite 900
                            Los Angeles, CA 90067
                            BY:  J. BERNARD ALEXANDER, III,
                            ESQ.

For Plaintiffs R.L.,        LAW OFFICES OF DALE K. GALIPO
M.L. and H.L., minors,      Attorney at Law
by and through             21800 Burbank Boulevard,
guardian ad litem          Suite 310
Roberta Haro; A.W., a       Woodland Hills, CA 91367
minor, by and through       BY:  DALE K. GALIPO, ESQ.
guardian ad litem
Alisha White:

For Defendant Kern          Kern County Counsel
County:                     1115 Truxton Avenue,
                            4th Floor
                            Bakersfield, CA 93301
                            BY:  ANDREW C. HAMILTON, ESQ.
                               KIMBERLY L. MARSHALL, ESQ.

For Defendant Ayala:        Kern County Counsel
                            1115 Truxton Avenue,
                            4th Floor
                            Bakersfield, CA 93301
                            BY:  ANDREW C. HAMILTON, ESQ.
                               KIMBERLY L. MARSHALL, ESQ.

                            Weakley & Arendt, APC
                            5200 N. Palm Avenue
                            Suite 211
                            Fresno, CA 93704
                            BY:  JAMES D. WEAKLEY, ESQ.
                              BRANDE LYNN GUSTAFSON, ESQ.

1   want to revisit with you that what I've previously discussed

2   with you is and I have reminded you yesterday and will

3   continue to emphasize to you today:

4           It's important that you decide this case based solely

5   on the evidence and the law presented here and you must not

6   learn any additional information about the case from sources

7   outside the courtroom.  And to ensure fairness to all parties

8   in this trial, I will now ask you whether you've learned about

9   or shared any information about this case outside of the

10  courtroom even if it was accidental.  And if you think you

11  have done so, please let me know now by raising your hands.

12  And I appreciate that no juror has raised your hands.  Thank

13  you for carefully following my admonitions.

14          All right.  We're now ready to resume with the

15  plaintiffs' case?

16          MS. JARAMILLA:  Yes, Your Honor.

17          THE COURT:  Next witness.

18          MS. JARAMILLA:  I'm going to call Mr. Mickel Lewis,

19  Jr., to the stand.

20          THE COURT:  Mr. Lewis, when you've reached the stand,

21  raise your right hand and be sworn.

22                          MICKEL LEWIS JR,

23  called as a witness on behalf of the Plaintiffs, having been

24  first duly sworn, testified as follows:

25          THE WITNESS:  I do.

1    one on left is my sister, Oriona Lewis.  And that handsome

2    young man is myself.

3    **Q.**  He is very handsome.

4           Now, let's talk a little bit about school and about

5    your dad and about school when he came and saw you.  Can you

6    tell us, did you participate in any extracurricular

7    activities?

8    **A.**  I did.  So in high school, I played a lot of sports.  I

9    played volleyball.  I did track and field, cross country,

10   basketball varsity, and participated in academic decathlon,

11   you name it.  He wanted me to do a little bit of everything to

12   see what I was good at.

13   **Q.**  Did your dad come see you play and do all your activities?

14   **A.**  He did.

15   **Q.**  How often?

16   **A.**  All the time.  He was always there.  And when he wasn't

17   there, he was on the phone, cheering me on or trying to video

18   watch me while he was at work.

19   **Q.**  When you weren't with your dad, did you communicate with

20   him often by phone or texts?

21   **A.**  24/7, yes.  He would always text me, send me little

22   motivational quotes of the day, let me know he loved me, just

23   to make sure I was doing alright, asked me if I needed money,

24   lunch money, if anybody was bothering me, make sure I was

25   taking care of my sisters.

384

1    serve my country.  But overall, I mean, it took sometime but

2    he got used to the idea and was really proud.  And he

3    definitely showed me by buying me all types of Army gear, Army

4    mugs, Army key chains, had a bumper sticker "Proud parent of

5    an Army shoulder" and just went all out.  So he was definitely

6    excited for it.

7    **Q.**  Good.

8         Now, we heard yesterday your testimony -- the

9    testimony from your sisters about holidays and things like

10   that.  Do you have something that stands out in your mind

11   about your holidays with your dad?

12   **A.**  I do.  Actually, I have a few of them.

13   **Q.**  Tell us.

14   **A.**  But the main one I can remember is we were celebrating

15   Christmas, and he made it seem like he didn't get us any

16   presents, so everybody was all sad, but they were all in the

17   garage.  I knew but I had to act the part because, you know,

18   he -- he had told me prior that he was going play this prank

19   on all of us.  But all the girls woke up -- this is when we

20   were living in -- it was me and my dad and Roberta and my

21   other sisters, R.L., M.L., and H.L.

22        And we -- we woke up and brought in all these

23   presents and everyone was happy.  And you know, he told

24   everybody he loved us and that, you know, he was really proud

25   of all of us.  And you know, I got -- I cried a little bit,

1  only because, you know, I love my dad and I was just really

2  happy for him and proud of him, because I know he had worked

3  so hard that year to make sure that he bought us anything we

4  wanted for Christmas that year.

5  **Q.**  Good.  Thank you for that.

6      Now, did you have any hobbies or do anything with

7  your dad that --

8  **A.**  Uh, I did.

9  **Q.**  -- was special to you?

10 **A.**  My dad liked old school music, as you probably heard from

11 my sisters.  He liked to rap as well.  My dad had a really --

12 he had a tattoo of a microphone, I believe it was his left

13 arm.  He would always try to get me to rap with him.  I wasn't

14 that good, but I tried.  We did that a lot, like every day,

15 every day.

16      Besides that, I mean, if it wasn't working on cars,

17 you know, just riding around, talking, going to get something

18 to eat.  We ate a lot.  As you heard from my sisters, we used

19 to eat a lot.

20      I mean, we would go to the park.  We went to swimming

21 a lot, amusement parks.  We fed the homeless a couple times,

22 went to church a lot.  We went to church a lot.  My dad was

23 definitely a church-going man, prayed a lot together.  We

24 really just talked about life, about what I wanted to be when

25 I grew up.  Uh, you know, the -- we -- we did a lot of things

1    together.  There's too many to name, but we had a lot of -- we

2    had a lot of good times together --

3    **Q.**  Did you --

4    **A.**  -- just me and him.

5    **Q.**  Did you ever go fishing?

6    **A.**  Yes, we did.  We went a few times, actually.  One of the

7    fondest memories I have is when me and him were on the boat

8    and we took a picture together.  He was trying to get me to

9    jump into this lake.  I was not about to do that, I'm sorry.

10   The water was green, I didn't know what was in it, but he was

11   like, Don't be a chicken, just do it.

12           I'm like, You do it.

13           And he was like, No, I'm asking you.

14           And I'm like, Why don't you do it then?

15           He's like, Alright, alright, never mind -- because he

16   wasn't going to do it anyway.

17           But, yeah, we didn't catch anything that day.  That

18   seems to be a thing, going fishing and not catching fish.

19   That's weird, right?  But I think it was more for the

20   conversation just spending time father-son, really getting to

21   understand where I was at at this time in life, because I

22   believe it was a little after high school, if I'm not

23   mistaken, the time I was referring to.  But it was more like,

24   hey, how is life going for you?  What are you doing?

25           One of the big things for him was he kept asking when

389

1          Why I got to get out of the car, I don't now how to

2    do this.

3          Get out the car.  Go hold the boat.

4          Go hold the boat?  What you --

5          Oh, but you know, he got out.  We were able to stop

6    everything, and he was showing me, you know, This is how you

7    drive the boat.  And he made sure, Make sure you put on that

8    life jacket, because I'm not about to get a ticket for you,

9    sorry.  But I put on the life jacket, whatever.

10          But no, this is one of my favorite memories because

11    we really bonded.  We talked about a lot of things that day.

12    Uh, he had asked me if I was into alcohol.

13          And I was like, No, that's not my thing.

14          And he's like, Do you do anything?

15          I'm like, No.

16          And he's like, Oh, my little nerd, my little nerd.

17          I'm like, Hey, that's me, your nerd, I guess.

18    Q.  I see you've got matching sweatshirts there.  What is

19    that?

20    A.  Yes.  So that logo was -- my dad was a grip.  He worked in

21    the entertainment industry with my uncle, James.  So those are

22    some sweaters that he -- that he got made.  And I felt it was

23    necessary for us to wear them together just to emphasize that

24    father-son bond that day.

25    Q.  Now, did he ever take you to the park?

1  **A.**  Oh, yes, he did.

2  **Q.**  Tell us about that.

3  **A.**  Yeah.  I have -- I have a really fond memory.  I had -- I

4  showed up to my dad's work.  I think at the time he was

5  working on The Voice, you know.  So he got me through the

6  gate, and he met me in the parking garage.  He didn't -- I

7  don't think he recognized me at first, because I had cut off

8  my hair.  So he walked right past me, and I'm like, Hello, I'm

9  right here.  He's like, Oh, what's up?  What's up baby boy?

10  What's going on?

11          You know, as soon as we walked in, he introduced me

12  to everybody, you know, This is my pride and joy.  This is my

13  son.  This is my junior, Mickel, Jr.

14          Everybody was very friendly, Hey, how you doing?  How

15  you doing?  I saw my uncle James.

16          Then he showed me crafts and services, showed me

17  where they work on the set, took me backstage.

18          And then we had breakfast at the -- what is it

19  called?  Sorry.  I'm blanking right now.  I apologize.  Uh, it

20  was the place where you go to eat -- the cafeteria.  Thank

21  you -- saying thank you to myself.

22  **Q.**  You're welcome.

23  **A.**  Uh, you know, we sat.  We just talked.  And he was like,

24  Could you ever see yourself being a grip one day?

25          And I'm like, Nah, you work too hard.  I'm trying to

1  have the easy life.

2        He's like, Coming from you, okay, okay.

3        No, but it was a really good time.  Uh, I got to see

4  a lot of the backstage, because -- you know, you see on TV how

5  things are, but you never really see how everything goes up.

6  And that's when I knew that day -- obviously, I knew my dad

7  was a hardworking man, but I knew he be breaking his back.  He

8  breaks his back every day with him and my uncle James to make

9  sure there's food on the table.  So I had a different level of

10 respect for him that day.  So I was really appreciative that

11 he allowed me to come that day.

12 **Q.**  Thank you for that.

13        Now, I want to turn your attention now to October

14 2nd, 2020.  This is the day of the incident.

15 **A.**  Okay.

16 **Q.**  How old were you at that time?

17 **A.**  I believe I was 23 years old.

18 **Q.**  Now, earlier that day, did you happen to see your father?

19 **A.**  I did.  I was --

20 **Q.**  Can you tell --

21 **A.**  I was -- excuse me.  I was on the way home.  At the time,

22 I was doing some extra work on the side, private hospice care.

23 I was driving on the freeway, the 14 -- excuse me.  Yeah, it

24 was the 14 freeway into Mojave.  And I saw my dad at the

25 Family Dollar in the truck that he had, and I was like, huh,

DX Dr. Carpenter

412

```
1                    DR. EUGENE CARPENTER,
2    called as a witness on behalf of the Plaintiffs, having been
3    first duly sworn, testified as follows:
4              THE CLERK:  Thank you.
5              If you would please be seated and state your name,
6    spelling your last name for the record.
7              THE WITNESS:  Eugene Carpenter, Jr.,
8    C-A-R-P-E-N-T-E-R.
9              MR. GALIPO:  May I inquire, Your Honor?
10             THE COURT:  You may.
11             MR. GALIPO:  Thank you.
12                       DIRECT EXAMINATION
13   BY MR. GALIPO:
14   Q.   Good morning, Dr. Carpenter.
15             I don't want to age you in any way, but when did you
16   go to medical school?
17   A.   First two years at the University of North Dakota School
18   of Medicine.  The last two years at Tulane School of Medicine.
19   Q.   And what years were that?
20   A.   From '68, '69, '70 to '72.  So I was graduated in '72.
21   Q.   Back then, did they have residency and fellowship and
22   things of that nature?
23   A.   Yes.
24   Q.   Can you tell the ladies and gentlemen of the jury what you
25   did your residence and fellowship in?
```

DX Dr. Carpenter/6

416

1    manner of death.  But the sheriff coroner determines the cause

2    and manner of death, it's just that 99.9 percent of the time

3    it's the same as determined by the medical doctor that has

4    been hired by contract to do the autopsy.

5    Q.   And in this case, the cause of death being multiple

6    gunshot wounds, the manner of death medical homicide, there

7    was an agreement between yourself and the sheriff coroner on

8    that?

