EXHIBIT 4

626

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. KIRK E. SHERRIFF


| | | |
|---|---|---|
| MICKEL ERICK LEWIS, JR., et al., | ) ) | 1:21-cv-00378-KES-CBD |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | JURY TRIAL, DAY 4 |
| vs. | ) ) | |
| COUNTY OF KERN, et al., | ) | Volume 4 |
| | ) | Pgs. 626 - 727, inclusive |
| Defendants. | ) ) | |
| R.L., et al., | ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | |
| vs. | ) ) | |
| COUNTY OF KERN, et al., | ) ) | |
| | ) | |
| Defendants. | ) ) | |

Fresno, California                    Friday, March 14, 2025


REPORTER'S TRANSCRIPT OF PROCEEDINGS


REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

**<u>APPEARANCES OF COUNSEL</u>**:

For Plaintiffs Mickel
Erick Lewis, Jr.,
Oriona Lewis and
Briona Lewis:

Toni Jaramilla,
A Professional Law Corp.
1900 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
BY:  TONI J. JARAMILLA, ESQ.

Alexander Morrison + FEHR LLP
1900 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
BY:  J. BERNARD ALEXANDER, III,
ESQ.

For Plaintiffs R.L.,
M.L. and H.L., minors,
by and through
guardian ad litem
Roberta Haro; A.W., a
minor, by and through
guardian ad litem
Alisha White:

LAW OFFICES OF DALE K. GALIPO
Attorney at Law
21800 Burbank Boulevard,
Suite 310
Woodland Hills, CA 91367
BY:  DALE K. GALIPO, ESQ.

For Defendant Kern
County:

Kern County Counsel
1115 Truxton Avenue,
4th Floor
Bakersfield, CA 93301
BY:  ANDREW C. HAMILTON, ESQ.
     KIMBERLY L. MARSHALL, ESQ.

For Defendant Ayala:

Kern County Counsel
1115 Truxton Avenue,
4th Floor
Bakersfield, CA 93301
BY:  ANDREW C. HAMILTON, ESQ.
     KIMBERLY L. MARSHALL, ESQ.

Weakley & Arendt, APC
5200 N. Palm Avenue
Suite 211
Fresno, CA 93704
BY:  JAMES D. WEAKLEY, ESQ.
  BRANDE LYNN GUSTAFSON, ESQ.

1    deposition of that person may be used at the trial.

2           The deposition of Nicholas Montoya was taken on

3    August 19, 2022.   Insofar as possible, you should consider

4    deposition testimony presented to you in court in lieu of live

5    testimony in the same way as if the witness had been present

6    to testify.

7           One moment.

8           Do not place any significance on the behavior or tone

9    of voice of any person reading the questions or answers.

10          Please proceed.

11          MR. GALIPO:  Thank you, Your Honor.

12          I have been asked to and I've agreed to read the

13   question.

14          And for the record, this deposition was taken on

15   August 19th, 2022.

16          MR. GALIPO:  Going to page 8, lines 4 through 7:

17          (As read):

18   Q.   "The court reporter when she placed you under oath, that

19   is an oath to tell the truth as if you were in a courtroom,

20   present; do you understand that?

21   A.   "I do."

22          MR. GALIPO:  Going to page 10, line 16 to page 13,

23   line 8:

24   Q.   "Okay.  So the deputy involved in this shooting was named

25   Deputy [sic] Ayala, and I may refer to him shorthand as Deputy

1  from that location anything that sounded to you like

2  screaming?

3  **A.**  "No.  Just -- I mean, the shouting was coming from the

4  deputy.  I didn't hear anything else other than the deputies

5  asking the person who he shot to stop.  I'm assuming that's

6  who he was asking.

7  **Q.**  "Okay.  So you could only detect one voice coming from

8  that scene of where the deputy and the gentleman that he

9  stopped was?

10  **A.**  "Correct.

11  Q.  "Did you ever hear anyone yell "no" from that scene?

12  A.  "I did not."

13       MR. GALIPO:  Going to page 20, line 20, page 23, line

14  1:

15  Q.  "Okay.  When you said 'pump the gas,' you were talking to

16  your ex-girlfriend?

17  A.  "Right.

18  Q.  "Okay.  And when you were talking to that gentleman, you

19  said, 'I saw everything' do you know who that was?

20  A.  "It was a truck driver that pulled up.  I mean, I don't

21  know.  I couldn't tell you when he pulled up, but he was

22  sitting right there when I started filming.

23       "Just to clarify, I thought I had been filming the

24  whole time, but I didn't press record until after the shots

25  had been fired.

717

1    A.   "Correct.

2    Q.   "And so after the bullets were shot, that's when you

3    started to move forward?

4    A.   "Correct."

5         MR. GALIPO:   Page 35 line 4, to page 36, line 21:

6    Q.   "And so that would mean that the distance that separated

7    you and the incident at that point when you first saw and

8    heard the gunshots, was approximately a full length -- a

9    hundred yards of a football field, correct?

