EXHIBIT 5

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. KIRK E. SHERRIFF

MICKEL ERICK LEWIS, JR., et al.,    )    1:21-cv-00378-KES-CDB
                                          )
        Plaintiffs,         )
                                          )    JURY TRIAL, DAY 5
    vs.                  )
                                          )
COUNTY OF KERN, et al.,       )    Volume 5
                                          )    Pgs. 728 - 986, inclusive
        Defendants.        )
_____)
                                          )
R.L., et al.,               )
                                          )
        Plaintiffs,         )
                                          )
    vs.                  )
                                          )
COUNTY OF KERN, et al.,       )
                                          )
        Defendants.        )
_____)

Fresno, California               Tuesday, March 18, 2025

REPORTER'S TRANSCRIPT OF PROCEEDINGS

REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

<u>**APPEARANCES OF COUNSEL**</u>:

| | |
|---|---|
| For Plaintiffs Mickel Erick Lewis, Jr., Oriona Lewis and Briona Lewis: | Toni Jaramilla, A Professional Law Corp. 1900 Avenue of the Stars, Suite 900 Los Angeles, CA 90067 BY:  TONI J. JARAMILLA, ESQ. |
| | Alexander Morrison + FEHR LLP 1900 Avenue of the Stars, Suite 900 Los Angeles, CA 90067 BY:  J. BERNARD ALEXANDER, III, ESQ. |
| For Plaintiffs R.L., M.L. and H.L., minors, by and through guardian ad litem Roberta Haro; A.W., a minor, by and through guardian ad litem Alisha White: | LAW OFFICES OF DALE K. GALIPO Attorney at Law 21800 Burbank Boulevard, Suite 310 Woodland Hills, CA 91367 BY:  DALE K. GALIPO, ESQ. |
| For Defendant Kern County: | Kern County Counsel 1115 Truxton Avenue, 4th Floor Bakersfield, CA 93301 BY:  ANDREW C. HAMILTON, ESQ. KIMBERLY L. MARSHALL, ESQ. |
| For Defendant Ayala: | Kern County Counsel 1115 Truxton Avenue, 4th Floor Bakersfield, CA 93301 BY:  ANDREW C. HAMILTON, ESQ. KIMBERLY L. MARSHALL, ESQ. |
| | Weakley & Arendt, APC 5200 N. Palm Avenue Suite 211 Fresno, CA 93704 BY:  JAMES D. WEAKLEY, ESQ. BRANDE LYNN GUSTAFSON, ESQ. |

743

1    Act.  But they've already answered yes to question 1.  If they

2    answer no to question 1, they proceed directly to question 4.

3                MR. GALIPO:  Okay.  I think that's fine.  You can

4    keep it like that.

5                THE COURT:  Okay.

6                MR. GALIPO:  It's fine.  And the other issues I think

7    we talked about in terms of 5 and 6 have within them -- and we

8    can argue this -- that the causation element is included.  And

9    we also talked about taking out other damages from the old 8

10   and Ms. White from the damage question and striking the

11   language for nominal damages, the Fourteenth Amendment and

12   punitive damages.

13               THE COURT:  Yes.  And those changes will be made.

14   Again, the issue of nominal damages is as addressed.  It's

15   either going to be in or out, depending on whether it's

16   something within any authority to take out.

17               MR. GALIPO:  Thank you, Your Honor.

18               THE COURT:  Okay.  Now, with respect -- I do want to

19   note briefly -- I want to bring the jury in soon, but I do

20   want to briefly address the Rule 50(a) motion.  And it may

21   make sense to address that before the special interrogatories,

22   Mr. Weakley?

23               MR. WEAKLEY:  Correct.  Yeah.

24               THE COURT:  Okay.  All right.  So I reviewed the

25   parties' submissions, the defendant's motion for judgment as a

744

1   matter of law filed on March 14th, at docket 135; the

2   plaintiffs' opposition, filed on March 17th, at docket 143.

3   And this case really does come down to a disputed version of

4   the facts.

5         And they're -- in ruling on a Rule 50(a) motion, I

6   have to view all the evidence in the light most favorable to

7   the nonmoving party.  That's the plaintiffs.  And draw all

8   reasonable inferences in plaintiffs' favor.  And judgment as a

9   matter of law would be appropriate only if the evidence

10  permits only one reasonable conclusion.

