# EXHIBIT 6

# EXHIBIT A

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. KIRK E. SHERRIFF

| | |
|---|---|
| MICKEL ERICK LEWIS JR., et al., ) | |
| ) | 1:21-cv-00378-KES-CBD |
| Plaintiffs, ) | **PRETRIAL CONFERENCE AND** |
| ) | **MOTIONS IN LIMINE HEARING** |
| vs. ) | |
| COUNTY OF KERN, et al., ) | |
| Defendants. ) | |
| R.L., et al., ) | |
| Plaintiffs, ) | |
| vs. ) | |
| COUNTY OF KERN, et al., ) | |
| Defendants. ) | |

Fresno, California                Monday, March 3, 2025

REPORTER'S TRANSCRIPT OF PROCEEDINGS

REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

28

1   number 3 and County's motion in limine number 6.

2           MR. GALIPO:  No.  The only follow-up to that point is

3   I will talk to counsel for the other plaintiffs on the

4   plaintiffs' side.  Sometimes, technically, I decide to

5   withdraw the punitive damage claim, Your Honor, and I will

6   talk to them about that.  That may not be an issue at all, and

7   we'll let you know prior to the start of the trial.

8           THE COURT:  Okay.  Very good.  Very good.  Thank you.

9           All right.  I'm going to come back to the motion in

10  limine dealing with Defendant Ayala's motion in limine

11  number 4 regarding the plaintiffs' expert, and also

12  plaintiffs' motion in limine number 3, regarding the

13  defendant's expert we're going to hit those last.  But I'm

14  going to turn now to the other motions in limine by the

15  plaintiffs.

16          So with respect to the first motion in limine, the

17  plaintiffs seek to exclude information that was not known to

18  Officer Ayala at the time of the shooting under Federal Rules

19  of Evidence 401, 402, 403, 404, and 802.  And let's -- the

20  plaintiffs break it down by certain categories, and I'm going

21  to take it more or less in those categories.  So let's start

22  with the drug and alcohol evidence.

23          It seems to me that this should be granted in part

24  but may largely depend on the evidence -- or may depend, to

25  some extent, on the evidence at trial.

29

1          If there is information that goes to Officer Ayala's
2   use of force and to information that facts and circumstances
3   that were known to Officer Ayala at the time of the incident,
4   that would seem to be relevant and admissible if it's tied in.
5   I'll note that the fact that he was aware, apparently -- or
6   that an informant had indicated that Mr. Lewis was -- had
7   previously been selling drugs, I -- I'm not really seeing the
8   connection to the use of force at the time of the incident.
9          So that's not something that's not -- it's not every
10  fact that's within his knowledge about Mr. Lewis; it's facts
11  that relate and that are tied in and a foundation laid for as
12  something having to do with -- or being relevant to his use of
13  force at the scene and to why he was stopping -- well, yes.
14  So, for example, it seems that -- let me -- let me be a little
15  clearer on this, hopefully, and then I'll hear from the
16  parties.
17         It seems to me that previously unrelated drug use,
18  I -- I'm not seeing the relevance of that.  And it would raise
19  a 403 issue.  Evidence of prior drug sales, seems to me to be
20  in the same category, and drug and alcohol evidence not known
21  to Mr. Ayala.
22         Now possibly relevant and admissible would be
23  evidence of intoxication at the time of the incident if it's
24  relevant to explaining or showing disputed behavior by
25  Mr. Lewis.

1        That seems -- the very fact, dependent on how the
2 evidence is comes in.  So --
3        And included within that would be, if in fact
4 Mr. Ayala's observations included that, based on his
5 observations, he suspected that Mr. Lewis was under the
6 influence and that caused him to act a certain way or to take
7 certain actions, that could be tied in potentially.  So I'm
8 not -- I hope I'm somewhat clear on -- on this.  It seems to
9 me largely to be dependent on how the evidence comes in at
10 trial, but wholesale bringing in every fact he knew about
11 Mr. Lewis, including concerning unrelated conduct from weeks
12 before, I don't see as coming in.
13        Any party like to be heard on this?
14        MR. GALIPO:  Briefly, Your Honor.  I agree with
15 Your Honor that the threshold, just because the officer knew
16 of something, the Court still has to do a 403 analysis and
17 other analyses, and I agree that some of this information is
18 not related to the reason for the shooting.
19        With respect to his perceptions, so if the deputy
20 says, you know, I perceived he was under the influence at the
21 time, I think that's probably fair game.  I'm a little more
22 hesitant about this issue of the actual toxicology.  I
23 understand there are some cases that talk about if there's
24 material dispute, one person says the person was acting
25 totally normally, and the other person says the person was