9    A.   Yes.

10   Q.   All right.  Now I want to talk -- you performed the

11   autopsy on Mickel Lewis, Sr., correct?

12   A.   On the body thereof.

13   Q.   Right.

14           And you wrote a report at some point relative to your

15   findings?

16   A.   Yes.

17   Q.   You also had photographs taken during the autopsy

18   documenting the bullet wounds?

19   A.   Yes.

20   Q.   And at some point you put probes in, if I'm using the

21   right term, to demonstrate the general trajectory in the body

22   of some of those holes?

23   A.   Yes.   These are stainless steel straight rods that can be

24   used to allow one to show the direction of the projectile

25   going into the body.

423

1    in your report as gunshot wound number 1.

2         Could you tell the ladies and gentlemen of the jury

3    where that impacted Mr. Lewis's body?

4    A.   That hit at the upper lateral or side of the right arm.

5    Q.   And could you possibly point on your and -- well,

6    actually, I think I have a -- I have it an exhibit here.  It

7    is Exhibit 9, page 4, that we discussed.

8         MS. MARSHALL:  Yes, Your Honor, for the record, no

9    objection.

10        THE COURT:  All right.  9-4 is admitted.

11    (Plaintiffs' Exhibit 9, page 4 was received.)

12        MR. GALIPO:  And I want to caution the family members

13   that I'm going to show some photos in case they want to look

14   down or leave for this part.

15        I think we need to switch it back maybe.  And are the

16   jury's -- is it on?  No.

17        THE COURT:  We're going to get the jury screens on.

18        MR. GALIPO:  That might be better.  Maybe if you

19   switch it back, I'll just have our technician put it --

20        THE COURT:  As you choose.

21        MR. GALIPO:  Okay.  Is the screens on for the jury

22   now?

23        Thank you.

24   BY MR. GALIPO:

25   Q.   Okay.  So this is Exhibit 9, page 4.  Does this show,

DX Dr. Carpenter[6]

424

1  Dr. Carpenter, the entrance or the gunshot wound you were

2  describing, wound number 1, to the right upper arm?

3  A.  Yes.

4  Q.  And does it have the shape and appearance of an entrance

5  wound?

6  A.  Yes.

7  Q.  What about the shape and appearance tells you it's an

8  entrance wound?

9  A.  If there's no intermediate object or -- that disrupts the

10  flight of the projectile, it will be round or oval in shape.

11  Q.  Can you tell the jury, Doctor, after this bullet entered

12  the body, what it traveled through inside the body?

13  A.  It traveled through and fractured the upper arm bone,

14  continued into the chest, went through the lung, and then hit

15  the spine of the chest called the thoracic spine.

16  Q.  And it actually impacted the spine?

17  A.  Yes.

18  Q.  And what was the trajectory of that shot through the body?

19  If you could describe that, please, to the jury.

20  A.  Yes.  It goes to the right downward and slightly to the

21  back.

22  Q.  So it had a right-to-left trajectory?

23  A.  Yes.

24  Q.  Would the -- and this might be somewhat simplistic, but

25  would the right side of the arm where we see that entrance

DX Dr. Carpenter 6

425

1    wound, have to be exposed to the muzzle of the gun in order to

2    get the entry?

3    A.   Yes.

4    Q.   Was that particular wound fatal?

5    A.   It's considered a lethal wound as it enters into to the

6    chest and pierces through the lung.

7    Q.   Why would that be fatal or potentially fatal?

8    A.   Well, because as it goes through the lung, it hits

9    vessels, and it's not predictable as to how much bleeding

10   occurs.  It is considered the type of wound that must -- that

11   hospitalization must be attempted, if it is the only wound.

12   If left alone, the chances are high that it may cause death

13   within hours.

14   Q.   Would that be through mostly a mechanism of internal

15   bleeding?

16   A.   Yes.

17   Q.   Let's talk about gunshot wounds to 2 and 3 together, if we

18   can.  But we'll start with Exhibit -- gunshot wound 2.

19        Where did that enter the body?

20   A.   Arbitrary number gunshot wound 2 hits at the right chest,

21   near the central chest, in the front of the chest.  It travels

22   toward the back, downward, and a bit to the right.

23   Q.   And what did it pass through?

24   A.   It goes through -- if I may --

25   Q.   Would you like to refer to your report to refresh your

DX Dr. Carpenter|6

427

1   **A.**  Yes.

2   **Q.**  And then that trajectory in the body was --

3           MR. GALIPO:  Let me show another exhibit if I may.

4   And this is Exhibit 9, page 3 that we discussed.

5           MS. MARSHALL:  No objection.

6           THE COURT:  It's admitted.

7       (Plaintiffs' Exhibit 9, page 3 was received.)

8           MR. GALIPO:  Can we display that, to the jury,

9   please, Exhibit 9, page 3?

10  BY MR. GALIPO:

11  **Q.**  Does this other image show the gunshot wound to the chest,

12  the number 2?

13  **A.**  Well, yes, it does.  It is above the topmost portion of

14  the liver in the tattoo area, just above the letter M.  This

15  is gunshot wound entrance wound number 2.

16  **Q.**  All right.  And I think you can actually -- I know this is

17  pretty fancy, but apparently if you touch the screen and make

18  a circle with your finger, it may actually leave a mark.

19          Do you want to try do that?

20  **A.**  (Witness complies.)

21  **Q.**  There we go.

22          Now I just have to figure out how to erase it later.

23  But I'll get there --

24          THE COURT:  The courtroom deputy can have it erased.

25  ///

DX Dr. Carpenter

429

1  consistent or inconsistent with certain scenarios, perhaps?

2  **A.**  Yes.  Given the position of either the handgun or the

3  body, I can tell what the other must be, assuming the almost

4  always true fact that the projectile travels in a straight

5  line.

6  **Q.**  And at a pretty fast speed?

7  **A.**  Yes.

8  **Q.**  So just assuming hypothetically -- in this case I think

9  you noted the height of Mr. Lewis to be 6 foot 6 in the

10  autopsy, 78 inches.  Does that sound right?

11  **A.**  Yes.

12  **Q.**  And assuming that someone who's 5 foot 10 is shooting from

13  somewhere around chest level, maybe even lower chest level,

14  and is on the same ground plane as -- the same road surface as

15  Mr. Lewis -- are you with me so far?

16  **A.**  Yes.

17  **Q.**  To get the shot to the chest, first of all, obviously the

18  front of the body would have to be exposed to the gun at that

19  point.  Is that a fair statement?

20  **A.**  Yes.

21  **Q.**  And then, to get a downward trajectory, is one possible

22  way to do it if the upper body is canted or tilted forward at

23  the time of the shot striking the body?

24  **A.**  Yes.

25  **Q.**  Let's talk about gunshot wound number 3.  Where is that?

DX Dr. Carpenter | 6

430

1   And if you see it on this diagram, and you could circle it for

2   the jury, that would be helpful.

3   **A.**   Okay.   It is at the mid front right chest.

4   **Q.**   Okay.  Would you like to make a circle?  Thank you.

5   **A.**   Witness complies.

6   **Q.**   Okay.  Close to the right nipple?

7   **A.**   Yes.

8   **Q.**   Tell the jury about that gunshot, what it passed through

9   once it entered the body and what was its trajectory in the

10  body.

11  **A.**   It is going -- again, I'm referring to my page 4 of 6, my

12  copy thereof.

13         It is going through the lower lobe of the left lung,

14  it's going through diaphragm, the liver, and part of the right

15  kidney.  Then it goes into the solis muscle, which is the back

16  right muscle near the spine just above the pelvis.  And then

17  it's recovered underneath the skin.

18         So the direction is, again, downward toward the back,

19  but this time continues a bit to the left.  But I'm going to

20  double check on that.

21  **Q.**   Okay.

22  **A.**   Yes.  It's heading downward toward the back, and towards

23  the spine.  And the solis muscle is along the lower spine in

24  the region of the pelvis.

25         This is a lethal wound due to the damage of the

1   internal organs.

2   **Q.**  Okay.  So is it correct, Dr. Carpenter, that both of the

3   two shots to the chest had a downward trajectory in the body?

4   **A.**  Yes.

5   **Q.**  And would both of those shots, in your opinion, be

6   consistent with the decedent, if he was standing on the same

7   ground plane as the shooter, understanding the decedent may

8   have been 8 inches taller, in my hypothetical, leaning or

9   canted forward at the time he's sustained the wounds?

10  **A.**  Yes.

11  Q.  Where was shots 4 and 5?

12         And let's start with shot 4, if we could, please.

13         And you could -- we could take this exhibit down.

14         THE COURT:  Mr. Galipo, when would be --

15         MR. GALIPO:  This would be a good time.

16         THE COURT:  -- an appropriate time to take a break.

17         MR. GALIPO:  This would be fine.

18         THE COURT:  All right.  So Members of the Jury, we're

19  going to take our mid morning recess at this time.

20         It's about 10:34.  We'll take about a 15-minute

21  break.  We'll bring you back in about 10:50.

22         Again, please remember the admonition on the break,

23  do not form or express any opinions about the case, don't let

24  yourself to be exposed to any outside report or comment, don't

25  access any information about the case or subjects related the

DX Dr. Carpenter

433

1          At this time we'll continue with the examination of

2    Dr. Carpenter.

3          Mr. Galipo.

4          MR. GALIPO:  Thank you, Your Honor.

5    BY MR. GALIPO:

6    Q.  Okay.  So gunshot wound number 1 was the right shoulder.

7    Gunshot wounds 2 and 3 were the upper chest.  We've talked

8    about those three, correct?

9    A.  Correct.

10   Q.  Tell us about gunshot wound number 4, please.

11   A.  Gunshot wound number 4 hits at the upper left back, and

12   travels slightly downward through the lung, and almost exits

13   the body but is trapped underneath the skin.  It's a lethal

14   wound.

15   Q.  What did it pass through -- what did it pass through in

16   the body?

17   A.  The lung.

18   Q.  And is there something sometimes used by medical examiners

19   such as yourself, an anterior or posterior midline, meaning an

20   imaginary line going down the middle of the body?

21   A.  Yes.  One can just say the midline.

22   Q.  Okay.  This shot number 4 to the back of the back, how far

23   was it from the midline or the center of the back?

24   A.  Okay.  That, if I may look at my technical page, is a

25   technical detail collected on the diagram.  And it is 2 inches

1    <mark>to the midline of the back, 12 inches from the top of the head</mark>
2    <mark>for it's location.</mark>
3          <mark>Then I also give the wound size and the marginal</mark>
4    <mark>abrasion, if anybody is interested in that.</mark>
5    **Q.**  Okay.  I think we're probably okay with that.  But
6    abrasion collars are normally associated with entry wounds?
7    **A.**  Yes.  Very rarely on occasion with an exit wound.
8    **Q.**  And since --
9          MR. WEAKLEY:  Your Honor, I'm sorry to interrupt.
10         Can I come over and see what he's looking at?
11         THE COURT:  Yes, you may approach.  Just briefly.
12         MS. MARSHALL:  Can I approach as well, Your Honor.
13         THE COURT:  Just to clarify, Mr. Galipo, if you want
14   to share with the --
15         MR. GALIPO:  I think I'm okay.  They want to look at
16   what the doctor is looking at?
17         THE COURT:  I believe so.
18         MR. GALIPO:  They could have asked.
19         THE WITNESS:  This is for the front of the body, and
20   this one, the next page is --
21         THE COURT:  Let's wait until we have a question.
22         MR. GALIPO:  Right, because I'm not sure if this is
23   on the record or off.
24         THE COURT:  Right.
25         Mr. Weakley -- Mr. Weakley, we need to --

DX Dr. Carpenter

436

1   A.   Okay.

2   Q.   So I'd like to show you another exhibit, Exhibit 9, page 1

3   that we discussed.

4           MS. MARSHALL:   No objection.

5           THE COURT:   It's admitted.

6       (Plaintiffs' Exhibit 9, page 1 was received.)

7           MR. GALIPO:   And we're going to try publish that one.

8   BY MR. GALIPO:

9   Q.   Okay.   Now, does this Exhibit show gunshot wound number 4

10  that you identified that's close to the middle of the back?

11  A.   Yes.

12  Q.   And although I think it's pretty obvious, can you go ahead

13  and circle it for the jury?

14  A.   (Witness complies.)

15          Done.

16  Q.   Thank you for that.

17          Now, obviously, in order to get a gunshot wound to

18  the back, would it be fair to say, Dr. Carpenter, that the --

19  and I'm turning around -- the back has to be exposed to the

20  shooter in order for the back to be hit?

21  A.   Yes.

22  Q.   That particular wound, given its path of travel you

23  indicated, was that lethal or potentially lethal?