10   A.   "It was about -- I walked it off with my feet.  I stepped

11   it off and at my foot, at my estimation was 100 -- 100 yards

12   or 300 feet.

13   Q.   "Now, at the point when you first -- at the point when you

14   saw the -- I'm sorry.

15        "At the point when you heard the gunshots, were you

16   looking the direction of the incident?

17   A.   "I was.   I watched.   I watched the whole entire incident.

18   Q.   "Now, if I understand correctly you indicated that the

19   driver of the vehicle you had seen him get out of his vehicle?

20   A.   "I did.

21   Q.   "And what part of his body were you able to see as the

22   occupant was getting out of the vehicle?

23   A.   "He looked at the deputy as he got out of the vehicle,

24   stopped for a second, kind of backed up, went towards the

25   front of his vehicle.   And then after he went to the front of

1   the vehicle, he then started making his way very quickly

2   towards the deputy.

3   Q.   "Now at that point, when the occupant of the vehicle

4   started to make his way towards the deputy, just before that

5   you had seen the occupant inside of the vehicle?

6   A.   "I didn't see him inside the vehicle.  I saw him stepping

7   out of the vehicle.  I saw him opening the door and getting

8   out of the vehicle.

9   Q.   "All right.  So at that point when you saw the occupant

10  opening the door and getting out of the vehicle, was he shot

11  immediately after that?

12  A.   "He was not.

13  Q.   "When you saw the individual get out of the vehicle, where

14  did he go?

15  A.   "He went inside -- I mean, he went away from his vehicle

16  and he turned towards the deputy and then start backing away

17  towards the front of his vehicle.  And then he made his way

18  back towards the deputy walking forward.  He was never

19  facing -- his back was never facing the deputy from what I

20  saw."

21        MR. GALIPO:  Page 37, line 11 to page 38, line 24:

22  Q.   "Okay.  Did you ever see at any point just before the

23  decedent, as you described it, charged at the officer, did you

24  ever see him inside of the vehicle?

25  A.   "I saw him getting out of the vehicle, yes.

720

1   A.  "I saw his hands in this -- how you're looking at me right

2   now.

3   Q.  "So your hands are in a match grip up, at your chest

4   level, extended a little bit?

5   A.  "I don't know how you were run, but that's how it appeared

6   to him to be.  He wasn't running.

7            "Now you're messing me up.  That's what it looked

8   like.  It looked like he was charging the deputy faster than

9   walking speed.  His hands were in front of him like this."

10           MR. GALIPO:  Page 39, lines 3 through 17:

11  Q.  "What I'm trying to do is, because we're on video, it's

12  difficult for the court reporter to take down where your hands

13  are.  So what I'm trying do is I'm trying to represent my

14  indicate what you're showing me in the video so that you --

15  A.  "More like a boxing stance than a running stance.  I'm

16  just being polite.

17  Q.  "And both hands were at the same location approximately in

18  front of him?

19  A.  "Approximately.

20  Q.  "Okay.  And you said that the officer moved back.  How

21  many steps did the officer move?

22  A.  "Come on, man, I have no idea how many steps he took back.

23  I know he was retreating backward yelling "stop" when the

24  shots -- shots were fired."

25           MR. GALIPO:  I think we go to page 40 next.  Page 40,

722

1  was moving towards the deputy?

2  **A.**  "No.  They were in between the police vehicle and the

3  decedent's vehicle.

4  **Q.**  "And at the point when you heard the last shot, do you

5  know how close -- do you have an estimate as to how close the

6  decedent was to the officer?

7  **A.**  "Not much closer.  The shots happened all in succession.

8  And as soon as the man hit the floor, the deputy no longer

9  shot any more.

10  **Q.**  "If I understand correctly, there's no point that you ever

11  heard the occupant of the vehicle, the decedent, say anything

12  to the officer; is that correct?

13  **A.**  "No.  Not that I remember, no."

14         MR. GALIPO:  I believe that concludes the reading,

15  Your Honor.

16         THE COURT:  All right.  Anything further?

17         MS. MARSHALL:  No.

18         THE COURT:  Not from the defense?

19         Okay.

20         MR. GALIPO:  Thank you, Your Honor.

21         THE COURT:  Thank you.  At this time.  We are about

22  five minutes to noon on Friday.  And as I indicated to you on

23  the first day -- and then, Ms. Gustafson, you can get down

24  from the witness stand.

25         MS. GUSTAFSON:  Thank you, Your Honor.

1          THE COURT:  Very good.  Have a good weekend.

2      (Proceedings were adjourned at 12:00 p.m.)

3

4

5

6

7

8

9

10     I, RACHAEL LUNDY, Official Reporter, do hereby certify the

11 foregoing transcript as true and correct.

12

13 Dated:  April 10, 2025              /s/ Rachael Lundy_____
                                    RACHAEL LUNDY, CSR-RMR
14                                  CSR No. 13815

15

16

17

18

19

20

21

22

23

24

25