11        And I cannot find on that standard that plaintiffs

12  could not -- under that standard with all reasonable

13  inferences being drawn in their favor, not prevail.  There's a

14  double negative in there meaning that there's not a basis for

15  granting the Rule 50(a) motion, given the dispute as to how

16  the events unfolded in the crucial time period and whether

17  Mr. Lewis was or was not reaching for something under the

18  seat, whether he was hiding his right hand as he came out of

19  the car, whether he was lunging at and aggressively charging

20  at the deputy, or whether he had his hands raised and had not

21  looked under the seat or searched under the seat and, instead,

22  was simply trying to turn the keys in the ignition, not

23  realizing they weren't there.

24        All of these are disputed facts in this case.  And

25  you have multiple eyewitnesses with different perspectives and

1    different views on the very same scene who have testified.

2           And those are issues that the jury is going to have

3    to decide.

4           I will note with respect to qualified immunity, it is

5    clearly established that deadly force is not justified where

6    the suspect poses no immediate threat.  That's been clearly

7    established for decades.  Among others, I'll cite the Garner

8    case, 471 U.S. at 11, which I -- I don't actually have the

9    date of that before me, but I believe it goes to back to the

10   1980s.

11          It's also clearly established that if an officer,

12   without warning, shot and killed an individual -- in this

13   instance I'm referring to the Hayes case from 736 F.3d 1223,

14   Ninth Circuit 2013.  An officer, without warning, shot and

15   killed an individual who was holding a knife, a weapon, but

16   not threatening, the deputy was standing 6 to 8 feet away,

17   that was excessive force.

18          Here we have a situation where there's a dispute --

19   it's undisputed that, ultimately, there was nothing in

20   Mr. Lewis's hand.  But the issue is whether his hands were

21   displayed, whether he was making what types of movements he

22   was making.  These are -- these are issues that the jury has

23   to consider and has to decide.  And the Court cannot at this

24   time find a basis to grant the Rule 50(a) motion.

25          Would either party like to be heard further?

746

1    MR. GALIPO:  No.  Thank you, Your Honor.

2    MR. WEAKLEY:  Very briefly, Your Honor.  We

3  understand, because the facts are in dispute here.  But under

4  qualified immunity, even though a Rule 50(a) motion is denied,

5  a Rule 50(b) motion may be appropriate.  But we need to be

6  able to understand the disputed facts, get a jury's decision

7  on them, which is why we submitted special interrogatories or

8  request the Court's assistance in drafting special

9  interrogatories to satisfy the Court's concern.

10    On clearly established -- that's the key, clearly

11  established law needs to be particularized to the case, not

12  just general statements that excessive force is unreasonable

13  if you shoot someone that's unarmed.

14    You need to know the facts of this case.  And those

15  facts are dependant upon how the jury sees Mr. Lewis' conduct.

16  So I think in order for us to be able to argue a qualified

17  immunity argument, we need to know what the jury thinks about

18  Mr. Lewis' conduct, particularly this case, not just a general

19  statement.

20    THE COURT:  Well, it seems to me that there's really

21  two versions here.  And that if -- Deputy Ayala has testified

22  as to everything that he perceived.  And his record is there.

23  And the issue is going to be whether the jury credits his

24  testimony and his statements or whether they credit the

25  plaintiffs' testimony -- I shouldn't say the plaintiffs'.

747

1   That's not the right word -- the testimony of other witnesses.

2   And to the extent there's some -- but even to the extent they

3   credit some portions of what a witness says and not other

4   portions, it's not -- this really is a situation in which you

5   have different versions of how these few seconds unfolded.

6           And I don't -- I don't see how -- I'm not convinced,

7   I'll put it that way, as to how the questions would help you

8   on that.  I'm not --

9           Let me also state this, the questions, as worded,

10  don't seem proper to me in that they assume a belief that is

11  in dispute.  So the questions assume that Deputy Ayala, for

12  example, believed that Lewis had a gun in his hand when he got

13  out of the car the second time.