31

1   acting very erratically, there's cases that say that could be
2   circumstantial evidence to support, you know, one version or
3   the other.  I'm not so sure you completely have that here
4   because, admittedly, there's some bizarre behavior that
5   everyone agrees to before the shooting ever happened, you
6   know, running and hiding momentarily behind a trailer and then
7   coming back, et cetera.
8           So I'm a little more hesitant on whether the actual
9   toxicology could then tie in with expert testimony to say,
10  there's a dispute as to whether he turned to the left or the
11  right, for example, or whether his hand was behind his back or
12  visible, for example, and it's been known that people that
13  drink this type of alcohol or take this type of drug turn to
14  their left instead of their right or have a hand behind their
15  back.  That's the link that I think we might be missing to the
16  analysis.
17          THE COURT:  I think that's fair.  To the extent it's
18  undisputed that, you know, all the, sort of, running back and
19  forth or running across to over by the truck and, you know,
20  that -- you know, to the extent there's no dispute as to what
21  happened before Mr. Lewis reenters the car, if I've got that
22  right, you know, it is what it is.  But if Mr. Ayala's account
23  of that is disputed and the witnesses are saying that, No, he
24  stood there, called me the whole time, he didn't run anywhere;
25  well, that's a different issue.  It sounds like there might

32

1  not be any dispute as to that.  And then you're in the
2  situation where Mr. Lewis is in the car and you're talking
3  about him coming out of the car and a couple of seconds
4  interaction at that point -- and I don't know the exact time.
5  I'm just -- it's -- it's a briefer interaction.  So I'm not
6  necessarily seeing how the evidence -- and I'm not saying the
7  evidence of intoxication is admissible, the subsequent
8  toxicology testing is what I'm talking about.  It's just that,
9  because it does -- it would need to be tied in to explaining
10 disputed behavior or providing some corroboration for relevant
11 disputed behavior, in my view.
12          MR. WEAKLEY:  I think it's relevant.  The behavior is
13 disputed.  Once he comes out of the car, the plaintiffs have
14 him putting his hands up in the air and being shot in the
15 back.
16          Where Deputy Ayala said he comes out of the car,
17 says, You're going to have to kill me, or I'm going to kill
18 you -- or some words to that effect -- and then charges at
19 Deputy Ayala.  That's the disputed fact.  And I think it's the
20 Cruz case that we cited -- pretty sure it's cited in our
21 brief, our trial brief -- it's very, very similar.  Where the
22 Court said, that level of intoxication, that -- I think that
23 was a methamphetamine case, too -- is important to explain the
24 bizarre behavior, why would somebody charge at a police
25 officer with a gun if he wasn't under the influence of

33

1 something.

2 THE COURT: All right. Well, it sounds to me like
3 I'm going to have to hear the evidence on this, and we're
4 going to have to take it question by question. I would say
5 that, you know, before -- and I think it would be clear that
6 you would -- it's not just going to come out of the blue on
7 the direct testimony of -- of a witness, the toxicology
8 information is not just going to come out. So I would just
9 say, raise this outside the presence of the jury, and we'll --
10 we'll evaluate it at trial based on how the evidence has come
11 in. And I'll rule on -- definitively on the toxicology
12 evidence at that time.

13 MR. WEAKLEY: Okay. Just so I understand for opening
14 statement purposes and voir dire purposes, as far as what
15 Deputy Ayala was aware of at the time, I just want to make
16 sure that I don't cross the line.

17 THE COURT: So just -- so we're talking about just --
18 and it's a little bit artificial to break it into different
19 categories, but that's how it was briefed. And I think
20 there's a certain logic there, so we're just talking about the
21 drug and alcohol evidence right now.

22 MR. WEAKLEY: Okay.

23 THE COURT: And as to the drug and alcohol evidence,
24 his perceptions at the scene, if there's -- you know, if he's
25 got a rational basis to suspect somebody is under the