24  A.   Yes.

25  Q.   And why?

DX Dr. Carpenter|6

437

1  **A.**  Because it enters the left chest, goes through the lung.

2  **Q.**  I take it, medically speaking, bullets going through the

3  lungs is not a good thing for the person?

4  **A.**  Correct.  Plus, when a projectile goes through the chest

5  wall, it is a good probability that it will hit an important

6  artery that runs underneath the ribs, and if that's the only

7  thing hit, that can cause death.

8  **Q.**  That, again, would be a problem with the substantial

9  internal bleeding?

10 **A.**  Yes.

11 **Q.**  Now I'm going to leave this photo up for a moment.  And

12 can you tell the jury about gunshot wound number 5, where that

13 is and whether we can see it on this photograph?

14 **A.**  Yes, number 5 is at the left side of the chest.  And if I

15 may, I'll circle it.

16 **Q.**  Yes, please.

17 **A.**  (Witness complies.)

18 **Q.**  Thank you.

19        And tell us -- tell the jury about that gunshot

20 wound, what it passed through the body and what its trajectory

21 was in the body.

22 **A.**  Yes.  Number 5 -- and I'm referring now again to my page 4

23 of 6 of the typed report -- it hits at the lateral left, mid

24 back and proceeds to the right, and toward the front, and a

25 bit upward through the tissues near the upper part of the left

DX Dr. Carpenter

438

1    kidney.  And then, it completely destroys the aorta.  And the

2    aorta is the main vessel in the body that carries blood from

3    the heart through the rest of the body.

4    Q.  All right.  You mentioned that a bullet going through the

5    lung could cause serious medical complications for a person.

6    How about the bullet going through the aorta, how does that

7    affect someone medically?

8    A.  Yes.  This is a lethal wound, and is the most immediately

9    lethal of the five projectile wounding events.  This the type

10    of death -- this is the type of wound that can cause death

11    within a few minutes.

12    Q.  And you're talking about the gunshot wound number 5 to the

13    left side of the back?

14    A.  Yes.

15    Q.  I think you already said this, but what was the trajectory

16    of that shot within the body, was it left to right or some

17    other trajectory?

18    A.  Left to right, towards the front and slightly upward.

19    Q.  And when you say "left to right," for example, Doctor,

20    would that -- would that wound be consistent with the -- the

21    left -- the left back side -- and I'm standing with my left

22    side to you -- the left back side being exposed to the muzzle

23    of the gun so that the wound could enter the left back and

24    come across the body left to right?

25    A.  Yes.  One can imagine the projectile traveling in a

443

1   Q.   And as we talked about earlier, we can see the shot to the
2   nipple, it has a -- looks like a substantial downward
3   trajectory.  Is that fair?
4   A.   Yes.
5   Q.   And again, as I indicated earlier, that would be
6   consistent with the body canted forward at the time of the
7   shot?
8   A.   Yes.
9        MR. GALIPO:  Okay.  We can take that down, please.
10  Just have a couple more.
11       Exhibit 9, page 11, previously discussed.
12       MS. MARSHALL:  We object, 403, for the record.
13       THE COURT:  Objection is overruled.
14       It's admitted.
15    (Plaintiffs' Exhibit 9, page 11 was received.)
16  BY MR. GALIPO:
17  Q.   This would be the shot, I think -- or gunshot wound number
18  4 that you identified to the back?
19  A.   Yes.
20  Q.   And this also had somewhat of a downward trajectory?
21  A.   Yes.
22       MR. GALIPO:  And then I wanted to be clear on this,
23  Your Honor, I think we were talking about pages 14 and 15 of
24  the exhibit, and I -- my notes indicate that 15 was the one we
25  were going to use, but I wanted to double check with

DX Dr. Carpenter|6

446

1    BY MR. GALIPO:

2    Q.  Showing you Exhibit 8, page 14 -- or I can use the Elmo

3    whichever is easier.

4          There it is.

5          What were you intending to show in this diagram,

6    Doctor?

7    A.  This was a diagram to illustrate the way the probes looked

8    to me as they went into the body, with the body on the autopsy

9    table in the anatomic position on its back.

10   Q.  Okay.  We see the right shoulder shot, is that had a

11   right-to-left trajectory?

12   A.  Yes.

13   Q.  And so am I understanding correctly what the dashed

14   arrow -- you're showing which way that bullet generally

15   traveled in the body?

16   A.  Yes.

17   Q.  And the shot -- looking on the right side, the shot to the

18   left back, you're generally showing which way that bullet

19   entered the body?

20   A.  Yes.

21   Q.  And you've already told us, I believe, that none of the

22   bullets had any soot or stippling associated with them, the

23   entrance wounds, is that correct?

24   A.  Had what associated with it?

25   Q.  They had no soot or stippling associated with it.

447

1    A.   Yes.   None of the entrance wounds -- none of the wounds

2    had any stippling or soot.

3    Q.   Okay.   Let me give you hype hypothetical, Doctor, and you

4    tell me whether this is consistent or inconsistent with the

5    five bullet wounds we have and their trajectory in the body.

6    I'm going to give you a hypothetical.   You let me know if you

7    can answer or need more information.   Is that okay?

8    A.   Yes.

9    Q.   I want you to assume for purposes of my hypothetical that

10   the decedent gets into a car and is either reach into the car

11   or temporarily sitting down in the car before getting out.

12   And it's a -- happens to be a Chevy Tahoe SUV.

13        Are you with me so far?

14   A.   Yes.

15   Q.   And it's parked on the street.   And the shooter is on the

16   street surface some distance behind the open driver's door on

17   the driver's side more towards the rear of the car.

18        Are you with me so far?

19   A.   Yes.

20   Q.   If the -- and I'm demonstrating now.   If the decedent got

21   out of the car, and turned -- the car -- and turned

22   counterclockwise initially, so that his left side was exposed

23   to the shooter as I am here, would that be at least consistent

24   with the trajectory entry wound that we see to the left back

25   side?

DX Dr. Carpenter [6

448

1    A.  It would be consistent with the trajectory, yes.

2    Q.  Okay.  And let's assume that the decedent continued to

3    rotate counterclockwise, now facing towards the shooter, but

4    having been struck with the first shot to the left side of his

5    back, he starts bending forward, so his upper body is tilted

6    or canted forward.

7         Are you with me so far?

8    A.  Yes.

9    Q.  And let's, for purposes of my hypothetical, assume the

10   next two shots 2 and 3 are to the chest.

11   A.  Okay.

12   Q.  Would that at least be consistent with the downward

13   trajectory we see of shots 2 and 3?

14   A.  Yes.

15   Q.  And let's say under any hypothetical, after receiving the

16   first shot to the left side of his back, and him rotating and

17   bending forward to get shots to 2 and 3, his body continues to

18   rotate so that now his right shoulder is to the shooter.

19         Are you with me?

20   A.  Yes.

21   Q.  Would that be consistent and an explanation for the entry

22   wound and trajectory of the shot to the right shoulder that's

23   going right to left across the body?

24   A.  Consistent.

25   Q.  And finally, after sustaining the shot to the left side of

DX Dr. Carpenter|6

449

1    the back, turning and bending forward, to get the two shots to

2    the chest, continuing to rotate to pick up the shot to the

3    right shoulder, assume he continues to rotate so now that his

4    back is to the shooter.

5         Are you with me?

6    A.   Yes.

7    Q.   Would that be at least an explanation or consistent with

8    the -- the shot we see to his back two inches from the

9    midline?

10   A.   No.

11   Q.   He'd have to start falling back?

12   A.   Yes.  He would have to be tilted back towards the gun.

13   Q.   Okay.

14   A.   Because it has a downward -- at least a slightly downward.

15   Q.   Good point.

16        So let's assume that his back is to the shooter and

17   he's starting to fall backwards.

18        Are you with me?

19   A.   Yeah.

20   Q.   Starting to fall backwards towards his back, would that be

21   consistent with the entry wound and trajectory of gunshot

22   wound number -- what you listed as number 4 to the back?

23   A.   Yes.

24   Q.   And let's assume his momentum continued forward and he

25   fell on his back.

450

1          Are you with me in the hypothetical?

2    A.  Yes.

3    Q.  So starting again with my hypothetical, if he gets out,

4    his left side is initially to the shooter, he sustains the

5    initial shot to the left side of his back, continues to rotate

6    but now bending forward for shots 2 and 3 to the chest,

7    continues to rotate, gets the shot to the right side of the

8    arm, that's right to left, continues to rotate and starting to

9    fall backwards and gets to the shot to the back, and he ends

10   up on his back, is that hypothetical at least consistent with

11   the five bullet wounds and trajectories we see in this case?

12   A.  Yes.

13          MR. GALIPO:  Thank you.  That's all I have.

14          THE COURT:  Cross-examination.

15          Well, were there any other questions from other

16   plaintiffs' counsel?

17          MR. ALEXANDER:  No.

18          THE COURT:  All right.  Cross-examination.

19                    CROSS-EXAMINATION

20   BY MS. MARSHALL:

21   Q.  Good morning, Dr. Carpenter.

22   A.  Good morning.

23   Q.  Could you define for us "medical homicide"?

24   A.  Uh, a medical homicide, to be clearly distinguished from a

25   legal homicide, is a medical term meaning death at the hands

CX Dr. Carpenter IN

453

1   can't say which shot was first and which shot was last; is

2   that correct?

3        Can you hear me?

4   A.   Yeah, that's -- yeah, I heard you.

5        No, I can't.  I can only point out that number 5 is

6   so lethal, if we start -- if -- and I don't think it applies,

7   but number 5 is going to be causing unconsciousness and

8   incapacity within just a few minutes.  But if all five shots

9   are coming rapidly, it doesn't help to distinguish anything.

10  Q.   Okay.

11  A.   But without number 5, the person is not going to

12  necessarily get stopped by anything.

13  Q.   Okay.

14  A.   The other wounds, it takes 30 minutes, an hour, even

15  before unconsciousness might supervene.  It's number 5 that is

16  the immediately lethal wound, where the others can take

17  sometime before there's enough bleeding to cause loss of

18  consciousness.

19  Q.   Okay.  Number 5 then, would you -- is it possible that

20  could be lethal almost immediately?

21  A.   Uh, it would be within minutes.  It's -- in hari-kari, the

22  sword goes right across the aorta and so people know that

23  those deaths come very quickly.

24        This projectile number 5 just took out the aorta

25  completely, so there's a sudden loss of blood pressure,

458

1   probably hard enough to deflect a projectile.

2       So the pathway for that projectile number 1, is

3   straight until it hits the spine and then it stopped.  It's

4   not deflected.

5   **Q.**  Right.  And --

6   **A.**  But -- oh, if I may.

7   **Q.**  You may.

8   **A.**  It does hit the hard bone of the arm.  Now that can

9   reflect a projectile.

10  **Q.**  Counsel asked you a hypothetical, she said, well, if

11  someone is charging and their upper body is not straight up

12  and down but, you know, bent forward somehow at the waist,

13  could that account for the downward trajectory or trajectories

14  to the chest shots, and I believe you said that's possible?

15  **A.**  Yes, consistent.

16  **Q.**  Consistent.

17       But in this type of case, if you have five shots, and

18  they are fired in a relatively short period of time, let's say

19  a second or two, then if you're really talking about a

20  hypothetical, you need to try to account for all the shots in

21  that hypothetical and not just one or two.  Is that generally

22  a fair statement?

23  **A.**  Right.  The hypothetical that is the simplest that

24  explains everything is -- can be considered very likely the

25  best hypothetical.

459

1    Q.   Was that the one that I gave or you have something else in
2    mind?
3    A.   I think both hypotheticals were consistent.
4    Q.   Well, my hypothetical counted for all five shots, correct?
5    A.   Yes.
6    Q.   Their hypothetical counted for two shots.
7             MS. MARSHALL:  Objection, misstates the evidence.
8             THE COURT:  Well --
9             MR. GALIPO:  I'll rephrase.
10            THE COURT:  Rephrase.
11   BY MR. GALIPO:
12   Q.   Did you understand that their hypothetical more or less
13   accounted for the two shots to the chest?  And I guess there
14   was some talk about the shot to the back.
15   A.   Right.  They -- the hypothetical was about the two shots
16   to the chest and the one to the back, and there's no mention
17   to the one at the arm.
18   Q.   Or the left side of the back.
19   A.   Or the left side.
20   Q.   But under their hypothetical, then, if I'm understanding
21   it correctly, you tell me your understanding, you got the two
22   shots to the chest and then the person suddenly turns around
23   and has their back to the officer falling backwards.  Is that
24   how you understood it?
25   A.   No.  I just answered the question whether their

Roy Dr. Carpenter G

460

1  hypothetical was consistent, and it was consistent.  I
2  didn't -- whether or not they were completely -- it was
3  supposed to be a complete explanation of the shots.  It's not
4  known to me.  It's not my business.
5        In other words, I just said it's consistent with
6  their hypothetical, with what they asked me.
7  Q.  Okay.  I get that.
8  A.  I can't make any conclusion about the completeness or the
9  incompleteness of their hypothetical for explaining the
10  at-scene situation.
11  Q.  You're just answering the questions that are asked of you,
12  right?
13  A.  Correct.
14  Q.  Okay.  I just want to get back to their hypothetical,
15  because maybe I misunderstood it.  You tell me if you had a
16  different understanding.
17        They asked you -- the first part about it was the two
18  shots to the chest if someone was bent forward.  Do you
19  remember that part?
20  A.  Yes.
21  Q.  And the shot to the back, you started thinking about some
22  scenario where, I'm assuming, you're thinking in your mind
23  that he was so far bent over, bending towards the ground that
24  his back became exposed?
25  A.  Correct.