14          I understand there was testimony, but the jury could

15  certainly infer that and could find that.  But that is -- to

16  ask them in a question that presumes that that is an

17  undisputed fact is not appropriate.

18          MR. WEAKLEY:  Understood, Your Honor.  That's why we

19  would request the Court's assistance, which can be done later

20  in the trial.  We don't know -- when we put these together, we

21  don't know what questions you have.

22          THE COURT:  All right.  Is there --

23          MS. GUSTAFSON:  Your Honor, I may have an example

24  that may assist you.  Considering your ruling on the Rule 50,

25  you just referenced Hayes and the fact of a deputy or an

1    officer not making a warning prior to -- or not having the

2    time to make a warning.

3         It might be reasonable to include a special

4    interrogatory that goes to that effect of whether or not there

5    was -- it was feasible, or insert the appropriate terminology

6    with regards to Deputy Ayala and whether it was feasible or

7    practical for him to give a warning in this situation.

8         THE COURT:  Well, I -- what I have before me are the

9    proposed interrogatories that you all have proposed and have

10   identified some concerns.  The concern is -- one of my

11   concerns is, as this is currently worded, they presume that

12   there -- certain facts that are in dispute, and then ask the

13   jury to find whether a belief that's in dispute, but that the

14   instructions ask them to presume is true and undisputed.  And

15   they're asking the jury to find whether that's reasonable

16   under the circumstances.

17        And so the questions before me are not appropriately

18   worded.  I don't -- with the jury waiting, I'm not going to

19   kind of try and craft questions on the fly here.  I'll

20   entertain other questions, if you think that there's a

21   specific question or two that could be more appropriately

22   worded.

23        But, Mr. Galipo, did you want to be heard on this?

24        MR. GALIPO:  Just briefly, Your Honor.

25        Plaintiffs agree with the Court that these proposed

1    questions are not appropriate.  They are not going to --

2    they're objectionable on several grounds.  And, as the Court

3    stated, given the factual scenario of this case, the jury is

4    going to go with one scenario or the other.  And we don't

5    believe the special interrogatories should be given at all.

6    And we think it's somewhat unfair to ask the Court to, you

7    know, figure out what questions, if any, should be given.  So

8    for those reasons, we don't think these questions should be

9    given.

10           THE COURT:  Okay.  All right.  Is there anything

11   further at this time before we bring the jury in?

12           MR. WEAKLEY:  Not with regard to the instructions.  I

13   do have a comment about the verdict form, but that can wait

14   until a break.

15           THE COURT:  Okay.  We can certainly address it on the

16   break, but I would -- but I would, if it's brief, like to

17   address it now, because I'd like to get those being worked on

18   while we're in trial.

19           MR. WEAKLEY:  Okay.  It is very brief, Your Honor,

20   but it deals with the question of state law damages.  And the

21   way the verdict form is now, it's breaking down damages as to

22   each plaintiff, asking the jury to award an amount for each

23   plaintiff.

24           And I believe under California wrongful death

25   damages, which is what the plaintiffs are seeking, the jury is

750

1    supposed to award one amount for all heirs.  And then later
2    the Court decides how that should be divided.  And so we would
3    propose that we follow CACI and the California law on the
4    California wrongful death question.
5            THE COURT:  Would you like to be heard on that,
6    Mr. Galipo, briefly?
7            MR. GALIPO:  Yes.  I think we discussed this perhaps
8    off the record.  There is no federal case that says the Court
9    procedurally cannot have separate lines.  I think in this case
10   you have multiple plaintiffs.  There were three different
11   mothers involved, a lot of evidence about the nature of their
12   relationships.
13           At the end of the day, it's really the same thing,
14   because presumably the total would be the separate.  But I
15   don't think it's fair to put this Court in a position later to
16   decide whether those should be divided equally or in some
17   other manner or what that breakdown would be.
18           So I see no harm to the defense, and I think to err
19   on the side of caution, we should keep the lines separately.
20   And although I'll acknowledge there's some state authority for
21   having one line, I could just tell the Court, based on my
22   experience with the federal courts, including in this building
23   with multiple cases, there always have been separate lines.
24           THE COURT:  I am going to overrule that objection or
25   deny the request to have one line.  I do think it's much more

1    objectively -- let me be clear.  It should not make any

2    difference.  If the jury has been instructed or will be

3    instructed appropriately and whether it's one line or it's

4    broken into individual lines for the separate plaintiffs could

5    not make any difference as to the total amount that's found.