34

1 influence based on his interactions with him, then he can
2 testify to this.
3     MR. WEAKLEY:  Okay.
4     THE COURT:  But I'm not seeing the tie in at this
5 point to prior information that he sold drugs, which is
6 different than being under the influence at the scene.
7     MR. WEAKLEY:  I'll stay away from that in opening.
8     THE COURT:  Okay.
9     MR. WEAKLEY:  It may -- I think that may play a part
10 in why there was a traffic stop to begin with, but we'll talk
11 about that later.
12     THE COURT:  Yes.  That may have, but there are other
13 grounds for the traffic stop as well, it sounds like.
14     Okay.  Anything further on motion in limine number 1
15 from the plaintiffs?
16     MR. GALIPO:  No.  Thank you, Your Honor.
17     THE COURT:  Okay.  With respect to motion in limine
18 number 2, plaintiffs seek to exclude any evidence of findings
19 by the district attorney or the County with respect to the use
20 of deadly force, and my intent is to grant that motion in
21 limine, which defendants don't oppose.  And I -- understanding
22 that they also are indicating that, you know, if,
23 hypothetically, there was an attempt to argue that Ayala
24 committed a crime -- that you -- your -- you basically want to
25 reserve the right to, if the door is open, to raise it.  And

Case 1:21-cv-00378-KES-CDB    Document 184-6    Filed 05/02/25    Page 11 of 20
Case 1:21-cv-00378-KES-CDB    Document 167-1    Filed 04/18/25    Page 10 of 19

35

1   if you believe that somehow the door has been open to get into
2   this sort of evidence, you're going to have to raise that
3   outside the presence of the jury.
4           MR. WEAKLEY:  Understood, Your Honor.
5           THE COURT:  Okay.  So that's granted subject to that
6   qualification.
7           MS. GUSTAFSON:  Your Honor, this Brande Gustafson.
8           THE COURT:  Yes.
9           MS. GUSTAFSON:  Can we turn back to plaintiffs'
10  motion in limine number 1?  I saw you addressed the first
11  issue.  Are we going to come back to --
12          THE COURT:  I'm sorry.  You're right.
13          MS. GUSTAFSON:  -- to --
14          THE COURT:  No, no.
15          MS. GUSTAFSON:  Thank you, Your Honor.
16          THE COURT:  Yup, yup.  Yup, thank you for pointing
17  that out.  I have a whole stack here behind that first one.
18          Okay.  So let's turn to the issue of the criminal
19  history and the knife.  And I -- I'm including the knife found
20  in the vehicle after the shooting just because it was
21  discussed, but really, the motion in limine is to exclude
22  information on criminal history.
23          With respect to the knife, it -- I mean, just to the
24  extent that is being argued on a motion in limine, I think
25  it's appropriate to grant that aspect of the motion to exclude

36

1   that, you know.  And I didn't see any evidence in the record
2   before me anyway that Officer Ayala had any knowledge about
3   there being a knife at the time of shooting.
4           MR. WEAKLEY:  Just for Your Honor, it was a gun, not
5   a knife.
6           THE COURT:  Oh, I thought there was a -- well, I'm
7   going to address the gun separately, but I thought there was
8   also some sort of knife found in the car.
9           MS. KARP:  Yes.  That's correct, Your Honor.
10          THE COURT:  Okay.  So there's -- he doesn't have any
11  knowledge of there being a knife.  Doesn't play a part in the
12  incident in any way.  So that -- that's excluded.
13          With respect to the criminal history, it seems to me
14  that Officer Ayala, it sounds like, was aware or would testify
15  that he was aware that Mr. Lewis was on probation, and if he
16  establishes, you know, the foundation being that that was
17  somehow relevant to his interaction, how he proceeded with
18  Mr. Lewis, then that seems fair game potentially.
19          I'm not seeing the relevance.  And to the extent it
20  is relevant, it does seem that his criminal history of certain
21  prior arrests, for example, that were mentioned, it seemed to
22  raise a 403 issue.  And -- and it should not be gotten into
23  there was a prior arrest for being a felon in possession or
24  something to that effect.
25          So -- but the fact of being on probation, if that's

37

1   the basis -- if that -- if that's tied into his interactions
2   and how he approaches the scene, that may be relevant.
3           MR. WEAKLEY:  Yeah, that's why he did the traffic
4   stop.  He --
5           THE COURT:  Understood.  Now with respect to there
6   was some indication that the past criminal history might
7   somehow have some relevance to the damages claim, but I'm
8   really not seeing that, particularly in the sense that, how
9   would Mr. Lewis' past criminal history, you know, his prior
10  arrest impact his ability to provide future care to the
11  plaintiffs to the extent the plaintiffs are arguing that they
12  were denied future care?
13          MR. WEAKLEY:  Well, his incarceration certainly goes
14  to the damages because they are -- damages are based on the
15  relationship and their time together.  So during the times
16  when he was incarcerated and not around, that would be
17  relevant to the damages.
18          MS. KARP:  Well, I thank Your Honor for
19  clarification.
20          THE COURT:  Yeah.
21          MS. KARP:  I think there's confusion over the damages
22  being sought.  I think, like the verdict form and jury
23  instruction that we're filing, we're just seeking past and
24  future emotional distress damages, loss of support
25  companionship, and so we were planning to pursue or continue