461

1    **Q.**  That you thought that wasn't very likely?

2    **A.**  Correct.

3    **Q.**  Okay.  So the other way to get the shot to the back would

4    be to have the decedent turning after the shots to the chest

5    in their hypothetical and then getting shot in the back?

6    **A.**  Correct.

7    **Q.**  But you're saying that in order to account for the

8    trajectory of the shot to the back, the person then would have

9    to be falling backwards, starting to fall backwards?

10   **A.**  Yes, as in your hypothetical for number 4.  You both have

11   the same hypothetical for number 4.

12   **Q.**  Falling backwards?

13   **A.**  Yes.

14   **Q.**  Okay.  So let me just ask you a few more questions.

15          Are the bullets wounds, in your mind, consistent with

16   the decedent in this case facing front to front to the shooter

17   for all five shots?

18   **A.**  No.

19   **Q.**  And you would agree for at least two of the shots the back

20   had to be exposed?

21   **A.**  Yes -- uh, the side of the back, the left side of the back

22   for one of those two, and the full back for number 4.

23          For number 5, it's the side of the back, the left

24   side of the back.

25   **Q.**  Understood.

RDX Dr Carpenter G

462

1    And you're saying, that particular shot to the left
2  side of the back, is that the one that went through the aorta?
3  A.  Yes.
4  Q.  And if a shot went through the aorta, do you think it
5  could cause someone who, let's say hypothetically, was
6  standing up with their back to the shooter, could that shot
7  through the aorta that caused the damage that you explained
8  cause someone to pass out and fall backwards?
9  A.  Yes.  But it would take a few minutes.
10  Q.  Okay.  So you're saying that all the other shots would
11  take more than a few minutes for him to die, but the shot to
12  the aorta was the most rapidly fatal?
13  A.  Yes.  All the other shots are not going to be a cause of
14  rapid unconsciousness or fatality.  It's number 5 that's going
15  to cause loss of consciousness and fatality.
16  Q.  And you're saying that that could happen in a few minutes?
17  A.  Yes.
18          MR. GALIPO:  Thank you very much, Doctor.  That's all
19  I have.
20          THE WITNESS:  You're welcome.
21          THE COURT:  Any recross?
22          MS. MARSHALL:  Yes, I do.
23                  RECROSS-EXAMINATION
24  BY MS. MARSHALL:
25  Q.  Good afternoon.

FRDX Dr. Carpenter G

464

1          MS. MARSHALL:  Okay.  Thank you.

2          THE COURT:  Anything further, Mr. Weakley?

3          MR. WEAKLEY:  No, Your Honor.

4          THE COURT:  May this witness be excused?

5          MR. GALIPO:  Unless I'm allowed to ask one question,

6     yes.

7          THE COURT:  If it's following up on the recross, you

8     may.

9                  FURTHER REDIRECT EXAMINATION

10    BY MR. GALIPO:

11    Q.  So under that last hypothetical that you just got, the

12    shot that you say was most fatal would have been the last

13    shot?

14    A.  Right.

15         MR. GALIPO:  Thank you.

16         THE COURT:  All right.  May this witness be excused?

17         MS. MARSHALL:  Yes.

18         MR. GALIPO:  Yes.

19         THE COURT:  Not subject to recall?

20         MR. GALIPO:  Yes.

21         MS. MARSHALL:  Not subject to recall.

22         THE COURT:  All right.  Dr. Carpenter, you're

23    excused.

24         THE WITNESS:  Thank you, Your Honor.

25         THE COURT:  Not subject to recall.

1          All right.  Next witness.

2          MR. GALIPO:  Yes.  Your Honor, with the Court's

3     permission, there is a witness by the name of Jeremy

4     Terletter, who the parties agree is unavailable to testify at

5     trial.  His deposition was taken, and the parties have agreed

6     to certain portions of his deposition to be read to the jury.

7     And I, along with Mr. Alexander -- I'm going to read the

8     questions, and Mr. Alexander has been kind enough to volunteer

9     to read the answers.  And we'd like to do now if that's okay.

10         THE COURT:  Okay.  Do you we need to approach or is

11    there --

12         MR. WEAKLEY:  No, I would just like to talk to them.

13         THE COURT:  So Mr. Alexander will be at the stand.

14         Ladies and gentlemen, Members of the Jury, I have an

15    instruction for you.

16         A deposition is the sworn testimony of a witness

17    taken before trial.  The witness is placed under oath to tell

18    the truth, and lawyers for each party may ask questions.  The

19    questions and answers are recorded.

20         When a person is unavailable to testify at trial, the

21    deposition of that person may be used at the trial.

22         The deposition of Jeremy Terletter was taken on

23    August 15, 2022.  Insofar as possible, you should consider

24    deposition testimony presented to you in court in lieu of live

25    testimony in the same way as if the witness had been present

1    **Q.**  Okay.  So I have 4.01 seconds.  Does that sound accurate
2    to you?
3    **A.**  Yes.
4    **Q.**  Okay.  You said that Mr. Lewis was close enough he could
5    have grabbed the deputy's shoulders.  In your estimation, was
6    he close enough that he could have grabbed Deputy Ayala's
7    firearm?
8    **A.**  Yes.
9    **Q.**  When Mr. Lewis was in his driver's seat, so after he ran
10    around your truck and he gets back in in his drivers's seat,
11    did you see what he was doing?
12    **A.**  I thought he was preparing to flee, like drive away.
13    **Q.**  Okay.  Can you remember back to what it was he did that
14    gave you that impression?
15    **A.**  Just, he got in the driver's seat, and it looked like
16    somebody who was getting ready to drive away, you know.
17    **Q.**  Okay.  So just the fact of getting in the driver's seat it
18    seemed that he was going to drive away?
19    **A.**  Yes.
20    **Q.**  Okay.  Could you see what he was doing with his hands
21    while he was in the driver's seat for that short period of
22    time?
23    **A.**  No."
24           MR. GALIPO:  I'm next going to go to page 18, line
25    14, and read to page 20, line 22.

1   vehicle?

2   **A.**  Right.  The colored lights, yes.  The sun hadn't set when

3   I pulled up, and then the traffic stop was taking place.  It

4   was beginning to set, so it wasn't yet dark.

5   **Q.**  So would you say it was dusk?

6   **A.**  Yeah.  It was at the period of time when the sun was in

7   the process of setting.

8   **Q.**  So it was close to sundown?

9   **A.**  Right.  Right."

10       MR. GALIPO:  I'm next going to page 22, line 12, to

11   page 26, line 12:

12   (As read:)

13   "Q.  You indicated that you saw the sheriff at the point when

14   the shooting occurred.  At any point before the sheriff shot,

15   did you ever see him -- did you ever see him moving backwards?

16   **A.**  I believe I recalled that backpedaled a little bit.

17   **Q.**  You want a moment to get some water, Mr. Terletter?

18   **A.**  Thank you.

19   **Q.**  When you say he backpedaled little bit, can you estimate

20   how many steps he took or how far he moved?

21   **A.**  I couldn't say for certain.

22   **Q.**  The person who got -- the person who you saw being shot,

23   did you see him actually get inside the SUV?

24   **A.**  Yes.

25   **Q.**  Did he sit inside the SUV?

1  **A.**  Yes.

2  **Q.**  It do you know if both legs were inside the SUV?

3  **A.**  At this point I couldn't say for certain.

4  **Q.**  Do you know whether at least one leg was inside the SUV?

5  **A.**  I would estimate that at least one leg, from kind of the

6  body position that I can recall.

7  **Q.**  And when the driver -- when the person who got inside the

8  SUV, when he got out of the car, did he turn towards you or

9  did he are towards his vehicle to look at the officer?  So I'm

10  basically asking, did he turn clockwise or counterclockwise?

11  **A.**  So I would explain it, as he steps out of the car, he spun

12  to his left, so his face would have gone from the front of the

13  vehicle towards my truck, across the street, and back around

14  towards the deputy.

15  **Q.**  Great.  So if I understand correctly, the SUV was pointed

16  south; is that right?

17  **A.**  That is correct.

18  **Q.**  And so if twelve o'clock is due south, you saw the person

19  who was inside the SUV turn left so it would get to the nine

20  o'clock position where you were?

21  **A.**  Right, counterclockwise, yes.

22  **Q.**  And then would have turned and been at the six o'clock

23  position where approximately the sheriff officer was, correct?

24  **A.**  That is correct.  That is correct.

25  **Q.**  At any point did you see the person in the SUV with his

1    hands up?

2    **A.**  No.

3    **Q.**  While he was outside the vehicle?

4    **A.**  No.

5    **Q.**  At any point did you see any of the -- either of the hands

6    of the person from the SUV at their waist?

7    **A.**  Not that I can recall.

8    **Q.**  At the point when you saw the person inside the SUV start

9    to turn from his vehicle, where was the officer, the sheriff's

10   officer?

11   **A.**  To the driver's side rear quarter panel of the vehicle

12   like, between the rear left tire and the rear left taillight

13   area.

14   **Q.**  So if I understand correctly, because your window was

15   closed because it may have been windy and because your engine

16   was on, you don't believe that you were able to hear the

17   actual gunshot, right?

18   **A.**  Either I didn't hear it, or just -- you know, the brains

19   trauma response kind of blocks that out.  I don't know.

20   **Q.**  Okay.  And when you -- with regard to the occupant, the

21   person who was coming from the SUV, your testimony was that it

22   appeared he was trying to tackle the officer before he --

23   between the point when the occupant of the SUV started running

24   and the point you felt like he was able to reach out and touch

25   the officer's shoulders, did you see the person, the occupant

1   in the SUV, pump his arms at any point?

2   A.  Somewhat.  They were mostly outstretched in front of him.

3   Q.  So it's your recollection that they were more outstretched

4   than pumping as though he was trying it gain momentum, right?

5   A.  Yes.  Yes.

6   Q.  It was your testimony that you thought that the officer

7   had shot at least twice.  Your impression of him having

8   shot -- having shot twice, can you tell us what it was that

9   caused you to believe there was a recoil as opposed to the

10  officer stepping back or something else?

11  A.  Just, you know, I've served in the military, I've

12  witnessed people discharging firearms, it appeared that

13  somebody was discharging a firearm.

14  Q.  In terms of a discharge of a firearm, strike that.

15         With regards to the decedent, the person from the SUV

16  reaching out, you indicated that his hands were close to the

17  officer's shoulders.  Is that the height of where his hands

18  were at the point where you saw them?

19  A.  Yeah.  That's the visual in my mind, is that he was

20  reaching out as if he was going to grab him by the shoulders.

21  Q.  And so the hands at like at the point when you can recall

22  them were actually at the height of the officer's shoulders?

23  A.  Yes.

24  Q.  Now, at the point when you saw the decedent's hands at the

25  height of the shoulders, did you have a recollection that his

479

1   hands were past the location of the gun?

2   **A.**   Yes.

3   **Q.**   So with regard to the gun, there's no point where you saw

4   a flash coming from the gun; is that correct?

5   **A.**   That is correct.

6   **Q.**   And so the two bullets that you heard, you can't tell

7   whether they were the only two bullets, were they the middle

8   two bullets or the last two bullets, right?

9   **A.**   I didn't hear any bullets."

10          MR. GALIPO:  Going to page 27.

11          And for the record, I continued on that page, page

12  26, line 17 through 23, which I had not mentioned earlier

13  because there was an objection in the middle.

14          So now I'm at page 27, lines 10 through 17.

15  (As read:)

16  "Q.   Okay.   Just to be clear, as the individual was moving

17  towards the officer, there's no point where you saw either of

18  his hands behind his back, correct?