6    And it certainly would be much more efficient and helpful,

7    from the Court's perspective, to have it identified plaintiff

8    by plaintiff.  So I'm going to keep the verdict form as

9    written in that respect.  Anything further?

10             MR. GALIPO:  No, Your Honor.  Is it possible to have

11   three minutes?

12             THE COURT:  It certainly is.  We can bring the jury

13   in at 9:25 or 9:30.  You tell me how long you need.  We've

14   been going since eight o'clock.  Why don't we say 9:30.

15             MR. GALIPO:  That will be fine.  Thank you,

16   Your Honor.

17             MR. HAMILTON:  Thank you, Your Honor.

18             MS. GUSTAFSON:  Thank you, Your Honor.

19             THE COURT:  So we're off the record.

20        (Recess taken from 9:20 a.m. to 9:33 a.m.)

21             THE COURT:  Before we bring the jury in, I did want

22   to just touch on the verdict form and the question about

23   damages and the breakdown.

24             What is the parties' position if I put in one line

25   for damages and then ask the jury to do a percentage breakdown

1  assigning a percentage for each plaintiff of the total amount?

2          MR. GALIPO:  I think it gets us to the same place.

3  I'm only worried -- I'm doing the math in my mind.  Seven

4  people and start figuring out percentages, even if you tried

5  to do it equally, it would be a bit confusing.

6          THE COURT:  Well, I think we can have an instruction

7  that, you know, a little parenthetical there indicating it

8  should total to 100 percent.

9          MR. GALIPO:  Okay.  I can tell you that at least in

10  my argument, Your Honor, I'm going to argue that the children

11  should each get equal amounts.  I'm not going to suggest one

12  deserves more than the other, because I think they've all

13  suffered a tremendous loss.  I don't know whether the jury

14  will see it that way or not, but that's how I'm going to

15  present it.

16          So if the jury adopts that, I guess, then, it would

17  have to figure out 100 percent divided by 7.  And I think,

18  doing the quick math, it's probably about 14 and change.  So I

19  don't know if --

20          THE COURT:  I see what you're saying.

21          MR. GALIPO:  Yeah.

22          THE COURT:  That it's not quite even.

23          MR. GALIPO:  Yeah.  And then I don't want to have

24  them, you know, spending an hour of their deliberation trying

25  to figure out those percentages.

1  and suffering experienced prior to death.

2          You should considering the following as to the

3  wrongful death damages for plaintiffs:

4          One, the loss of Mickel Lewis, Sr.'s, love,

5  companionship, comfort, care, assistance, protection,

6  affection, society, and moral support.

7          In determining plaintiffs' wrongful death damages, do

8  not consider plaintiffs' grief, sorrow or mental anguish,

9  Mickel Lewis, Sr.'s, pain and suffering or the poverty or

10  wealth of plaintiffs.

11          It is for you to determine what damages, if any, have

12  been proved.  Your award must be based upon evidence and not

13  upon speculation, guesswork or conjecture.

14          All right.  At this time we are going to begin

15  closing arguments.  And, remember, what is said during closing

16  argument is not evidence.

17          What the counsel say is intended to help you

18  interpret and analyze the evidence.  And you should rely on

19  your own memory if the facts as stated by any attorney differ

20  from the way you remember the facts.

21          Because the plaintiff has the burden of proof in the

22  case, he will present -- the plaintiffs will present their

23  closing argument first, then the defendants will make their

24  presentation, and then the plaintiffs may make a reply.