38

1  to pursue those types of damages as far as that particular
2  financial support.
3          THE COURT: Okay. Doesn't that address that?
4          MR. WEAKLEY: I'm not sure how you can argue that
5  they lost support from somebody that wasn't there to
6  emotionally support them.
7          THE COURT: Well, I mean, this is not the situation
8  of somebody -- and I don't know his -- the extent -- it's
9  really not before me, the extent of the criminal history or,
10 you know, what -- I had some indication of maybe a prior
11 conviction and a couple prior arrests. No indication of any,
12 you know -- this is not the situation of somebody who's
13 been -- as far as I know anyway, you tell me if I'm wrong --
14 in custody for 25 years and something happens and the
15 plaintiffs are arguing loss of consortium claim.
16         How is that, you know -- it seems to me to be getting
17 into a 403 issue with -- but go ahead. I'll hear you out.
18         MS. MARSHALL: Your Honor, if I may. He did do two
19 years in Arizona, and he was on bail for being a felon in
20 possession of a gun at the time of this incident. And so that
21 would affect his loss of consortium if he went to prison on
22 the case that he was on bail for.
23         THE COURT: All right. Plaintiffs' counsel want to
24 address that?
25         MR. GALIPO: Yes, Your Honor. I think -- again, this

39

1 is a 403 analysis, and I think, as the Court looks at it, the
2 prejudicial effect is going to outweigh any probative value.
3 Even if he did some time, it really is -- is unduly
4 prejudicial, and I think that there will be other questions
5 that can be elicited. And I also think it depends in part in
6 how the plaintiffs present their damages and whether or not
7 they think the door's been opened. And we can address later.
8 But I think at the outset, I think it's, from our perspective,
9 more prejudicial than probative and that's why we filed the
10 motion.
11          THE COURT: And -- yeah, I -- I certainly don't think
12 this is something I can rule on now as to definitively, but it
13 does seem to me that, you know, if you're talking about a year
14 or two in custody and the -- potentially speculative, you
15 know, risks that -- or a concern that he may have gone -- may
16 have faced further custody were he to be convicted of a charge
17 that he was maybe arrested for but not convicted of yet,
18 that's -- that's seems to be -- we're getting into speculative
19 concerns, significant 403 concerns for little relevance when
20 you're talking about -- how old was Mr. Lewis when he passed
21 away?
22          MR. HAMILTON: I believe 39, Your Honor.
23          MR. WEAKLEY: I think he was 39.
24          THE COURT: I'm presuming. I don't know what the
25 Plaintiffs' evidence will be, but presumably, if he's 39 and

1  he had a -- assuming, if he did in fact have a lengthy
2  relationship with the plaintiffs, you're talking about two
3  years out of a couple decades potentially or more of -- I'm
4  not sure if exactly what the timing would be.  So I think we
5  are in 403 territory with this issue, but, you know -- we
6  can -- I will hear you outside the presence of the jury if you
7  believe there's a basis for it as based on how the evidence
8  develops at trial.
9          Okay.  Anything further on that with respect to the
10 criminal history and the knife?
11         MR. GALIPO:  No.  Thank you, Your Honor.
12         THE COURT:  All right.  With respect to the gun,
13 plaintiffs seek to exclude information that was not known to
14 Officer Ayala at the time of the shooting, specifically with
15 respect to the gun.
16         Now, the fact that a gun was later found in the
17 possession of a car passenger does seem to have some limited
18 relevance, but it does raise a 403 issue if Officer Ayala had
19 no interaction with it during the incident.
20         Now -- and I understand it was Ms. Komnenus -- am I
21 getting that name correct?
22         MR. WEAKLEY:  I think so.
23         MR. ALEXANDER:  Yes.
24         THE COURT:  Okay.  Now, is she -- do the plaintiffs
25 intend -- or are the parties calling her as a witness?

41

1           MR. ALEXANDER:  We've subpoenaed her.

2           THE COURT:  Okay.  So now I understand there's an
3   argument from the defense that she had the gun and that
4   arguably goes to her credibility based on how her answers to
5   the police at the scene.  But leaving that for a moment --
6   well, not for a moment.  I think we'll see how, in fact,
7   Ms. Komnenus testifies at trial, but even if that were to come
8   in on a bias theory with respect to Ms. Komnenus, that she
9   misrepresented whether there was something, you know -- that
10  arguably she misled the police about whether she had a gun or
11  whether there was a gun, where she got the gun and attributing
12  it to the defendant's -- I'm sorry.  Not talking about the
13  defendant -- to Mr. Lewis, attributing it to Mr. Lewis seems
14  to me to raise a 403 issue arguably.  So I don't know that it
15  gets you all the way to where the defense is trying to go with
16  that.  And there should not be any mention of the gun at trial
17  without a proffered basis for it outside the presence of the
18  jury first.