19  **A.**   Not that I saw.

20  **Q.**   And there's no point at which you saw either of their

21  hands at the waist level, either the front of the waist or the

22  back of the waist?

23  **A.**   Not that I saw."

24          MR. GALIPO:  Page 30, line 15, to page 31, line 5:

25  (As read:)

481

1    A.  Yes.  He appeared to me to be getting in the vehicle to

2    drive.  I don't know if he ever got both feet in, like you

3    asked me earlier, but that's -- the motions that he was making

4    led me to believe he was about to drive away."

5            MR. GALIPO:  I believe that's concludes the reading.

6            MR. WEAKLEY:  Yes.

7            MR. GALIPO:  Thank you, Your Honor.

8            THE COURT:  All right.

9            MR. GALIPO:  And thank you, Mr. Terletter.

10           THE COURT:  And there's nothing further with respect

11   to the deposition testimony?

12           MR. WEAKLEY:  That is correct, Your Honor.

13           THE COURT:  All right.  Then Members of the Jury, at

14   this time we're going to take our noon recess.

15           We're going to -- why don't we take about an hour --

16   I'm going to give a slightly longer lunch recess, an hour and

17   a half.  It's noon right now.  We'll bring you back in here by

18   about 1:30.  So please be back in the jury room prior to 1:30.

19           Again, I'm going to -- remember the admonitions,

20   don't form or express any opinions about the case.  Don't let

21   yourself be exposed to any outside report or comment, don't

22   access any information about the case or subjects related to

23   case, and don't do any inquiry or investigation or research on

24   your own.

25           We'll see you back here about 1:30.  Have a good

486

1                          SCOTT DeFoe,

2   called as a witness on behalf of the Plaintiffs, having been

3   first duly sworn, testified as follows:

4            THE WITNESS:  I do.

5            THE CLERK:  Thank you.  If you would please be

6   seated.  State your full name, spelling your last name for the

7   record.

8            THE WITNESS:  Yes, ma'am.

9            My name is Scott DeFoe.  That's S-C-O-T-T, D-E,

10  capital F, O-E.

11                    DIRECT EXAMINATION

12  BY MR. GALIPO:

13  Q.  You're coming over loud and clear.  Usually we tell people

14  to get closer to the microphone, but you might be good at an

15  inch or two further away.

16  A.  Yes, sir.

17  Q.  Good afternoon.

18  A.  Good afternoon.

19  Q.  Do you have a background in law enforcement?

20  A.  I do.

21  Q.  And have you been, over the last several years, we'll get

22  into the specifics, been serving as an expert witness

23  including in courts like this regarding police cases?

24  A.  I have.

25  Q.  And does that include cases involving different types of

496

1   the woman communicates over texts that Mr. Lewis is in a black

2   SUV, she believes he has a gun in the car, maybe even a rifle

3   in the car, that he came into her room and made some

4   statements that she felt were threatening, and she was

5   encouraging Deputy Ayala to try to come and take him off the

6   streets or into custody.  Are you still with me?

7   **A.**  Yes.

8   **Q.**  And Deputy Ayala is on duty, in uniform, in a marked

9   vehicle, and he decides that he wants to try to make contact

10  with Mr. Lewis by himself without backup, because he feels

11  that backup is too far away.  Are you still with me in the

12  hypothetical?

13  **A.**  Yes.

14  **Q.**  He sees the car in the drive thru, and he's waiting for it

15  to come out of the drive thru, so he could do a traffic stop.

16  Are you still with me?

17  **A.**  I am.

18  **Q.**  In terms of tactics, do you think from a police practice

19  perspective it's a good idea for Deputy Ayala to try to make

20  contact with this vehicle by himself without another officer?

21  **A.**  No.

22  **Q.**  Can you explain to the jury why not?

23  **A.**  It's a poor tactic.  If I reasonably believe -- for one, I

24  would need to vet that information that I received, from this

25  alleged informant, to make sure that it's credible, which is

1    one part of it.

2            And the second part of it is, if I reasonably believe

3    that a vehicle has a rifle, a pistol, or any type of weapon in

4    it, I'm clearly not going to pull that vehicle over by myself.

5    I'm going to request backup.

6            If timeliness of the issue, obviously, I'm going to

7    request as soon as I can.  I'm going to wait for that backup,

8    and I'm going to treat that vehicle as if there was a firearm

9    in the vehicle, which means there's specific stops, vehicle

10   stops that officers are taught in the academy as to how to

11   conduct a vehicle stop if this gentleman commitment a traffic

12   violation, or if there's a belief that this gentleman has guns

13   in his car.  They are two separate, different, distinct types

14   of stops that I'm going to conduct.  I'm clearly going to wait

15   for backup at least -- for at least one officer.  With an SUV,

16   I'm probably going to request two units because I don't know

17   maybe how many people are inside of that SUV.  So at least two

18   additional units in the event people run from the vehicle, or

19   I need additional assets.

20   Q.  What if the officer says that, I really didn't want to

21   wait, this was a good opportunity, I didn't know when I would

22   see the car again.  And, The other officers were too far away,

23   they were 10 or 15 minutes away in Mojave, so I didn't want to

24   wait, I just wanted to do it by myself?

25   A.  There's no urgency, for one.  It's secondary information.

DX1 Bell G

498

1    I didn't physically see a gun at any point, so I need to
2    validate or verify that information.
3              And officer safety is paramount and citizen safety.
4    I don't want to rush into this.  There is a plate on the
5    vehicle, and watch that plate, I can follow it until my backup
6    arrives.  I don't need to activate my lights and siren.  I can
7    slowly follow it.
8              And I have the individual's information.  I was
9    provided this information from this alleged informant, so now
10   I know who he is, where he's going to go.  So there's no rush
11   at this point where I'm going to put myself in a poor tactical
12   position where I could be injured or killed, or use tactics
13   that may not be reasonable based on the totality of the
14   circumstances simply because I'm by myself.
15   Q.  What would be the benefit of having another unit or two in
16   doing a stop like that?
17   A.  For one, we're going to formulate a plan.  I'm going to
18   convey to the officers either on the radio or on the frequency
19   we would utilize, and let them know what we have, what the
20   allegations are at least from this alleged informant.  We're
21   going to conduct a felony vehicle pull over, which means we're
22   going to stop that vehicle two- to three-car lengths behind.
23   We're not walking up to the vehicle under any circumstances.
24   Going to use that P.A. system in my vehicle, and I'm going to
25   order the occupants out of the vehicle.  I'm going to try to

DX PeFee G

500

1   still going to call that person out of the vehicle.  Most

2   police vehicles have a -- obviously, all have an engine block,

3   which is a form of cover.  They have ballistic panels, many of

4   them, in the door.  So I'm going to come out of my car, stand

5   by my door.  I'm going to get on my PA, tell the driver to

6   shut the vehicle off.  I'm going to have the driver drop the

7   keys outside of the windows so there's no keys in conjunction

8   of the ignition.  Have the drive step out.  Have the driver

9   put his hands up.  Have him pirouette, turn around 360

10  degrees, have him walk back towards me.  If I reasonably

11  believe he's armed, I'm going to put him in a felony prone

12  position, which is, put him down on the ground, facing away

13  from me, in the prone position.  That means body down, on the

14  ground.

15          I'm going to hold him there until my backup gets up.

16  I'm still not going to approach because I still haven't

17  cleared that car.  I don't know who -- if there might be three

18  people in there, might be five people in there.  At night

19  especially, I'm not going to -- to risk that.  I'm going to

20  let my backup know I've got one down on the ground, the

21  driver.  I'm going to wait for backup, however long that

22  takes.

23          And once backup comes up we're going to quickly

24  formulate a plan.  We're going to take the driver into

25  custody.  We're going to clear the car of any occupants.  And

501

1    then, if necessary, we're going to search the driver, so we

2    would do that.  And then, obviously, the car, if necessary.

3    Q.  Okay.  So just moving forward and what actually happened

4    here, Deputy Ayala, after doing the search of Mr. Lewis,

5    seeing that he has no weapons on him, is thinking he wants to

6    search the car.  And he's walking Mr. Lewis over to his patrol

7    car to put him in the back, and at some point he might tell

8    Mr. Lewis something to the effect, you know, Again, I know

9    you're on probation.  I'm going to search your car now.  I'm

10   going to put you in the back of my patrol car while you do it.

11   And it's a little unclear, but there may have been an attempt

12   to start the handcuffing process of Mr. Lewis.  Are you with

13   me so far?

14   A.  Yes.

15   Q.  And at some point, Mr. Lewis says, something like, F no,

16   and starts -- there's an allegation by Deputy Ayala that he

17   tried -- you know, he kind of lunged at him as if maybe he was

18   going to try to hit him but he never tried to hit him.  There

19   was no physical contact.

20          And then Mr. Lewis runs away and ends up laying down

21   on -- behind this tractor trailer parked across from the SUV

22   that's hauling hay.  Are you with me so far?

23   A.  Yes.

24   Q.  So up to this point in time what tactically now do you

25   think would have been best for Deputy Ayala to do?

502

1  **A.**  Well, for one, I'm not going to search the vehicle until I
2  have other deputies, because I don't know how many -- I can't
3  search the car with people in it, if they are people in it.
4  So I'm going to wait for additional deputies.

5          Secondly, if he runs, I'm not going to chase him by
6  myself.  I'm going to establish containment, which means I'm
7  going to get on radio and say the suspect ran eastbound or
8  westbound from that location, description:  African American,
9  shorts, white t-shirt.  That way I'm going to contain it.

10          I'm not going to chase after him.  A, the vehicle has
11  not been searched even though he has been searched and I've
12  patted him down and I realize he doesn't have any weapons on
13  him.  I'm still going to contain it.  I'm going to run after
14  him.  It could be a ruse.  We know there's layoff people in
15  other vehicles.  We know there's a lot of other tactical
16  concerns, but I'm not going to run after him.  I'm going to
17  get on the radio and request additional resources that I
18  should have already requested that hopefully are on their way
19  by that point.  I'm going to contain it, creating a perimeter
20  which is basically creating a box around that area --  pardon
21  me.

22          If he runs away, I may request canine.  There's a
23  number of things I can use as assets or resources, but I'm not
24  going to run after him.  At that point I'm going to hold my
25  position, tacitly retreat back to my car, stay on the outside

1  that Mr. Lewis is reaching under the seat of a car -- of the

2  car, the front seat, to get a gun.  You've read that in some

3  of the materials that claim or allegation?

**A.**  Yes.

**Q.**  For a moment, let's just assume that that's true, that's

something that Deputy Ayala actually saw and actually believed

at the time.  What would be the tactics of an officer if you

really thought someone was reaching for a gun underneath the

seat?

**A.**  I'm going to tacitly retreat, which means I'm going to go

back towards my police vehicle and use that as cover.  Once

again, I'm going to now elevate that call that, you know, if

people are responding to an expedited response.

At that point, obviously, I'm going to take my

firearm out of its holster.  I'll be in a low-ready position,

which is basically your pistol pointing at a 45-degree angle.

And I'm going to give him commands.  If I see him

come out with an object such as a firearm, it would have to be

a firearm, I'm going to give him commands as to drop the

firearm.  If he does not comply with the dropping the firearm,

then I'm going to use reasonable force once again to deal with

the life threatening threat at the time.

**Q.**  Why would it be a good idea if you think someone is

reaching for a weapon to get cover as opposed to standing out

in the open?

505

1  **A.**  You're creating time and distance, which is you're going

2  to deescalate.  I want to put a barrier, something that is

3  going to cover something that would deflect a bullet being an

4  engine block, ballistic door panel.  It's clearly not an

5  open-air environment.

6  So if I was -- for this room, I would want to get

7  behind the strongest part of that wood door over there.  I

8  wouldn't stand in an open space like that, because I have to

9  deal with a number of other factors such as reaction, lag time

10  and distance, in the event this person does produce a firearm

11  or has a firearm.  So I'm going to use cover, something that

12  in the event the suspect does have a firearm, and he takes an

13  offensive action, there's going to be a barrier between me and

14  that individual, if -- if at all possible.

15  **Q.**  Regarding this claim by Deputy Ayala that Mr. Lewis was

16  reaching underneath the seat of the car when he got back in

17  the car, as an expert witness in this case, did you look at

18  other evidence and other statements and depositions to see if

19  that was corroborated by anyone else?

20  **A.**  Yes.

21  **Q.**  And in looking at all the statements and depositions,

22  including witnesses in the car and out of the car, did anyone

23  else, based on your review, corroborate the claim that

24  Mr. Lewis was reaching under the seat of the car?

25  **A.**  No.