25          Counsel for plaintiffs.

892

1    MR. GALIPO:  Thank you, Your Honor.  May I inquire if
2    the screens in the jury box are on or not.
3        They're not on yet.
4        THE COURT:  Let's have them on.
5        MR. GALIPO:  If they can have them on, that would be
6    great.
7        THE COURT:  Please.
8    MR. GALIPO:  Okay.  I think we're ready.  Good
9    afternoon to all of you.  First and foremost, I want to thank
10   you all very much on behalf of my co-counsel, families,
11   everybody here, for being such a good jury, listening
12   carefully, paying attention.  I realize sometimes it's
13   difficult when things are going longer than we hoped or
14   lawyers are talking forever.  So we really appreciate your
15   time and attention very much.
16       We know that you all have a lot of personal and
17   professional things going on.  You might remember in opening
18   statement I promised I would try to get this case to you as
19   quickly as possible.  I think we rested on Thursday, at least
20   the plaintiffs' case.  So I hope you're not too disappointed
21   in that.  So thank you all in advance for that.
22       I want to take us back just for a moment to jury
23   selection.  You may recall the judge asked you questions.  The
24   lawyers asked you some questions.  And a couple things I think
25   are very important to keep in mind at the outset.

893

1          First of all, I think you all understand by now this

2   is a not a criminal case.  This is a civil case.  So there's

3   two things that are very important in that regard.

4          First, I don't have to prove any crime was committed

5   by Deputy Ayala or even that he had any bad intent.  That's

6   all really I -- the only intent, really, that I have to prove,

7   other than him pressing the trigger five times, which he

8   admitted he did, is that Bane Act claim where I have to prove

9   he acted with a reckless disregard for Mr. Lewis' rights to be

10  free from excessive force.  And I'll talk about that.

11         The second important distinction is the burden of

12  proof.  So some of you, from either being on a criminal jury

13  or watching television, we always hear about proof beyond a

14  reasonable doubt.  It's a very high standard, because

15  someone's liberty is at stake.  If they lose the trial,

16  presumably they can go to prison.  And that's a very high

17  standard.  The proof has to be beyond any reasonable doubt.

18         There's no real percentage on it.  Some people think

19  it's like 99 percent.  Very, very high.  But in this case,

20  it's only a civil case, and the burden of proof is only

21  preponderance of the evidence.

22         The judge read you an instruction.  I think it's

23  instruction number 5.  That basically says "more probably true

24  than not."  So what that means is slightly more than 50

25  percent.  If the scales of justice were even and a feather

1      What else did you learn?  An overreaction is

2   excessive force.  And that's what I think the evidence mostly

3   supports happening here.  Deputy Ayala overreacted.  He

4   overreacted.  He might have had fear.  He might have been

5   scared.  But it wasn't life-threatening.  It wasn't to that

6   level that he should have killed this person, who was so

7   beloved by his family and his children.

8          And that's why we get to this concept of reverence

9   for human life.  Because the reality is everyone's life has

10  value and is important, because people love them, care about

11  them, whether they're brothers and sisters, parents, children,

12  friends.  People love other people, care about other people.

13  And that's why we have to have value for human life.

14          So you heard about all that.  And you might have

15  noticed in the instructions -- for example, instruction 10 is

16  the Fourth Amendment instruction.  You may wonder, why are we

17  in federal court?

18          Well, the reason we're in federal court is because

19  under the Fourth Amendment to the United States Constitution,

20  all of us have a right to be free from excessive force by the

21  police.  It's a constitutional right.  It's a very important

22  constitutional right, just like other important constitutional

23  rights like freedom of speech, freedom of religion, freedom to

24  bear arms and all the other constitutional rights we enjoy.

25          It's a right we all have to be free from excessive

1        And, then, it's kind of interesting, the distance.

2   You heard Mr. Lewis is a tall guy, six-five, six-six.  And we

3   had photographs of where his body ended up.  Now, this is kind

4   of interesting, because you could see where his feet are, kind

5   of in line with the back of the car, the rear tire, the back

6   of the car.

7        But, imagine -- I'm not six-six.  Maybe I'm between

8   six-one and six-two, but imagine if my feet were where they

9   are now and I fell backwards.  So my feet would be this way,

10  and my head would be over here.  But that doesn't mean that's

11  where I was when I fell.  If I fell backwards, you got to

12  imagine where were the feet when he fell.

13        And so if, you know, he gets out and Ayala is near

14  the passenger door and he only moved between the door and the

15  rear tire, there's not a lot of movement.  We've heard of

16  charging and sprinting and tackling.  But I'm not so sure the

17  circumstantial evidence supports that.