19          MR. WEAKLEY:  Well, the fact that he was told about
20  guns should be -- should be --

21          THE COURT:  Well, the fact -- that's a different
22  issue.

23          I think the fact that this goes to Ayala's knowledge
24  of risk in terms of dealing with the incident, if he was aware
25  based on the informant and based on timely information, not

42

1  that three weeks ago he had a gun, but that he was -- and I
2  understand that there was an indication that he was aware or
3  that Officer Ayala would testify that he was aware that night
4  when he was responding that Mr. Lewis was armed and had just
5  threatened the informant, something to that effect.  Do I have
6  that more or less correct?  So --
7          And I think that if that relates to and is tied into
8  how he approaches the interaction and the incident and
9  perceives risks, then that would be admissible.
10         But the fact that a gun was found in the possession
11 of Ms. Komnenus, as I understand, she dropped it somewhere,
12 but it was she who had it and dropped it, that's not coming in
13 without a proffer outside the presence of the jury.
14         MR. WEAKLEY:  Then, Your Honor, I would request,
15 since what we're talking about here is what Deputy Ayala knew
16 at the time, that the plaintiffs should be precluded from
17 offering any evidence there was no gun, from denying there was
18 a gun, denying he was on meth, and --
19         THE COURT:  Well --
20         MR. WEAKLEY:  And denying that he had a criminal
21 history.
22         THE COURT:  Well, I think that -- that if the
23 plaintiffs were to take the position that he did not have a
24 criminal history, that there was no gun in the car, and that
25 he was not under the influence of anything, and to

43

1  affirmatively state those things, that would, I mean, arguably
2  be misleading to the jury and that would change the 403
3  analysis.  And we would have to revisit it at that point.
4          MR. WEAKLEY:  Thank you.
5          MR. GALIPO:  Yes.  We're not intending to make those
6  types of statements because we don't want to unnecessarily
7  open the door and have to revisit these issues, so we're going
8  to do our best to keep focused on the issues and the evidence
9  of it so the door is not opened.
10         THE COURT:  All right.  Is there anything further on
11 that, with respect to the gun, that aspect of the motion in
12 limine number 1?
13         MR. WEAKLEY:  Not from the defendants.
14         THE COURT:  Okay.  With respect to the -- we've
15 already addressed this in part, but the toxicology report and
16 the out-of-court statements by the confidential informant, I
17 think we've already addressed this.  Is the -- and to be
18 clear, I want to be clear that, is the informant testifying?
19         MR. WEAKLEY: She's gone.  We don't know where she
20 is.
21         THE COURT:  Okay. Okay.  I want to be clear that the
22 informant's statements to Mr. Ayala, to the extent they come
23 in, they don't come in -- they would have to come in for a
24 non-hearsay purpose, and it would not be for the truth.  It
25 would be for the effect on Defendant Ayala and how he

Case 1:21-cv-00378-KES-CDB   Document 184-6   Filed 05/02/25   Page 20 of 20
Case 1:21-cv-00378-KES-CDB   Document 167-1   Filed 04/18/25   Page 19 of 19

70

1  consistent with the evidence that came in.  And if there's
2  demonstratives for witnesses, again, same issue.  Just make
3  sure to show to the other side first and not two minutes
4  before because then we're -- I don't want to slow down the
5  evidence and the presentation at trial.
6          MS. KARP:  Understood.  Thank you.
7          THE COURT:  Okay.  All right.  Thank you all.  We'll
8  see you at 8:30 a.m. on March 11th.
9          MR. WEAKLEY:  Thank you, Your Honor.
10         MR. GALIPO:  Okay.  Thank you, Your Honor.
11         MR. ALEXANDER:  Thank you, Your Honor.
12         THE COURT:  Court's in recess.
13     (Proceedings were concluded at 3:20 p.m.)
14
15         I, RACHAEL LUNDY, Official Reporter, do hereby
16 certify the foregoing transcript as true and correct.
17
18 Dated:  March 13, 2025          /s/ Rachael Lundy_____
                                    RACHAEL LUNDY, CSR-RMR
19                                  CSR No. 13815
20
21
22
23
24
25