DX Page G

506

1    **Q.**  Add to it that Deputy Ayala claims that as Mr. Lewis was
2    in the car, he said something to the effect of -- excuse my
3    language, You're going to have to fucking kill me.  And then
4    he's getting out to face him and is facing him now, and
5    approaching him and says something like, You're going to die.
6         Let's assume for a moment that happened.  And assume
7    in my hypothetical Deputy Ayala sees no gun up to this point.
8    He was concerned that he might be reaching for one, but he
9    doesn't see one.  Are you with me?
10   **A.**  I am.
11   **Q.**  But he hears these statements according to him, You're
12   going to fucking have to kill me, and, You're going to die.
13   Is that enough based on the POST standards and training to
14   shoot someone?
15   **A.**  No.
16   **Q.**  Why not?
17   **A.**  It's not life-threatening.
18   **Q.**  Well, what if someone threatened my life and says, You're
19   going to die, is it okay if I shoot him?
20   **A.**  It has to be an imminent threat and an opportunity at that
21   point for that particular suspect, which means he would have
22   to be armed with a firearm.
23   **Q.**  When you looked as an expert witness in this case at the
24   other depositions, the other statements, the people in the
25   car, the people out of the car, did you look to see if anyone

507

1    else corroborated that they heard these threatening statements

2    that Deputy Ayala said Mr. Lewis made?

3    A.   I did review the statements, and no one corroborated those

4    statements.

5    Q.   Now, I want to just take a moment -- and the jury's heard

6    a little bit about this -- to go over some of the standards

7    that are trained to police officers, both in the academy and

8    their ongoing training, that relate to the use of deadly

9    force.   Do you have that in mind?

10    A.   Yes.

11    Q.   LAPD used an acronym called IDOL; is that right?

12    A.   Yes.

13    Q.   That's I-D-O-L, all caps?

14    A.   Yes.

15    Q.   What does it stand for?

16    A.   Immediate Defense of Life.

17    Q.   And how does it apply to the use of deadly force?

18    A.   That the subject's actions are life threatening and

19    there's immediate defense of your life or someone else's life

20    would be the point at which you can use lethal force to

21    protect yourself or that individual.

22    Q.   And do the current POST standards that were in effect in

23    the current training talk about that the person has to have

24    the present ability, opportunity, and apparent intent to

25    immediately cause death or serious bodily injury?

1    **A.**  Yes.

2    **Q.**  Is that the requirement?

3    **A.**  It is.

4    **Q.**  You need all three of those?

5    **A.**  Correct.

6    **Q.**  So as far as the threat level, can it be less than an

7    immediate threat of death or serious bodily injury?

8    A.  No.

9    Q.  Does POST have a table or a matrix that talks about other

10   types of conduct and what type of force can be used?

11   A.  Yes.

12   Q.  Can you explain that to the jury?

13   A.  In learning domain 20 there's a table that all officers in

14   the State of California learn.  First is compliance, I tell

15   this gentleman to stand over there, and he does it, he stands

16   over there, he complies.

17        The second one is passive non-compliance, which

18   means, typically you see like a demonstrator, they are sitting

19   in the middle of the row, they're not offering any form of

20   physical resistance, but they're not listening to you.  You

21   tell them to move, they are just not having it.

22        Second is activity resistance -- or third, pardon

23   me -- which is tense embracing or running away.  So maybe the

24   person -- maybe I charged at this individual right here,

25   that's active resistance, or I run the other direction, I'm

1    actively resisting.

2         Or this gentleman comes up to me and wants to take me

3    into custody, I embrace myself against this barrier here.  So

4    I'm not listing, but I'm not assaulting at this point, which

5    means I'm not punching, kicking.  I'm not making statements

6    that I'm going to, you know, "beat your behind" or "I'm going

7    to kill you," words such as that that a reasonable officer

8    could determine that the pre-assaultive behavior.

9         Once again, with each -- and then the last is life

10   threatening.  With each of these levels, there's appropriate

11   and reasonable force options associated with that particular

12   level of resistance.

13        Active resistance, someone running away from the

14   stolen car, you possibly could send a canine, you could use a

15   TASER, you could use OC spray.  I could use physical control

16   hold to take that person into custody.

17        Someone comes up and they say that he want to beat me

18   up and they have clenched fists, that is pre-assaultive

19   behavior.  I don't need to wait to get hit.  I can go ahead

20   and use either strikes myself, a TASER, a baton, OC spray.

21        Life threatening or -- which is the last, which is

22   the last is when there's an imminent threat or immediate

23   threat of great bodily injury or death and that level and only

24   that level can I use lethal force.  And that lethal force can

25   be with a pistol, a shotgun, or can even with a bean bag

1  to exist at the time; if not, then that force would be
2  unreasonable based on the totality of the circumstances.
3  **Q.**  Now, is there training and standards related to subjective
4  fear or fear of future harm or even controlling fear?
5  **A.**  Yes.
6  **Q.**  Can you explain to the jury those concepts?
7  **A.**  That's once again in learning domain 20, which myself and
8  Deputy Ayala would have reviewed going through the police
9  academy and throughout our career.
10         The fairest would be reasonably objective.  You're
11  going to be afraid.  You pull someone over at night, you
12  should be afraid.  Obviously that keeps you sharp tacitly to
13  have a reasonable amount of fear.
14         But the fear can't be so overwhelming that it's
15  subjective where it means the level of fear does not correlate
16  with the facts and circumstances at the time.  If that was the
17  case, you could use legal force every time you're afraid, and
18  you can't.  You can use lethal force only when there's an
19  imminent threat of great bodily injury or death by an officer
20  or someone else that officer may be protecting.
21  **Q.**  What if it's a fear of future harm?  What if it's like, I
22  think the person has a gun, I haven't seen it yet, but I need
23  to shoot him before they shoot me?
24  **A.**  No.
25  **Q.**  Why not?

512

1  **A.**  It would have to be something that the officer reasonably

2  believes at the time the force is used, what that subject's

3  level of resistance is at the time.

4        Which means at the time in which I used lethal force

5  just because that subject is now presenting an imminent threat

6  of great bodily injury or death for me or for someone else.

7  **Q.**  How about the concept of overreaction, do sometimes --

8  based on your review of other officer-involved shooting cases,

9  do officers overreact and use more force than is necessary?

10 **A.**  At times an overreaction is considered excessive force.

11 **Q.**  Does the concept of controlling your fear relate at all to

12 the potential of overreacting when using deadly force?

13 **A.**  Yes, because of tactics.  That's why tactics are so

14 important in training, is that had we can control our fear, we

15 can control our anxiety, we can control our fears associated

16 with the event that's happening by using proper tactics,

17 requesting additional people, using cover, using appropriate

18 pull-over strategies, we don't need to rush into anything.

19        There's not a crime in progress, conducting a vehicle

20 stop.  There's no urgency at that time.  I'm going to wait.

21 I'm going to use my time and get resources, may use a police

22 helicopter.  I may consider a bunch of other options that I'm

23 going to use before I get to control and dictate the terms of

24 that stop or of that event, not always, but if you have the

25 opportunity to do that, then an officer is trained or should

514

1          And Deputy Ayala claims that in addition to thinking

2     that Mr. Lewis was reaching under the seat of his car and

3     making these threats that I just indicated, Mr. Lewis gets on

4     to the car, faces him, and starts to approach him with his

5     right hand behind his back.  Are you with me?

6     A.  I am.

7     Q.  According to Deputy Ayala, he believes that Mr. Lewis has

8     a handgun possibly in his right hand behind his back.  Are you

9     still with me in my hypothetical?

10    A.  Yes.

11    Q.  And according to Deputy Ayala, Mr. Lewis is advancing

12    towards him and getting really close to him almost like in his

13    face I think is how he described it.  Are you with me in terms

14    of my hypothetical?

15    A.  Yes.

16    Q.  Would it then be okay to shoot him based on the standards?

17    A.  No.

18    Q.  Why not?

19    A.  Someone is running towards me, it's pre-assaultive

20    behavior.  I'm not seeing an object.  I'm not seeing a weapon.

21    His hands are behind his back.  That's why cover and distance

22    is important.  I'm going to tell you, Let me see your hands.

23          And even if you run towards me with your hands behind

24    your back, I've never seen a weapon.  I didn't see a weapon in

25    the car.  I didn't see you come out with your weapon.  I've

515

1    already patted you down.  There's no weapon.  If he did, in

2    fact, retrieve a weapon, and you're going to cause me harm, I

3    would be thinking, why would you not -- why would you have it

4    behind your back.  If you're looking to take an offensive

5    action with a handgun, you're going to produce it and use it.

6           The idea of someone running at me, which has happened

7    many times in my past, I'm going to use defensive tactics and

8    other things that I've learned to stop that person as they

9    advance on me, none which would include shooting based on the

10   hypothetical.

11   Q.  Under the facts of this case, do you have an opinion as to

12   whether or not to justify the use of deadly force Deputy Ayala

13   would have had to specifically see and identify a firearm?

14   A.  Yes.

15   Q.  What is your opinion in that regard?

16   A.  Based on my review of the facts, he never did see and

17   identify a firearm prior to firing his five rounds from his

18   GLOCK model 22 .40 caliber pistol.

19   Q.  And do you have an opinion as to whether he would have had

20   to at least identify a firearm in the hand before firing?

21   A.  Yes, not pointing at the officer.  We're not going to wait

22   until someone points a gun at us.  But an object that would

23   resemble a firearm, based on his review of watching what's in

24   the hands.  Once I saw an object that would -- once again

25   officers are trained what a firearm looks like, so it wouldn't

1  be a black object, it would be handgun, the person that's

2  coming in an offensive action, the use of lethal force would

3  be reasonable.

4  **Q.**  Now, in terms of this claim by Deputy Ayala that Mr. Lewis

5  was advancing towards him with his right hand behind his back,

6  did you look in the record, other witnesses' statements,

7  depositions to see if anyone else said, Mr. Lewis had his hand

8  behind his back?

9  **A.**  I did.

10  **Q.**  Did you find any corroboration from any other statement or

11  witness?

12  **A.**  No.

13  **Q.**  So is the only person based on your review of the records

14  that said that Mr. Lewis was reaching under the seat, made

15  threatening statements, and had his hand behind his back

16  Deputy Ayala?

17  **A.**  Yes.

18  **Q.**  The jury this morning heard some testimony read regarding

19  Mr. Terletter's deposition.  You reviewed that as one of the

20  documents?

21  **A.**  Yes.

22  **Q.**  And Mr. Terletter -- and I'm just paraphrasing in part,

23  saw Mr. Lewis approaching Deputy Ayala with both hands in

24  front of him, outstretched, I think he might have said he

25  thought maybe he was going to tackle him or grab his shoulders

1    or something like that.  Can you assume that for a moment?

2    A.  Yeah, actually, testified that he never saw his hands in

3    his front waistband or rear waistband at any point.

4    Q.  Right.  And I think the jury heard it this morning.  You

5    recall, he said he never saw Mr. Lewis's hand behind his back?

6    A.  I wasn't here this morning but based on the deposition

7    testimony.

8    Q.  Yeah, we read the deposition this morning, because

9    Mr. Terletter was not available to come to trial.

10   A.  Okay.  That's --

11   Q.  What I'm getting at, but do you recall Mr. Terletter -- I

12   agree he said what you said.  But do you recall him also

13   saying that he saw both of Mr. Lewis' hands in front of him,

14   outstretched towards Deputy Ayala just before, during the

15   shooting?

16   A.  Yes, sir.

17   Q.  So let's just assume for hypothetical purposes that's

18   true, that Mr. Lewis was rapidly approaching Deputy Ayala, he

19   had his hands both outstretched, close to Deputy Ayala, would

20   that justify shooting him?

21   A.  No.

22   Q.  Why not?

23   A.  Because there's no object in his hands and definitely not

24   a firearm or gun in his hands.

25   Q.  And the jury hasn't heard yet from another witness that I

519

1  **A.**  No.

2  **Q.**  Why not?

3  **A.**  Because shootings are reviewed after the fact to make a

4  determination if the officer's actions were reasonable based

5  on the totality of the circumstances.  That's looking

6  everything from the tactics, the planning, the communication,

7  less and lethal force considerations, what the officer had at

8  the time on his or her person, and ultimately, was the use of

9  lethal force reasonable based on the totality of the

10 circumstances, specifically at the time in which the force is

11 used, did the suspect at any point present an imminent threat

12 of great bodily injury or death to that officer or another

13 person.

14 **Q.**  And did you note in Deputy Ayala's deposition when asked

15 if Mr. Lewis ever reached for his weapon he said, no, he did

16 not?

17 **A.**  Yes.