18        You might remember I asked Ayala, Well, how many

19  steps did he take?  I don't know.  What distance did he

20  travel?  I don't know.  In fact, Ayala says, I can't really

21  see his body; I can just see his face.  You have to decide how

22  credible the testimony is.

23        A couple other jury instructions I want to talk to

24  you about.  So the Bane Act.  So the Bane Act is one of the

25  state claims; and the judge just read this; and which

1    essentially you need -- you need excessive force, plus the
2    officer acted with a reckless disregard.
3         And I think this might not be the final version.  So
4    a reckless disregard for the rights, as defined by the judge.
5    And I would suggest everyone has a right to be free from
6    excessive force.  And if you're shooting someone, the
7    expectation is you're going to cause death or serious bodily
8    injury.
9         So you're shooting someone in the back.  You're
10   shooting someone without seeing a gun.  We believe that
11   supports a reckless disregard for that person's rights.  And
12   that's what happened in this case.  It doesn't make Deputy
13   Ayala a bad person.  I'm not trying to say that.
14        What I'm trying to say is he overreacted in this
15   case.  It wasn't necessary to kill this man.  That is what we
16   are saying.  And that's based on the evidence and the law.
17        So a couple other instructions, and then I'll look
18   back at the verdict form with you.
19        For the state claims of battery, negligence and
20   violation of the Bane Act, a person's conduct may combine with
21   another factor to cause harm.  If you find that Jason Ayala's
22   conduct was a substantial factor in causing Mickel Lewis,
23   Sr.'s, harm, then Jason Ayala is responsible for the harm.
24        Jason Ayala cannot avoid responsibility just because
25   some other person, condition or event was also a substantial

1    knowing he was unarmed, knowing he was bleeding to death, he

2    was thinking in his mind, I'm never going to see my children

3    again.  I'm going to die right here at 39 years old.

4           It's horrible.  It really is horrible.  And just

5    imagine, the daughter, who just saw her dad, being told, Hey,

6    your dad's been shot.  The son driving up, seeing his father,

7    wanting to come help him, give him CPR, dying in the street.

8    Imagine, you can't go to your own loved one to try to help

9    them.  Stay back.  Put him in the car.

10          So pre-death pain and suffering?  I don't know.  I

11   guess the defense will say, Well, it wasn't that long, so

12   don't give them much.  Shot five times.  Knowing you're dying.

13   I would submit that number should be $1 to $2 million.  It's

14   totally up to you.

15          It can't get worse than that.  And how about the loss

16   of his life?  I would submit nothing really should be more

17   valuable than human life.  All of our lives, everyone.  The

18   value of human life.  Every one of these pictures, he's happy.

19   He's smiling.  He loves his children.  He loves his family.

20   He's got his whole life to look forward to.

21          He wanted some of his children to have grandchildren.

22   Two of them have, since he's died.  But he's not here to see

23   them.  The value of his life.  He died at 39 years old.  At

24   least 40 years too soon, maybe more, depending on whether he

25   would have lived -- if he had lived to be 89, 50 years; 79,

919

1  40 years.  I would submit his loss of life should be
2  $5 million for the loss of his life.  Maybe it should be more.
3  I don't know.  It's up to you.

4        And then the kids.  These kids have suffered
5  tremendously.  And the reality is, we're all going to go home
6  in the next day or so.  You'll think about this case time to
7  time.  Hopefully it won't be in too negative of a way.  But
8  this family has to live with this for the rest of their life.
9  Every day.

10        Every day for the rest of their life.  You think
11  Junior is ever going to forget this day when he saw his father
12  bleeding to death on the street?  Or his daughter coming to
13  her father or these young people at the ages of 13, 9, 8 and 5
14  being told, Your father's dead?  For a young person.

15        And you heard from them.  And I didn't want to keep
16  them on the stand too long, the younger children.  I know you
17  people understand the situation.  I don't want to put them
18  through that.

19        And we're not here just to try to get sympathy, but
20  this is a very sad, serious situation.  And you could see from
21  these pictures, he was their guiding light for them.  And I
22  can tell you there's something very special about a
23  relationship between a child and a father, like a child and a
24  mother.  Both very special.  Both very unique.