18 **Q.**  So if Mr. Lewis didn't reach for Deputy Ayala's weapon and

19 Mr. Lewis' hands are visibly empty, from your perspective, how

20 can you justify the use of deadly force?

21 **A.**  You can't.

22 **Q.**  What if the person says, Well, the guy was much bigger

23 than I was and I thought maybe he could do something to me?

24 **A.**  That's why officers are trained or should be trained in

25 defensive tactics, in the possession of a TASER, which is

1    **A.**  Yes, sir.

2    **Q.**  This is a narrative of one of the witnesses named Destiny

3    Salcedo; isn't it?

4    **A.**  It is.

5    **Q.**  Earlier to plaintiffs' question you said, in reviewing the

6    records there was nothing supporting the statement Deputy

7    Ayala heard from Lewis that, You're going to have to kill me,

8    You're going to die.  Do you remember that?

9    **A.**  Yes.

10   **Q.**  Look in the third paragraph, the last sentence.

11          MR. GALIPO:  Your Honor, I'm going to object to this

12   as calling for hearsay.  And I know this is a narrative.  It's

13   nowhere in her recorded statement.

14          THE COURT:  Okay.  Let me -- let's go to sidebar on

15   this.

16     (Sidebar commences):

17          THE COURT:  We're at sidebar.  Plaintiffs counsel are

18   present.  Defense counsel are present.

19          This report indicates that the interviewer activated

20   his digital recorder.  Is this purporting to be a summary of a

21   recorded statement or --

22          MR. WEAKLEY:  It's going to impeach Mr. DeFoe when he

23   said there's nothing that he's reviewed that supports Ayala's

24   statement, and this directly impeaches that testimony.

25          THE COURT:  I understand the form.  I guess what's --

1 the reason I have you all here is I'm -- there's a

2 representation that it's not in her recorded statement, but it

3 is in that document.  Is that --

4    MR. WEAKLEY:  I don't know if it's in her recorded

5 statement.

6    MS. MARSHALL:  I don't think it is in the recorded

7 statements, but it is in this document.  And he was provided

8 and reviewed this document.

9    MR. WEAKLEY:  He even testified to that --

10    MS. MARSHALL:  We're not asking --

11    COURT REPORTER:  One at a time, please.

12    MR. GALIPO:  So I think it appears that everyone's in

13 agreement that it's not in her recorded statement.

14    So this, I assume, is supposed to be a summary of a

15 recorded statement and if it is, it's a very unfair summary to

16 say that she said something in her statement that she did not

17 say.

18    MR. WEAKLEY:  It's not offered for the truth.

19    MR. GALIPO:  I know that but --

20    MR. WEAKLEY:  It's offered to impeach him.

21    THE COURT:  Well, I know, but it seems to me if

22 there's universe agreement of both parties that she did not in

23 fact make that statement --

24    MR. WEAKLEY:  I can't say that.  It's not recorded.

25    THE COURT:  Well, if, in the same paragraph, the

524

1   officer indicates that he activated the digital recorder prior
2   to speaking to her and then he has quotes, and I'm being told
3   by both parties that the quoted sentence at the end of the
4   paragraph is not in the record statement -- no, let me finish
5   -- my concern is that there may be a document in which
6   somebody says something that blatantly untrue based on the
7   recorded statement.  It seems a 403 issue if -- as asked.  But
8   I'll hear you.
9           MR. WEAKLEY:  Well, he said he's reviewed the records
10  and there's nothing to support Ayala.  Whether this is true or
11  not, it does support Ayala.
12          MR. GALIPO:  Yeah, but --
13          THE COURT:  We're going to get into a whole.
14          MR. GALIPO:  The problem is --
15          THE COURT:  As I've understood it so far, correct me
16  if I'm wrong, the recorded statement does not include the
17  purported quote in this summary.
18          MR. WEAKLEY:  That's my understanding.
19          MS. MARSHALL:  My understanding is the recording was
20  lost.  So there isn't a recorded statement, but there is
21  Deputy Guerrero.
22          THE COURT:  Okay.  So there is no recorded statement
23  of Salcedo.
24          MS. MARSHALL:  No.
25          THE COURT:  All right.

GX DeFoe W

525

1          MS. GUSTAFSON:  Well, what she's saying is there was

2     once upon a time, but we no longer have it.

3          THE COURT:  Who lost it?

4          MS. MARSHALL:  The sheriff's department.

5          MS. GUSTAFSON:  Yeah.

6          THE COURT:  Well, I --

7          MS. MARSHALL:  But he testified there was nothing in

8     the record, which is not true.  This was in the records he

9     reviewed.  So he -- all he's asking him is --

10         MS. GUSTAFSON:  And he --

11         MS. MARSHALL:  -- to review that and, Are you

12    mistaken.

13         MR. GALIPO:  Well --

14         MS. MARSHALL:  So that's not hearsay.

15         MR. GALIPO:  -- the problem is, she did give a

16    recorded statement that we all do have --

17         MR. WEAKLEY:  Here's a solution.

18         MR. GALIPO:  Let me finish -- but it's not referenced

19    in.

20         Your office took her deposition where this was never

21    referenced, ever.  So I think it's very misleading to the jury

22    to try to get through Mr. DeFoe that there was some summary

23    that she allegedly said on a recorded statement that has been

24    lost for the same department that Deputy Ayala works for,

25    leading this jury to believe that she did say that.

526

1        MR. MARSHALL:  But you're leading the jury to believe
2    that she didn't.
3        MR. WEAKLEY:  The counter to that is that he has now,
4    on the witness stand, not telling the truth.  So what I'm
5    willing to do is drop it as long as we strike that portion of
6    his testimony.
7        THE COURT:  What's the plaintiffs' position as to
8    that?
9        MR. GALIPO:  What's the position that we strike?
10        MR. WEAKLEY:  That he reviewed the records, there's
11    nothing supporting the statements of Deputy Ayala that he
12    heard Lewis saying, You're going to have to kill me, you're
13    going to die -- or you're F'ing going to die.  That's
14    paraphrasing.
15        MR. GALIPO:  Well, let me ask you this, if this comes
16    in, are you comfortable with establishing or stipulating that
17    this alleged recorded statement where that was said has been
18    lost.
19        MR. WEAKLEY:  No.  Because all I want to do is point
20    out to the jury that he's not telling the truth.  I don't care
21    what she said, if she didn't say it-
22        MR. GALIPO:  I'm --
23        THE COURT:  The problem I have with this is that
24    it's not clear to me from this statement what she's saying.
25    It's, is that something an officer just told her, and then she

1    says, "Well, I guess he said that because you said he said
2    that"?  Is it something she saying he said, quote, I don't
3    know.  I don't -- you know, if she was on the stand, and she
4    testified, and she was asked upon direct, cross-examination
5    about what she heard and didn't hear and that did not come in.
6    　　　　　　MS. GUSTAFSON:  No, that was Jessica.
7    　　　　　　THE COURT:  Oh, this is two different --
8    　　　　　　MS. GUSTAFSON:  Yeah.
9    　　　　　　THE COURT:  All right.
10    　　　　　　MR. GALIPO:  But the point I'm making in her recorded
11    statement and her deposition, which we're both making, this
12    was never a part of that record.  And it's very troubling that
13    they claim she said it while it was allegedly being recorded,
14    this was somehow lost.
15    　　　　　　THE COURT:  I --
16    　　　　　　MS. MARSHALL:  Whether it was lost or not, Mr. DeFoe
17    testified there was nothing in what he reviewed that said that
18    supported this Deputy Ayala's position that Mr. Lewis
19    threatened him.  And this right here supports that he
20    reviewed --
21    　　　　　　THE COURT:  How does that support that?  Let me ask
22    you this, it supports that she is saying that, I guess he said
23    that.  It's -- there's no basis for it without recording.  I
24    don't know if she's saying that because she was told that by
25    the officer, and she's saying, Well -- you know, or she's --

528

1    there's an "I guess" in there.  I find that a 403 issue

2    because of the "I guess," and because of the context where we

3    can refer specifically to the additional recordings which the

4    County apparently lost.

5                And I understand, Mr. Weakley, you're not the County

6    here.  You're your client's --

7                MR. WEAKLEY:  Right.

8                THE COURT:  -- individual officer, and I appreciate

9    that.  But if this is all there is, then that's a 403 issue.

10               MR. GALIPO:  Thank you, Your Honor.

11               THE COURT:  That's --

12               MR. WEAKLEY:  I want to make a record.

13               THE COURT:  You can make a record.

14               MR. WEAKLEY:  So Exhibit A-00117, the sentence is:

15   Ms. Destiny Salcedo, narrative of apparently what Destiny

16   Salcedo told the detective, she said, "I guess my stepdad said

17   he was going to shoot him, comma, but he had nothing on him

18   period, he didn't do nothing wrong."  End of quote.

19               THE COURT:  We've got a double hearsay issue here.

20   What's not here, to me, is that that's something she heard as

21   opposed to something that she has been allegedly told by

22   someone other hearsay source.  So you've got a 403 issue where

23   the purported statement is -- it's hearsay.  But --

24               MR. WEAKLEY:  Understood.

25               THE COURT:  -- implies it's a double layer of

529

1  hearsay.  And the proof of what was actually said in the

2  context of which it was said and the question to which it was

3  responding to would have been on a digital recording that the

4  County lost.  So this is a 403 issue.

5          MR. WEAKLEY:  Okay.  But I want to make a point.

6          THE COURT:  Make your record.

7          MR. WEAKLEY:  I'm not offering it for hearsay.  I'm

8  not offering it for the truth.

9          THE COURT:  I know you're offering it to --

10         MR. WEAKLEY:  Rehabilitate Deputy Ayala.  Because he

11 made a blank -- a blatant statement, there's nothing in the

12 record --

13         THE COURT:  But let me just say, I don't find this

14 corroborating for a Deputy Ayala statement.  It -- this

15 appears to be a double hearsay statement.  And the actual

16 context of it that would have been clear if we had the

17 recording, but I don't think that it is -- directly

18 contradicts his prior statement.

19         MR. WEAKLEY:  Okay.  Thank you.

20         MR. GALIPO:  Thank you, Your Honor.

21         MS. MARSHALL:  Thank you.

22     (Sidebar ends.)

23         THE COURT:  You may proceed.

24         MR. WEAKLEY:  Thank you, Your Honor.

25 BY MR. WEAKLEY:

GX DeFoe    W

530

1    **Q.**  Mr. DeFoe, you were aware, weren't you, that Mr. Lewis was
2    on felony probation?
3    **A.**  After the fact, correct.
4    **Q.**  Right, right.  You couldn't have known it before the fact.
5    You didn't know Mr. Lewis, did you?
6    **A.**  Correct, I did not know Mr. Lewis.
7    **Q.**  So in your work on this case for the plaintiffs, you
8    became aware that Mr. Lewis was on felony probation the night
9    of this incident?
10   **A.**  Correct.
11   **Q.**  And you're also -- although you didn't see the actual
12   conditions, you're familiar with the conditions of felony
13   probation generally, correct?
14   **A.**  Yes.
15   **Q.**  In fact, even the learning domains have sections on
16   probation under "searches," correct?
17   **A.**  Correct.
18   **Q.**  So correct me if I'm wrong, but aren't police officers
19   taught that probation is a sentencing alternative for a person
20   convicted of a criminal offense is granted at the judge's
21   discretion?
22   **A.**  You're correct.
23   **Q.**  And the individual serving probation must agree to certain
24   conditions, correct?
25   **A.**  Yes, sir.

556

1  **Q.** For example, if an officer is being shot at and taking

2  bullets and it's nighttime but they can't exactly see the gun,

3  they may be able to return fire in that instance?

4  **A.** They could, yes.

5  **Q.** And I think you referenced to a situation where the

6  officer actually saw the gun earlier?

7  **A.** Correct.

8  **Q.** So your opinion that under the totality of the

9  circumstances in this case, the officer would need to see the

10 gun?

11 **A.** Correct.

12 **Q.** And speaking of totality of the circumstances, which

13 counsel asked you about, does that include the officer's

14 conduct and tactics leading up to the shooting?

15 **A.** It does.

16 **Q.** And counsel asked you if that includes information the

17 officer had at the time.  Do you remember a question to

18 that -- in that regard?

19 **A.** I do.

20 **Q.** So in reviewing the deposition of Deputy Ayala, did you

21 note in your review that Deputy Ayala conceded that he had no

22 information prior to that day that Mr. Lewis had ever

23 committed a violent act, a violent crime, or ever physically

24 injured anyone his entire life.  Do you recall that?

25 **A.** Yes.

559

1          MR. GALIPO:  That will be fine.

2          THE COURT:  And we will -- we will -- that will be

3     noted that way in the transcript.