25        My father had a lot of faults, but I loved him

921

1   affection, society and moral support.  That's what the law

2   says.

3         All these different things that a father provides.

4   So it happened October 2020.  So it's been about four and a

5   half years.  Four and a half years to date.  This family has

6   suffered without their father.  And to think about the manner

7   in which he lost his life.

8         Every one of them has been here with us every day.

9   They know he was unarmed.  They know he was shot five times,

10  without commands, without warning, shot in the back.  They

11  know.  And that's all they can do is sit here and hope to God

12  that this jury will see the truth.

13         And then we got the rest of their lives; 20, 30,

14  40 years plus without their dad.  Graduation, new job,

15  marriage.  Who's going to walk these ladies down the aisle?

16  Child, you never met your grandfather.  Holidays, Father's

17  Day, I can go on and on.  You get the idea.  For the rest of

18  their life, taken away from them.

19         I would say, if you combine past, the last four and a

20  half years, and the rest of their life, they deserve, based on

21  the law and the evidence, at least $3 million each.  It's up

22  to you.  You have the ultimate decision on everything.

23         I thank you for listening to me.  I know I've been

24  talking a while.  And sometimes, as a lawyer, I feel it's

25  important to put it out there, because you're going to be

938

1    If you go to 1045.  This is an early picture of the

2  family when there were only three; Briona, Oriona and -- I'm

3  off with names.  I apologize -- and Mickel Jr.  And this is --

4  this is who he was.  Because you would have thought this would

5  have been enough, and then you see all these other kids

6  behind.

7    If we could show 1017.  This is an early Halloween.

8  This is Briona inside this picture.  This is a picture of her

9  and her half-sisters, being able to refer to each other as

10  half-sisters.  It's, they're sisters, all right.  And it's one

11  of the things that the youngest will not be able to see, will

12  not be able to experience.

13    If we could go to 1038.  Oriona and her father.  She

14  will not be able to experience that during the years of his

15  latter years, nor will the younger ones be able to experience

16  that.

17    1029.  ==I only represent -- we only represent three of==

18  ==the people, but we think we all should get the same amount.==

19  ==And -- I disagree with Mr. Galipo.  I don't think $3 million==

20  ==is anywhere near what it should be.  I'm afraid to tell you==

21  ==what I think the number should be, based on the loss to this==

22  ==family.  But I think the numbers should start with five for==

23  ==each one of them, for what they lost, for what they had the==

24  ==right to expect they would have in the future.  Thank you.==

25    THE COURT:  Mr. Weakley, do you --

943

1          First of all, there was a reliable informant that was

2     vetted.  Again, just a few minutes ago you heard, Well, we

3     don't know of any other crimes that this confidential

4     informant talked about.

5          Well, that was the whole vetting process.  She was

6     providing information about other criminal activity in Mojave,

7     which they had already verified.  And that was part of the

8     vetting.  So she had provided information about other crimes.

9     She wasn't just talking about Lewis.

10         And that's why she was vetted.  And the information

11    that she provided through -- to Deputy Ayala was through

12    texting.  And everybody has the text messages.  If he said

13    anything that was inaccurate, then you would have seen that in

14    the text message.  The fact is, everything he told you that

15    the confidential informant told him was actually told to him.

16    It was a truth to him.

17         It was what she said.  Otherwise, they would have

18    brought out text messages to say, Where did she say that or

19    didn't she say this?  And what she said, basically, is he was

20    on probation.  He was involved in activity, and he had

21    firearms.

22         Now, that's the information that Deputy Ayala had,

23    but he didn't just take that information on face value.  He

24    did his own research.  He did a background check and found

25    out, yeah, there is -- he is on felony probation.

1    was reasonable in his using force, that that was an imminent

2    threat, that movement.  Even though he doesn't see the gun,

3    that is an imminent threat.

4         So the question is, was there a gun in the car?

5    Well, Deputy Ayala had been told by the confidential

6    informant, just an hour or two before that Lewis had guns.  In

7    fact, I think she said he had a handgun.  If there's no gun in

8    the car, why would Lewis then run and jump in the car?