4          MR. GALIPO:  That will be fine.

5          THE COURT:  Please come up to the witness stand and

6     raise your right hand.

7                               A.W.,

8     called as a witness on behalf of the Plaintiffs, having been

9     first duly sworn, testified as follows:

10         THE WITNESS:  I do.

11         THE CLERK:  Thank you.

12         Please be seated and state your first name and your

13    first initial of your last name.

14         THE WITNESS:  A.W.

15                         DIRECT EXAMINATION

16    BY MR. GALIPO:

17    Q.  Thank you.

18         How old are you?

19    A.  I'm 17.

20    Q.  Do you currently go to school?

21    A.  Yes.

22    Q.  Where do you go?

23    A.  St. Joseph's High School.

24    Q.  Are you interested in any sports by any chance?

25    A.  I play basketball.

1   scholarship offers to play college basketball?

2   **A.**  Yes.

3   **Q.**  Do you sometimes think it would be cool if your father

4   could come see some of your game?

5   **A.**  Yes.  That -- like, when I was younger, that's just what

6   motivated me like to push hard, to, you know, make it -- make

7   it on TV, get a call from my dad, like, oh, I seen you on TV.

8   You did great.  I'm proud of you.  I love you.  I, like,

9   that's just what I pushed for, what where I yearned for in

10   basketball.

11   **Q.**  How did you make it you feel when your dad would tell you

12   he's proud of you and he loves you?

13   **A.**  If -- it meant the world to me.  Like, that's all I wanted

14   was acceptance.  And it felt like I was doing something right

15   when he told me, like, that, it fulfilled me.

16   **Q.**  That's really good.

17        How did you find out that your dad had been shot and

18   killed?

19   **A.**  The night of -- I had got calls from my brother Mikey, but

20   I missed them because they were in the middle of night.  So I

21   call him back in the morning, and he -- he's like, can you

22   give the phone my mom?  And I gave it to her, and she just,

23   like, she just started crying.  I was, like, what happened?

24   And she told me and I locked myself in bathroom and was crying

25   for like an hour or two.

565

1       THE COURT:  So you're excused.

2       Next witness.

3       MR. GALIPO:  Okay.  They all seem to rhyme.  I'm

4   going to call R.L.

5       THE COURT:  Please approach the -- come up to the

6   witness stand and raise your right hand, and you'll be asked

7   to state your first name and last initial.

8                               R.L.

9   called as a witness on behalf of the Plaintiffs, having been

10  first duly sworn, testified as follows:

11      THE WITNESS:  I do.

12      THE CLERK:  Thank you.

13      Please state your first name and just your last

14  initial.

15      THE WITNESS:  R.L.

16                  DIRECT EXAMINATION

17  BY MR. GALIPO:

18  Q.  Hello there.

19  A.  Hi.

20  Q.  How old are you?

21  A.  13.

22  Q.  Where do you go to school?

23  A.  Purview Middle School in Lancaster.

24  Q.  What grade are you currently in?

25  A.  Eighth.

566

1   **Q.**  Are you going to get in trouble for missing school this

2   week or they know you're here?

3   **A.**  They know I'm here.

4   **Q.**  Okay.  What do you like to do in your spare time?

5   **A.**  I like to play with my siblings, like, hang out with them,

6   you know, like that.

7   **Q.**  Okay.   How about games, volleyball?

8   **A.**  Yeah.

9   **Q.**  All that?

10   **A.**  All my siblings.

11   **Q.**  I want to show you some pictures, but I'm going to try not

12   to embarrass you too much.  Okay?

13   **A.**  Yeah.

14        MR. GALIPO:  All right.  So may I approach counsel?

15        THE COURT:  You may.

16   (Discussion was had off the record.)

17        MR. GALIPO:  Okay.  By agreement, let me give you

18   these numbers, if it's okay, Your Honor.  They are all from

19   Exhibit 10.

20        THE COURT:  We're going to run through the computer?

21        MR. GALIPO:  Yeah, we're just going to put them on

22   the computer, but I wanted to give you the numbers and then

23   move them in, and then I'll publish them, if that's okay.

24        THE COURT:  Yes.

25        MR. GALIPO:  Okay.  So it's 10-1, 10-30, 10-24, and

569

1  for me.  Like, he's always someone to talk to.  Yeah, he was

2  just always there.

3  **Q.**  Did you -- did he did you feel like he loved you a lot?

4  **A.**  Yeah.

5  **Q.**  What did he do to make you feel like he loved you a lot?

6  **A.**  He would always tell me -- he would, like, help me when I

7  needed it.  He would always tell me, like, he's proud of me,

8  he loves me, just like that.  Just -- hug me and stuff.

9  **Q.**  He give you good hugs?

10  **A.**  Yeah.

11  **Q.**  Would you tell him that you loved him too?

12  **A.**  Yeah.

13  **Q.**  Now, how -- you're 13 now, so you were like only --

14  **A.**  9.

15  **Q.**  -- 9 years old when this happened?

16  **A.**  Yeah.

17  **Q.**  Who told you about what happened to your dad?

18  **A.**  My mom.

19  **Q.**  You must have been really shocked?

20  **A.**  Yeah.

21  **Q.**  Are you trying to deal with it the best you can?

22  **A.**  Yeah.

23  **Q.**  You miss him a lot?

24  **A.**  Very much.

25  **Q.**  It will be okay if I don't ask you any more questions?

 1  **A.**  Yeah.

 2          MR. GALIPO:  I don't think I have any more questions

 3  for Reyana, Your Honor.

 4          THE COURT:  All right.  Anything further from other

 5  plaintiffs' counsel?

 6          MR. ALEXANDER:  Nothing.

 7          THE COURT:  Cross-examination.

 8          MS. MARSHALL:  No, Your Honor.

 9          MS. GUSTAFSON:  No, Your Honor.

10          THE COURT:  All right.  You're excused.

11          Next witness?

12          MR. GALIPO:  Yes.  As the rhymes continue, M.L.

13          THE CLERK:  Please raise your right hand.

14                        M.L.,

15  called as a witness on behalf of the Plaintiffs, having been

16  first duly sworn, testified as follows:

17          THE WITNESS:  I do.

18          THE CLERK:  Thank you.

19          Please be seated and state your first name and your

20  last initial.

21          THE WITNESS:  M.L.

22                    DIRECT EXAMINATION

23  BY MR. GALIPO:

24  **Q.**  Okay.  How old are you?

25  **A.**  I'm 12.

572

1    **Q.**  Do you have pictures you have your dad?  Do you think of
2    your dad a lot?
3    **A.**  Every day.
4    **Q.**  Does it make you feel sad that he's not here?
5    **A.**  Yes.
6    **Q.**  You were kind of looking forward to him living old so that
7    he could see you get older?
8    **A.**  Yeah.
9    Q.  Are you trying to do the best you can to help your
10   brothers and sisters and your mom and everybody?
11   A.  Yeah.
12   Q.  I'll spare you all the photographs since we've seen so
13   many of them.
14           So I don't anymore questions.  Okay?
15           All right.  The other side may or may not, so just
16   hang on a second.
17           THE COURT:  Any cross-examination?
18           MS. MARSHALL:  No, Your Honor.
19           THE COURT:  All right.  Can this witness be excused?
20           MR. GALIPO:  Yes, Your Honor.
21           THE COURT:  All right.  You may be excused.
22           MR. GALIPO:  Okay.  Last, but certainly not least,
23   H.L..
24           May I have one moment, Your Honor?
25           THE COURT:  You're going to want to raise your right

576

1    Exhibit 10.

2            Are you in that one?

3    A.  Yes.

4    Q.  Which one are you?

5    A.  The one with the headband on.  I was always wearing pink.

6    Q.  Oh, you like -- pink was like your favorite color?

7            What are all these things you guys are on?

8    A.  Candy.  Oh, I was sitting on my dad's lap and they were

9    hugging each other on the candy.

10   Q.  Oh, that's all candy?  Oh, my goodness.

11   A.  (Nods head.)

12   Q.  Okay.  Let's look at Exhibit 10, page 11.

13           Which one are you?

14   A.  The one that my dad is holding.

15   Q.  Did you love being with your dad?

16   A.  (Nods head.)

17   Q.  Who picked your hairstyle out that day?

18   A.  Uh, I think it was my mom.

19   Q.  Okay.  I got to show you one more.  I apologize in the

20   advance for this one.  Exhibit 10, page 35.

21   A.  Oh, my gosh.

22   Q.  Are you in that picture?

23   A.  Yeah.

24   Q.  What is on your face?

25   A.  Cake.

1    **Q.**   Is it like a birthday or something, you put the cake in
2    your face?
3    **A.**   (Nods head.)
4    **Q.**   You love your daddy a lot?
5    **A.**   (Nods head.)
6    **Q.**   You miss him a lot?
7    **A.**   (Nods head.)
8    **Q.**   Okay.   We all know that.
9           All right.  I'm good.  I don't have any more
10   questions.  All right.  So just hang in there for a moment.
11          THE COURT:  Any questions from the defense?
12          MS. MARSHALL:  No, Your Honor.
13          MS. GUSTAFSON:  No, Your Honor.
14          THE COURT:  All right.  You are excused.
15          MR. GALIPO:  Your Honor, may we approach regarding
16   scheduling?
17          THE COURT:  You may.
18      (Sidebar commences.)
19          MR. GALIPO:  I just wanted to check with my
20   colleagues.
21          THE COURT:  We're at sidebar.  Plaintiffs' counsel
22   are present, defense counsel are all present also.
23          MR. GALIPO:  Yeah, thank you, Your Honor.
24          So we are prepared to rest our case in chief, subject
25   to discussion of any exhibits later.

591

1        And then if the Court is going to say, okay, well,

2    how often he was seeing her could be, I agree with you on

3    that.  Right?  I mean, that's at least a factor to consider.

4        And they had an opportunity to ask A.W. some

5    questions.  They chose not to.  That's okay.  That was a

6    tactical decision they made.  But in addition to looking at

7    401, whether it's relevant, then the Court has to balance 403

8    and 404, because someone could say, I think he's doing drugs

9    and I think he may be involved with guns, but not have an

10   actual basis to say that.

11       THE COURT:  Right.

12       MR. GALIPO:  They are saying that in part because

13   they want to, you know, get full custody of their child, or it

14   benefits them somehow in the divorce proceeding.

15       So I guess the question is, you know, maybe some of

16   it is appropriate, but other parts not.  And that's what we

17   have to figure out.

18       THE COURT:  I think that's right.

19       And so I do think that -- whether they -- it was not

20   inappropriate for defense to decide not to cross-examine

21   them -- Ms. White's daughter.  I do think it's fair for the

22   defense to call Ms. White to inquire into the daughter's

23   relationship with the decedent.

24       MR. GALIPO:  That --

25       THE COURT:  From the mother's perspective, that seems

599

1          Please raise your right hand and be sworn.

2                    ALISHA WHITE,

3     called as a witness on behalf of the Defendants, having been

4     first duly sworn, testified as follows:

5          THE WITNESS:  I do.

6          THE CLERK:  Thank you.

7          Please state your full and spell your last name for

8     the record.

9          THE WITNESS:  Okay.  Alisha Denae White, W-H-I-T-E.

10                   DIRECT EXAMINATION

11    BY MR. WEAKLEY:

12    Q.  Good afternoon, Ms. White.

13    A.  Good afternoon.

14    Q.  Now you were the -- you were the wife of Mr. Lewis?

15    A.  Yes.

16    Q.  The decedent in this case, correct?

17    A.  Yes.

18    Q.  In fact, you were still married to Mr. Lewis on the date

19    of his death?

20    A.  Yes.

21    Q.  And you had been married to Mr. Lewis -- well, let me back

22    up.

23          Is it true that you filled a petition for divorce in

24    September of 2018?

25    A.  Yes.

625

1          MR. GALIPO:  No.  Thank you, Your Honor.

2          THE COURT:  All right.  We'll be back on the record

3    at 8:30 in the morning, and then we'll begin at 9:00 a.m. as

4    discussed with the jury.

5          MR. GALIPO:  Thank you, Your Honor.

6          MR. WEAKLEY:  Thank you, Your Honor.

7          THE COURT:  All right.

8       (Proceedings were concluded at 5:18 p.m.)

9

10      I, RACHAEL LUNDY, Official Reporter, do hereby certify the

11   foregoing transcript as true and correct.

12

13   Dated:  April 2, 2025              /s/ Rachael Lundy_____
                                        RACHAEL LUNDY, CSR-RMR
14                                      CSR No. 13815

15

16

17

18

19

20

21

22

23

24

25