9         Well, there's only two reasons.  One is if he has a

10   gun that he wants to use, and the other is if he wants to get

11   away.  And I'm going to get to that in a minute.

12        But the real question is, why didn't -- why didn't

13   the other people in the car come and testify?  You've never

14   heard -- nobody.  There's nobody that was with Lewis that

15   night -- in fact, a day or two before that night when they

16   were in the motel together, the woman that was the passenger

17   and the other daughter, even Jessica, when she was here,

18   nobody, nobody said that Lewis did not have a gun.  Nobody

19   says that.  And that's a key issue.

20        And, remember, these people that were in the car are

21   friends, right?  They're friends of theirs.  Now, you know,

22   he's going to say, Well, why didn't we call her?  Well, we

23   tried.  She's not showing up.  Well, why didn't you read her

24   deposition?  It's worthless.

25        The real issue is why wasn't she here if, in fact,

952

1              So what happens is he comes out of the car.  He gets

2      down.  He's charging, six-foot-six, 39-year-old, athletic,

3      fast.  This is like -- for those that follow football, this

4      was like a middle linebacker coming at a small quarterback

5      who's completely unprotected, and the linebacker is completely

6      unblocked.  I mean, this -- that's what happening within

7      seven-eight feet.

8              So did -- Lewis did pose a threat, an immediate

9      threat of death or serious bodily injury according to all the

10     circumstances and information that Deputy Ayala had.  If it

11     does -- Mr. Chapman said if you wait to see the gun, that's

12     the last thing you're going to see.

13             Was Lewis actively resisting or attempting to evade

14     arrest?  Well, again, we go through the same thing.  As soon

15     as he's told about the gun, he runs and hides, ran back to the

16     car attempting to -- he's attempting to escape.  That's

17     certainly attempting to evade arrest by flight.  Attempting to

18     get a gun, that's actively resisting.  So that circumstance is

19     clearly met.

20             This is the picture of the car door open.  So the

21     question here is -- and I'm showing some photographs, if your

22     clients want to go.

23             Why run into the SUV?  He's high on meth.  He

24     believes he's high on meth.  Why run to the SUV if you haven't

25     been engaging in criminal behavior?  Why leave the door open

969

1    ignore the law.

2        And they want you to give money, because they know

3    sympathy means money.  But just remember our theme of the

4    case, Lewis controlled everything.

5        Thank you.  I appreciate your attention.

6        THE COURT:  Mr. Galipo.

7        MR. GALIPO:  Yes.  Thank you.

8        Thank you, Your Honor.  Just to be clear, we don't

9    want you to decide this case on sympathy.  That includes any

10   sympathy for Deputy Ayala.  We want you to follow the law and

11   follow the evidence.

12       You know, it's in credible that if we didn't put all

13   these pictures up showing you what a loving father he was,

14   they would be saying, Where are the pictures?

15       If they wanted to specifically ask about his

16   employment history, they could have asked.  If they wanted to

17   read from the depositions of the people in the car, they could

18   have read those.  They want you to totally speculate as to

19   evidence.  They want to blame Mr. Lewis for everything.

20   That's what they want to do.

21       They want to blame Mr. Lewis for everything.  If he

22   had just stopped, we wouldn't be here.  It's all Mr. Lewis'

23   fault.  That's why we're here.  Because they won't accept any

24   responsibility for killing this man.  Any.

25       He says, Well, Mr. Lewis made these threats.  No one

986

1          MR. GALIPO:  No concern.  That's agreed.

2          THE COURT:  Okay.  Very good.

3          MR. WEAKLEY:  That's fine.  Thank you.

4          MS. GUSTAFSON:  Thank you, Your Honor.

5          THE COURT:  Very good.  Okay.  Thank you all.

6      (Proceedings were adjourned at 5:27 p.m.)

7

8

9

10

11

12

13      I, RACHAEL LUNDY, Official Reporter, do hereby certify the

14  foregoing transcript as true and correct.

15

16  Dated:  April 9, 2025          /s/ Rachael Lundy_____
                                   RACHAEL LUNDY, CSR-RMR
17                                 CSR No. 13815

18

19

20

21

22

23

24

25